# 23-655



In the
## United States Court of Appeals
### For the Second Circuit

NICOLE BROECKER, MICHELLE MARTINO, GINA PORCELLO, AMOURA BRYAN, RENA GELLMAN, FONTINA LAMBOS, KERRY BEN-JACOB, EKATERINA UDINA, ANDREA TICHIO, MARIANNA CIACCA-LISS, ANITA QUASH, KELLY DIXON, FELICIA HAGAN, MARITZA ROMERO, MARIA RUSCELLI, BETZIADA CRUZ, FRANCINE TRAPANI, JEANNINE LAM, JESSICA NARCISO, BRIANNA PEREZ, NICOLETTA MASULLO, ANASTASIA CHRISTOPOULOS, FAYE KOTZER, BENEDICT LOPARRINO, YADITZA RODRIGUEZ, RAFAEL TORO, SERINA MENDEZ, DINA HUSSEIN, HERENDYRA PEREYRA, ROSA ABREU, LISA WILLIAMS, JOAN GIAMMARINO,

*Plaintiffs-Appellants,*

*(See inside cover for continuation of caption and appearances)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF NEW YORK (BROOKLYN)

## JOINT APPENDIX
### Volume III of VII (Pages JA-543 – JA-814)

STROOCK & STROOCK
  & LAVAN LLP
*Attorneys for Defendants-Appellees
  United Federation of Teachers,
  Local 2, American Federation of
  Teachers, AFL-CIO, Michael
  Mulgrew, Council of Supervisors
  and Administrators and Mark
  Cannizzaro*
180 Maiden Lane
New York, New York 10038
(212) 806-5400
aherskowitz@stroock.com
aklinger@stroock.com
dkolker@stroock.com

THE SCHER LAW FIRM, LLP
*Attorneys for Plaintiffs-Appellants*
600 Old Country Road, Suite 440
Garden City, New York 11530
(516) 746-5040
agraff@scherlawfirm.com

NEW YORK CITY LAW DEPARTMENT
  APPEALS DIVISION
*Attorneys for Defendants-Appellees
  New York City Department of Education
  and Meisha Porter*
100 Church Street
New York, New York 10007
(212) 356-2067
jtownsen@law.nyc.gov

———————————————

ANDREA JACKSON, MARIA KLAPAKIS, STELLA PORTO, TONIANN MIRAGLIA, ROSEANNA SILVERSTRI INCANTALUPO, JULIA MAVIS, CHRISTOPHER HANSEN, ANNETTE BACKOF, DIANE PAGEN, LYNN PEPE, STEPHANIE EDMONDS, YVONNE COSTELLO, DEBBIE HARTZ, SORAYA SANCHEZ, MONIQUE MOORE, ANGELA VELEZ, SALLY MUSSAFI, JESSICA NICCHIO, DORCA GENAO, RACHEL MANISCALCO, JAMES HOFFMAN, SHARLAYNE JACOBS, CRYSTAL SALAS, FRANCES DIPROSSIMO, CAROLA MARTINEZ-VANBOKKEM, AYSE USTARES, ELIZABETH FIGUEROA, DIANNE BAKER-PACIUS, NICOLE MOORE, ELIZABETH PLACENCIO, DEBBIE BERTRAM, KIMBERLI MADDEN, FRAN SCHMITTER, VICTORIA RUSSO, PAUL CIFARELLI, DANIELLE HEAL, SARA COOMBS-MORENO, LISA SIMO, TAMI BENEDUCE, ZABDIEL VALERA, NATHALIE CHARLES, JANELLE LOTITO, JEANEAN SANCHEZ, MARIE MOSLEY, TARA PALLADINO, DANIELLE MCGUIRE, JULIA HARDING, LEAH KUKLA, STEPHANIE FRANZESE, JULIA BLASIS-MARING, BETH SCHIANO, LAURA SALAMONE, AURA MOODY, AUBREY JOERGENS, MEAGAN VELEZ, JENNIFER ZACCARIELLO, RICHARD JOSEPH, ELIZABETH LOIACONO, LORRAINE MASCIARELLI, DEIDRA STATUTO, ELENI GERASIMOU and HENRIETTA SHAYA,

*Plaintiffs-Appellants,*

v.

NEW YORK CITY DEPARTMENT OF EDUCATION, MEISHA PORTER, UNITED FEDERATION OF TEACHERS, LOCAL 2, AMERICAN FEDERATION OF TEACHERS, AFL-CIO, MICHAEL MULGREW, COUNCIL OF SUPERVISORS AND ADMINISTRATORS, MARK CANNIZZARO, DISTRICT COUNCIL 37, AFSCME AFL-CIO, HENRY GARRIDO, SHAUN D. FRANCOIS, I, FRANCINE FRANCIS, MARTIN F. SCHEINMAN, SCHEINMAN ARBITRATION AND MEDIATION SERVICES, LLC, SCHEINMAN ARBITRATION AND MEDIATION SERVICES, DISTRICT COUNCIL 37, AFSCME AFL-CIO, LOCAL 372, DISTRICT COUNCIL 37, AFSCME AFL-CIO, LOCAL 1251,

*Defendants-Appellees.*
*(See inside cover for additional appearances)*

———————————————

———————————————

COHEN, WEISS AND SIMON LLP
*Attorneys for Defendants-Appellees*
  *District Council 37, AFSCME AFL-CIO,*
  *Henry Garrido, Shaun D. Francois, I,*
  *Francine Francis, District Council 37,*
  *AFSCME AFL-CIO, Local 372 and*
  *District Council 37, AFSCME*
  *AFL-CIO, Local 1251*
900 3rd Avenue, Suite 2100
New York, New York 10022
(212) 356-0216
pdechiara@cwsny.com

VIGORITO, BARKER, PATTERSON,
  NICHOLS & PORTER, LLP
*Attorneys for Defendants-Appellees*
  *Martin F. Scheinman, Scheinman*
  *Arbitration and Mediation Services,*
  *LLC and Scheinman Arbitration and*
  *Mediation Services*
300 Garden City Plaza, Suite 308
Garden City, New York 11530
(516) 282-3355
g.weinstock@vbpnplaw.com
a.medina@vbpnplaw.com

———————————————

i

# Table of Contents

**Page**

Docket Entries ............................................................ JA-1

Complaint, Dated November 17, 2021 ..........................................JA-49

    Exhibit A to Complaint -
    E-Mail from NYC Department of Education to
    Jeannine Lam, Dated October 2, 2021 .....................................JA-78

    Exhibit B to Complaint -
    Secretary Collective Bargaining Agreement (CBA) ................JA-80

    Exhibit C to Complaint -
    Paraprofessional Collective Bargaining Agreement (CBA) .....JA-184

    Exhibit D to Complaint -
    Teachers Collective Bargaining Agreement (CBA) ..................JA-251

Proposed Order to Show Cause for a Temporary Restraining
    Order and a Preliminary Injunction ...........................................JA-489

Emergency Affirmation of Austin Graff, for Plaintiffs,
    in Support of Order to Show Cause,
    Dated November 17, 2021 ......................................................JA-497

Affidavit of Nicole Broecker, Plaintiff, in Support of
    Order to Show Cause, Sworn to November 16, 2021 ...............JA-501

Affidavit of Jeannine Lam, Plaintiff, in Support of
    Order to Show Cause, Sworn to November 15, 2021 ...............JA-503

    Exhibit 1 to Lam Affidavit -
    E-Mail from Jeannine Lam to Michael Mulgrew,
    Dated November 13, 2021 .......................................................JA-506

    Exhibit 2 to Lam Affidavit -
    Redacted E-Mail from Jeannine Lam to Austin Graff,
    Dated November 12, 2021 .......................................................JA-508

    Exhibit 3 to Lam Affidavit -
    Teachers Collective Bargaining Agreement (CBA)
    (Reproduced herein at pp. JA-251–JA-488) .............................JA-511

Affidavit of Stella Porto, Plaintiff, in Support of Order
    to Show Cause, Sworn to November 16, 2021 ........................JA-512

Affidavit of Gina Porcello, Plaintiff, in Support of Order
    to Show Cause, Sworn to November 15, 2021 ........................JA-514

ii

**Page**

Exhibit 1 to Porcello Affidavit -
Secretary Collective Bargaining Agreement (CBA)
(Reproduced herein at pp. JA-80–JA-183) ...............................JA-516

Affidavit of Dina Hussien, Plaintiff, in Support of Order
to Show Cause, Sworn to November 15, 2021 ........................JA-517

Exhibit 1 to Hussien Affidavit -
Paraprofessional Collective Bargaining Agreement (CBA)
(Reproduced herein at pp. JA-184–JA-250) .............................JA-520

Exhibit A  -
E-Mail from NYC Department of Education to
Jeannine Lam, Dated October 2, 2021
(Reproduced herein at pp. JA-78–JA-79) ................................JA-520

Plaintiffs' Memorandum of Law in Support of Motion,
Dated November 17, 2021 .......................................................JA-521

Order to Show Cause for a Temporary Restraining Order and
a Preliminary Injunction, Dated November 17, 2021 ...............JA-543

Defendants New York City Department of Education and
Meisha Porter's Memorandum of Law in Opposition
to Motion, Dated November 19, 2021.......................................JA-546

Declaration of Andrea O'Connor, for Defendants New York
City Department of Education and Meisha Porter, in
Opposition to Order to Show Cause,
Dated November 19, 2021 .......................................................JA-580

Exhibit A to O'Connor Declaration -
Arbitration Award Decision of Arbitrator Martin F.
Scheinman, *in the Matter of the Arbitration Between
Board of Education of the City School District of the City of
New York and the United Federation of Teachers, Local 2,
AFT, AFL-CIO*, Dated September 10, 2021,
with Cover Letter ...................................................................JA-583

Exhibit B to O'Connor Declaration -
Arbitration Award Decision of Arbitrator Martin F.
Scheinman, *in the Matter of the Arbitration Between
Board of Education of the City School District of the City of
New York and the Council of Supervisors and Administrators,*
Dated September 15, 2021, with Cover Letter.........................JA-602

iii

Page

Exhibit C to O'Connor Declaration -
Memorandum of Agreement Between District Council 37,
City of New York and the Board of Education of the
City School District for the City of New York,
Dated October 3, 2021 ..............................................................JA-617

Exhibit D to O'Connor Declaration -
Transcript of Proceedings, in the Matter of *Michael Kane v.
Bill De Blasio, et al.*, 21 Civ. 7863 (S.D.N.Y.)(VEC),
Dated October 12, 2021 ...........................................................JA-624

Exhibit E to O'Connor Declaration -
Affidavit of Vicki Bernstein, in Opposition to Order to Show
Cause, Sworn to November 19, 2021.......................................JA-699

Exhibit F to O'Connor Declaration -
Various Arbitration Awards ......................................................JA-702

Defendant United Federation of Teachers, Local 2, AFL-CIO's
Memorandum of Law in Opposition to Order to Show Cause,
Dated November 19, 2021 .......................................................JA-709

Declaration of Alan M. Klinger, for Defendants United
Federation of Teachers, Local 2, AFL-CIO, in Opposition
to Order to Show Cause, Dated November 19, 2021 ...............JA-737

Exhibit A to Klinger Declaration -
Declaration of Impasse, Dated September 1, 2021 ..................JA-745

Exhibit A to Declaration of Impasse -
E-Mail from Renee Campion to Harry Nespoli,
Dated July 27, 2021 .............................................................JA-760

Exhibit B to Declaration of Impasse -
Order of Dave A. Chokshi, M.D. Commissioner of Health
and Mental Hygiene to Require COVID-19 Vaccination
or Testing for Staff in Public Healthcare Settings,
Dated July 21, 2021 .............................................................JA-762

Exhibit C to Declaration of Impasse -
COVID-Safe Requirement: Frequently Asked Questions,
Issued August 11, 2021.........................................................JA-765

Exhibit D to Declaration of Impasse -
Letter from Harry Nespoli to Honorable Dean Fuleihan,
Emma Wolfe and Renee Campion, Dated August 12, 2021 .JA-775

iv

**Page**

Exhibit E to Declaration of Impasse -
Letter from Harry Nespoli to Honorable Dean Fuleihan,
Emma Wolfe and Renee Campion, Dated August 17, 2021 .JA-777

Exhibit F to Declaration of Impasse -
Order of Dave A. Chokshi, M.D. Commissioner of Health
and Mental Hygiene to Require COVID-19 Vaccination
for Department of Education Employees, Contractors
and Others, Dated August 24, 2021 ......................................JA-779

Exhibit B to Klinger Declaration -
Letter from William M. Conley to Meisha Porter and
Michael Mulgrew Regarding Appointment of Mediator,
Dated September 3, 2021 ...........................................................JA-783

Exhibit C to Klinger Declaration -
E-Mail from Alan M. Klinger to William M. Conley,
Dated September 6, 2021 ...........................................................JA-784

Exhibit D to Klinger Declaration -
Arbitration Award Decision of Arbitrator Martin F.
Scheinman, *in the Matter of the Arbitration Between
Board of Education of the City School District of the City of
New York and International Brotherhood of Teamsters,
Local 237*, Dated September 15, 2021, with Cover Letter........JA-785

Exhibit E to Klinger Declaration -
Amended Order to Show Cause for a Temporary Restraining
Order and a Preliminary Injunction, in the Matter of *The New
York City Municipal Labor Committee v. The City of New
York, et al.*, Index No. 158368/2021,
Dated September 9, 2021 ...........................................................JA-801

Declaration of Beth A. Norton, for Defendants United
Federation of Teachers, Local 2, AFL-CIO, in Opposition
to Order to Show Cause, Dated November 19, 2021 ................JA-804

Exhibit A to Norton Declaration -
E-Mail from Jeannine Lam to Beth A. Norton,
Dated November 12, 2021 .........................................................JA-809

Letter from Austin Graff to Honorable Kiyo A. Matsumoto,
Dated November 24, 2021, with Attachment............................JA-812

Letter from Andrea O'Connor to Honorable
Kiyo A. Matsumoto, Dated November 24, 2021 ......................JA-814

v

**Page**

Memorandum and Order of Honorable Kiyo A. Matsumoto,
Dated November 24, 2021 .......................................................JA-815

Plaintiffs' Memorandum of Law, Dated November 30, 2021 ......JA-843

Defendants United Federation of Teachers, Local 2, AFL-CIO's
Supplemental Memorandum of Law,
Dated December 7, 2021 ...........................................................JA-856

Declaration of Alan M. Klinger, for Defendant
United Federation of Teachers, Local 2, AFLO-CIO,
Dated December 7, 2021 ...........................................................JA-880

Defendants New York City Department of Education
and Meisha Porter's Supplemental Briefing,
Dated December 7, 2021 ...........................................................JA-883

Appendix A to Klinger Declaration -
Affirmation of Michelle E. Morse,
Dated November 15, 2021 .......................................................JA-907

Letter from Dina Kolker to Honorable Kiyo A. Matsumoto,
Dated December 9, 2021 ...........................................................JA-915

Plaintiff's Response to the Court's Order to Show Cause
Regarding The Plaintiff's Standing,
Dated December 13, 2021 .........................................................JA-918

Defendants New York City Department of Education
and Meisha Porter's Memorandum of Law,
Dated December 20, 2021 .........................................................JA-935

Defendant United Federation of Teachers, Local 2, AFL-CIO's
Reply to Plaintiffs' Response to The Courts Order to Show
Cause Regarding Plaintiffs' Standing,
Dated December 20, 2021 .........................................................JA-944

Letter from Austin Graff to Honorable Kiyo A. Matsumoto,
Dated December 20, 2021 .........................................................JA-959

Amended Complaint, Dated January 10, 2022 .............................JA-960

Exhibit A to Amended Complaint -
UFT's Webpage "About the UFT" ...........................................JA-1021

Exhibit B to Amended Complaint -
CSA's Webpage "What is CSA" ...............................................JA-1023

vi

**Page**

Exhibit C to Amended Complaint -
Local 372's Webpage "About Us"............................................JA-1026

Exhibit D to Amended Complaint -
Local 1251's Webpage "About Us"..........................................JA-1029

Exhibit E to Amended Complaint -
UFT Arbitration Award, Dated September 10, 2021,
with Cover Letter ....................................................................JA-1034

Exhibit F to Amended Complaint -
Scheinman's Arbitration Award, Dated September 15, 2021,
with Cover Letter ....................................................................JA-1053

Exhibit G to Amended Complaint -
Order of The Commissioner of Health and Mental Hygiene,
Dated September 15, 2021 .......................................................JA-1068

Exhibit H to Amended Complaint -
New York Post Article Titled "DOE Skips Deadline to
Suspend Employees Who Havent's Show Proof of
Second Vax"..............................................................................JA-1072

Exhibit I to Amended Complaint -
UFT's Declaration of Impasse, Dated September 1, 2021,
with Exhibit A to F..................................................................JA-1082

Exhibit J to Amended Complaint -
Letter from William M. Conley to Meisha Porter and
Michael Mulgrew Regarding Appointment of Mediator,
Dated September 3, 2021
(Reproduced herein at p. JA-783) ...........................................JA-1126

Exhibit K to Amended Complaint -
E-Mail from Alan M. Klinger to William M. Conley,
Dated September 6, 2021
(Reproduced herein at p. JA-784) ...........................................JA-1126

Exhibit L to Amended Complaint -
Joint Intentions and Commitments...........................................JA-1127

Exhibit M to Amended Complaint -
Memorandum of Agreement Between District Council 37,
City of New York and the Board of Education of the
City School District for the City of New York,
Dated October 3, 2021
(Reproduced herein at pp. JA-617–JA-623) ............................JA-1365

vii

**Page**

Exhibit N to Amended Complaint -
Waiver .......................................................JA-1366

Letter from Austin Graff to Honorable Kiyo A. Matsumoto,
Dated February 4, 2022 ............................................JA-1367

Letter from Alan M. Klinger to Honorable Kiyo A. Matsumoto,
Dated February 4, 2022 ............................................JA-1370

Letter from Andrea O'Connor to Honorable Kiyo A.
Matsumoto, Dated February 7, 20222 ........................................JA-1373

Letter from Karolina Wiaderna to Honorable Kiyo A.
Matsumoto, Dated February 7, 2022 ........................................JA-1378

Proposed Order to Show Cause .......................................JA-1380

Affirmation of Austin Graff, for Plaintiffs, in Support of
Order to Show Cause, Dated February 8, 2022 ........................JA-1382

Declaration of James Hoffman, for Defendant New York City
Department of Education, Dated February 4, 2022 .................JA-1386

Declaration of Nathalie Charles, Dated February 4, 2022 ...........JA-1388

Declaration of Serina Mendez, Dated February 4, 2022 ...............JA-1390

Declaration of Tara Palladino, Dated February 7, 2022 ...............JA-1392

Declaration of Janelle Lotito, Dated February 8, 2022 .................JA-1394

Exhibit A to Graff Affirmation -
Termination Notice, Dated January 31, 2022,
with E-Mails .................................................................JA-1396

Exhibit B to Graff Affirmation -
New York City Department of Education
Health Screening Questionnaire ................................................JA-1402

Exhibit C to Graff Affirmation -
Plaintiffs' Antibody Tests for Covid-19 ...................................JA-1403

Exhibit D to Graff Affirmation -
I Love You Day Flyer .............................................................JA-1408

Exhibit E to Graff Affirmation -
Job Post of Indeed ...................................................................JA-1409

viii

**Page**

Exhibit F to Graff Affirmation -
Plaintiffs' Memorandum of Law, in Support of Motion,
Dated February 8, 2022 ...........................................................JA-1412

Letter from Alan M. Klinger to Honorable Kiyo A. Matsumoto,
Dated February 8, 2022.....................................................JA-1433

Letter from Austin Graff to Honorable Kiyo A. Matsumoto,
Dated February 8, 2022.....................................................JA-1438

Defendants New York City Department of Education and
Meisha Porter's Memorandum of Law in Opposition to
Motion, Dated February 8, 2022 .................................................JA-1445

Appendix A to Memorandum of Law -
Decisions and Orders of Honorable Lyle E. Frank,
Dated January 21, 2022...............................................................JA-1488

Appendix B to Memorandum of Law -
Affirmation of Michelle E. Morse,
Dated November 15, 2021 .......................................................JA-1492

Plaintiffs' Reply Memorandum of Law in Further Support of
Motion, Dated February 10, 2022 .............................................JA-1500

Letter from Andrea O'Connor to Honorable
Kiyo A. Matsumoto, Dated February 11, 2022........................JA-1514

Order to Show Cause for a Temporary Restraining Order and
Preliminary Injunction, Dated February 10, 2022.....................JA-1516

Interim Order of Honorable Judy H. Kim,
Dated February 10, 2022.............................................................JA-1520

Letter from Austin Graff to Honorable Kiyo A. Matsumoto,
Dated February 11, 2022.............................................................JA-1522

Memorandum and Order of Honorable Kiyo A. Matsumoto,
Dated February 11, 2022.............................................................JA-1523

Notice of Motion to Dismiss Amended Complaint,
Dated April 4, 2022.....................................................................JA-1566

Declaration of Andrea O'Connor, for Defendants
New York City Department of Education and Meisha Porter,
in Support of Motion, Dated April 4, 2022 ...............................JA-1569

Exhibit A to O'Connor Declaration -
Order of Honorable Lynn R. Kotler, Dated March 15, 2022 ....JA-1572

**Page**

Memorandum of Law, Dated April 4, 2022 ...................................JA-1582

Notice of Motion to Dismiss, Dated April 4, 2022 ......................JA-1614

Memorandum of Law in Support of Motion,
    Dated April 4, 2022 ...................................................................JA-1618

Reply Memorandum of Law in Further Support of Motion,
    Dated May 20, 2022 .................................................................JA-1642

Notice of Motion to Dismiss Amended Complaint,
    Dated April 4, 2022 ...................................................................JA-1655

Memorandum of Law in Support of Motion,
    Dated April 4, 2022 ...................................................................JA-1657

Notice of Motion to Dismiss Complaint,
    Dated April 4, 2022 ...................................................................JA-1682

Martin F. Scheinman, Scheinman Arbitration and Mediation
    Services and Scheinman Arbitration and Mediation
    Services, LLC's Memorandum of Law in
    Support of Motion, Dated April 4, 2022 ...................................JA-1686

Declaration of Karolina Wiaderna, for Defendants
    Martin F. Scheinman, Scheinman Arbitration and Mediation
    Services and Scheinman Arbitration and Mediation Services,
    LLC, in Support of Motion, Dated April 4, 2022 ....................JA-1705

Affirmation of Austin Graff, for Plaintiffs,
    in Opposition to Motion, Dated May 9, 2022 ...........................JA-1707

Exhibit A to Graff Affirmation -
Decisions by Scheinman Arbitration .........................................JA-1709

Exhibit B to Graff Affirmation -
Decisions by Scheinman Arbitration .........................................JA-1713

Exhibit C to Graff Affirmation -
Arbitration Award, Dated October 2, 2021 ...............................JA-1720

Exhibit D to Graff Affirmation -
Arbitration Award, Dated September 25, 2021.........................JA-1722

Exhibit E to Graff Affirmation -
Arbitration Award, Dated October 4, 2021 ...............................JA-1728

Exhibit F to Graff Affirmation -
Arbitration Award, Dated October 4, 2021 ...............................JA-1735

x

**Page**

Exhibit G to Graff Affirmation -
Notifications from New Yor State Department of Labor..........JA-1740

Plaintiffs' Memorandum of Law in Opposition to Motion,
Dated May 9, 2022 ....................................................................JA-1743

Memorandum of Law in Support of Motion,
Dated May 24, 2022 ..................................................................JA-1794

Reply Memorandum of Law in Further Support of Motion,
Dated May 24, 2022 ..................................................................JA-1808

Martin F. Scheinman, Scheinman Arbitration and Mediation
Services and Scheinman Arbitration and Mediation
Services, LLC's Reply Memorandum of Law in Further
Support of Motion, Dated May 24, 2022 ..................................JA-1823

Letter from Austin Graff to Honorable Kiyo A. Matsumoto,
Dated July 7, 2022 ....................................................................JA-1834

Exhibit A to Letter -
New York Post Titled "DOE Suit Aims to Keep at Lease 82
Teachers Suspended without Pay Over Fake Vaccine Cards",
Dated July 6, 2022 ....................................................................JA-1837

Exhibit B to Letter -
Opinion and Order of Hon. Martin F. Scheinman,
Dated June 27, 2022 ..................................................................JA-1843

Letter from Dina Kolker to Honorable Kiyo A. Matsumoto,
Dated July 8, 2022 ....................................................................JA-1857

Letter from Andrea O'Connor to Honorable
Kiyo A. Matsumoto, Dated July 11, 2022 ................................JA-1859

Letter from Karolina Wiaderna to Honorable
Kiyo A. Matsumoto, Dated July 11, 2022 ................................JA-1861

Letter from Andrea O'Connor to Honorable
Kiyo A. Matsumoto, Dated February 16, 2023........................JA-1862

Letter from Austin Graff to Honorable Kiyo A. Matsumoto,
Dated February 17, 20232.........................................................JA-1864

Exhibit 1 to Letter -
Announcement of Mayor BioGraphy News Officials,
Dated February 6, 2023 .............................................................JA-1866

xi

**Page**

Letter from Dina Kolker to Honorable Kiyo A. Matsumoto,
  Dated February 17, 2023 ............................................................JA-1868

Letter from Hanan B. Kolko to Honorable Kiyo A. Matsumoto,
  Dated February 17, 2023 ............................................................JA-1870

Letter from Karolina Wiaderna to Honorable
  Kiyo A. Matsumoto, Dated February 20, 2023 ........................JA-1873

Memorandum and Order of Honorable Kiyo A. Matsumoto,
  Dated March 30, 2023 .................................................................JA-1874

Judgment of The United States District Court Eastern District
  of New York, Dated March 31, 2023, Appealed From .............JA-1916

Notice of Appeal, Dated April 20, 2023 .......................................JA-1917

Case 23-655, Document 73, 06/05/2023, 3525005, Page15 of 286

JA-543

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X

NICOLE BROECKER, MICHELLE MARTINO, GINA PORCELLO, AMOURA BYRAN, RENA GELLMAN, FOTINA LAMBOS, KERRY BEN-JACOB, EKATERINA UDINA, ANDREA TICHIO, MARIANNA CIACCA-LISS, ANITA QUASH, KELLY DIXON, FELICIA HAGAN, MARITZA ROMERO, MARIA RUSCELLI, BETIZIADA CRUZ, FRANCINE TRAPANI, JEANNINE LAM, JESSICA NARCISCO, BRIANNA PEREZ, NICOLETTA MASULLO, ANASTASIA CHRISTOPOULOS, FAYE KOTZER, BENEDICT LOPARRINO, YADITZA RODRIGUEZ, RAFAEL ADRIAN TORO, SERINA MENDEZ, DINA HUSSIEN, HERENDYRA PEREYRA, ROSA ABREU, LISA WILLIAMS, JOAN GIAMMARINO, ANDREA JACKSON, MARIA KLAPAKIS, STELLA PORTO, TONIANN MIRAGLIA, ROSEANNA SILVESTRI-INCANTALUPO, JULIA A. MAVIS, CHRISTOPHER HANSEN, ANNETTE BACKOF, DIANE PAGEN, LYNN PEPE, STEPHANIE EDMONDS, YVONNE COSTELLO, DEBBY HARTZ, SORAYA SANCHEZ, MONIQUE MOORE, ANGELA VELEZ, SALLY MUSSAFI, JESSICA NICCHIO, DORCA GENAO, RACHEL MANISCALCO, JAMES HOFFMAN, SHARLAYNE JACOBS, CRYSTAL SALAS, FRANCES DIPROSSIMO, CAROLA MARTINEZ-VAN BOKKEM, AYSE USTARES, ELIZABETH FIGUEROA, DIANE BAKER-PACIUS, NICOLE MOORE, ELIZABETH PLACENCIO, DEBBIE BERTRAM, KIMBERLI MADDEN, FRAN SCHMITTER, VICTORIA RUSSO, PAUL CIFARELLI, DANIELLE HEAL, SARA COOMBS-MORENO, LISA SIMO, TAMI BENEDUCE, ZABDIEL VALERA, NATHALIE CHARLES, JANELLE LOTITO, JEANEAN SANCHEZ, MARIE MOSLEY, TARA PALLADINO, DANIELLE MCGUIRE, JULIA HARDING, LEAH KUKLA, STEPHANIE FRANZESE, JULIA BALASIS-MARING, BETH SCHIANO, on behalf of themselves and all other similarly situated employees of the New York City Department of Education,

Plaintiffs,

-against-

NEW YORK CITY DEPARTMENT OF EDUCATION, MEISHA PORTER, in her official and individual capacities, UNITED FEDERATION OF TEACHERS,

INDEX NO.  21-cv-6387

**ORDER TO SHOW CAUSE**

1

LOCAL 2, AMERICAN FEDERATION OF
TEACHERS, AFL-CIO, MICHAEL MULGREW, in his
official and individual capacities, JOHN DOE #1-10, in
their official and individual capacities; and JANE DOE
#1-10 in their official and individual capacities,
                                        Defendants.
--------------------------------------------------------------------------X

     Upon the Affidavit of Nicole Broecker, sworn to on the 16th day of November 2021, the
Affidavit of Jeannine Lam, sworn to on the 15th day of November 2021, Affidavit of Stella Porto,
sworn to on the 16th day of November 2021, Affidavit of Gina Porcello, sworn to on the 15th day
of November 2021, Affidavit of Dina Hussein, sworn to on the 15th day of November 2021
accompanying Affirmation of Austin Graff, affirmed to on the 17th day of November 2021, the
accompanying Memorandum of Law, and upon the copy of the Complaint hereto annexed, it is

     **ORDERED,** that personal service on all named Defendants of a copy of this
Order, the Affidavit of Nicole Broecker, sworn to on the 16th day of November 2021, the
Affidavit of Jeannine Lam, sworn to on the 15th day of November 2021, Affidavit of Stella
Porto, sworn to on the 16th day of November 2021, Affidavit of Gina Porcello, sworn to
on the 15th day of November 2021, Affidavit of Dina Hussein, sworn to on the 15th
day of November 2021 accompanying Affirmation of Austin Graff, affirmed to on the 17th
day of November 2021, the accompanying Memorandum of Law, and of the Summons and
Complaint on or before **9:30 AM, Thursday, November 18, 2021,** shall be deemed good and
sufficient service thereof upon the Defendants.

     **ORDERED,** that Defendants shall respond to the Order to Show Cause via ECF by
**Friday, November 19, 2021, at 3:00 PM**. All parties are required to send two bound courtesy
copies of all papers relating to Plaintiff's motion for preliminary injunction/temporary restraining
order, including but not limited to all related declaration, affidavits, exhibits, and memoranda
of law, to chambers. Courtesy copies should be sent via FedEx or messenger to Judge
Matsumoto's chambers, by **5:00 PM, close of business, Friday, November 19, 2021**.

**JA-545**

**ORDERED** that security in the amount of $0.00 be posted by the Plaintiffs; and it is further

**ORDERED**, that counsel for the above named Plaintiffs and Defendants appear for a hearing before this Court, with their clients if they choose to present testimony, at Courtroom 6C South, United States Courthouse, Eastern District of New York, 225 Cadman Plaza East, Brooklyn, New York, County of Kings County, State of New York on **Tuesday, November 23, 2021 at 12:00 PM** thereof, or as soon thereafter as counsel may be heard, why an order should not be issued pursuant to Rule 65 of the Federal Rules of Civil Procedure regarding the Plaintiffs' requested relief. Counsel and their clients shall observe all COVID-19 protocols within the Courthouse and shall notify the Court via ECF by **12:00 PM on Monday, November 22, 2021**, whether they will present witness testimony at the hearing, and if so, they shall provide the names of all witnesses.

Dated:  November 17, 2021                                     ___/s/ Kiyo A. Matsumoto_____
Issued: Brooklyn, NY                                                United States District Judge

3

JA-546

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x

NICOLE BROECKER, et al., on behalf of themselves and
all other similarly situated employees of the New
York City Department of Education,,

No. 21 Civ 6387 (KAM)(LB)

Plaintiffs,

- against -

NEW YORK CITY DEPARTMENT OF EDUCATION,
MEISHA PORTER, in her official and individual
capacities, UNITED FEDERATION OF TEACHERS,
LOCAL 2, AMERICAN FEDERATION OF TEACHERS,
AFL-CIO, MICHAEL MULGREW, in his official and
individual capacities, JOHN DOE #1-10, in their official
and individual capacities; and JANE DOE #1-10 in their
official and individual capacities,

Defendants.

------------------------------------------------------------------- x

**DEFENDANTS NEW YORK CITY DEPARTMENT OF EDUCATION AND MEISHA
PORTER'S MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

**GEORGIA M. PESTANA**
Corporation Counsel of the City of New York
Attorney for Defendants DOE and Porter
100 Church Street
New York, New York 10007

*Of Counsel:*      Andrea O'Connor
                   Iván A. Méndez, Jr.
                   Maxwell Leighton

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................. ii

PRELIMINARY STATEMENT ................................................... 1

STATEMENT OF FACTS ............................................................... 4

ARGUMENT .........................................................................

    A.    PLAINTIFFS DO NOT HAVE STANDING TO CHALLENGE THE IMPACT ARBITRATION AWARD .. ........................... 7

    B.    PLAINTIFFS SEEK A MANDATORY INJUNCTION, AND FAIL TO MEET THE ASSOCIATED BURDEN......................... 8

    C.    PLAINTIFFS DO NOT MEET THE STANDARD FOR A PRELIMINARY INJUNCTION ................................. 10

    D.    PLAINTIFFS CANNOT SHOW IRREPARABLE HARM............................... 10

    E.    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS ................................. 14

        1.    Plaintiffs Are Not Being Subject to Discipline......................... 15

        2.    Alternatively, Plaintiffs Have Been Provided All Process Owed to Them ................................. 20

    F.    THE BALANCE OF EQUITIES DOES NOT TIP IN FAVOR OF PLAINTIFFS................................. 25

    G.    AN INJUNCTION IS NOT IN THE PUBLIC INTEREST ................................. 27

CONCLUSION................................. ................................. 27

## TABLE OF AUTHORITIES

**Cases**                                                                                                                   **Pages**

14 Penn Plaza LLC v. Pyett,
    556 U.S. 247 (2009) ...........................................................................................7

Abdul Wali v. Coughlin,
    754 F.2d 1015 (2d Cir. 1985)............................................................................7

Adams v. N.Y. State Educ. Dep't,
    08 Civ. 5996 (VM), 2010 U.S. Dist. LEXIS 15635 (S.D.N.Y 2008).....................19

Adrian v. Bd. of Ed.,
    92 A.D.3d 1272 (4th Dep't 2012), leave to appeal granted, 19 N.Y.3d 804
    (2012) ..........................................................................................................15, 16

Almontaser v. N.Y. City Dep't of Educ.,
    519 F.3d 505 (2d Cir. 2008)...............................................................................9

Blake v. Potter,
    2004 U.S. Dist. LEXIS 6596 (S.D.N.Y. Apr. 12, 2004).........................................7

Brown & Williamson Tobacco Corp. v. Engman,
    527 F.2d 1115 (2d Cir. 1975)............................................................................25

Brown v. Bd. of Educ.,
    2009 N.Y. Misc. LEXIS 5475 (Sup. Ct. N.Y. Co. July 22, 2009).........................15

Matter of Brown v. Bd. of Educ. of City Sch. Dist. of City of N.Y.,
    2009 NY Slip Op 31687(U) (Sup. Ct., N.Y. Co. 2009)....................................15, 16

Buckley v. N.Y. & Presbyterian Hosp.,
    No. 21 Civ. 7864 (LTS), 2021 U.S. Dist. LEXIS 181135 (S.D.N.Y. Sep. 21,
    2021) ...............................................................................................................12

Capul v. City of N.Y.,
    No. 19 Civ. 4313 (KPF), 2020 U.S. Dist. LEXIS 92727 (S.D.N.Y. May 27,
    2020),
    aff'd 832 Fed. App'x. 766 (2d Cir. 2021) ...........................................................20

Citibank, N.A. v. Citytrust,
    756 F.2d 273 (2d Cir. 1985)...............................................................8, 9, 10, 11

City School District v. McGraham,
    17 N.Y.3d 917 (2011) ......................................................................................16

Cleveland Bd. of Educ. v. Loudermill,
    470 U.S. 532 (1985)........................................................................................21

Cornejo v. Bell,
    592 F.3d 121 (2d Cir. 2010)..............................................................................13

**Cases**                                                                                                    **Pages**

Dechberry v. N.Y.C. Fire Dep't,
   124 F. Supp. 3d 131 (E.D.N.Y. 2015) ................................................................13

Doninger v. Niehoff,
   527 F.3d 41 (2d Cir. 2008) ...................................................................................9

E.E.O.C. v. Joint Apprenticeship Comm. of Joint Indus. Bd. of the Elec. Indus.,
   164 F.3d 89 (2d Cir. 1998) ..................................................................................13

Ezekwo v. N.Y.C. Health & Hosps. Corp.,
   940 F.2d 775 (2d Cir. 1991) ...........................................................................21, 22

Faiveley Transp. Malmo AB v. Wabtec Corp.,
   559 F.3d 110 (2d Cir. 2009) ................................................................................9

Felix v. Dep't of Citywide Admin. Servs.,
   3 N.Y.3d 498 (2004) ....................................................................................16, 18

Ford v. Reynolds,
   316 F.3d 351 (2d Cir. 2003) ..............................................................................12

Guitard v. United States Sec'y of Navy,
   967 F.2d 737 (2d Cir. 1992) ..............................................................................12

Hellenic Am. Neighborhood Action Comm. v. City of New York,
   101 F.3d 877 (2d Cir. 1996) ..............................................................................21

Holt v. Continental Group,
   708 F.2d 87 (2d Cir. 1983), cert. denied, 465 U.S. 1030 (1984) ............................12

Impax Media Inc. v. Northeast Adver. Corp.,
   No. 17 Civ. 8272, 2018 U.S. Dist. LEXIS 4940 (S.D.N.Y. Jan. 10, 2018) ..............9

J.S. v. T'Kach,
   714 F.3d 99 (2d Cir. 2013) ................................................................................14

Jayaraj v. Scappini,
   66 F.3d 36 (2d Cir. 1995) ..................................................................................13

JSG Trading Corp. v. Tray-Wrap, Inc.,
   917 F.2d 75 (2d Cir. 1990) ...........................................................................10, 12

Kane v. de Blasio,
   21 Civ. 7863 (S.D.N.Y.) (VEC) ..............................................................1, 2, 11, 12

Katir v Columbia Univ.,
   15 F.3d 23 (2d Cir. 1994) ....................................................................................7

**Cases**                                                                                                                          **Pages**

Matter of Koutros v. Dep't of Educ. of City of N.Y.,
     2013 NY Slip Op 33491 (Sup. Ct. N.Y. County October 22, 2013) affirmed at
     129 A.D.3d 434 (App. Div. 1st Dept.)..................................................................17

LaRouche v. Kezer,
     20 F.3.d 68, 74 n.7 (2d Cir. 1994)..........................................................................8

Le Sportsac, Inc. v. Dockside Research, Inc.,
     478 F. Supp. 602 (S.D.N.Y. 1979) .......................................................................10

MacFall v. City of Rochester,
     495 F. App'x 158 (2d Cir. 2012) ..........................................................................14

Mandelkern v. City of Buffalo,
     64 A.D.2d 279 (4th Dept. 1978) ...........................................................................17

Maniscalco v. N.Y. City Dept. of Educ.,
     No. 21 Civ.5055 (E.D.N.Y.) (BMC)................................................................1, 2, 4

Martz v. Inc. Vill. of Valley Stream,
     22 F.3d 26 (2d Cir. 1994).....................................................................................14

McPherson v. New York City Dep't of Educ.,
     457 F.3d 211 (2d Cir. 2006).................................................................................14

Moore v. Consol. Edison Co. of N.Y., Inc.,
     409 F.3d 506 (2d Cir. 2005).................................................................................12

Narumanchi v. Board of Trustees of Connecticut State Univ.,
     850 F.2d 70 (2d Cir. 1988)...................................................................................20

New York State Inspection, Sec. & Law Enforcement Emples., Dist. Council 82
     v. Cuomo,
     64 N.Y.2d 233 (1984) ...........................................................................................14

Matter of New York State Off. of Children & Family Servs. v. Lanterman,
     14 N.Y.3d 275 (2010) .....................................................................................16, 18

Noel v. N.Y. State Office of Mental Health Cent. N.Y. Psychiatric Ctr.,
     697 F.3d 209 (2d Cir. 2012).................................................................................13

O'Connor v. Board of Education,
     48 A.D.3d 1254 (4th Dept. 2008) lv. denied 10 N.Y.3d 928 (2008)...........15, 16, 17

Patsy v. Board of Regents of Florida,
     457 U.S. 496 (1982).............................................................................................20

**Cases**                                                                                    **Pages**

Rivera-Powell v. New York City Bd. of Elections,
    470 F.3d 458 (2d Cir. 2006)....................................................................21

Roman Catholic Diocese v. Cuomo,
    141 S. Ct. 63 (2020)..........................................................................25

Sampson v. Murray,
    415 U.S. 61 (1974)........................................................................10, 12

Score, Inc. v. Cap Cities/ABC, Inc.,
    724 F. Supp. 194 (S.D.N.Y. 1989) ........................................................10

Smith v. Bd. of Educ.,
    102 A.D.2d 655 (3d Dep't 1984), aff'd, 65 N.Y.2d 797 (1985)............................16

The New York City Municipal Labor Committee ("MLC"), et al. v. The City of
    New York, et al.,
    Index No. 158368/2021 (N.Y. Sup., N.Y. Cnty.) ....................................1

Tom Doherty Assocs. v. Saban Entm't, Inc.,
    60 F.3d 27 (2d Cir. 1995)..................................................................7, 9

Tough Traveler, Ltd. v. Outbound Prod.,
    60 F.3d 964 (2d Cir. 1995)..................................................................11

Trump v. Deutsche Bank AG,
    943 F.3d 627 (2d Cir. 2019), rev'd on other grounds, __U.S.__, 140 S.Ct.
    2019 (2020)....................................................................................24

Velasco v. Beth Isr. Med. Ctr.,
    279 F. Supp. 2d 333 (S.D.N.Y. 2003)......................................................7

Weinberger v. Romero-Barcelo,
    456 U.S. 305 (1982).........................................................................24

Winter v. Natural Res. Def. Council, Inc.,
    555 U.S. 7 (2008)........................................................................9, 24

Zinermon v. Burch,
    494 U.S. 113 (1990)....................................................................13, 21

Case 23-655, Document 73, 06/05/2023, 3525005, Page24 of 286

JA-552

**Statutes**                                                                                                   **Pages**

Civil Service Law § 75 ..................................................................................14, 16, 18, 19

Education Law § 2573 ...............................................................................................17

Education Law § 3001(2)...........................................................................................16

Education Law § 3009(1)...........................................................................................16

Education Law § 3010 ...............................................................................................16

Education Law § 3020(4)(a) ......................................................................................19

Education Law § 3020-a ........................................................................14, 15, 16, 17, 18, 19

Education Law § 3020-a and § 75 ..............................................................................19

N.Y. Labor Law § 27-a ..............................................................................................14

§ 1983 .......................................................................................................................20

**Other Authorities**

Board of Education of the City School District of the City of New York and the
    United Federation of Teachers, Local 2, AFT, AFL-CIO (hereafter "Impact
    Arbitration Decision"), at 4...........................................................................5, 6, 23

DOE Vaccination Mandate at
    https://www1.nyc.gov/assets/doh/downloads/pdf/covid/covid-19-vaccination-
    requirement-doe-3.pdf ......................................................................................1

Emergency Executive Order No. 98 ...........................................................................3, 4

The Rehabilitation Act, And Other EEO Laws, at K.1.
    (https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-
    rehabilitation-act-and-other-eeo-laws, last visited Nov. 18, 2021)..........................15

vi

JA-553

## PRELIMINARY STATEMENT

On August 24, 2021—the day after the U.S. Food and Drug Administration ("FDA") fully approved the Pfizer COVID-19 vaccine—the Commissioner of the New York City Department of Health and Mental Hygiene ("DOHMH"), David A. Chokshi, issued a Commissioner's Order ("COH Order") requiring all New York City Department of Education ("DOE") employees to show proof of at least one dose of vaccination against COVID-19 by September 27, 2021 (the "DOE Vaccination Mandate").[1]  The COH Order's preliminary paragraphs provide a salient and unassailable predicate for making the mandate, including that the U.S. Centers for Disease Control and Prevention ("CDC") extols vaccination as the primary strategy to stop the spread of COVID-19 and thus recommends that teachers, school administrators and other employees working in school buildings be vaccinated as soon as possible to help schools safely resume full operations.  Further, DOE is the largest school district in the country, with approximately one million students, hundreds of thousands of whom are not yet vaccinated.  Thus, the DOE Vaccination Mandate is fully premised on potentially saving lives, protecting public health, and promoting public safety.

The DOE Vaccination Mandate the subject of several legal challenges brought in state and federal court. See, e.g., Maniscalco v. N.Y. City Dept. of Educ., No. 21 Civ.5055 (E.D.N.Y.) (BMC)[2];  Kane v. de Blasio, 21 Civ. 7863 (S.D.N.Y.) (VEC); Keil v. The City of New York, et al., 21 Civ. 8773 (SDNY)(VEC); The New York City Municipal Labor Committee ("MLC"), et al. v. The City of New York, et al., Index No. 158368/2021 (N.Y. Sup., N.Y. Cnty.).

---

[1]  DOE Vaccination Mandate at https://www1.nyc.gov/assets/doh/downloads/pdf/covid/covid-19-vaccination-requirement-doe-3.pdf.  Last accessed on Nov. 18, 2021.

[2] Notably, Rachel Maniscalco – the lead plaintiff in Maniscalco – is also a plaintiff herein.

1

Plaintiffs in these challenges have sought to enjoin the enforcement of the DOE Vaccination Mandate as applied to DOE employees.  Id.  In MLC, Maniscalco, Keil and Kane, the respective Court denied the plaintiffs' application for a temporary restraining order and/or preliminary injunction seeking to enjoin the mandate, finding, among other things, that plaintiffs had not shown the likelihood of success on the merits.  As such, there can be no debate that the DOE Vaccination Mandate is itself sound and enforceable.

Plaintiffs are DOE employees who seek to represent themselves and a class of other DOE employees who oppose the DOE Vaccination Mandate and consequences for failure to comply with this mandate.   Plaintiffs claim that requiring COVID-19 vaccination as a qualification of employment for DOE employees interferes with their procedural due process rights under the Fourteenth Amendment of the United States Constitution.  Plaintiffs now seek— seven weeks after the deadline for employees to show proof of vaccination—a preliminary, and mandatory, injunction that would prohibit DOE from taking any action stemming from plaintiffs' refusal to comply with the lawful DOE Vaccination Mandate and that would disrupt the status quo by requiring DOE to return Plaintiffs to DOE payroll.

While this motion is couched as a constitutional claim, Plaintiffs are actually contending that a duly authorized government authority, namely, DOHMH, has no ability to impose requirements of employment in response to a public health emergency.  This is simply incorrect.  The COH Order – which has been repeatedly upheld as lawful – altered the circumstances under which a DOE employee may maintain their fitness to perform their job duties by requiring that DOE employees must be vaccinated against COVID-19.   The consequence of this requirement is that those DOE employees who are unwilling to be vaccinated – and have not obtained an exemption or reasonable accommodation with respect to the mandate – are no longer fit to perform their job duties at DOE.  As explained below, it is

2

JA-555

well-established that government authorities are entitled to establish lawful employment requirements, such as holding a particular license or a residency requirement, and an employee's failure to adhere to these requirements permits their summary separation from service.  Plaintiffs have not complied with the lawful COH Order and DOE Vaccination Mandate and, absent exemption from the mandate, they are not fit to work for the DOE.

Putting aside the validity of the DOE Vaccination Mandate, and the ample scientific and legal justifications for the same, Plaintiffs' request for a preliminary injunction must be denied for the simple reason that they have not demonstrated irreparable harm. Plaintiffs, by their own admission, were taken off of DOE payroll on October 4, 2021, more than six weeks before seeking _affirmative_ injunctive relief returning them to payroll. Thus, Plaintiffs' own inaction and delays in seeking injunctive relief belie the purported emergency relief sought here.

In addition, the allegedly irreparable harm articulated here—loss of salary and employment—is precisely the sort of harm that the Second Circuit has repeatedly held to be insufficient to justify injunctive relief.

Finally, the claims on which the preliminary injunction request are premised (which rely exclusively on a novel procedural due process theory), are unlikely to succeed on the merits. Because of that, and the other reasons set forth below, Plaintiffs meet none of the requirements for a preliminary injunction.  Therefore, Defendants DOE and Porter ("DOE Defendants") respectfully submit that Plaintiffs' application for a preliminary, and mandatory, injunction must be denied in its entirety.

**STATEMENT OF FACTS**

**COVID-19 Pandemic and Impact on Schools**

On March 12, 2020, Mayor Bill de Blasio issued Emergency Executive Order No. 98, declaring a state of emergency in the City of New York ("the City") to address the threat posed by COVID-19 to the health and welfare of City residents, and this order remains in effect today. See DOE Vaccination Mandate at p. 1. Thereafter, on March 25, 2020, the DOHMH Commissioner declared the existence of a public health emergency within the City to address the continuing threat posed by COVID-19 to the health and welfare of City residents, and recently declared that the public health emergency continues to be in effect. Id.

The CDC has recommended that school teachers and staff be "vaccinated as soon as possible" because vaccination is "the most critical strategy to help schools safely resume full operations" and is "the leading public health prevention strategy to end the COVID-19 pandemic." Id. The DOE serves approximately one million students across the City, including students in the communities that have been disproportionately affected by the COVID-19 pandemic and students who were, until very recently, too young to be eligible to be vaccinated. See id. p. 2. Given these circumstances and the CDC's judgment, DOHMH determined that requiring vaccination for individuals working in school settings or other DOE buildings will potentially save lives, protect public health, and promote public safety. Id.

On August 23, 2021, Mayor de Blasio and the DOHMH Commissioner announced that DOE employees would be subject to a "vaccine only" mandate, as opposed to a vaccination-or-testing requirement, as described thereafter in the COH Order. See id. Under this policy, by September 27, 2021, DOE employees were required to submit proof that they were fully vaccinated; or received a single dose vaccine, or the second dose of a two-dose vaccine; or

4

**JA-557**

received the first dose of a two-dose vaccine, with the additional requirement to provide proof of the second dose thereafter. Id.[3]

**Impact Arbitration Decisions and Agreement**

Defendant United Federation of Teachers ("UFT") is the bargaining unit for Teachers, Secretaries, Paraprofessionals, Guidance Counselors, Speech Language Pathologists, School Psychologists, and Social Workers, among other titles, employed by DOE. See "About Your Union" available at https://www.uft.org/your-union/about-uft; last accessed Nov. 19, 2021. On September 10, 2021, the UFT filed a Declaration of Impasse with the Public Employment Relations Board ("PERB") over the impact of the DOE Vaccination Mandate. See O'Connor Decl., Exh. A (September 10, 2021 Arbitration Award Decision in Board of Education of the City School District of the City of New York and the United Federation of Teachers, Local 2, AFT, AFL-CIO (hereafter "Impact Arbitration Decision"), at 4. PERB appointed an arbitrator and several days of discussions were held. Id. On September 10, 2021, the arbitrator issued a decision, which established  (1) a process for exemptions and accommodation requests; (2) options to voluntarily separate from service with certain benefits; and (3) that the DOE may "unilaterally separate employees" who have not complied with the Vaccination Mandate or have an approved exemption or accommodation and have not opted for either separation option. Id. at 6-13.

The process established by the Impact Arbitration Decision applies to medical and religious exemptions as well as accommodations for those who, having received a full course of vaccination, remain unable to mount an immune response. See id. at 6-13.[4] It also sets forth that

---

[3] As a result of a brief appellate stay in Maniscalco, the deadline for showing proof of at least one dose of a vaccine was extended to October 1, 2021, by 5 p.m. No other later deadlines were impacted or adjusted.

[4] As detailed below, seven plaintiffs availed themselves of the accommodation process.

employees who have not requested an exemption, or whose request was denied, may be placed on leave without pay by the DOE starting September 28, 2021. See id. at 13. While on leave without pay, employees continue to be eligible for health insurance. Id. at 15. Employees who submit proof of vaccination before November 30, 2021, will be eligible to return to their school within one week of submitting their documentation to the DOE. Id. at 14.

The decision also sets forth a process for separation from employment with enhanced payment of accrued paid time off, or extension of leave without pay and with health benefits. See id. at 14. DOE employees who have not complied with the DOE Vaccination Mandate could opt to either separate from service by October 29, 2021 and receive enhanced payment of accrued paid time off and health insurance through September 5, 2022, unless they are eligible for health insurance from another source. Id. at 16. Alternatively, as a second option, employees can also opt to have their leave without pay extended to September 5, 2022, and maintain health coverage. Id. at 17. To the extent that those employees who have chosen to extend their leave without pay do not comply with the DOE Vaccination Mandate by the end of the period, they will be deemed to have voluntarily resigned. Id. In addition the Impact Arbitration Decision provides that on or after December 1, 2021, DOE will unilaterally separate employees who remain out of compliance with the DOE Vaccination Mandate and have not applied for either the extended leave or separation. Id.

Following the issuance of the Impact Arbitration Decision, the City's Office of Labor Relations engaged in impact bargaining with the remaining unions representing DOE employees; for example, the Council of Supervisors and Administrators ("CSA"), which represents DOE Principals and Assistant Principals, and District Council 37, City of New York ("DC 37"), which represents many school-based employees such as school aides, school food workers and Parent Coordinators. Similar to the process that led to the Impact Arbitration

6

Decision – which covers the majority of plaintiffs herein – the negotiations with CSA reached an impasse and the parties proceeded to arbitration.  See O'Connor Decl. at B, September 15, 2021 Arbitration Award Decision in Board of Education of the City School District of the City of New York and the Council of Supervisors and Administrators.  On September 15, 2021, an arbitration award was issued that exactly mirrors that of the Impact Arbitration Decision.  Id.

The City and DC 37 were able to successfully negotiate an agreement with respect to the leave procedures for those DOE employees who do not comply with the DOE Vaccination Mandate and, again, reached an agreement that mirrors that of the Impact Arbitration Decision.   See O'Connor Decl. at C, Memorandum of Agreement District Council 37, City of New York, and the Board of Education of the City School District for the City of New York, dated October 3, 2021.[5]

## ARGUMENT

### A.   PLAINTIFFS DO NOT HAVE STANDING TO CHALLENGE THE IMPACT ARBITRATION AWARD

"[A]n individual employee represented by a union generally does not have standing to challenge an arbitration proceeding to which the union and the employer were the only parties." Katir v Columbia Univ., 15 F.3d 23, 24-25 (2d Cir. 1994).  The remedy for an individual is to pursue a duty of fair representation claim against his or her union.  See id. at 24-25.  See also 14 Penn Plaza LLC v. Pyett, 556 U.S. 247, 260 (2009) (holding that unions were free to negotiate a departure from federal statutory scheme on behalf of their members); Velasco v. Beth Isr. Med. Ctr., 279 F. Supp. 2d 333, 336 (S.D.N.Y. 2003) (dismissing challenge to arbitration award on standing grounds); Blake v. Potter, 2004 U.S. Dist. LEXIS 6596, at *9 (S.D.N.Y. Apr. 12, 2004) (same).  This is precisely the situation plaintiffs here find themselves

---

[5] Because the applicable CSA decision and the DC 37 agreement are identical in all relevant respects to the Impact Arbitration Decision, for ease of reference this memorandum will refer to all three as the Impact Arbitration Decision.

7

in: they are challenging their placement on Leave Without Pay ("LWOP") and potentially their separation from DOE; however, their placement on LWOP and their projected separation was the result of negotiations and arbitration award between the City and the various unions representing plaintiffs, not plaintiffs individually.   Accordingly, plaintiffs do not have standing to challenge their placement on LWOP and/or potential separation due to the fact that this procedure was collectively bargained with the respective unions, most notably, the UFT, CSA and DC 37.

### B.   PLAINTIFFS SEEK A MANDATORY INJUNCTION, AND FAIL TO MEET THE ASSOCIATED BURDEN

A typical injunction seeks to maintain the status quo pending a trial on the merits. Abdul Wali v. Coughlin, 754 F.2d 1015 (2d Cir. 1985).  Plaintiffs are required to meet the higher standard of a mandatory injunction if (1) the injunction would alter, rather than maintain the status quo or (2) the injunction would grant the movant with substantially all the relief sought and that relief cannot be undone even if defendants would prevail on the merits.  Tom Doherty Assocs. v. Saban Entm't, Inc., 60 F.3d 27, *33-34 (2d Cir. 1995).  Here, Plaintiffs are seeking, among other things, to be restored to DOE payroll after having been placed on LWOP for their failure to comply with the DOE Vaccination Mandate.   It must be noted that, in addition to being restored to payroll, Plaintiffs seek to have their "benefits, including health benefits, and pension credits," restored.  As per the Impact Arbitration Decision, Plaintiffs on LWOP maintain their health benefits and therefore all the Plaintiffs herein continue to maintain their health benefits despite their placement on LWOP.

The status quo in a preliminary injunction is the "last, peaceable uncontested status which preceded the pending controversy." LaRouche v. Kezer, 20 F3.d 68, 74 n.7 (2d Cir. 1994).  For the purposes of Plaintiffs' application to be restored to payroll, the last "peaceable" moment was the day prior to being placed on LWOP.   Utilizing Plaintiff Broecker as an example, she avers in her affidavit that she has been on LWOP since October 4, 2021.  Thus, in

8

**JA-561**

order to maintain the status quo of remaining on payroll, Plaintiff Broecker would have been required to make the instant application on or before October 3, 2021.  She – and the other Plaintiffs – failed to do so.  Thus, if plaintiffs' application were granted, it would alter, not maintain, the status quo.

Plaintiffs' application is completely silent as to why Plaintiffs waited until November 17, 2021 to seek this "emergency" relief from the Court.  This is despite the fact that the Complaint, and Exhibit A annexed thereto, confirm that Plaintiffs were given advance warning that they were going to be placed on LWOP as of October 4, 2021.  Plainly, Plaintiffs' own delay strongly counsels against the extraordinary equitable relief they seek. See Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985) ("Preliminary injunctions are generally granted under the theory that there is an urgent need to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action.").

In any event, given their placement on LWOP well over one month ago, Plaintiffs must meet the higher standard required for mandatory injunctions.  In particular, they must show a "clear" or "substantial" likelihood of success on the merits.  Tom Doherty Assocs. v. Saban Entm't, Inc., 60 F.3d 27 (2d Cir. 1995); Doninger v. Niehoff, 527 F.3d 41, *47 (2d Cir. 2008). From their Complaint, it is clear that Plaintiffs will not be able to meet this high burden because the *only* harm associated with their placement on LWOP is removal from payroll.  This type of alleged harm is – by definition – reparable.  Accordingly, Plaintiffs cannot meet the mandatory injunction standard and their application should be denied.  And, even so, for substantially the same reasons as discussed below, Plaintiffs cannot meet even the lower, more permissive standard of a prohibitory injunction.

9

### C. PLAINTIFFS DO NOT MEET THE STANDARD FOR A PRELIMINARY INJUNCTION

In order to justify a preliminary injunction, plaintiffs must demonstrate: (1) irreparable harm absent injunctive relief; (2) a likelihood of success on the merits; (3) the balance of equities tips decidedly in their favor; and (4) that the public interest weighs in favor of granting an injunction.  See Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24-25 (2008); Almontaser v. N.Y. City Dep't of Educ., 519 F.3d 505, 508 (2d Cir. 2008).   Of these requirements, a showing of likely irreparable harm is often referred to as the **most** important.  See, e.g., Citibank, N.A., 756 F.2d at 275.   An injunction is unwarranted because Plaintiffs cannot demonstrate any of these requirements.

### D. PLAINTIFFS CANNOT SHOW IRREPARABLE HARM

"[I]rreparable harm is the 'single most important prerequisite for the issuance of a preliminary injunction.'"  Impax Media Inc. v. Northeast Adver. Corp., No. 17 Civ. 8272, 2018 U.S. Dist. LEXIS 4940 at *10 (S.D.N.Y. Jan. 10, 2018) (quoting Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009)).   In making a showing of irreparable harm, Plaintiffs must demonstrate that there is a threat of actual injury for which available legal remedies are inadequate.  See Score, Inc. v. Cap Cities/ABC, Inc., 724 F. Supp. 194, 198 (S.D.N.Y. 1989).   "Irreparable injury is one that cannot be redressed through a monetary award. Where money damages are adequate compensation a preliminary injunction should not issue."  JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 79 (2d Cir. 1990).  As the Supreme Court has held "the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury . . . [m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of

10

JA-563

litigation, weighs heavily against a claim of irreparable harm." Sampson v. Murray, 415 U.S. 61, 90 (1974).

Plaintiffs identify two so-called "irreparable" harms: continued loss of pay while on LWOP and their potential separation from DOE.  Neither of these harms is irreparable or otherwise sufficient to justify a preliminary injunction.

As noted above, the extraordinary delay in seeking to enjoin a certain eventuality that will occur on December 1, 2021, but was entirely known to Plaintiffs on October 4, 2021 if not earlier, greatly forecloses the validity of any professed "urgent need for speedy action to protect the plaintiffs' rights." Citibank N.A., 756 F.2d at 276.  Having delayed to the point of manufacturing an emergency, Plaintiffs' application claiming an impending crisis now exists must be viewed as a bald calculation bordering on pure gamesmanship.  Indeed, the Second Circuit has explained that a party's "failure to act sooner 'undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.'" Id. at 277 (quoting Le Sportsac, Inc. v. Dockside Research, Inc., 478 F. Supp. 602, 609 (S.D.N.Y. 1979)).  A delay "may, standing alone, preclude the granting of preliminary injunctive relief, because the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." Tough Traveler, Ltd. v. Outbound Prod., 60 F.3d 964, 968 (2d Cir. 1995) (internal quotation marks and citations omitted).  While Courts have not imposed rigid deadlines by which a request for preliminary injunctive relief must be made, even a relatively brief delay may be deemed too long.  See, e.g., Citibank, 756 F.2d at 276-77.

Here, as noted above, Plaintiffs allege they have all been on LWOP since October 4, 2021.  Plaintiffs nevertheless waited 44 days to seek this "emergency" relief from the Court. This delay is both lengthy and completely unexplained thereby severely undercutting any

11

"urgency" associated with this application.  In <u>Kane</u>, the Honorable Valerie E. Caproni addressed

a similar delay by teachers seeking to challenge the DOE Vaccination Mandate by way of an

application for a preliminary injunction:

> Before I turn to the likelihood of success on the
> merits, I note that preliminary injunctions are
> generally issued when there is an urgent need for
> speedy action to protect a plaintiff's rights. As the
> Second Circuit has noted, "a delay in seeking
> enforcement of those rights...tends to indicate at
> least a reduced need for such drastic, speedy
> action." <u>Citibank, N.A. v. Citytrust</u>, 756 F.2d 273,
> 276 (2d Cir. 1985). I am absolutely baffled by
> plaintiffs' delay in seeking a preliminary injunction.
> The vaccine mandate was announced on August 23
> and published on August 24. Plaintiffs filed this
> action almost a month later, on September 21.
> Although the complaint asserted that plaintiffs were
> seeking a preliminary injunction, see Compl. ¶ 6,
> there is no indication that they served the complaint
> promptly and, even if they did, they waited to seek
> an order to show cause why a TRO and preliminary
> injunction should not be granted until October 4,
> three days after the effective date of the order they
> were challenging. Although I am not denying the
> request for emergency relief because of plaintiffs'
> delay, the apparent gamesmanship by plaintiffs'
> counsel in waiting to file this case and then in
> seeking a preliminary injunction does nothing to
> help her cause.

<u>See</u> O'Connor Decl. at Ex. D, Transcript of Proceedings held on October 12, 2021 in <u>Kane</u> at

58:20-59:17.  Here, it is similarly "baffling" as to why Plaintiffs waited over six weeks to

challenge their placement on LWOP and the notification that they would be subject to summary

termination as of December 1, 2021.

Next, "[i]rreparable injury is one that cannot be redressed through a monetary

award. Where money damages are adequate compensation a preliminary injunction should not

issue." <u>JSG Trading Corp. v. Tray-Wrap, Inc.</u>, 917 F.2d 75, 79 (2d Cir. 1990).  As the Supreme

Court has held "the temporary loss of income, ultimately to be recovered, does not usually

**JA-565**

constitute irreparable injury . . . [m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." Sampson v. Murray, 415 U.S. 61, 90 (1974).

Here, the two claimed harms, i.e. the continued loss of pay and projected separation from employment, are quintessential **reparable** harms.  See Moore v. Consol. Edison Co. of N.Y., Inc., 409 F.3d 506, 510 (2d Cir. 2005); Ford v. Reynolds, 316 F.3d 351, 355 (2d Cir. 2003).  Plaintiffs' allegation that they have been placed on LWOP and are facing a possible "loss of employment is insufficient to carry [their] burden of showing irreparable harm because [they] make no showing that the loss of [their] employment cannot be remedied with money damages." Buckley v. N.Y. & Presbyterian Hosp., No. 21 Civ. 7864 (LTS), 2021 U.S. Dist. LEXIS 181135 (S.D.N.Y. Sep. 21, 2021); see also Holt v. Continental Group, 708 F.2d 87, 90-91 (2d Cir. 1983), cert. denied, 465 U.S. 1030 (1984) ("the requisite irreparable harm is not established in employee discharge cases by financial distress or inability to find other employment, unless truly extraordinary circumstances are shown."); Guitard v. United States Sec'y of Navy, 967 F.2d 737, 742 (2d Cir. 1992)("injuries that generally attend a discharge from employment — loss of reputation, loss of income and difficulty in finding other employment — do not constitute the irreparable harm necessary to obtain a preliminary injunction")(internal citations omitted).

In examining the DOE Vaccination Mandate in MLC, the Court held that the petitioners were "unlikely to be succeed on the second prong of the preliminary injunction test as they cannot establish an irreparable harm as the loss of employment is compensable by money damages and reinstatement to said employment. Petitioners represented employees who refuse to

13

accept vaccination and are ineligible for an exemption are still entitled to contest any negative outcome through their union procedures and additionally are able to pursue their profession outside of those schools impacted by the Order." See N.Y.C. Mun. Labor Comm. v. City of N.Y., 2021 NY Slip Op 21260, ¶ 5 (Sup. Ct.).

Indeed, even a loss of "benefits" attendant to employment does not constitute irreparable harm. See Noel v. N.Y. State Office of Mental Health Cent. N.Y. Psychiatric Ctr., 697 F.3d 209, 213 (2d Cir. 2012) (back pay includes lost fringe benefits such as vacation pay and pension benefits); E.E.O.C. v. Joint Apprenticeship Comm. of Joint Indus. Bd. of the Elec. Indus., 164 F.3d 89, 101 (2d Cir. 1998)(holding same); Jayaraj v. Scappini, 66 F.3d 36, 39 (2d Cir. 1995)(a reinstatement order issued by the District Court could award "full pension benefits, including an award of seniority status covering the interim between termination and a final disposition of the parties' rights."). Because Plaintiffs are unable to demonstrate irreparable harm, their motion for a preliminary injunction must be denied.

### E.    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS

In order to state a procedural due process violation, a plaintiff must allege that (1) the challenged conduct was "committed by a person acting under color of state law;" and (2) such conduct "deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States." See Cornejo v. Bell, 592 F.3d 121, 127 (2d Cir. 2010). "Where a plaintiff alleges violations of procedural due process, the deprivation by state action of a constitutionally protected interest in life, liberty, or property is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law." Dechberry v. N.Y.C. Fire Dep't, 124 F. Supp. 3d 131, 158-60 (E.D.N.Y. 2015) (internal quotation marks omitted) (citing, among others, Zinermon v. Burch, 494 U.S. 113, 125 (1990)).

**JA-567**

"To plead a violation of procedural due process, a plaintiff must plausibly allege that he was deprived of property without constitutionally adequate pre- or post-deprivation process." J.S. v. T'Kach, 714 F.3d 99, 105 (2d Cir. 2013). "[A plaintiff] must first identify a property right, second show that the [government] has deprived him of that right, and third show that the deprivation was effected without due process." Id. (internal citation and quotation marks omitted). "Property interests protected by due process . . . are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." MacFall v. City of Rochester, 495 F. App'x 158, 159 (2d Cir. 2012) (quoting Martz v. Inc. Vill. of Valley Stream, 22 F.3d 26, 29 (2d Cir. 1994). In order to establish a protected property interest, a plaintiff must show that he had a "legitimate claim of entitlement" to the interest, and not just a "unilateral expectation" of it. Id. (quoting McPherson v. New York City Dep't of Educ., 457 F.3d 211, 216 (2d Cir. 2006)).

Plaintiffs argue that they have been "suspended without pay" and face separation from the DOE without the due process owed to them and therefore they are likely to succeed on the merits. Plaintiffs are incorrect.

## 1.  Plaintiffs Are Not Being Subject to Discipline

Plaintiffs premise their procedural due process claim on the faulty notion that they are being subjected to "discipline" in the form of an unpaid "suspension" without the process owed to them via Education Law § 3020-a or Civil Service Law § 75.  Not so.  In fact, the Impact Arbitration Award specifically states that placement on LWOP is non-disciplinary. Rather, by virtue of Plaintiffs' unwillingness to comply with the DOE Vaccination Mandate, they are simply no longer fit and/or qualified to continue their public employment with the DOE.

JA-568

As detailed below, they are, therefore, not entitled to any process in advance of their placement on LWOP and separation.

The DOE, as a government employer, has a duty to maintain a safe workplace.  See generally N.Y. Labor Law § 27-a.  The obligation of how best to do so is within the discretion of the employer.  See New York State Inspection, Sec. & Law Enforcement Emples., Dist. Council 82 v. Cuomo, 64 N.Y.2d 233, 237-40 (1984).  Federal, state and local law also confirm, in the context of the COVID-19 pandemic, that employers can refuse to allow employees to work who are not fit for work under the applicable medical standards set forth by the public health authorities.  See e.g. EEOC Guidance, What You Should Know About Covid-19 and the ADA, the Rehabilitation Act, and Other EEO Laws, at K.1. (https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws, last visited Nov. 18, 2021).

The DOE, consistent with its obligation to provide a safe workplace, and in compliance with the lawful COH Order, cannot permit unvaccinated employees, absent exemption or accommodation required by law, to perform their job functions when they lack fitness to do so under the COH Order.  When employees are not fit to perform their duties under these circumstances, they are not being "suspended" but rather are unable to work due to ineligibility caused by their lack of fitness, even where here the ineligibility may be temporary and curable.  C.f. Matter of Brown v. Bd. of Educ. of City Sch. Dist. of City of N.Y., 2009 NY Slip Op 31687(U), ¶ 6 (Sup. Ct., N.Y. Co. 2009), citing O'Connor v. Board of Education, 48 A.D.3d 1254 (4th Dept. 2008) lv. denied 10 N.Y.3d 928 (2008) (teacher's termination due to failure to maintain residency was not a disciplinary matter and therefore was outside the scope of § 3020-a.).  To be sure, the Second Circuit earlier this month upheld vaccination as a "condition

of employment" in the healthcare field.  We the Patriots USA, Inc. v. Hochul, Nos. 21-2179, 21-2566, 2021 U.S. App. LEXIS 32880, at *52-53 (2d Cir. Nov. 4, 2021).

Section 3020-a hearings are not required in the context of employment qualifications "unrelated to job performance, misconduct, or competency."  O'Connor v. Bd. of Educ., 48 A.D.3d 1254, 1255 (4th Dep't 2008) (3020-a hearing not required when teacher is terminated for failure to comply with residency requirement as this constitutes a job qualification, not discipline), appeal dismissed, 10 N.Y.3d 928 (2008); Adrian v. Bd. of Ed., 92 A.D.3d 1272, 1273 (4th Dep't 2012) (same), leave to appeal granted, 19 N.Y.3d 804 (2012); Brown v. Bd. of Educ., 2009 N.Y. Misc. LEXIS 5475, *9-10 (Sup. Ct. N.Y. Co. July 22, 2009) ("The termination of Petitioner did not implicate the procedural protections of Education Law § 3020-a because Petitioner's termination was due to her legal ineligibility to serve as a teacher, rather than any alleged misconduct or incompetence on her part.") (citations omitted; Felix v. Dep't of Citywide Admin. Servs., 3 N.Y.3d 498, 505 (2004) (failure to maintain residency requirement does not trigger the protections of Civil Service Law § 75 because it is a matter of job eligibility, not discipline for misconduct).  Indeed, the Court of Appeals has explicitly held that termination for failure to have a teaching certification is not discipline and termination is required.  Matter of New York State Off. of Children & Family Servs. v. Lanterman, 14 N.Y.3d 275, 282 (2010); see also City School District v. McGraham, 17 N.Y.3d 917, 918 n.1 (2011).

For example, New York Education Law expressly states that a teacher who does not possess a teaching certificate issued by the State of New York is unqualified, as a matter of law.  Indeed, the Court of Appeals has explicitly held that summary termination for failure to have a teaching certification is not discipline.  Lanterman, 14 N.Y.3d at 282; see also McGraham, 17 N.Y.3d at 918 n.1 (2011).

17

JA-570

Thus, Plaintiffs' argument that they were entitled to a § 3020-a or § 75 hearing in advance of being placed on LWOP or being ultimately separated is misplaced. Here, the DOE is enforcing the lawful COH Order by removing unvaccinated employees from the workplace because they are no longer fit to perform their duties. While this is a new job requirement put in place to combat at novel virus, the analysis remains unchanged. The DOE is able to separate employees that are not in compliance with lawful job requirements. In essence, plaintiffs seek to redefine "discipline" to include a failure to meet a qualification of their DOE employment. The Courts have repeatedly rejected such attempts. O'Connor, 48 A.D.3d at 1255; Adrian, 92 A.D.3d at 1273; Brown, 2009 N.Y. Misc. LEXIS 5475, at *9-10, Appendix "A,"; see Felix, 3 N.Y.3d at 505.

Indeed, in O'Connor, the petitioners were tenured teachers employed by the Niagara Falls Board of Education who were terminated for their failure to comply with a residency requirement. O'Connor, 48 A.D.3d 1254, 1255. In bringing a procedural due process claim challenging their termination, the petitioners argued that they could not be terminated without the Board of Education first issuing disciplinary charges against them, followed by a hearing under Education Law § 3020-a. Id.

The Court disagreed, holding that § 3020-a was inapplicable because that section deals solely with "issues relating to a teacher's competency and the applicable disciplinary procedures and penalties attendant thereto." Id. In contrast, the residency requirement was a "qualification of employment" that was "unrelated to job performance, misconduct or competency" and therefore the Board of Education "may impose it if [it] chooses to do so without running afoul of the Constitution or general laws of the State." Id., citing Mandelkern v. City of Buffalo, 64 A.D.2d 279, 281 (4th Dept. 1978).

18

Similarly, in <u>Matter of Koutros v. Dep't of Educ. of City of N.Y.</u>, 2013 NY Slip Op 33491 (Sup. Ct. N.Y. County October 22, 2013) <u>affirmed at</u> 129 A.D.3d 434 (App. Div. 1st Dept.), the Court held that the termination of a tenured teacher did not implicate the procedural protections of § 3020-a because plaintiff's termination was due to his legal ineligibility to serve as a teacher, rather than any alleged misconduct or incompetence.

Likewise, under Education Law § 2573, a teacher must complete four years of service to achieve tenure.  <u>See</u> O'Connor Decl., Ex. E, Affidavit of Vicki Bernstein at 2.  New York State's Education Department permits a teacher to begin teaching with what is referred to as an "Initial Certificate," which is valid for five years, during which time the teacher is expected to obtain a master's degree and a "Professional Certificate" and complete all necessary certification requirements.  <u>Id.</u>  A teacher may complete probation during this time period and, purusant to the collective bargaining agreement between the Department and UFT, be entitled to the protections afforded by Education Law § 3020-a.  <u>Id.</u>

Each year, the DOE reviews certification statuses for teachers and other staff and identifies staff who have an expired Initial Certificate (including teachers and other pedagogical staff who have completed probation) and who have not completed the necessary certifications. <u>Id.</u> at 4.  Once identified, the DOE then separates these employees from service without a hearing pursuant to § 3020-a.  <u>Id.</u>  Indeed, the union representing most of the plaintiffs in this case, the United Federation of Teachers, on its own website, admonishes that "although you can be tenured while holding an initial certificate, you can be terminated without the right to due process for failure to complete the requirements for the professional certificate in the same license area" <u>See</u> <u>id.,</u> <u>citing</u> "How do I achieve Tenure" *available at* https://www.uft.org/teaching/new-teachers/tenure; last accessed on Nov. 18, 2021.  For example, in the 2018-19 school year, DOE separated 136 staff (131 teachers, 3 guidance counselors, and 2

19

Case 23-655, Document 73, 06/05/2023, 3525005, Page44 of 286

social workers); in the 2019-20 school year, DOE separated 30 staff (27 teachers, and 3 social workers); and in the 2020-2021 school year, DOE separated 217 staff (198 teachers, 3 guidance counselors, 15 social workers, 1 psychologist) from service based on their failure to obtain the required certifications.  Id. at 5.

Similarly, under Civil Service Law § 75, it is equally well-settled that the failure to maintain eligibility for employment is not an act of misconduct or one related to job performance so as to implicate the disciplinary procedures mandated by Civil Service Law § 75.  See Lanterman, 14 N.Y.3d at 282 (2010); Felix, 3 N.Y.3d 498 at 505.

Thus, it is clear that a public employer may lawfully, and summarily, separate employees from service without process due to the employee's legal ineligibility to maintain their employment.  Here, the City's Health Commissioner promulgated a lawful eligibility requirement: to be eligible to work for DOE, an individual must be vaccinated against COVID-19.  Plaintiffs have not complied with that lawful requirement and are therefore subject to separation.  This ineligibility in no way implicates the disciplinary procedures delineated in Education Law § 3020-a or Civil Service Law § 75 because it does not pertain to misconduct or job performance.  Therefore, because plaintiffs no longer meet eligibility requirements, they can be separated from service without the disciplinary procedures delineated in § 3020-a and/or § 75.

## 2. Alternatively, Plaintiffs Have Been Provided All Process Owed to Them

Even if Plaintiffs could demonstrate that their placement on LWOP and potential separation was somehow "disciplinary" in nature, their procedural due process claim nevertheless fails for several reasons.

First, although not specifically delineated as such, it appears as though Plaintiffs are arguing that their respective unions – of which only UFT is named – essentially bargained away the due process rights owed to them under § 3020-a and § 75.  While Plaintiffs may have a

20

gripe against their unions, this type of complaint does not suffice to state a Constitutional violation.  To be sure, courts of this Circuit have held that "§ 3020(4)(a) authorizes the DOE and the UFT to enter into a collective bargaining agreement modifying the procedures set forth in § 3020-a."  Adams v. N.Y. State Educ. Dep't, 08 Civ. 5996 (VM)(AJP), 2010 U.S. Dist. LEXIS 15635, at *31 (S.D.N.Y 2008).  Thus, even if the Court were to accept that Plaintiffs' placement on LWOP and projected separation is disciplinary in nature, thereby implicating § 3020-a, it is clear that the City and UFT had the ability to bargain over modifications to § 3020-a related to the DOE Vaccination Mandate.  Here, the City bargained over the impact of the DOE Vaccination Mandate and, ultimately, this bargaining reached an impasse which proceeded to arbitration.  The LWOP and separation procedures being challenged by Plaintiffs are the result of collective bargaining and impasse arbitration, negotiated and statutorily-regulated processes which can appropriately modify the procedures set forth in § 3020-a.  To the extent Plaintiffs are unhappy with the Impact Arbitration Decision, their avenue for relief is not a constitutional claim against DOE.

Second, while a plaintiff in a § 1983 case is not required to exhaust their administrative remedies before bringing suit, (see Patsy v. Bd. of Regents of Fla., 457 U.S. 496 (1982)), this general rule does not apply in a procedural due process suit if plaintiffs failed to avail themselves of the right to be heard.  See Narumanchi v. Bd. of Trustees of Conn. State Univ., 850 F.2d 70, 72 (2d Cir. 1988).  In Narumanchi, the Second Circuit explained that in procedural due process cases, the limited procedural rights guaranteed under the circumstances of a particular case could be satisfied by pre-deprivation notice and hearing rights contained in grievance procedures of a collective bargaining agreement.  850 F.2d at 72.

Here, Plaintiffs contend that they are entitled to hearings pursuant to their respective collective bargaining agreements.  See Dkt. No. 2-10, Plaintiffs' Memorandum of

21

Law at 16-17.   The collective bargaining agreements governing the terms of Plaintiffs'

employment establish grievance and arbitration procedures that Plaintiffs could use to challenge

the so-called "disciplinary actions" taken against them.   Thus, Plaintiffs' procedural rights were

adequately satisfied by the grievance procedures contained in the applicable collective

bargaining agreements.   The fact that Plaintiffs chose not to utilize such procedures does not

change this outcome. Cf. Capul v. City of N.Y., No. 19 Civ. 4313 (KPF), 2020 U.S. Dist. LEXIS

92727, at *39 (S.D.N.Y. May 27, 2020) (holding that City employees' failure to avail themselves

of adequate post-deprivation remedies did not render their procedural due process claims viable),

aff'd 832 Fed. App'x. 766 (2d Cir. 2021).

        To the extent that certain Plaintiffs are claiming that UFT was "not accepting"

grievances prior to November 12, 2021, see Dkt. No. 2-3, Affidavit of Jeannine Lam, that

allegation does not impact the constitutional analysis vis-à-vis the DOE.   Indeed, while Plaintiffs

may be claiming that UFT breached its duty of fair representation by allegedly failing to accept

grievances, that alleged failure on UFT's part does not change the fact that Plaintiffs had ample

process at their disposal via their collective bargaining agreements (or via Article 78 proceedings

brought in New York State Supreme Court).   Thus, UFT's supposed failure to bring grievances

does not suffice to establish a Constitutional violation against DOE.

        Third, DOE has provided the process due to plaintiffs under the Impact Arbitration

Decisions.   "[T]o determine whether a constitutional violation has occurred, it is necessary to ask

what process the State provided, and whether it was constitutionally adequate."   Zinermon v.

Burch, 494 U.S. 113, 126 (1990).   The Second Circuit has explained that in evaluating what

process satisfies the Due Process Clause, "the Supreme Court has distinguished between . . .(1)

claims based on random, unauthorized acts by state employees," and "(2) claims based on

established state procedures."   Rivera-Powell v. New York City Bd. of Elections, 470 F.3d 458,

22

465 (2d Cir. 2006). When "the alleged deprivation of a protected property . . . interest without due process of law occurred because of a random and arbitrary act," it is often impossible for the state to provide a pre-deprivation remedy, and, on those occasions, "an Article 78 proceeding is a perfectly adequate post-deprivation remedy." Hellenic Am. Neighborhood Action Comm. v. City of New York, 101 F.3d 877, 881 (2d Cir. 1996)). If, however, "the alleged deprivation was predictable, pre-deprivation procedures were possible, and the alleged improper conduct was taken by those who were acting within their authority," a pre-deprivation remedy is required. Ezekwo v. N.Y.C. Health & Hosps. Corp., 940 F.2d 775, 784 (2d Cir. 1991).

Here, Plaintiffs' placement on LWOP and projected separation was not random or arbitrary but rather was duly promulgated via the collective bargaining process. While the due process clause therefore requires DOE to provide "notice and opportunity for a hearing" before terminating an employee with a protected property interest in his employment, Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985) (internal quotation marks omitted), Ezekwo makes clear that in order to satisfy this "hearing" requirement, an employee need only be provided with "an opportunity to respond to [their] concerns before a final decision was made" and that this could be "accomplished through informal procedures; no formal hearing was required." Ezekwo, 940 F.2d at 786.

All Plaintiffs had ample advance notice that they were being placed on LWOP and that, as a result of their non-compliance with the DOE Vaccination Mandate, they would be separated from the DOE. In fact, the vast majority of Plaintiffs have had notice of these potential outcomes since September 10, 2021, when the highly publicized Impact Arbitration Decision was issued. Furthermore, nearly immediately after the September 27, 2021 implementation date for the DOE Vaccination Mandate, Plaintiffs were notified on October 2, 2021, that they were not in compliance with such mandate, that they would be placed on LWOP as of October 4,

2021, and that DOE would seek to separate them as of December 1, 2021 if they did not opt to extend their LWOP status and remained out of compliance with the mandate. See Dkt. No. 1-1.

After this notice was given, Plaintiffs certainly could have sought relief via an Article 78 proceeding which would have provided them with a sufficient pre-deprivation remedy. In addition, the Impact Arbitration Decision provided for an expedited process to review requests for exemptions and accommodations, providing further opportunities to Plaintiffs to be heard before being subject to separation, as further described below. But Plaintiffs waited 44 days to bring this "emergency" application claiming that their procedural due process rights had been violated. Plaintiffs' claims ring hollow, however, given their completely unexplained delay in seeking to enforce their Constitutional rights. In fact, this "emergency" application is entirely of Plaintiffs' own making as they could have filed an Article 78 proceeding challenging the October 2, 2021 notification immediately after it was received. Again, they chose not to do so in order to manufacture an "emergency" requiring this Court's intervention.

As noted, the Impact Arbitration Decision creates additional processes available to all DOE employees, including Plaintiffs. First, the Impact Arbitration Decision establishes a robust process by which DOE employee may apply for medical and/or religious exemptions as well as accommodations for those who, having received a full course of vaccination, remain unable to mount an immune response. See O'Connor Decl., Exh. A, Impact Arbitration Decision at 6-13. The Impact Arbitration Decision further provides that employees who seek to challenge the denial of an accommodation may do so via an additional arbitration. Id. Notably, Plaintiffs Porcello, Amoura, Quash, Dixno, Ruscelli, Lam and Christopoulos each availed themselves of the process available to them to seek an accommodation with respect to the DOE Vaccination Mandate. See O'Connor Decl. at Ex. F. In fact, these plaintiffs proceeded to arbitration in

24

connection with their accommodation requests.  Id.  Despite that, Plaintiffs – including these plaintiffs – are claiming they were not provided with constitutionally sufficient due process. The Court should not countenance such hollow arguments.

Next, the Impact Arbitration Decision sets forth a process for separation from employment or extension of LWOP.  See id. at 14.  Under this process, DOE employees who had not complied with the DOE Vaccination Mandate by October 29, 2021 could have opted to be separated from employment and continue to be eligible for health insurance through September 5, 2022, unless they are eligible for health insurance from another source.  Id. at 16.  Employees could also in the alternative opt to have their leave without pay extended to September 5, 2022, and maintain health coverage.  Id. at 17. To the extent that those employees who have chosen to extend their leave without pay do not comply with the DOE Vaccination Mandate by the end of the period, they will be deemed to have voluntarily resigned.  Id.  DOE employees have until November 30, 2021 to proceed with one of the above-delineated processes.  Those who do not avail themselves of these processes are subject to summary separation as of December 1, 2021. Id.  While Plaintiffs may not like these processes, and may have chosen not to avail themselves of them, this does not amount to a Constitutional due process violation.

Therefore, even if Plaintiffs could demonstrate that their placement on LWOP and potential separation was somehow "disciplinary" in nature, their procedural due process claim nevertheless fails because they were provided with all process they were owed.

## F.   THE BALANCE OF EQUITIES DOES NOT TIP IN FAVOR OF PLAINTIFFS

Even if Plaintiffs could prove irreparable harm and demonstrate a likelihood of success on the merits – which they cannot – they would, nonetheless, be unable to prove that the balance of hardship tips decidedly in their favor.  Trump v. Deutsche Bank AG, 943 F.3d 627, 640 (2d Cir. 2019), rev'd on other grounds, __U.S.__, 140 S.Ct. 2019 (2020).  To balance the

25

Case 23-655, Document 73, 06/05/2023, 3525005, Page50 of 286

equities in each case, courts must balance the competing claims of injury on each party of either granting or withholding the requested relief.  Winter v. NRDC, Inc., 555 U.S. 7, at 24 (2008) (citing Amoco Production Co., 480 U.S. 531, 542 (1987)). In exercising their sound discretion, courts should pay particular regard to the public consequences in employing the extraordinary remedy of injunction.  Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982).

Here, the balance of equities clearly tips in the favor of DOE.  As laid out throughout this Memorandum of Law, the City's public health experts, who are charged with ensuring the safety and wellbeing of the City's residents, determined that the most effective means of containing the deadly COVID-19 pandemic in schools and keep school children safe was to mandate that school staff be vaccinated. The COH Order's preliminary paragraphs provide a salient and unassailable predicate for making the mandate, including that the U.S. Centers for Disease Control and Prevention extols vaccination as the primary strategy to stop the spread of COVID-19 and recommends that teachers, school administrators and other employees working in school building be vaccinated as soon as possible to help schools safely resume full operations.  Further, and to that end, DOE is the largest school district in the country, with around one million students, hundreds of thousands of whom are not yet vaccinated.  Simply put, the DOE Vaccination Mandate is fully premised on potentially saving lives, protecting public health, and promoting public safety as well as minimizing disruption to in-person classroom disruption. The harm DOE seeks to prevent here, the death or serious illness of students and staff, and further disruption to the education of approximately one million students, is not compensable.

By contrast, Plaintiffs here, who were taken off of DOE payroll 44 days before filing this "emergency application," are not in danger of irreparable harm. Should they succeed, they can be made whole and compensated. In light of the foregoing, it is plain that the equities

tip heavily in favor of the DOE. As such, Plaintiffs' request for a preliminary injunction should be denied.

### G.    AN INJUNCTION IS NOT IN THE PUBLIC INTEREST

Courts must also consider whether the granting of the requested relief contravenes the public interest.  Brown & Williamson Tobacco Corp. v. Engman, 527 F.2d 1115 (2d Cir. 1975). The Supreme Court has recognized that stemming the spread of COVID-19 is a compelling public interest. Roman Catholic Diocese v. Cuomo, 141 S. Ct. 63, 67 (2020). Thus, maintaining the status quo in this case, and refraining from ordering DOE to return the unvaccinated plaintiffs to payroll when the DOE cannot permit them to perform work, is a compelling public interest that militates against imposing an affirmative injunction.

### CONCLUSION

For the foregoing reasons, plaintiffs' motion for a preliminary injunction should be denied.

Dated:        New York, New York
              November 19, 2021

GEORGIA M. PESTANA
Corporation Counsel of the
  City of New York
Attorney for Defendants DOE and Porter
100 Church Street, Room 2-100
New York, New York 10007
212-356-4015

By:    _____/s/_____

       Andrea O'Connor
       Assistant Corporation Counsel

27

JA-580

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x

NICOLE BROECKER, et al., on behalf of themselves and
all other similarly situated employees of the New
York City Department of Education,,

                                              Plaintiffs,

                    - against -

NEW YORK CITY DEPARTMENT OF EDUCATION,
MEISHA PORTER, in her official and individual capacities,
UNITED FEDERATION OF TEACHERS, LOCAL 2,
AMERICAN FEDERATION OF TEACHERS, AFL-CIO,
MICHAEL MULGREW, in his official and individual
capacities, JOHN DOE #1-10, in their official and individual
capacities; and JANE DOE #1-10 in their official and
individual capacities,

                                              Defendants.

-------------------------------------------------------------------- x

**DECLARATION OF
ANDREA O'CONNOR IN
OPPOSITION TO
PLAINTIFFS'
APPLICATION FOR A
PRELIMINARY
INJUNCTION**

No. 21 Civ 6387 (KAM)(LB)

        **ANDREA O'CONNOR** declares, pursuant to 28 U.S.C. § 1746 and subject to the

penalties of perjury, that the following is true and correct:

        1.      I am an Assistant Corporation Counsel in the office of Georgia M. Pestana,

Corporation Counsel of the City of New York, attorney for Defendants New York City Department

of Education and Meisha Porter (collectively DOE Defendants) and as such I am familiar with the

facts as set forth herein.

        2.      I respectfully submit this declaration in opposition to plaintiffs' application

for a preliminary injunction.

        3.      Attached hereto as Exhibits "A" to "F" are documents maintained in the

ordinary course of DOE Defendants' business, publicly available documents, a transcript of

proceedings held before the Honorable Valerie E. Caproni on October 12, 2021 in <u>Kane v. de</u>

1

**JA-581**

<u>Blasio</u>, 21 Civ. 7863 (S.D.N.Y.) (VEC) and the affidavit of Vicki Bernstein.  Copies of these documents are as follows:

A. Arbitration Award Decision in <u>Board of Education of the City School District of the City of New York and the United Federation of Teachers, Local 2, AFT, AFL-CIO</u>, dated September 10, 2021,annexed hereto as Exhibit A;

B. Arbitration Award Decision <u>in Board of Education of the City School District of the City of New York and the Council of Supervisors and Administrators</u>, September 15, 2021, annexed hereto as Exhibit B;

C. Memorandum of Agreement District Council 37, City of New York, and the Board of Education of the City School District for the City of New York, dated October 3, 2021, annexed hereto as Exhibit C;

D. Transcript of proceedings held before the Honorable Valerie E. Caproni on October 12, 2021 in <u>Kane v. de Blasio</u>, 21 Civ. 7863 (S.D.N.Y.)(VEC), annexed hereto as Exhibit D;

E. Affidavit of Vicki Bernstein, dated November 19, 2021, annexed hereto as Exhibit E; and

2

F.    Arbitration Awards issued in connection with Plaintiffs Porcello, Amoura,

Quash, Dixno, Ruscelli, Lam and Christopoulos accommodation requests,

annexed hereto collectively as Exhibit F.

Dated:    New York, New York
          November 19, 2021

                          **GEORGIA M. PESTANA**
                          Corporation Counsel of the
                            City of New York
                          Attorney for Defendants DOE and Porter
                          100 Church Street, Room 2-104
                          New York, New York  10007
                          (212) 356-4015
                          aoconnor@law.nyc.gov

                   By:    _____/s/_____
                          Andrea O`Connor
                          Assistant Corporation Counsel

3



**SCHEINMAN**
ARBITRATION & MEDIATION SERVICES

September 10, 2021

<u>**Via E-Mail Only**</u>
Renee Campion, Commissioner
Steven H. Banks, Esq.
New York City Office of Labor Relations
The Office of Labor Relations
22 Cortlandt Street, 14th Floor
New York, NY 10007

Alan M. Klinger, Esq.
Stroock & Stroock & Lavan, L.L.P.
180 Maiden Lane, 33rd Floor
New York, NY 10038

Beth Norton, Esq.
Michael Mulgrew, President
United Federation of Teachers
52 Broadway, 14th Floor
New York, NY 10004

Re:   **Board of Education of the City School District of the City of New York**
      **and**
      **United Federation of Teachers, Local 2, AFT, AFL-CIO**
      **(Impact Bargaining)**

Dear Counsel:

Enclosed please find my Award in the above referenced matter.

Thank you.

Sincerely,

Martin F. Scheinman

MFS/sk
BOE-UFT Impact Bargaining.awd

322 Main Street ◆ Port Washington, NY 11050 ◆ 516.944.1700 ◆ fax: 516.944.1771 ◆ www.ScheinmanNeutrals.com

```
-------------------------------- X
In the Matter of the Arbitration
                                   X
         between
                                   X
BOARD OF EDUCATION OF THE CITY                    Re: Impact Bargaining
SCHOOL DISTRICT OF THE CITY OF     X
NEW YORK
                                   X
         "Department"
                                   X
         -and-
                                   X
UNITED FEDERATION OF TEACHERS,
LOCAL 2, AFT, AFL-CIO              X

             "Union"               X

-------------------------------- X
```

**APPEARANCES**

   **For the Department**
     Renee Campion, Commissioner of Labor Relations
     Steven H. Banks, Esq., First Deputy Commissioner
     and General Counsel of Labor Relations

   **For the Union**
   STROOCK & STROOCK & LAVAN, L.L.P.
       Alan M. Klinger, Esq.

   Beth Norton, Esq., UFT General Counsel
   Michael Mulgrew, UFT President

**BEFORE:** Martin F. Scheinman, Esq., Arbitrator

**BACKGROUND**

The Union ("Union" or "UFT") protests the Department of Education's ("Department" or "DOE") failure to reach agreement on the impact of its decision mandating all employees working in Department buildings show proof they started the Covid-19 vaccination protocols by September 27, 2021. The Union contends the Department failed to adequately provide, among other things, for those instances where employees have proof of a serious medical condition making the vaccine a danger to their health, as well as for employees who have a legitimate religious objection to vaccines.

Most of the basic facts are not in dispute.

For those in the New York City ("NYC" or "City") metropolitan area, we are now in the 18th month of the Covid-19 pandemic. During that time, we have seen substantial illness and loss of life. There have been periods of significant improvement and hope, but sadly, we have seen resurgence with the Delta variant. Throughout this period, NYC and its municipal unions have worked collaboratively to provide needed services for the City's 8.8 million residents in as safe an environment as possible. Yet, municipal employees have often borne great risk. The Department and the UFT are no exception. The DOE and the UFT immediately moved to remote instruction and then later a hybrid model of both in-person and remote learning for the 2020-2021 school year. Educators at all levels strove to deliver the best experience possible under strained circumstances. For this

2

coming school year, both the DOE and the UFT have endeavored to return, as much as possible, to in-person learning.  They have developed protocols regarding masking and distancing to effectuate a safe environment for the City's students and educators.

To this end, the Delta resurgence has complicated matters.  In recognition of increased risk, there have been various policies implemented at City agencies and other municipal entities. Mayor de Blasio in July 2021 announced a "Vaccine-or-Test" mandate which essentially requires the City workforce, including the UFT's educators, either to be vaccinated or undergo weekly testing for the Covid-19 virus effective September 13, 2021.

Most relevant to this matter, on August 23, 2021, the Mayor and the NYC Commissioner of Health and Mental Hygiene, David A. Chokshi, MD, announced a new policy for those workforces in NYC DOE buildings. Those employees would be subject to a "Vaccine Only" mandate.  That is, such employees would need to show by September 27, 2021, they had at least started the vaccination protocol or would not be allowed onto DOE premises, would not be paid for work and would be at risk of loss of job and benefits.  This mandate was reflected in an Order of Commissioner Chokshi, dated August 24, 2021.  That Order, by its terms, did not expressly provide for exceptions or accommodations for those with medical contraindications to vaccination or sincerely-held religious objections to inoculation. Nor did it address matters of due process with regard to job and benefits protection.

3

The UFT promptly sought to bargain the impact and implementation of the Vaccine Only mandate. A number of discussions were had by the parties but important matters remained unresolved.

On September 1, 2021, the UFT filed a Declaration of Impasse with the Public Employment Relations Board ("PERB") as to material matters. The City/DOE did not challenge the statement of impasse and PERB appointed me to mediate the matters. Given the exigencies of the imminent start of the school year and the coming of the September 27, 2021, mandate, together with the importance of the issues involved to the workforce, mediations sessions were held immediately on September 2, 3, 4 and 5, 2021, with some days having multiple sessions. Progress was made, and certain tentative understandings were reached, but significant matters remained unresolved. By agreement of the parties, the process moved to arbitration. They asked I serve as arbitrator.[1]

Arbitration sessions were held on September 6 and 7, 2021. During the course of the hearings, both sides were given full opportunity to introduce evidence and argument in support of their respective positions. They did so. Both parties made strenuous and impassioned arguments reflecting their viewpoints on this entire issue.

During the course of these hearings, I made various interim rulings concerning the impact of the "Vaccine Only" mandate. I then

---

[1] My jurisdiction is limited to the issues raised during impact bargaining and not with regard to the decision to issue the underlying "Vaccine Only" order.

directed the parties to draft language reflecting those rulings. Even though I am very familiar with the language of the current Collective Bargaining Agreement, as well as the parties' relationship since I am a member of their permanent arbitration panel and have served as a fact-finder and mediator during several rounds of bargaining, I concluded the parties are more familiar with Department policy and how leave and entitlements have been administered in accordance with prior agreements. As such, my rulings reflect both the understandings reached during the negotiations prior to mediation, those reached in the mediation process and the parties' agreed upon language in response to my rulings. All are included, herein.

I commend the parties for their seriousness of purpose and diligence in addressing these complicated matters. The UFT made clear it supports vaccination efforts and has encouraged its members to be vaccinated. Nonetheless, as a Union, it owes a duty to its members to ensure their rights are protected. The City/DOE demonstrated recognition of the importance of these issues, particularly with regard to employees' legitimate medical or religious claims. I appreciate both parties' efforts in meeting the tight timeline we have faced and the professionalism they demonstrated serving the citizens of the City and what the million plus students deserved. They have invested immense effort to insure such a serious issue was litigated in such a thoughtful way.

JA-589

Yet, in the end, it falls to me, as Arbitrator, to arrive at a fair resolution of the matters at hand.

This matter is one of the most urgent events I have been involved with in my forty (40) plus years as a neutral. The parties recognized the complexity of the issues before me, as well as the magnitude of the work that lies ahead to bring this conflict to completion in a timely manner. For this reason, they understood and accepted the scope and complexity of this dispute could not be handled by me alone. They agreed my colleagues at Scheinman Arbitration and Mediation Services ("SAMS") would also be involved.

I want to thank my colleagues at SAMS, especially Barry J. Peek, for their efforts and commitment to implementing the processes to resolve this matter. This undertaking could not be accomplished by any single arbitrator.

**Opinion**

After having carefully considered the record evidence, and after having the parties respond to countless inquiries. I have requested to permit me to make a final determination, I make the rulings set forth below. While some of the language has been drafted, initially, by the parties in response to my rulings, in the end the language set forth, herein, is mine alone. I hereby issue the following Award:

**I.   Exemption and Accommodation Requests & Appeal Process**

As an alternative to any statutory reasonable accommodation

6

process, the City, the Board of Education of the City School District for the City of New York (the "DOE"), and the United Federation of Teachers, Local 2, AFT, AFL-CIO (the "UFT"), (collectively the "Parties") shall be subject to the following Expedited Review Process to be implemented immediately for full-time staff, H Bank and non-pedagogical employees who work a regular schedule of twenty (20) hours per week or more inclusive of lunch, including but not limited to Occupational Therapists and Physical Therapists, and Adult Education teachers who work a regular schedule of twenty (20) or more hours per week. This process shall only apply to (a) religious and medical exemption requests to the mandatory vaccination policy, and (b) medical accommodation requests where an employee is unable to mount an immune response to COVID-19 due to preexisting immune conditions and the requested accommodation is that the employee not appear at school. This process shall be in place for the 2021-2022 school year and shall only be extended by mutual agreement of the Parties.

Any requests to be considered as part of this process must be submitted via the SOLAS system no later than Monday, September 20, 2021, by 5:00 p.m.

A. Full Medical Exemptions to the vaccine mandate shall only be considered where an employee has a documented contraindication such that an employee cannot receive any of the three (3) authorized vaccines (Pfizer, Moderna, J&J)—with contraindications delineated in CDC clinical

7

considerations for COVID-19 vaccination.  Note that a prior immediate allergic reaction to one (1) type of vaccine will be a precaution for the other types of vaccines, and may require consultation with an allergist.

B. Temporary Medical Exemptions to the vaccine mandate shall only be based on the following valid reasons to defer or delay COVID-19 vaccination for some period:

o Within the isolation period after a COVID-19 infection;

o Within ninety (90) days of monoclonal antibody treatment of COVID-19;

o Treatments for conditions as delineated in CDC clinical considerations, with understanding CDC guidance can be updated to include new considerations over time, and/or determined by a treating physician with a valid medical license responsible for the immunosuppressive therapy, including full and appropriate documentation that may warrant temporary medical exemption for some period of time because of active therapy or treatment (e.g., stem cell transplant, CAR T-cell therapy) that would temporarily interfere with the patient's ability to respond adequately to vaccination;

o Pericarditis or myocarditis not associated with COVID-19 vaccination or pericarditis or myocarditis associated with COVID-19 vaccination.

8

Length of delay for these conditions may vary, and the employee must get vaccinated after that period unless satisfying the criteria for a Full Medical Exemption described, above.

C. Religious exemptions for an employee to not adhere to the mandatory vaccination policy must be documented in writing by a religious official (e.g., clergy). Requests shall be denied where the leader of the religious organization has spoken publicly in favor of the vaccine, where the documentation is readily available (e.g., from an online source), or where the objection is personal, political, or philosophical in nature. Exemption requests shall be considered for recognized and established religious organizations (e.g., Christian Scientists).

D. There are cases in which, despite an individual having sought and received the full course of the vaccination, he or she is unable to mount an immune response to COVID-19 due to preexisting immune conditions. In these circumstances, each individual case shall be reviewed for potential accommodation. Medical accommodation requests must be documented in writing by a medical doctor.

E. The initial determination of eligibility for an exemption or accommodation shall be made by staff in the Division of Human Capital in the Office of Medical, Leaves and Benefits; the Office of Equal Opportunity; and Office of Employee

9

Relations. These determinations shall be made in writing no later than Thursday, September 23, 2021, and, if denied, shall include a reason for the denial.

F. If the employee wishes to appeal a determination under the identified criteria, such appeal shall be made in SOLAS to the DOE within one (1) school day of the DOE's issuance of the initial eligibility determination. The request for appeal shall include the reason for the appeal and any additional documentation. Following the filing of the appeal, any supplemental documentation may be submitted by the employee to the Scheinman Arbitration and Mediation Services ("SAMS") within forty eight (48) hours after the filing of the appeal. If the stated reason for denial of a medical exemption or accommodation request is insufficient documentation, the employee may request from the arbitrator and, upon good cause shown, the arbitrator may grant an extension beyond forty eight (48) hours and permit the use of CAR days after September 27, 2021, for the employee to gather the appropriate medical documentation before the appeal is deemed submitted for determination.

G. A panel of arbitrators identified by SAMS shall hear these appeals, and may request the employee or the DOE submit additional documentation. The assigned arbitrator may also request information from City and/or DOE Doctors as part of the review of the appeal documentation. The assigned

10

arbitrator, at his or her discretion, shall either issue a decision on the appeal based on the documents submitted or hold an expedited (virtual) factual hearing. If the arbitrator requests a factual hearing, the employee may elect to have a union representative present but neither party shall be required to be represented by an attorney at the hearing. The expedited hearing shall be held via Zoom telecommunication and shall consist of brief opening statements, questions from the arbitrator, and brief closing statements. Cross examination shall not be permitted. Any documentation submitted at the arbitrator's request shall be provided to the DOE at least one (1) business day before the hearing or the issuance of the written decision without hearing.

H. Appeal decisions shall be issued to the employee and the DOE no later than Saturday September 25, 2021. Appeal decisions shall be expedited without full Opinion, and final and binding.

I. While an appeal is pending, the exemption shall be assumed granted and the individual shall remain on payroll consistent with Section K below. However, if a larger number of employees than anticipated have a pending appeal as of September 27, 2021, as determined by SAMS, SAMS may award different interim relief consistent with the parties' intent. Those employees who are vaccinated and have applied for an

JA-595

accommodation shall have the ability to use CAR days while their application and appeal are pending. Should the appeal be granted, these employees shall be reimbursed any CAR days used retroactive to the date of their initial application.

J. The DOE shall cover all arbitration costs from SAMS under this process. To the extent the arbitrator requests additional medical documentation or information from the DOE, or consultation with City and/or DOE Doctors, arranging and paying for such documentation and/or consultation shall be the responsibility of the DOE.

K. An employee who is granted a medical or religious exemption or a medical accommodation under this process and within the specific criteria identified above shall be permitted the opportunity to remain on payroll, but in no event required/permitted to enter a school building while unvaccinated, as long as the vaccine mandate is in effect. Such employees may be assigned to work outside of a school building (e.g., at DOE administrative offices) to perform academic or administrative functions as determined by the DOE while the exemption and/or accommodation is in place. For those with underlying medical issues granted an accommodation under Section I(D), the DOE will make best efforts to ensure the alternate work setting is appropriate for the employee's medical needs. The DOE shall make best efforts to make these assignments within the same borough as

the employee's current school, to the extent a sufficient number of assignments exist in the borough. Employees so assigned shall be required to submit to COVID testing twice per week for the duration of the assignment.

L. The process set forth, herein, shall constitute the exclusive and complete administrative process for the review and determination of requests for religious and medical exemptions to the mandatory vaccination policy and accommodation requests where the requested accommodation is the employee not appear at school. The process shall be deemed complete and final upon the issuance of an appeal decision. Should either party have reason to believe the process set forth, herein, is not being implemented in good faith, it may bring a claim directly to SAMS for expedited resolution.

## II.  <u>Leave</u>

A. Any unvaccinated employee who has not requested an exemption pursuant to Section 1, or who has requested an exemption which has been denied, may be placed by the DOE on leave without pay effective September 28, 2021, or upon denial of appeal, whichever is later, through November 30, 2021. Such leave may be unilaterally imposed by the DOE and may be extended at the request of the employee consistent with Section III(B), below. Placement on leave without pay for these reasons shall not be considered a disciplinary action for any purpose.

13

B. Except as otherwise noted, herein, this leave shall be treated consistent with other unpaid leaves at the DOE for all purposes.

C. During such leave without pay, employees shall continue to be eligible for health insurance. As with other DOE leaves without pay, employees are prohibited from engaging in gainful employment during the leave period.

D. Employees who become vaccinated while on such leave without pay and provide appropriate documentation to the DOE prior to November 30, 2021, shall have a right of return to the same school as soon as is practicable but in no case more than one (1) week following notice and submission of documentation to the DOE.

E. Pregnancy/Parental Leave

    i.  Any soon-to-be birth mother who starts the third trimester of pregnancy on or before September 27, 2021, (e.g. has a due date no later than December 27, 2021), may commence UFT Parental Leave prior to the child's birth date, but not before September 27, 2021.

    ii.  No documentation shall be necessary for the early use of Parental Leave, other than a doctor's written assertion the employee is in her third trimester as of September 27, 2021.

    iii.  Eligible employees who choose to start Parental Leave prior to the child's birth date, shall be required to first use CAR days until either: 1) they exhaust CAR/sick days,

at which point the Parental Leave shall begin, or 2) they give birth, at which point they shall be treated as an approved Parental Leave applicant for all purposes, including their prerogative to use additional CAR days prior to the commencement of Parental Leave.

iv.  Eligible employees who have a pregnancy disability or maternity disability outside of the regular maternity period may, in accordance with existing rules, borrow CAR/sick days and use a Grace Period.  This eligibility to borrow CAR/sick days does not apply to employees during the regular maternity recovery period if they have opted to use Parental Leave.

v.  In the event an eligible employee exhausts CAR/sick days and parental leave prior to giving birth, the employee shall be placed on a leave without pay, but with medical benefits at least until the birth of the child.  As applicable, unvaccinated employees may be placed in the leave as delineated in Section II(A).

vi.  If not otherwise covered by existing Family Medical Leave Act ("FMLA") or leave eligibility, an employee who takes Parental Leave before the birth of the child shall be eligible to be on an unpaid leave with medical benefits for the duration of the maternity recovery period (i.e., six weeks after birth or eight weeks after a birth via C-Section)

15

vii.   All other eligibility and use rules regarding UFT Parental Leave as well as FMLA remain in place.

## III. Separation

A. During the period of September, 28, 2021, through October 29, 2021, any employee who is on leave without pay due to vaccination status may opt to separate from the DOE. In order to separate under this Section and receive the commensurate benefits, an employee must file a form created by the DOE which includes a waiver of the employee's rights to challenge the employee's involuntary resignation, including, but not limited to, through a contractual or statutory disciplinary process. If an employee opts to separate consistent with this Section, the employee shall be eligible to be reimbursed for unused CAR days on a one (1) for one (1) basis at the rate of 1/200th of the employee's salary at departure per day, up to 100 days, to be paid following the employee's separation with documentation including the general waiver and release. Employees who elect this option shall be deemed to have resigned involuntarily effective on the date contained in the general waiver as determined by the DOE, for non-disciplinary reasons. An employee who separates under this Section shall continue to be eligible for health insurance through September 5, 2022, unless they are eligible for health insurance from another source (e.g., a spouse's coverage or another job).

16

B. During the period of November 1, 2021, through November 30, 2021, any employee who is on leave without pay due to vaccination status may alternately opt to extend the leave through September 5, 2022. In order to extend this leave pursuant to this Section, and continue to receive the commensurate benefits, an employee must file a form created by the DOE which includes a waiver of the employee's rights to challenge the employee's voluntary resignation, including, but not limited to, through a contractual or statutory disciplinary process. Employees who select this option shall continue to be eligible for health insurance through September 5, 2022. Employees who comply with the health order and who seek to return from this leave, and so inform the DOE before September 5, 2022, shall have a right to return to the same school as soon as is practicable but in no case more than two (2) weeks following notice to the DOE. Existing rules regarding notice of leave intention and rights to apply for other leaves still apply. Employees who have not returned by September 5, 2022, shall be deemed to have voluntarily resigned.

C. Beginning December 1, 2021, the DOE shall seek to unilaterally separate employees who have not opted into separation under Sections III(A) and III(B). Except for the express provisions

**JA-601**

contained, herein, all parties retain all legal rights at all times relevant, herein.

September /0 , 2021.

_____
Martin F. Scheinman, Esq.
Arbitrator

STATE OF NEW YORK        )
                         )   ss.:
COUNTY OF NASSAU         )

I, MARTIN F. SCHEINMAN, ESQ., do hereby affirm upon my oath as Arbitrator that I am the individual described herein and who executed this instrument, which is my Award.

September /0 , 2021.

_____
Martin F. Scheinman, Esq.
Arbitrator

DOE.UFT.Impact Bargaining.awd

18

JA-602



**SCHEINMAN**
ARBITRATION & MEDIATION SERVICES

September 15, 2021

**<u>Via E-Mail Only</u>**
Renee Campion, Commissioner
Steven H. Banks, Esq.
New York City Office of Labor Relations
The Office of Labor Relations
22 Cortlandt Street, 14th Floor
New York, NY 10007

Alan M. Klinger, Esq.
Stroock & Stroock & Lavan, L.L.P.
180 Maiden Lane, 33rd Floor
New York, NY 10038

David N. Grandwetter, Esq., General Counsel
Mark Cannizzaro, President
Council of Supervisors and Administrators
40 Rector Street, 12th Floor
New York, NY 10006

Re:   **Board of Education of the City School District of the City of New York**
      **and**
      **Council of Supervisors and Administrators**
      **(Impact Bargaining)**

Dear Counsel:

Enclosed please find my Award in the above referenced matter.

Thank you.

Sincerely,

*Martin F. Scheinman*

MFS/sk
BOE.CSA.Impact Bargaining.txax

322 Main Street ◆ Port Washington, NY 11050 ◆ 516.944.1700 ◆ fax: 516.944.1771 ◆ www.ScheinmanNeutrals.com

```
-------------------------------- X
In the Matter of the Arbitration
                                 X
           between
                                 X
BOARD OF EDUCATION OF THE CITY              Re: Impact Bargaining
SCHOOL DISTRICT OF THE CITY OF   X
NEW YORK
                                 X
           "Department"
                                 X
        -and-
                                 X
COUNCIL OF SUPERVISORS
AND ADMINISTRATORS               X

           "Union"               X

-------------------------------- X
```

**APPEARANCES**

**For the Department**
Renee Campion, Commissioner of Labor Relations
Steven H. Banks, Esq., First Deputy Commissioner
and General Counsel of Labor Relations

**For the Union**
STROOCK & STROOCK & LAVAN, L.L.P.
Alan M. Klinger, Esq.

David N. Grandwetter, Esq., General Counsel
Mark Cannizzaro, President

**BEFORE:** Martin F. Scheinman, Esq., Arbitrator

JA-604

## BACKGROUND

In the aftermath of the Arbitration Award issued by the undersigned to resolve the Impasse regarding the implementation of the City's Vaccine Only mandate between the United Federation of Teachers ("UFT"), on the one hand, and the City of New York and NYC Department of Education ("DOE"), dated September 10, 2021, on the other, the Council of Supervisors & Administrators ("CSA") and the City of New York ("City") reached out to me to similarly address their concerns. Given the exigencies of the opening of school and the imminent effective date of the City's mandate, it was agreed the parties would promptly move to arbitration. Accordingly, an arbitration session was held on September 14, 2021, in which representatives of all parties participated.

At the September 14, 2021, session, it became apparent much of the UFT/DOE Award would govern, here. The proceeding thereupon focused on the few, but important matters, at issue. Therefore, I find that the terms of the UFT/DOE Award shall apply with the three (3) modifications set forth below and in my Opinion and Award:

1.   Due to the imminent deadlines for submission of exemption requests, I issued an interim direction that SOLAS portal be opened to any CSA member at the start of business on September 15, 2021. Any CSA member may now apply in SOLAS for a COVID-19 Vaccination Mandate Related Exemption or Accommodation. The deadline for requests to be considered

2

JA-605

as part of this process must be submitted via SOLAS system by Tuesday, September 21 at 5:00 p.m.

2.   The assigned arbitrator identified by SAMS who shall hear appeals for exemptions or accommodations may request the employee or the DOE to submit additional documentation from the Doctors as part of this appeal review process.

3.   Section II (E) references to "CSA Parental Leave" shall be changed to "CSA Paid Parental Leave".

## Opinion

After having carefully considered the record evidence, and after having the parties respond to countless inquiries, I have requested to permit me to make a final determination, I make the rulings set forth, below.   While some of the language has been drafted, initially, by the parties in response to my rulings, in the end the language set forth, herein, is mine alone.   I hereby issue the following Award:

## I.   Exemption and Accommodation Requests & Appeal Process

As an alternative to any statutory reasonable accommodation process, the City, the Board of Education of the City School District for the City of New York (the "DOE"), and CSA (collectively the "Parties) shall be subject to the following Expedited Review Process to be implemented immediately for Principals, Assistant Principals, Education Administrators and Clinical Supervisors.   This process shall only apply to (a) religious and medical exemption requests to

3

Case 23-655, Document 73, 06/05/2023, 3525005, Page78 of 286

the mandatory vaccination policy, and (b) medical accommodation requests where an employee is unable to mount an immune response to COVID-19 due to preexisting immune conditions and the requested accommodation is that the employee not appear at school. This process shall be in place for the 2021-2022 school year and shall only be extended by mutual agreement of the Parties.

Any requests to be considered as part of this process must be submitted via the SOLAS system no later than Tuesday, September 21, 2021, by 5:00 p.m.

A. Full Medical Exemptions to the vaccine mandate shall only be considered where an employee has a documented contraindication such that an employee cannot receive any of the three (3) authorized vaccines (Pfizer, Moderna, J&J)—with contraindications delineated in CDC clinical considerations for COVID-19 vaccination. Note that a prior immediate allergic reaction to one (1) type of vaccine will be a precaution for the other types of vaccines, and may require consultation with an allergist.

B. Temporary Medical Exemptions to the vaccine mandate shall only be based on the following valid reasons to defer or delay COVID-19 vaccination for some period:

o Within the isolation period after a COVID-19 infection;

o Within ninety (90) days of monoclonal antibody treatment of COVID-19;

4

JA-607

o   Treatments for conditions as delineated in CDC clinical considerations, with understanding CDC guidance can be updated to include new considerations over time, and/or determined by a treating physician with a valid medical license responsible for the immunosuppressive therapy, including full and appropriate documentation that may warrant temporary medical exemption for some period of time because of active therapy or treatment (e.g., stem cell transplant, CAR T-cell therapy) that would temporarily interfere with the patient's ability to respond adequately to vaccination;

o   Pericarditis or myocarditis not associated with COVID-19 vaccination or pericarditis or myocarditis associated with COVID-19 vaccination.

Length of delay for these conditions may vary, and the employee must get vaccinated after that period unless satisfying the criteria for a Full Medical Exemption described, above.

C. Religious exemptions for an employee to not adhere to the mandatory vaccination policy must be documented in writing by a religious official (e.g., clergy). Requests shall be denied where the leader of the religious organization has spoken publicly in favor of the vaccine, where the documentation is readily available (e.g., from an online source), or where the objection is personal, political, or

philosophical in nature. Exemption requests shall be considered for recognized and established religious organizations (e.g., Christian Scientists).

D. There are cases in which, despite an individual having sought and received the full course of the vaccination, he or she is unable to mount an immune response to COVID-19 due to preexisting immune conditions. In these circumstances, each individual case shall be reviewed for potential accommodation. Medical accommodation requests must be documented in writing by a medical doctor.

E. The initial determination of eligibility for an exemption or accommodation shall be made by staff in the Division of Human Capital in the Office of Medical, Leaves and Benefits; the Office of Equal Opportunity; and Office of Employee Relations. These determinations shall be made in writing no later than Thursday, September 23, 2021, and, if denied, shall include a reason for the denial.

F. If the employee wishes to appeal a determination under the identified criteria, such appeal shall be made in SOLAS to the DOE within one (1) school day of the DOE's issuance of the initial eligibility determination. The request for appeal shall include the reason for the appeal and any additional documentation. Following the filing of the appeal, any supplemental documentation may be submitted by the employee to the Scheinman Arbitration and Mediation Services

6

("SAMS") within forty eight (48) hours after the filing of the appeal. If the stated reason for denial of a medical exemption or accommodation request is insufficient documentation, the employee may request from the arbitrator and, upon good cause shown, the arbitrator may grant an extension beyond forty eight (48) hours and permit the use of CAR days after September 27, 2021, for the employee to gather the appropriate medical documentation before the appeal is deemed submitted for determination.

G. A panel of arbitrators identified by SAMS shall hear these appeals, and may request the employee or the DOE submit additional documentation. The assigned arbitrator may also request information from City and/or DOE Doctors as part of the review of the appeal documentation.  The assigned arbitrator, at his or her discretion, shall either issue a decision on the appeal based on the documents submitted or hold an expedited (virtual) factual hearing. If the arbitrator requests a factual hearing, the employee may elect to have a union representative present but neither party shall be required to be represented by an attorney at the hearing. The expedited hearing shall be held via Zoom telecommunication and shall consist of brief opening statements, questions from the arbitrator, and brief closing statements. Cross examination shall not be permitted. Any documentation submitted at the arbitrator's request shall be

7

provided to the DOE at least one (1) business day before the hearing or the issuance of the written decision without hearing.

H. Appeal decisions shall be issued to the employee and the DOE no later than Saturday September 25, 2021. Appeal decisions shall be expedited without full Opinion, and final and binding.

I. While an appeal is pending, the exemption shall be assumed granted and the individual shall remain on payroll consistent with Section K below. However, if a larger number of employees than anticipated have a pending appeal as of September 27, 2021, as determined by SAMS, SAMS may award different interim relief consistent with the parties' intent. Those employees who are vaccinated and have applied for an accommodation shall have the ability to use CAR days while their application and appeal are pending. Should the appeal be granted, these employees shall be reimbursed any CAR days used retroactive to the date of their initial application.

J. The DOE shall cover all arbitration costs from SAMS under this process. To the extent the arbitrator requests additional medical documentation or information from the DOE, or consultation with City and/or DOE Doctors, arranging and paying for such documentation and/or consultation shall be the responsibility of the DOE.

8

K. An employee who is granted a medical or religious exemption or a medical accommodation under this process and within the specific criteria identified above shall be permitted the opportunity to remain on payroll, but in no event required/permitted to enter a school building while unvaccinated, as long as the vaccine mandate is in effect. Such employees may be assigned to work outside of a school building (e.g., at DOE administrative offices) to perform academic or administrative functions as determined by the DOE while the exemption and/or accommodation is in place. For those with underlying medical issues granted an accommodation under Section I(D), the DOE will make best efforts to ensure the alternate work setting is appropriate for the employee's medical needs. The DOE shall make best efforts to make these assignments within the same borough as the employee's current school, to the extent a sufficient number of assignments exist in the borough. Employees so assigned shall be required to submit to COVID testing twice per week for the duration of the assignment.

L. The process set forth, herein, shall constitute the exclusive and complete administrative process for the review and determination of requests for religious and medical exemptions to the mandatory vaccination policy and accommodation requests where the requested accommodation is the employee not appear at school. The process shall be

9

JA-612

deemed complete and final upon the issuance of an appeal decision. Should either party have reason to believe the process set forth, herein, is not being implemented in good faith, it may bring a claim directly to SAMS for expedited resolution.

## II.  Leave

A.  Any unvaccinated employee who has not requested an exemption pursuant to Section 1, or who has requested an exemption which has been denied, may be placed by the DOE on leave without pay effective September 28, 2021, or upon denial of appeal, whichever is later, through November 30, 2021. Such leave may be unilaterally imposed by the DOE and may be extended at the request of the employee consistent with Section III(B), below. Placement on leave without pay for these reasons shall not be considered a disciplinary action for any purpose.

B.  Except as otherwise noted, herein, this leave shall be treated consistent with other unpaid leaves at the DOE for all purposes.

C.  During such leave without pay, employees shall continue to be eligible for health insurance. As with other DOE leaves without pay, employees are prohibited from engaging in gainful employment during the leave period.

D.  Employees who become vaccinated while on such leave without pay and provide appropriate documentation to the DOE prior to November 30, 2021, shall have a right of return to the same school as soon as is practicable but in no case more than one

10

Case 23-655, Document 73, 06/05/2023, 3525005, Page85 of 286

(1) week following notice and submission of documentation to the DOE.

E. CSA Paid Parental Leave

   i. Any soon-to-be birth mother who starts the third trimester of pregnancy on or before September 27, 2021, (e.g. has a due date no later than December 27, 2021), may commence CSA Paid Parental Leave prior to the child's birth date, but not before September 27, 2021.

  ii. No documentation shall be necessary for the early use of Parental Leave, other than a doctor's written assertion the employee is in her third trimester as of September 27, 2021.

 iii. Eligible employees who choose to start Parental Leave prior to the child's birth date, shall be required to first use CAR days until either: 1) they exhaust CAR/sick days, at which point the Parental Leave shall begin, or 2) they give birth, at which point they shall be treated as an approved Parental Leave applicant for all purposes, including their prerogative to use additional CAR days prior to the commencement of Parental Leave.

 iv. Eligible employees who have a pregnancy disability or maternity disability outside of the regular maternity period may, in accordance with existing rules, borrow CAR/sick days and use a Grace Period. This eligibility to borrow CAR/sick days does not apply to employees during

the regular maternity recovery period if they have opted
to use Parental Leave.

v.  In the event an eligible employee exhausts CAR/sick days
and parental leave prior to giving birth, the employee
shall be placed on a leave without pay, but with medical
benefits at least until the birth of the child.   As
applicable, unvaccinated employees may be placed in the
leave as delineated in Section II(A).

vi. If not otherwise covered by existing Family Medical Leave
Act ("FMLA") or leave eligibility, an employee who takes
Parental Leave before the birth of the child shall be
eligible to be on an unpaid leave with medical benefits
for the duration of the maternity recovery period (i.e.,
six weeks after birth or eight weeks after a birth via C-
Section).

vii. All other eligibility and use rules regarding CSA Parental
Leave as well as FMLA remain in place.

III. **Separation**

A. During the period of September, 28, 2021, through October 29,
2021, any employee who is on leave without pay due to
vaccination status may opt to separate from the DOE. In order
to separate under this Section and receive the commensurate
benefits, an employee must file a form created by the DOE which
includes a waiver of the employee's rights to challenge the
employee's involuntary resignation, including, but not limited

12

to, through a contractual or statutory disciplinary process. If an employee opts to separate consistent with this Section, the employee shall be eligible to be reimbursed for unused CAR days on a one (1) for one (1) basis at the rate of 1/200th of the employee's salary at departure per day, up to 100 days, to be paid following the employee's separation with documentation including the general waiver and release. Employees who elect this option shall be deemed to have resigned involuntarily effective on the date contained in the general waiver as determined by the DOE, for non-disciplinary reasons.   An employee who separates under this Section shall continue to be eligible for health insurance through September 5, 2022, unless they are eligible for health insurance from another source (e.g., a spouse's coverage or another job).

B. During the period of November 1, 2021, through November 30, 2021, any employee who is on leave without pay due to vaccination status may alternately opt to extend the leave through September 5, 2022. In order to extend this leave pursuant to this Section, and continue to receive the commensurate benefits, an employee must file a form created by the DOE which includes a waiver of the employee's rights to challenge the employee's voluntary resignation, including, but not limited to, through a contractual or statutory disciplinary process. Employees who select this option shall continue to be eligible for health insurance through September 5, 2022.

13

JA-616

Employees who comply with the health order and who seek to return from this leave, and so inform the DOE before September 5, 2022, shall have a right to return to the same school as soon as is practicable but in no case more than two (2) weeks following notice to the DOE. Existing rules regarding notice of leave intention and rights to apply for other leaves still apply. Employees who have not returned by September 5, 2022, shall be deemed to have voluntarily resigned.

C. Beginning December 1, 2021, the DOE shall seek to unilaterally separate employees who have not opted into separation under Sections III(A) and III(B). Except for the express provisions contained, herein, all parties retain all legal rights at all times relevant, herein.

September /5, 2021.

_____
Martin F. Scheinman, Esq.
Arbitrator

STATE OF NEW YORK        )
                         )   ss.:
COUNTY OF NASSAU         )

I, MARTIN F. SCHEINMAN, ESQ., do hereby affirm upon my oath as Arbitrator that I am the individual described herein and who executed this instrument, which is my Award.

September /5, 2021.

_____
Martin F. Scheinman, Esq.
Arbitrator

DOE.CSA.Impact Bargaining.awd

14

**Memorandum of Agreement**
**District Council 37, City of New York,**
**and the Board of Education of the City School District for the City of New York**

**WHEREAS;** The Commissioner of the Department of Health and Mental Hygiene has issued an order mandating that all Department of Education staff and other City employees working in school settings be vaccinated against COVID-19 by October 1, 2021; and

**WHEREAS;** the parties desire to reach agreement regarding a process for requests for exemptions to this mandate and the leave status of those who do not comply with the mandate;

**NOW THEREFORE,** the parties agree as follows:

I.   **Exemption and Accommodation Requests & Appeal Process**

As an alternative to any statutory reasonable accommodation process, the City of New York (the "City"), the Board of Education of the City School District for the City of New York (the "DOE"), and the District Council 37, (collectively the "Parties") shall be subject to the following Review Process to be implemented immediately for full-time staff and staff who work a regular schedule of 20 or more hours per week employed by the DOE and by the Department of Health and Mental Hygiene (DOHMH) and working in DOE schools. This process shall only apply to (a) religious and medical exemption requests to the mandatory vaccination policy, and (b) medical accommodation requests where an employee is unable to mount an immune response to COVID-19 due to preexisting immune conditions and the requested accommodation is that the employee not appear at school. This process shall be in place for the 2021-2022 school year and shall only be extended by mutual agreement of the Parties.

Any requests to be considered as part of this process must be submitted via the SOLAS system for DOE employees or to DOHMH's EEO office, on a form created by EEO, for DOHMH employees, no later than 5pm on Tuesday, October 5th.

A.  Full Medical Exemptions to the vaccine mandate shall only be considered where an individual has a documented contraindication such that an individual cannot receive any of the 3 authorized vaccines (Pfizer, Moderna, J&J)—with contraindications delineated in CDC clinical considerations for COVID-19 vaccination.  Note that a prior immediate allergic reaction to one type of vaccine will be a precaution for the other type of vaccine, and may require consultation with an allergist.

B.  Temporary Medical Exemptions to the vaccine mandate shall only be based on the following valid reasons to defer or delay COVID-19 vaccination for some period:
   o  Within the isolation period after a COVID-19 infection;
   o  Within 90 days of monoclonal antibody treatment of COVID-19;
   o  Treatments for  conditions as delineated in CDC clinical considerations, with understanding that CDC guidance can be updated to include new considerations over time, and/or determined by a treating physician with a valid medical license responsible for the immunosuppressive therapy, including full and appropriate

1

JA-618

documentation that may warrant temporary medical exemption for some period of time because of active therapy or treatment (e.g., stem cell transplant, CAR T-cell therapy) that would temporarily interfere with the patient's ability to respond adequately to vaccination;

o   Pericarditis or myocarditis not associated with COVID-19 vaccination or pericarditis or myocarditis associated with COVID-19 vaccination.

Length of delay for these conditions may vary, and staff member must get vaccinated after that period unless satisfying the criteria for a Full Medical Exemption described above.

C.   Religious exemptions for an employee to not adhere to the mandatory vaccination policy must be documented in writing by a religious official (e.g., clergy). Requests shall be denied where the leader of the religious organization has spoken publicly in favor of the vaccine, where the documentation is readily available (e.g., from an online source), or where the objection is personal, political, or philosophical in nature.  Exemption requests shall be considered for recognized and established religious organizations (e.g., Christian Scientists).

D.   There are cases in which, despite an individual having sought and received the full course of the vaccination, they are unable to amount an immune response to COVID-19 due to preexisting immune conditions. In these circumstances, each individual case should be reviewed for potential accommodation.  Medical accommodation requests must be documented in writing by a medical doctor.

E.   The initial determination of eligibility for an exemption or accommodation shall be made for DOE employees by staff in the Division of Human Capital in the Office of Medical, Leaves and Benefits; the Office of Equal Opportunity; and Office of Employee Relations, and for DOHMH employees by DOHMH's EEO office. These determinations shall be made in writing no later than Friday, October 8th and, if denied, shall include a reason for the denial.

F.   If the employee wishes to appeal a determination under the identified criteria, such appeal shall be made in SOLAS to the DOE for DOE employees and to DOHMH's EEO office for DOHMH employees within 48 hours of the agency's issuance of the initial eligibility determination.  Those employees who have already applied for an exemption or accommodation and received a determination from DOE shall be notified by DOE of their right to appeal and such appeal shall be made in SOLAS within 48 hours of receipt of such notification. The request for appeal should include the reason for the appeal and any additional documentation. Following the filing of the appeal, any supplemental documentation may be submitted by the employee to the Scheinman Arbitration and Mediation Services ("SAMS") within 48 hours after the filing of the appeal. If the stated reason for denial of a medical exemption or accommodation request is insufficient

2

JA-619

documentation, the employee may request from the arbitrator and, upon good cause shown, the arbitrator may grant an extension beyond 48 hours for the employee to gather the appropriate medical documentation before the appeal is deemed submitted for determination.

G. A panel of arbitrators identified by SAMS shall hear these appeals and may request that the employee or the agency submit additional documentation. The assigned arbitrator may also request information from City and/or DOE doctors as part of the review of the appeal documentation.  The assigned arbitrator, at his/her discretion, will either issue a decision on the appeal based on the documents submitted or hold an expedited (virtual) factual hearing. If the panel requests a factual hearing, the employee may elect to have a union representative present but neither party shall be required to be represented by an attorney at the hearing. The expedited hearing shall consist of brief opening statements, questions from the arbitrator, and brief closing statements. Cross examination shall not be permitted. Any documentation submitted at the Arbitrator's request must be provided to the agency at least one business day before the hearing or the issuance of the written decision without hearing.

H. Appeal decisions shall be expedited without full Opinion, and the decision is final and binding.

I. While the exemption/accommodation review process and/or any appeal is pending the individual shall remain on Leave without pay with Health Benefits. Those employees who are vaccinated and have applied for an accommodation will have the ability to use sick and/or annual leave while their application and appeal are pending, should the appeal be granted, these employees will be reimbursed any sick and/or annual leave used retroactive to the date of their initial application.

J. The employing agency shall cover all arbitration costs from SAMS under this process. To the extent that the arbitrator requests additional medical documentation or information from the agency, or consultation with City and/or DOE doctors, arranging and paying for such documentation and/or consultation shall be the responsibility of the agency.

K. An employee who is granted a medical or religious exemption or a medical accommodation under this process and within the specific criteria identified above shall be permitted the opportunity to remain on payroll while the exemption and/or accommodation is in place, but in no event required/permitted to enter a school building while unvaccinated, as long as the vaccine mandate is in effect. In order to keep the employee on payroll, the agency may, in its discretion:
   I.   Assign the employee to work outside of a school building (e.g., at DOE administrative offices for DOE employees, or at other DOHMH locations for DOHMH employees) to perform functions as determined by the agency.

3

JA-620

II.   Assign the employee to work on alternative shifts, with no payment of any shift differentials.

III.   Temporarily detail the employee to perform work for another City agency which is not subject to a vaccination mandate.

IV.   Assign the employee to continue in their current non-school-based assignment and work location subject to the terms set forth herein or to an alternative non-school-based location to perform functions as determined by the DOE.

L.   For those with underlying medical issues granted an accommodation under Section I(D), the agency will make best efforts to ensure that the alternate work setting is appropriate for the employee's medical needs.  The agency shall make best efforts to make these assignments within the same borough as the employee's current work location, to the extent such assignment exists.  DOE employees assigned to alternative assignments shall be required to submit to COVID testing twice per week for the duration of the assignment. DOHMH employees so assigned shall be required to comply with DOHMH's testing policy for unvaccinated employees.

M.   The process set forth herein shall constitute the exclusive and complete administrative process for the review and determination of requests for religious and medical exemptions to the mandatory vaccination policy and accommodation requests where the requested accommodation is that the employee not appear at school.  The process shall be deemed complete and final upon the issuance of an appeal decision. Should either party have reason to believe the process set forth herein is not being implemented in good faith, it may bring a claim directly to SAMS for expedited resolution.

N.   A 12-month employee who is granted a full (i.e., not temporary) medical or religious exemption under this process whose exemption or accommodation is not extended past the end of the school year shall have the right to elect to be placed on leave without pay with health benefits through September 5, 2022 pursuant to all the terms and conditions set forth in Section III(B) of this agreement. Such election must be made within two weeks of the date the exemption of accommodation ceased.

II.   **Leave**

A.   Any unvaccinated employee who has not requested an exemption pursuant to Section 1, or who has a pending exemption request or has requested an exemption which has been denied, may be placed by the agency on leave without pay effective October 4, 2021 through November 30, 2021. Such leave may be unilaterally imposed by the agency and may be extended at the request of the employee consistent with Section III(B), below. Placement on leave without pay for these reasons shall not be considered a disciplinary action for any purpose.

4

JA-621

B. Except as otherwise noted herein, this leave shall be treated consistent with other unpaid leaves at the agency for all purposes.

C. During such leave without pay, employees shall continue to be eligible for health benefits. As with other agency leaves without pay, employees are prohibited from engaging in gainful employment during the leave period.

D. Employees who become vaccinated while on such leave without pay and provide appropriate documentation to the agency prior to November 30, 2021 shall have a right of return to active duty as soon as is practicable but in no case more than one week following notice and submission of documentation to the agency.

E. Pregnancy/Parental Leave
   i. Any soon-to-be birth mother who starts the third trimester of pregnancy on or before October 1, 2021 (e.g. has a due date no later than January 1, 2022), may utilize sick leave, annual leave, and/or compensatory time prior to the child's birth date, but not before October 1, 2021.  Upon giving birth, they shall be eligible for paid family leave ("PFL") or FMLA in accordance with existing law and rules.
   ii. No documentation shall be necessary for this use of accrued leave, other than a doctor's written assertion that the employee is in her third trimester as of October 1, 2021.
   iii. In the event that an eligible employee exhausts accrued leave prior to giving birth, that employee shall be placed on a leave without pay, but with medical benefits at least until the birth of the child.  As applicable, unvaccinated employees may be placed in the leave as delineated in Section II(A).
   iv. If not otherwise covered by existing FMLA or leave eligibility, an employee who exhausts their leave before the birth of the child will be eligible to be in an unpaid leave with medical benefits for the duration of the maternity recovery period (i.e., six weeks after birth or eight weeks after a birth via C-Section).
   v. All other eligibility and use rules regarding use of sick leave, annual leave, compensatory time, paid family leave, and FMLA remain in effect.
   vi. Except as provided in this subsection E, no employee placed on leave without pay pursuant to this agreement may return to another leave status (e.g., annual leave, sick leave, FMLA) after going on leave without pay.

## III.   Separation

A. During the period of October 4, 2021 through October 29, 2021 any employee who is on leave without pay due to vaccination status may opt to separate from the agency. In order to separate under this Section and receive the commensurate benefits, an employee must file a form created by the agency which includes a waiver of the employee's rights to

5

challenge the employee's involuntary resignation, including, but not limited to, through a contractual or statutory disciplinary process. If an employee opts to separate consistent with this Section, the employee shall be eligible to be reimbursed for unused sick leave on a one-for-one basis, up to 100 days to be paid following the employee's separation with documentation including the general waiver and release. Employees who elect this option shall be deemed to have resigned involuntarily effective on the date contained in the general waiver as determined by the agency, for non-disciplinary reasons.  An employee who separates under this Section shall continue to be eligible for health benefits through September 5, 2022, unless they have health insurance available from another source (e.g., a spouse's coverage or another job).

B. During the period of November 1st through November 30, 2021, any employee who is on leave without pay due to vaccination status may alternately opt to extend the leave through September 5, 2022. In order to extend this leave pursuant to this Section and continue to receive the commensurate benefits, an employee must file a form created by the agency which includes a waiver of the employee's rights to challenge the employee's voluntary resignation, including, but not limited to, through a contractual or statutory disciplinary process. Employees who select this option shall continue to be eligible for health benefits through September 5, 2022. Employees who comply with the health order and who seek to return from this leave, and so inform the agency before September 5, 2022, shall have a right to return to active duty as soon as is practicable but in no case more than two weeks following notice to the agency.  Existing rules regarding notice of leave intention and rights to apply for other leaves still apply. Employees who have not returned by September 5, 2022 will be deemed to have voluntarily resigned.

C. Beginning December 1, 2021, the agency will seek to unilaterally separate employees who have not opted into separation under Sections III(A) and III(B). Except for the express provisions contained herein, all parties retain all legal rights at all times relevant herein.

**FOR THE CITY OF NEW YORK**        **FOR THE BOARD OF EDUCATION**

BY:_____        BY:_____
RENEE CAMPION                                          RANDY ASHER
Commissioner of Labor Relations                 Deputy CEO, Labor Policy

6

**FOR DISTRICT COUNCIL 37**

BY _____
HENRY GARRIDO
Executive Director

**FOR LOCAL 372**

BY _____
SHAUN D FRANCOIS I
President

Dated ___October 3___ , 2021

7

```
     LacWkanD

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    MICHAEL KANE, et al.,

4                    Plaintiffs,

5          v.                              21 Civ. 7863 (VEC)

6    BILL DE BLASIO, et al.,

7                    Defendants.
                                           Decision
8    ------------------------------x
                                           New York, N.Y.
9                                          October 12, 2021
                                           11:00 a.m.
10
     Before:
11
                         HON. VALERIE E. CAPRONI ,
12
                                           District Judge
13

14                          APPEARANCES

15   SUJATA S. GIBSON
     MARY HOLLAND
16        Attorneys for Plaintiffs

17   GEORGIA M. PESTANA
          Corporation Counsel of the City of New York
18        New York City Law Department
          Attorney for Defendant City of New York
19   BY:  LORA MINICUCCI
          AMANDA C. CROUSHORE
20        JESSICA GIAMBRONE
          Assistants Corporation Counsel
21

22

23

24

25
```

JA-625

LacWkanD

1               (Case called; appearances noted)

2               THE COURT:  Everyone please be seated.

3               OK.  Let me start, for everyone, and this is both for

4       the people who are present in this courtroom, people who are on

5       the telephone and people who are in the overflow courtrooms, I

6       want to lay out the rules of the road.

7               First, if you're on the telephone, you may not record

8       or rebroadcast this proceeding.  We've allowed a telephone

9       hookup to accommodate constraints on the number of people who

10      can be in the courtroom, but I am not permitting it to be

11      recorded or rebroadcast.  If you record it or rebroadcast it,

12      you're in contempt of court, and it will be dealt with

13      accordingly.

14              Second, let me remind everybody who is present in this

15      courtroom or in any of the overflow courtrooms, the standing

16      order of the Southern District is that you must wear a face

17      covering.  It must cover both your mouth and your nose.  This

18      is your warning on that front.  If you let your mask fall below

19      your nose, whether in my courtroom or any of the overflow

20      courtrooms, the court security officers have been directed to

21      immediately remove you.  They're not going to warn you.  You've

22      been warned now.  You must keep your face covering over your

23      nose and your mouth.

24              Lastly, let me just say that for all the people in my

25      courtroom as well as in all of the overflow courtrooms, you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LacWkanD

1   must behave in accordance with the rules of decorum that are

2   appropriate for a courtroom.  That means there can be no

3   outbursts and no talking.  If you're in an overflow courtroom

4   or in my courtroom and you do not think you can abide by that

5   rule, let me encourage you to leave now and to call in on the

6   phone number so that you can participate by listening.

7          I'm going to give you the call-in number again.  So if

8   you're somebody who does not think that you can maintain

9   decorum if something happens during this hearing that you don't

10  like, I'm encouraging you to leave now.  The call-in number is

11  844-291-5489.  The access code is 9438556.  And as with the

12  issue of wearing face coverings, the court security officers

13  have been directed that there is zero tolerance for misconduct

14  in the courtroom, whether you are physically in my courtroom or

15  you're in an overflow courtroom.

16         That's it for the preliminary matters.  Let me turn

17  first to the issue of witnesses.

18         Ms. Gibson, you have indicated a desire to call a

19  whole bunch of witnesses.  I'm not quite sure what the purpose

20  of that would be, so can you tell me; can you give me a proffer

21  for what, understanding you were going to update what has

22  happened with some of the plaintiffs via the appeal process,

23  what else did you want people to testify to?

24         MS. GIBSON:  Your Honor, primarily with the witnesses,

25  if it would be acceptable to counsel and the Court, I could

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LacWkanD

1   just put in additional declarations rather than waste time on

2   having a full hearing, but I just wanted to update.  Almost all

3   of them have been denied at this point, which wasn't the case

4   when we first filed.

5         As to Amanda Ruiz, she was going to testify about the

6   conditions in one of the schools where the plaintiff teaches

7   now that the plaintiffs and others have been removed from the

8   school, which goes to the public interest element of this

9   analysis.

10        THE COURT:  OK.

11        MS. GIBSON:  I did submit a declaration from her in

12  lieu of testimony.

13        THE COURT:  I saw it.  I'm going to ask you if you can

14  stand up when you talk, because otherwise I can't see you.

15        MS. GIBSON:  Oh, my goodness.  I'm sorry, Judge.

16        THE COURT:  It's OK.

17        MS. GIBSON:  And as to the expert witness, that would

18  just be going to really the substance of their declarations,

19  but going to the issue of whether the plaintiffs constitute a

20  threat based on their vaccine status and the significance of

21  that threat.

22        THE COURT:  OK.  So they weren't going to add to their

23  declarations; they were just going to reiterate what they'd

24  already said in it.

25        MS. GIBSON:  I would say so, your Honor, yes.  It

JA-628

LacWkanD

1    would give the other side a chance to cross-examine them and so

2    forth.

3          THE COURT:  I really don't think that's necessary.

4    I've read all the affidavits, and I understand your point that

5    some of the plaintiffs who had not previously been denied have

6    now been denied, so I don't think their testimony is required.

7          MS. GIBSON:  Thank you, your Honor.

8          THE COURT:  All right.  This is your motion.  Would

9    you like to be heard?

10         MS. GIBSON:  Thank you.

11         Your Honor, we're here today challenging two

12   overarching policies of the defendants.  The first is a policy

13   promulgated by Mayor de Blasio, Commissioner Chokshi and

14   implemented by the Department of Education, which is the

15   overall vaccine mandate for teachers, which requires, among

16   other things, that nobody who is unvaccinated is allowed to go

17   into any school building as of October 4, 2021, and that

18   includes people who have religious or medical accommodations

19   pursuant to the other policy we're challenging.

20         On its face defendants have pointed out that there is

21   a clause that says legally required accommodations are not

22   necessarily excluded from consideration, but in practice, the

23   city has made very clear that they do not consider religious

24   accommodations to be a valid reason to have to legally excuse

25   someone from the requirement.

LacWkanD

1          THE COURT:  That means if the religious exemption has

2     been granted.

3          MS. GIBSON:  I'm still just dealing with the

4     overarching view of the Commissioner Chokshi policy.  That

5     doesn't even really provide for religious or medical

6     exemptions.  That was challenged then by the union and an

7     arbitration award did provide for limited religious and medical

8     exemptions, but the DOE has implemented it in a manner, and

9     facially that policy which the DOE has implemented is facially

10    discriminatory against anyone who holds beliefs that are

11    outside of certain dogmas of certain religions.  And both that

12    policy and the overarching policy were promulgated amidst a

13    flurry of hostile statements by the mayor and by

14    representatives of the DOE.

15         THE COURT:  I looked at your papers, and I didn't

16    see -- the mandate was issued in late August.  The only thing

17    that you cited prior to that, so when you say it was announced

18    amidst a flurry of antireligious statements, the only statement

19    you quote in your papers is from August the 3rd that preceded

20    the announcement of the policy.

21         Is that what you're relying on?

22         MS. GIBSON:  Well, that was the first, one of the

23    first statements, but the mayor and the governor both went on

24    record many times saying that they do not believe, and

25    afterwards saying that they do not believe that religious

LacWkanD

1    exemptions are legitimate to --

2              THE COURT:  Well --

3              MS. GIBSON:  -- that there's no legitimate religious

4    reason to opt out of the vaccine and they, many times,

5    mentioned the Pope, which later the DOE, and that's where the

6    declarations come in, each of the plaintiffs, when they were in

7    their Zoom appeals, the DOE attorneys repeatedly, over and

8    over, the representatives of the DOE would mention the Pope as

9    the reason they should be denied.

10             THE COURT:  That appears to be an as-applied argument.

11             Do you want to just start on the facial validity or

12   invalidity?  You mentioned that it was promulgated amidst a

13   flurry of antireligious statements, so I'm trying to nail you

14   down on that.  What exactly are you referring to?  Because the

15   only thing in your papers that was around the time or preceding

16   the announcement is this transcript from Mayor de Blasio when

17   he announced generally that you need a vaccine, if you're in

18   New York City, to do just about anything.  But there's nowhere

19   in it that references religion.

20             MS. GIBSON:  Your Honor, I do apologize.  I can go

21   back and look at the record and pull out a few other examples,

22   but I do believe that there were some news articles from that

23   time, right after it was promulgated, where the mayor came

24   forward and said that there are no valid religious issues for

25   exemption and that the Pope is very much in support of

LacWkanD

1    vaccination, and so he takes the position that, therefore,

2    nobody's religious beliefs that are contrary to the Pope's

3    would be valid.

4         THE COURT:  OK.  But again, do you have anything other

5    than the August 3 transcript of Mayor de Blasio's interview,

6    which is silent on religion, that suggests hostility to

7    religion at or before the time the mandate was announced?

8         MS. GIBSON:  I believe I do, your Honor.  I'm just

9    looking for it.  The complaint discusses it, I believe, and

10   then also, my motion papers.

11        THE COURT:  What paragraph of the complaint

12   particularly?

13        MS. GIBSON:  Your Honor, that's a fair question, and I

14   just wasn't prepared for it.  I'm sorry.  But I do have several

15   articles, one from Spectrum.

16        THE COURT:  Dated what?

17        MS. GIBSON:  So, in exhibit 17, 17-1 -- sorry, I mean

18   17-3, -4, -5 and -6.

19        THE COURT:  17-3 is October 3.  17-5 is September 15.

20   17-4 is September 26.

21        MS. GIBSON:  Well, your Honor, my understanding of

22   this law is that it doesn't -- I mean of animus, the indicia of

23   animus is it doesn't have to be preceding the promulgation of

24   the rule.  It can also come afterwards, like it did in the

25   *Masterpiece Cakeshop*, where the court held that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LacWkanD

1  post-deprivation statements or during the time --

2          THE COURT:  That's not true.  Those statements were

3  made at around the time they were considering.  It was an

4  as-applied challenge.

5          MS. GIBSON:  I'd be happy to have a hearing on the

6  factual issue of whether there was others.

7          THE COURT:  None of the witnesses that you proposed

8  can speak to this.

9          MS. GIBSON:  I do believe, your Honor, that my

10  witnesses can speak to the animus that they received from the

11  DOE.

12          THE COURT:  That was after this mandate was announced.

13  Right?  I mean you're making a facial challenge, and you said,

14  the first thing out of your mouth almost, was it was

15  promulgated among a flurry of antireligious comments; that's

16  almost a quote.  So I'm trying to see if you actually have

17  anything to back that up, and it sounds to me like the answer

18  is you do not.

19          MS. GIBSON:  Well, your Honor, I believe there's an

20  article with the mayor and the governor discussing passing this

21  together, and then another article sharing the governor's very

22  clear stance on this issue.

23          THE COURT:  Well, there's no question that the

24  governor has suggested that she believes that people should get

25  vaccinated.  That's clearly her statement.  But that's not what

Case 23-655, Document 73, 06/05/2023, 3525005, Page105 of 286

JA-633

LacWkanD

```
1    you're challenging.  You're challenging the city's mandate.

2    The governor didn't have anything to do with the city's

3    mandate.

4              MS. GIBSON:  I would counter that, your Honor.  I mean

5    the governor and the mayor, and there is an article in here, in

6    No. 17, as well, the governor and the mayor sat down right

7    before August 24, when this was promulgated, and they announced

8    that they were together passing initiatives on the state and

9    city level to ensure that there would be no exemptions for

10   vaccinations.

11             THE COURT:  Whoa, whoa, whoa.  Please tell me where

12   that is in the record, because I don't remember that.

13             MS. GIBSON:  So, exhibit 3 of --

14             THE COURT:  17-3?

15             MS. GIBSON:  17-3 is a Spectrum article, and I'm going

16   to get to the next part.  Exhibit 3 is the Spectrum article

17   from August 24, which is the date this mandate was passed, and

18   in that article the mayor and the governor announced that

19   they'd been meeting regularly and were both going to be working

20   in concert to enact regulations that would protect the public

21   health with vaccination.

22             The second --

23             THE COURT:  Where?  Where?  Whoa, whoa, whoa.  Can you

24   direct me to a paragraph?

25             This is a kumbaya article.  This is saying that the
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LacWkanD

1    mayor and the new governor have sat down, they've worked

2    together, they're happy.

3            MS. GIBSON:  And it says they're going to work in

4    coordination to protect the public health.

5            THE COURT:  OK, but that --

6            MS. GIBSON:  So then --

7            THE COURT:  First off, it says -- what you quoted --

8    the mayor says vaccine mandates are on his to-do list.

9            MS. GIBSON:  Right.  The timing --

10           THE COURT:  Nothing in there suggests hostility to

11   religion.

12           MS. GIBSON:  So, correct, your Honor.

13           THE COURT:  OK.

14           MS. GIBSON:  But then the next article, The New York

15   Times article, the NPR article and, I believe, the Post

16   article, discuss -- oh, the Post and the Gotham article then

17   discuss the mayor's open hostility towards people who have

18   religious beliefs that aren't in line with the Pope's.

19           THE COURT:  The Post article, what's the number on

20   that one?

21           MS. GIBSON:  No. 7, your Honor.

22           THE COURT:  All right.  17-7.  Here's the issue with

23   17-7.  One, it's hearsay.  Right?

24           Two, it doesn't actually quote the mayor.  It says de

25   Blasio has said the religious exemptions would also be limited

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LacWkanD

1   to "two well-established religions: Christian Science and

2   Jehovah's Witnesses, that have a history on this of religious

3   opposition."

4           They're not quoted.  The newspaper article says the

5   mayor warned those exemptions would be rare.  So I don't know

6   exactly what the mayor said, but in any event, this was after

7   the arbitration award.  This was after the arbitrator had

8   determined that there would be exemptions.

9           MS. GIBSON:  I believe it shows that the mayor does

10  not believe that they -- he has made other comments as well,

11  and I'm happy to gather them.  But the mayor has gone on

12  record.

13          THE COURT:  Tell me.  This is your opportunity.

14          MS. GIBSON:  The mayor has gone on many times stating

15  that, just as Governor Hochul has, that there aren't valid

16  religious objections to vaccination; that it's illegitimate.

17          THE COURT:  That's an as-applied challenge, right?

18          MS. GIBSON:  I don't know.  I believe that that shows

19  animus and legitimacy.

20          THE COURT:  Why does it show animus?  Why does it show

21  animus that the mayor says, in his view, there are going to be

22  few religious exemptions because major religious leaders, which

23  would deal with a vast majority of people, have all said it's

24  OK?  That's not to say that there's not any religious leader

25  anywhere or any religious person anywhere that believes, as a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LacWkanD

1   religious matter, they can't take the vaccine.  But saying they

2   don't think this is going to be common because there is

3   widespread, from established religions, acceptance and support

4   of the vaccines does not -- I'm having difficulties getting

5   from that to hostility to religion.

6        MS. GIBSON:  Your Honor, I think *Masterpiece Cakeshop*,

7   *Lukumi* and a number of other cases talk about any comments that

8   would call into question the city's neutrality on the

9   legitimacy of religious viewpoints.  So it's not just

10  religions.  But the mayor has gone on the record.  The governor

11  who is -- I think the circumstances do lead to indicia of

12  animus and working together because not only did they announce

13  they're working together, two days after this mandate from the

14  New York City Department of Health was issued, a parallel

15  mandate was issued by the governor through the state department

16  of health.

17       THE COURT:  Do you have any evidence that those were

18  coordinated?

19       MS. GIBSON:  I believe that the Spectrum article

20  leads --

21       THE COURT:  No.

22       MS. GIBSON:  -- to the inference that they were.

23       THE COURT:  OK, but remember, you're the plaintiff.

24  You're asking for extraordinary relief, so you've got to show a

25  substantial likelihood that you're going to prevail on this

LacWkanD

1    argument, and you're relying on a Spectrum -- I'm not quite

2    sure what Spectrum is, a Spectrum article that's hearsay.

3         MS. GIBSON:  Your Honor, in terms of animus, I believe

4    that in a preliminary injunction hearing, hearsay is

5    appropriate as published by the papers.

6         THE COURT:  It may be if you can tell what the context

7    is.  There are certainly times that I would say that's good

8    enough, but here, they tell nothing about the context in which

9    the statement was made, and you're relying on statements that

10   are not quotes.  So even assuming that the reporters are

11   reliable and responsible journalists, you don't have a full

12   quote.

13        MS. GIBSON:  We do have a quote, your Honor, from the

14   mayor saying that only Christian Scientists and Jehovah's

15   Witnesses will be considered.

16        THE COURT:  That's not really what he says.  Again, I

17   just read that quote into the record.  You're quoting the Post

18   article, which isn't a quote at all.

19        The other article, which I just quoted, has the piece

20   that says religious exemptions would be limited to Christian

21   Science and Jehovah's Witnesses.  That piece of the sentence is

22   not in quotes.

23        MS. GIBSON:  OK, your Honor.  It was reported on by

24   multiple papers, the Gothamist paper --

25        THE COURT:  I did not myself go out and hunt for

LacWkanD

 1  statements.  I relied on what the plaintiffs presented me.

 2         MS. GIBSON:  Understood, your Honor.

 3         I would then say that additional indicia of hostility

 4  and animus was those with religious beliefs against

 5  vaccinations can be found in the conduct that the Department of

 6  Education, both within the hearings and also in response -- so

 7  one of the things that happened that the plaintiffs, many of

 8  them, did report on -- and I can bring them up to testify some

 9  more if you'd like -- is that in nearly every appeal, the

10  Department of Education was advocating for them to be denied on

11  the basis that the Pope does not believe in vaccination -- or

12  does -- has been vaccinated, and this was even said to

13  Buddhists.  This was even said to, you know, people who are not

14  Catholic.

15         THE COURT:  But then what do you make of the DOE's

16  affidavit that says they've granted more than 20 for a wide

17  variety of expressed religious beliefs?

18         MS. GIBSON:  Well, I'm not sure really on what basis.

19  Facially, the arbitration award itself, which they've adopted

20  as their policy, so they can't say that it's not.

21         THE COURT:  Well, let me ask you about that.  Did

22  they?  The city's position was no exemptions.  You must be

23  vaccinated, period, end.  The union objected.  They hit an

24  impasse, and per requirements of the collective bargaining

25  agreement, they then ended up in arbitration.  The arbitrator

LacWkanD

1    said this is how it's going to be implemented.

2             So what was the city supposed to do?  Or what was the

3    union supposed to do?

4             MS. GIBSON:  The city couldn't even avoid liability

5    for discrimination when they implemented a state standard,

6    state-required test on teachers in the famous case of, I

7    believe -- I'm sorry.  I'll get the citation for your Honor,

8    but it's just been settled after 20 years, where teachers --

9    there was a discriminatory impact from the state-required

10   tests, and the Second Circuit held that it wasn't enough for

11   the city to say, Well, this is required by the state.

12            I don't see how in this instance, when they have

13   implemented a facially discriminatory policy, which really on

14   its face --

15            THE COURT:  How is it facially discriminatory?  How is

16   the mandate facially discriminatory?

17            MS. GIBSON:  The UFT award is facially discriminatory.

18            THE COURT:  OK.  On that, why are you the right person

19   to sue?  Why isn't that the obligation of the union, and at

20   best what your claim might be -- and it might be; I haven't

21   really agonized over it -- a claim against the union for not

22   providing appropriate representation of its represented

23   members?

24            MS. GIBSON:  No, your Honor.  The plaintiffs against

25   the DOE, as the employer, who has the responsibility as the

LacWkanD

1    state, not to enforce discriminatory laws against my clients

2    who have personally held religious beliefs and are excluded

3    from the protection of, you know, reasonable religious

4    accommodations on the basis of the type of religion that they

5    practice.  So if they're not a Christian Scientist or a

6    Jehovah's Witness -- and, you know, frankly, the DOE's response

7    that they've granted these exemptions to 20 people is also

8    hearsay, and we haven't talked to those people or determined on

9    what basis they said yes to them versus our clients, who really

10   were told point-blank that they cannot get relief if they have

11   personally held beliefs or if they do not submit a letter from

12   clergy.

13           That's facially discriminatory, and so the reason that

14   the union is not the appropriate party is that this is the

15   state's responsibility, and they can't sidestep this by

16   saying -- the union didn't agree to this award either.  This

17   was an arbitrator, with whom I would push back on the assertion

18   that it's a neutral arbitrator.  I did include two articles

19   about Arbitrator Scheinman's relationship as a fund-raiser for

20   the mayor.  But in any event, once the state implements a

21   facially discriminatory award, that facially discriminates

22   against my clients, they have a right to sue the state.

23           THE COURT:  OK.  You don't think they have an

24   obligation to start by filing an Article 75 to challenge the

25   award?

LacWkanD

1      MS. GIBSON:  No, your Honor.  In fact, I think the

2  case law is pretty clear on that with the -- they haven't

3  waived their right to proceed.

4      THE COURT:  They haven't waived their rights.  There's

5  no question they have not waived their rights.

6      MS. GIBSON:  And the appropriate place to challenge

7  constitutional issues is not within an Article 75 proceeding.

8  An Article 75 proceeding can't really even deal effectively

9  with constitutional issues.  It has very narrow grounds for

10 relief.

11     What we're challenging is the constitutionality of the

12 state imposing on these teachers a facially discriminatory

13 requirement that they have to belong to only certain religions,

14 which violates both the establishment clause and the free

15 exercise clause.

16     THE COURT:  That sounds like you are not challenging

17 the mandate, that you've abandoned your challenge to the

18 mandate.

19     MS. GIBSON:  Your Honor, we are challenging the

20 mandate.

21     THE COURT:  The mandate is neutral.  Do you agree that

22 the mandate, as promulgated by Mr. Chokshi, is neutral?  It

23 says you must be vaccinated.

24     MS. GIBSON:  No, your Honor, I wouldn't agree, but I

25 do think that the indicia of animus is there.  I'm happy to

LacWkanD

1    supplement it and bring another motion with more materials on

2    that issue, but at the -- I am, we are challenging both.  I

3    mean it also has a disparate impact on people who have

4    religious beliefs.  It's burdening their rights in a way that

5    is not --

6            THE COURT:  But again, if you go back to the

7    jurisprudence of how you evaluate something that has a First

8    Amendment impact, if you look at Chokshi's mandate, it is

9    neutral as to religion.  It applies to everybody.  It applies

10   to people regardless of why they're not vaccinated.  You've got

11   to be vaccinated if you're a DOE employee, period, end.  That

12   is a sort of prototypical neutral position, isn't it?

13           MS. GIBSON:  I would say not in light of the comments,

14   but also, I would say not in light of the fact that people who

15   only have one dose of the vaccine are allowed to go in, even

16   though they're not fully vaccinated.

17           THE COURT:  But what does that have to do with the

18   religion?  How does that make the mandate not neutral from a

19   religious perspective?

20           MS. GIBSON:  For example, in *Roman Catholic Diocese*,

21   the court held that it wasn't neutral because, *v. Cuomo*, that

22   they weren't neutral because there were secular activities that

23   were excused.

24           THE COURT:  But that was on the statute itself or on

25   the executive order itself.  It distinguished between houses of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LacWkanD

1   worship and secular activities, so on its face it was not

2   neutral.

3        Again, what about Chokshi's mandate, on its face, is

4   not neutral, other than your claim that there were hostile

5   statements made, which you have no evidence of in the record?

6        MS. GIBSON:  I believe that the neutrality goes to if

7   you have a religious need to not be vaccinated, it is just

8   arbitrary to discriminate between --

9        THE COURT:  But that's an incidental effect on the

10  religion.  It's a neutral statute that has an incidental effect

11  on some people.  Right?  That's the definition of it.

12       Look, there are two different ways of making a First

13  Amendment analysis.  One is is it a neutral statute that has

14  incidental effect on religion?  If so, it has to be rational.

15  It has to pass the rational relationship test.  We'll get to

16  that in a second.

17       The second is if, on its face, it discriminates or it

18  makes distinctions between religious and nonreligious.  That's

19  subject to strict scrutiny.  Right?

20       OK.  So we agree on the basic structure of First

21  Amendment law.

22       MS. GIBSON:  Well, general applicability is the second

23  thing, so this vaccine mandate is not generally applicable to

24  those who are only vaccinated with one dose of a vaccine.

25  They're not fully vaccinated, but they're allowed to be in the

LacWkanD

1   building.

2          THE COURT:  What does that have to do with religion?

3          MS. GIBSON:  Well, religious people are not allowed to

4   be in the building although they also aren't fully vaccinated.

5          THE COURT:  Again, saying someone who has a political

6   objection isn't allowed in the building either if they're not

7   vaccinated.

8          MS. GIBSON:  I don't believe the standard is that

9   everybody, only religion has to be excluded.  I believe if

10  there's anybody excluded for a secular purpose, that that could

11  go towards general applicability.  But again, going back to the

12  indicia of animus, I think that the fact that unvaccinated

13  people who have only had one dose are allowed in the building

14  but people with religious exemptions are not --

15         THE COURT:  On the one dose, aren't they required to

16  get the second dose; there's like a time frame and by X point

17  you have to get the second dose too?

18         MS. GIBSON:  Yes, your Honor, but October 4 that

19  wasn't in effect.  It doesn't make any sense why starting

20  October 4 they wouldn't be allowed in.

21         Also, just so I can clarify my argument for the Court

22  and I don't waste your time, is the Court's taking the position

23  that Governor Hochul's quite blatant statements about the

24  illegitimacy of people who hold opinions different from hers

25  about what God wants according to vaccines not relevant here?

JA-645

LacWkanD

1          THE COURT:  What she had to say had nothing to do with

2     Chokshi's mandate.  Chokshi's mandate preceded that by a month

3     and a half, and it's a city mandate, not a state mandate.

4          MS. GIBSON:  Well, it was on the eve of -- both

5     mandates were passed through the DOE after Governor Hochul and

6     de Blasio announced that they were working in partnership,

7     within two days of each other.  Both mandates were supposed to

8     take effect on September 27.  Both mandates were highly

9     controversial in that they negated any religious exemption, and

10    Governor Hochul actually went forward and said she did that on

11    purpose, which is recorded in the NPR article, Dkt. 17.

12         THE COURT:  That's the healthcare mandate.  You're

13    representing the teachers.

14         MS. GIBSON:  And my position, or plaintiffs' position,

15    is that these were promulgated in concert.

16         THE COURT:  You might be able to prove that at some

17    point, but you certainly haven't proved it for purposes of

18    preliminary relief.

19         MS. GIBSON:  Understood, your Honor.

20         And then we would take the position that later

21    statements and just open hostility towards those who get

22    religious exemptions or who are denied because the Pope, you

23    know, does not agree with them, they do indicate hostility

24    towards those with religious beliefs.  The mayor, whether or

25    not he said it openly on August 24, he certainly said it later,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LacWkanD

1   that he doesn't believe that there are legitimate reasons for

2   vaccination.

3          THE COURT:  He doesn't believe there are legitimate

4   reasons for vaccination?

5          MS. GIBSON:  Sorry.  Religious exemptions for

6   vaccination, religious objections to vaccination.

7          THE COURT:  Or he says he doesn't believe there are

8   going to be many.

9          MS. GIBSON:  I believe the Gothamist and the Post

10  article both also reference the Pope.  Am I mistaken, your

11  Honor?

12         THE COURT:  I don't know whether it does or not, but

13  saying that he doesn't anticipate a lot of objections because

14  there is widespread acceptance within many religious

15  communities is not saying he's hostile to other religions.

16  It's just a statement in the context of what impact is this

17  going to have?  I don't think it's going to have a big impact

18  because most religions say there's nothing wrong with the

19  vaccine.  That doesn't suggest hostility to religion.

20         I'm struggling, again, to get from what you've quoted,

21  the limited quotes that you have, that are quotes to hostility.

22  What I read the Pope -- not the Pope.  What the governor and

23  the mayor, but the governor's statements that are not all that

24  significant.  What the mayor is saying I don't anticipate a lot

25  of it, because there was a lot of discussion at the time about

LacWkanD

1    what kind of impact is this going to have on DOE.

2         MS. GIBSON:  Your Honor, I think read in connection

3    with the UFT award and how it was implemented by the DOE, you

4    know, reading statements like only Jehovah's Witnesses and

5    Christian Scientists have a prayer for relief, and sure, it's

6    not in quotation marks, but it was reported on by both the

7    Gothamist article and the Post article does clarify that the

8    intention is to deny -- when you look at the UFT arbitration

9    award, which also says the same thing, that people will be

10   denied if any religious leader within their proposed religious

11   belief system, as applied by the DOE, if they think any

12   religious leader has ever come out in favor of vaccination,

13   they're going to be denied, if they have personally held

14   beliefs that conflict with the Pope's, they're going to be

15   denied.

16        THE COURT:  You do agree that DOE has a right to

17   separate out people who have genuinely, sincerely held beliefs

18   from people who are just politically objecting?

19        MS. GIBSON:  Yes, your Honor.

20        (Indiscernible overlap)

21        MS. GIBSON:  And I would point to Mr. Kane's

22   declaration in which he describes how when the arbitrator asked

23   whether the DOE objects to his, the sincerity of his beliefs,

24   they didn't even know that that was part of the inquiry.  They

25   said again, No, we just think that -- you know, we would like

LacWkanD

1   him to be denied because the Pope is in favor of vaccination,

2   and he doesn't have a clergy letter.  So this isn't about

3   sincerity.  I'll also point out --

4           THE COURT:  Again, that's your as-applied argument.

5           MS. GIBSON:  Yes.

6           THE COURT:  It would help the record if you could keep

7   these two separate, because they are truly separate arguments.

8           MS. GIBSON:  Sure.  I understand, your Honor.  I'll

9   try to do that.

10          So, I would, as applied, as a general policy, not even

11  just to these individual plaintiffs, I would say that the

12  department -- it's quite clear that the department adopted a

13  policy of denying, in conjunction with the facially

14  discriminatory UFT award, of attempting to deny anyone

15  protection who has religious beliefs that would be, would meet

16  the dictionary definition of a heretic, or heretical, somebody

17  whose beliefs conflict with established religious dogma, which

18  violates the establishment clause.

19          THE COURT:  OK.

20          MS. GIBSON:  So I do think that that's been

21  established in this motion, but also, they denied everybody at

22  the outset.  That's another part of this motion.

23          The DOE issued blanket denials to every person that

24  applied, stating that it would be an undue burden to accept any

25  religious exemption given that the commissioner's mandate

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LacWkanD

1    doesn't allow them to be in the building.  And so on that

2    basis, they categorically said religious exemptions shouldn't

3    be granted to anybody.  Then the appeals process unfolded.

4           None of my plaintiffs were given the impression that

5    the process could really challenge the constitutionality of it,

6    and indeed, it can't, because the arbitrators are bound really

7    to that agreement.  But the DOE then aggressively advocated to

8    have them denied based on discriminatory reasons.

9           Then after that, they implemented a policy where

10   anybody that they had denied as having personally held

11   religious beliefs -- and nobody was told that they were being

12   denied because they were insincere, by the way.  But everybody

13   whose religious beliefs were deemed invalid by the DOE or the

14   arbitrator, for whatever reason, because they weren't actually

15   given a reason, was then subjected to very harsh treatment,

16   some of them -- all of them policies adopted by the DOE.

17   They're not allowed to be paid.  They're not allowed to get

18   unemployment insurance.  They're not allowed to even use their

19   accrued vacation and sick time.  They really -- it's really

20   openly hostile in terms of the effect on these plaintiffs'

21   rights.

22          THE COURT:  Isn't it the same effect that applies to

23   someone who had a political objection and therefore is out of

24   compliance with the policy?  There's not a separate set of

25   penalties for people who assert a religious exemption and are

LacWkanD

1        denied, is there?

2                MS. GIBSON:  No, your Honor, there's not.

3                THE COURT:  OK.

4                MS. GIBSON:  So, I would just submit that implementing

5        the openly discriminatory policy is state action, is openly

6        discriminatory.  It does violate *Sherr v. Northport* schools,

7        which I know isn't binding but is an important case in this

8        arena.  That's the Eastern District case.  The entire state of

9        New York changed their religious exemption policy because of

10       that case, and this case is really just the same, the same

11       thing that was challenged there.  Can you say you have to

12       belong to a bona fide religion?  Can you require a

13       certification of a clergy member?  And the court held that you

14       cannot and that that is discrimination against personally held

15       religious beliefs and the state of New York changed their

16       statute as a result.  So they knew or should have known that

17       they couldn't implement this policy in that way and that it is

18       facially unconstitutional, and yet they proceeded to do it.

19       And I would say that the mayor's statements to the media

20       indicated that they intended to do that.

21               I would ask the Court, if the Court's position is that

22       we have not put in enough information about animus, whether the

23       Court would give us leave for that portion of the motion, to

24       hold that in abeyance and supplement the record with additional

25       indicia of animus and evidence that would meet the Court's

LacWkanD

1    standard, that has direct quotes and so forth, instead of just

2    being newspaper articles that report on what was said.

3            THE COURT:  I'll take that request under advisement.

4            MS. GIBSON:  Thank you, your Honor.

5            THE COURT:  Anything further?

6            MS. GIBSON:  Implementation of the discriminatory

7    policy is something that we need to -- we feel that, the

8    plaintiffs feel that needs to be addressed now, because they

9    haven't raised their right to challenge being subjected to that

10   unlawful discriminatory policy, and they have been impacted

11   quite egregiously by it.

12           And that is all for the motion.  Thank you, your

13   Honor.

14           THE COURT:  So you're abandoning your medical

15   exemption issue.

16           MS. GIBSON:  We're focusing on the religious exemption

17   now.  If anyone is denied their medical exemption, we will

18   bring that as a separate motion.

19           THE COURT:  OK.

20           Ms. Minicucci.

21           MS. MINICUCCI:  Your Honor, do you have any specific

22   questions about our papers?

23           THE COURT:  I have a question about the DOE's

24   blanketly denying requests for religious exemptions.  And

25   what's the current status of the appeal?  If you can also help

LacWkanD

1   me, walk me through it procedurally.  Anyone who wants a

2   religious exemption makes the request to the Department of

3   Education.  If the Department of Education denies it, they get

4   an appeal pursuant to the collective bargaining agreement to an

5   arbitrator.  Right?

6           MS. MINICUCCI:  They get an appeal pursuant to the UFT

7   award.

8           THE COURT:  Which is?

9           MS. MINICUCCI:  Pursuant to the collective bargaining

10  agreement.

11          THE COURT:  Collective bargaining agreement.

12          MS. MINICUCCI:  Correct.

13          So that's essentially the process.

14          THE COURT:  And if they don't like the answer of the

15  arbitrator, then they can file an Article 75.

16          MS. MINICUCCI:  Correct, or bring a plenary challenge,

17  as plaintiffs have in this case.

18          THE COURT:  Right.

19          MS. MINICUCCI:  So that is essentially the whole

20  process.

21          THE COURT:  Have any Article 75s been filed?

22          MS. MINICUCCI:  Not to my knowledge.  Not to my

23  knowledge.

24          THE COURT:  OK.

25          What about the plaintiffs' argument that the UFT award

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LacWkanD

1   facially is drawing distinctions between types of religious

2   practices that are unconstitutional?

3          MS. MINICUCCI:  Your Honor, the UFT award obviously

4   was not, is not a policy of the Department of Education,

5   although the Department of Education is a party to this

6   arbitration.

7          On page 5, it sets forth some requirements, some of

8   the procedural requirements for the religious exemptions, and

9   it names as an example Christian Scientists, and I think the --

10  I mean I can't speak for what the arbitrator was thinking when

11  he put it in the decision, but I think that's just an example

12  of a well-known religion that generally opposes medical

13  treatment.

14         Obviously, as our supplemented declaration shows, that

15  over 20 religions, both established and personal religious

16  beliefs have been granted and this is over -- you know, more

17  than 20 people have had religious exemptions granted.  This is

18  just a listing of the different religions within the DOE

19  (inaudible).  So -- right.  So, the DOE --

20         THE COURT:  So in the first sentence, the

21  documentation in writing, *e.g.* clergy, it doesn't have to be a

22  clergy member; it could be the person himself or herself.

23         MS. MINICUCCI:  Well, it has to be a religious

24  official, so unless plaintiffs are religious officials

25  themselves, that would not necessarily work.  But I think

LacWkanD

1   ultimately it's not just one document that's going to make the

2   difference, and in any event, each of these applications are

3   individual.  Each of them are evaluated by the arbitrator based

4   on the individual's belief, which are personal, so it makes it

5   very difficult to find a blanket challenge to this policy,

6   because each person's personal religious belief would require

7   different kinds of evidence and different kinds of statements.

8   And it's up to the arbitrator, in the first instance, to

9   determine whether that belief is sincerely held and it relates

10  to the vaccination generally and is not a political --

11          THE COURT:  And it's religious.

12          MS. MINICUCCI:  Correct.

13          THE COURT:  All right.

14          MS. MINICUCCI:  Any other questions, your Honor?

15          THE COURT:  I've discussed with your adversary the

16  issue of the mayor's statements, but what was the mayor trying

17  to say?

18          MS. MINICUCCI:  I could not speak for what the mayor

19  was trying to say, because I don't know.  I will say that the

20  mayor is not responsible for making these determinations, nor

21  was he a party to the arbitration agreement.  DOE and the

22  arbitrators, who are not DOE employees, not part of the city of

23  New York's employees, came to this determination ultimately for

24  a framework and then make the individual decisions.  So I

25  submit that the mayor's comments are irrelevant to this

LacWkanD

1    specific process.

2            THE COURT:  The plaintiffs' argument is that the city

3    can't escape liability by saying, Hey, we're complying with the

4    UFT award if the UFT award itself is being applied in a

5    discriminatory way.  Do you agree with that?

6            MS. MINICUCCI:  Certainly in -- if we're evaluating

7    questions of liability, those are questions that are ultimately

8    questions of fact for a case to be litigated at the end.

9    Certainly if the DOE is liable, then they're liable.  I don't

10   think that's the position that our papers take, that we would

11   escape all liability because an arbitrator made the decision.

12           THE COURT:  Well, what is your position?

13           MS. MINICUCCI:  About liability?

14           THE COURT:  No.  About whether they've sued the right

15   people.  I understood your argument to be, until you said they

16   can bring a plenary claim, I understood your position to say if

17   they're complaining about what happens in the arbitration, they

18   need to either fight that out by bringing a claim that the

19   union is violating its duty of fair representation to them or

20   they take an Article 75.  But just five minutes ago, you said,

21   Or they can file a plenary lawsuit like this.

22           MS. MINICUCCI:  Correct.  I meant that they can bring

23   a lawsuit as individuals if they believe their individual

24   rights were violated.

25           THE COURT:  So why would you argue in your papers

LacWkanD

1   about duty of fair representation?

2           MS. MINICUCCI:  Because in that case, your Honor, they

3   were talking about the arbitration awards.

4           THE COURT:  They're still talking about the

5   arbitration awards.

6           MS. MINICUCCI:  Correct.  I'm sorry.  I'm getting

7   mixed up between plaintiffs' claims as applied, and that's what

8   I mean.  They can bring a plenary challenge to the arbitration

9   award, or not even the arbitration award, to the way that DOE

10  is applying the challenge to them, the award to them.

11          THE COURT:  Like an as-applied challenge.

12          MS. MINICUCCI:  Correct.

13          THE COURT:  Like what this lawsuit is.

14          MS. MINICUCCI:  Correct.  However, this injunction is

15  saying that this award and the law is facially

16  unconstitutional, which it is not.

17          THE COURT:  Well, they're also saying that as applied

18  it's unconstitutional.

19          MS. MINICUCCI:  It may be ultimately found to be

20  unconstitutional.  At this juncture, there's no evidence to

21  support that.

22          THE COURT:  Why don't you articulate your argument on

23  why there's no evidence, on an as-applied basis, that the

24  mandate, as applied via the UFT decision -- as applied -- is

25  unconstitutional.

LacWkanD

1          MS. MINICUCCI:  The mandate is not unconstitutional

2    because it doesn't favor one religion over another.

3          THE COURT:  Not the mandate.

4          MS. MINICUCCI:  I'm sorry.

5          THE COURT:  As applied by the UFT decision.

6          MS. MINICUCCI:  Correct.  The mandate, as applied by

7    the UFT decision, is not unconstitutional because it doesn't

8    favor one religion over another and it doesn't give any

9    religion an advantage.  It just sets forth a framework by which

10   to apply for an exemption.

11         THE COURT:  So all of the plaintiffs' argument that

12   the DOE lawyers are quoting the Pope and the exemptions are

13   being granted almost not at all and they've been summarily

14   denied their requested exemption even though there's no

15   question that they have -- they didn't question the good faith

16   belief on the plaintiffs' part, according to your affidavits,

17   what do I make of that?

18         MS. MINICUCCI:  Those are individual as-applied

19   challenges.  They're not challenging the law itself or the

20   award.  They're just saying what happened between, you know --

21         THE COURT:  Are you saying that the Court should grant

22   these ten plaintiffs' as-applied challenges?

23         MS. MINICUCCI:  No, your Honor.  I submit that they

24   haven't met that requirement either.

25         THE COURT:  So talk about that.

LacWkanD

1          MS. MINICUCCI:  OK.  So, in order to bring a case for

2    a violation of constitutional right or to qualify for -- excuse

3    me.

4          To qualify for religious exemption, plaintiffs would

5    have to show that their religious beliefs prevent them from

6    getting a vaccine, and it's the DOE's position that they have

7    not shown that.  And that's what the DOE argued in the

8    arbitration, and that's why they don't qualify for a

9    constitutional -- for an injunction in this case either.

10         THE COURT:  OK, but the plaintiffs have put in

11   affidavits that say they have an honestly held religious belief

12   and they, at least some of them, were denied the exemption.

13   They appealed it to the arbitrator.  The denial of the

14   exemption was upheld.  What does the city put in to controvert

15   that?

16         MS. MINICUCCI:  It depends on the specific case.  I'm

17   not sure what the DOE put in specifically to controvert --

18         THE COURT:  What do you put in to me?

19         MS. MINICUCCI:  The updated and supplemented

20   declaration.

21         THE COURT:  Which says that over 20 people have been

22   granted exemptions.

23         MS. MINICUCCI:  It says that people from over 20

24   religions have been granted.

25         THE COURT:  Sorry.  OK.  Because you didn't give me a

LacWkanD

1   number, I can only assume it's one per religion.

2           MS. MINICUCCI:  Your Honor, it's more than that.  Last

3   time I checked, it was over a hundred people.

4           THE COURT:  OK.  And therefore, the Court should infer

5   that the problem is not how the rule is being enforced; it is

6   that there was something about the plaintiff's particular

7   claims that the arbitrator didn't buy.

8           MS. MINICUCCI:  That's correct, your Honor.

9           THE COURT:  OK.

10          MS. MINICUCCI:  Just in conclusion, we submit that the

11  plaintiffs have not met their burden for a preliminary

12  injunction, let alone a mandatory injunction, and that they

13  don't have success of likelihood of the merits and that the

14  balance of equities is really in the favor of upholding the

15  mandate and keeping unvaccinated teachers outside of schools.

16          THE COURT:  What's DOE going to do with people who are

17  granted a religious exemption?  They're not letting them on the

18  school grounds, correct?

19          MS. MINICUCCI:  That's correct.

20          THE COURT:  What are they going to do with them?

21          MS. MINICUCCI:  I believe the arbitration awards set

22  forth that they are to stay on payroll and that to the extent

23  there are --

24          THE COURT:  If they can find jobs for them that won't

25  require them being on premises, they'll get them, if possible.

LacWkanD

1    Otherwise, they're out.  Otherwise they're going to be

2    discharged as well, correct?

3           MS. MINICUCCI:  I don't believe that that's been set

4    forth in the awards.

5           THE COURT:  Oh.

6           MS. MINICUCCI:  That there would be a termination for

7    anybody who meets the burden of religious exemption.

8           THE COURT:  Well, but if you can't accommodate them,

9    then what?

10          OK.  Never mind.

11          Does any of the rest of you know what the DOE is going

12   to do for people who cannot be accommodated?  Normally, if you

13   can't accommodate a religious exemption, the employee's not

14   kept on.

15          Not you.  You do not represent DOE.

16          MS. GIAMBRONE:  I think that the DOE's attempting to

17   accommodate everybody as best they can, and I don't think that

18   that has presented itself yet.

19          THE COURT:  It's not a live issue.  OK.  Fine.

20          Anything further?

21          MS. MINICUCCI:  No, your Honor.

22          THE COURT:  All right.

23          Ms. Gibson, I'll give you the last word.

24          MS. GIBSON:  Your Honor, just to reiterate, this UFT

25   arbitration award, which has been implemented by the DOE is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LacWkanD

1   facially discriminatory.  It says right in the award that

2   people with personally held religious beliefs or who have

3   religious beliefs that are not the same as the Pope or --

4            THE COURT:  Where does it say that?  Where does it say

5   that if you don't agree with the Pope you're out?

6            MS. GIBSON:  Pardon me.  Let me rephrase.

7            People who have religious beliefs that have been

8   contradicted by any religious leader.

9            THE COURT:  Where does it say that?

10           MS. GIBSON:  It says it in the UFT arbitration award.

11           THE COURT:  What page?

12           MS. GIBSON:  If there's any religious leader of

13   your --

14           THE COURT:  What page?

15           MS. GIBSON:  Your Honor, just give me a moment,

16   please.  Your Honor, I just have to pull the award.  I believe

17   I quoted it in the motion papers, but I -- one moment.

18           I'm happy to supplement that record with a written

19   page citation, but it does say in the UFT award and the CSA

20   award if any religious leader of your religion has come forward

21   and made statements in favor of vaccination, you will not be

22   granted an exemption.

23           THE COURT:  Right, but it's clear that they're

24   granting exemptions notwithstanding that.  So whatever the

25   gloss is on that, which presumably would be some employee who

LacWkanD

1    is saying, I'm X, therefore I can't be vaccinated, except that

2    the leader of X says that's not right, that's not what our

3    religion believes, and the employee doesn't say, Well, OK, so

4    it's not because of the specific doctrine of my church, but I

5    have a specific religious belief of something else.  It's clear

6    that whatever he meant by that, it hasn't precluded DOE of

7    granting exemptions to people even though the head of their

8    faith organization has made statements supporting vaccines.

9        MS. GIBSON:  Well, your Honor, this is news to us,

10   these 20 people who have gotten --

11       THE COURT:  You got it.

12       MS. GIBSON:  -- exemptions that don't --

13       THE COURT:  You got it last week.

14       MS. GIBSON:  -- comply with the UFT awards.

15       THE COURT:  You got it last week.

16       MS. GIBSON:  Yes, but we don't know the names.  We

17   haven't had --

18       THE COURT:  You didn't ask to adjourn this hearing so

19   that you could take expedited discovery.  You didn't do any of

20   that.  If you had asked for that, to take discovery of DOE on

21   this issue, I may have granted it, but you didn't.

22       MS. GIBSON:  So, your Honor, just to point out that to

23   the extent that they've deviated from the facially

24   discriminatory policy in 20 cases or even a hundred cases out

25   of thousands doesn't mean that these plaintiffs got any such

LacWkanD

1   deviation.  In fact, these plaintiffs were told very precisely

2   that they would not get a deviation from the award, that this

3   award is binding, it's discriminatory and that they just have

4   to live with that if they don't meet the criteria, which is not

5   about sincerity but, rather, about whether you belong to one of

6   these established religions and whether your religious leaders

7   have ever said anything contrary to what you believe.

8         So let's take the case of Margaret Chu, for example.

9   She details in her declaration how she repeatedly told the

10  arbitrator and the DOE attorney that she, as a practicing

11  Catholic, believes that her moral conscience is more important

12  than anything that the Pope has taken a position on and that

13  that is a part of her religion.  She was told that that doesn't

14  matter and that they're going to take the word of the Pope over

15  a layperson like her.

16        THE COURT:  Did you submit an arbitration award where

17  the arbitrator said, We reject your view because the Pope said

18  X?

19        MS. GIBSON:  The arbitrators didn't put any reason for

20  any of the plaintiffs' denials.  They simply wrote, checked the

21  box that said denied.

22        THE COURT:  OK.

23        MS. GIBSON:  (inaudible) arbitration they said that.

24        THE COURT:  But you don't know exactly what, then, was

25  the deciding factor for the arbitrator.

JA-664

LacWkanD

```
1          MS. GIBSON:  Well, what they told her was that --

2          THE COURT:  They who?

3          MS. GIBSON:  The arbitrator told Margaret Chu that he

4     was going to take the word of the Pope over a layperson and he

5     could not consider her personally held Catholic beliefs over

6     the word of the Pope.  And that was brought up in multiple

7     plaintiffs' arbitration hearings not only by the arbitrators

8     but by the DOE who advocated that the policy on its face

9     requires discrimination.  To the extent individual

10    arbitrators -- 20, maybe a hundred times, and I don't know if

11    that was after the suit was filed or not.  But to the extent

12    that any of them deviated from the facially discriminatory

13    standard, the standard itself is discriminatory.  And so at

14    that point, strict scrutiny has to apply.

15         So in this instance, I would submit, and we have

16    submitted, evidence from two very highly regarded public health

17    officials, certainly not antivaccine.  They're Stanford and

18    Johns Hopkins public health authorities who have --

19         THE COURT:  The guy from Stanford is a public policy

20    guy, health policy.

21         MS. GIBSON:  Well, I believe he's published over --

22    he's been cited in over 11,000 public health scientific

23    articles.  He is an authority on this subject.

24         THE COURT:  On vaccines in particular?  That's not

25    what his affidavit says, but go ahead.  Make your argument.
```

LacWkanD

1          MS. GIBSON:  Dr. Makary, from Johns Hopkins, who has

2     sat on the World Health Organization advisory committee, who is

3     also an authority in this subject, they both have extensive

4     things to say about whether people pose a direct threat based

5     on their vaccination status in this instance, which it would

6     then become the obligation of the Department of Education and

7     the other defendants to prove that they cannot grant sincerely

8     held religious exemptions because of that.  And in this

9     instance -- or that these people cannot be in the building at

10    all.  And in this instance, you know, there's really not,

11    there's really not good science on that.

12          The CDC has admitted, and that's in exhibit 5 of my

13    most recent affidavit that went with my supplemental materials,

14    the CDC director went on national TV and stated that the

15    vaccines can't stop transmission.

16          THE COURT:  OK.  Let me stop you.  Do you agree, do

17    the plaintiffs agree, that the vaccines make it less likely

18    that someone who has been vaccinated will contract Covid?

19          MS. GIBSON:  Your Honor, that's why the expert

20    testimony is interesting.  The experts both --

21          THE COURT:  They don't address this.  They do not

22    address the issue of whether the vaccine is effective to reduce

23    the risk of contracting the virus.

24          MS. GIBSON:  They do discuss the waning vaccine

25    immunity, and they discuss the extensive science showing that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LacWkanD

1  you're just as infectious, if you're infected, and that even if

2  vaccinated, even if there's some slight protection against

3  infection --

4           THE COURT:  Some slight protection?

5           MS. GIBSON:  -- that it wanes rapidly.

6           THE COURT:  Slight protection?

7           MS. GIBSON:  Yes, and there's a number of --

8           THE COURT:  Slight?

9           MS. GIBSON:  Yes.  Slight.

10           THE COURT:  Come on.

11           MS. GIBSON:  Your Honor, there's a number of studies

12  that are showing --

13           THE COURT:  Come on.  You're losing credibility.

14           MS. GIBSON:  -- that it goes from pretty fairly good

15  protection for a few weeks to, and then within a couple of

16  months drops down to almost no protection against infection,

17  and we don't have --

18           THE COURT:  It does not.  There are not peer-reviewed

19  studies that show that.

20           MS. GIBSON:  I think --

21           THE COURT:  That they drop to almost no protection,

22  six weeks after vaccination.

23           MS. GIBSON:  No.  Six months, your Honor.  There are.

24  I mean, there's just a study out of Israel that says that.  But

25  we haven't even been tracking right through --

LacWkanD

1           THE COURT:  That drop to nothing?  No.

2           MS. GIBSON:  They said nothing yesterday, but I would

3    be happy to bring Dr. Bhattacharyta and even Dr. Makary up to

4    talk about these studies.  But even if there was some

5    protection against infection, that goes away if you've had

6    natural immunity, so anyone who was vaccinated --

7           THE COURT:  What do you mean it goes away if you've

8    got natural immunity?

9           MS. GIBSON:  Well, there's no -- you don't have a

10   greater -- there's no greater -- like, the natural immunity has

11   a greater protective effect against subsequent infection than

12   the vaccine immunity does, and there's a lot of studies that

13   show that, and they both speak about that extensively.

14          Your Honor, you're shaking your head, and I appreciate

15   that.  But that's why it's so important to bring experts on.

16   They can discuss the studies that have been done, which have

17   been extensive and thorough.

18          THE COURT:  Do you know how many studies --

19          MS. GIBSON:  And there are other mitigating --

20          THE COURT:  Excuse me.

21          Do you know how many of the studies that your experts

22   cite that are not peer reviewed?

23          MS. GIBSON:  I'm happy to bring them up here.  I don't

24   think there's any --

25          THE COURT:  Do you know?  You are the attorney arguing

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LacWkanD

1   this.  You are propounding these people as experts.  That's my

2   question.  Do you have any idea how many of the studies that

3   they cite are not peer reviewed?

4           MS. GIBSON:  No, your Honor, I don't.  But I do know

5   that there are no peer-reviewed studies -- the only study --

6   there are no peer-reviewed studies that say that naïve,

7   unvaccinated versus people with natural immunity have a greater

8   protection.  The Kentucky study that the defendants cite, I

9   don't know if it's even peer reviewed.  It's odd.  It's a CDC

10  study that takes Kentucky out of the 50 states that they have

11  data on, so it's not clear why they chose that state.  And it

12  doesn't test unvaccinated -- I mean vaccinated people who have

13  not had infection against people who have had infection.  It

14  tests vaccinated people who have already been infected against

15  people with infection to see if vaccination can further protect

16  against immunity.  But if you just take all of the studies that

17  have shown vaccinated people who have not had infection against

18  unvaccinated people who have had infection, show that natural

19  immunity is substantially more robust.  And I do believe some

20  of them are peer reviewed.  But I'm happy to bring them up

21  here.

22          I think the other mitigation strategies, though,

23  suggested are the -- there's no reason why these plaintiffs

24  can't do the weekly testing or the biweekly testing.

25          THE COURT:  All you're saying is that there are other

LacWkanD

1   things that might also be a rational response, but that doesn't

2   mean that the plan that the city came up with is irrational.

3          MS. GIBSON:  Well, if you have to -- we're looking at

4   strict scrutiny for the UFT arbitration awards.  So if we're

5   looking at, you know, whether that's the least restrictive

6   means, it's certainly not; that there are -- every other

7   teacher in the state, people two miles away from the schools in

8   Queens, for example, do not have to get vaccinated.  They're

9   getting tested, so there's no real reason why these particular

10  teachers have to be subjected to violating their religious

11  beliefs or getting fired when they have that other testing

12  option.

13          In terms of whether it's a rational reason, if we were

14  in that realm, I'm not sure that it is completely rational.

15  The unrefuted record right now --

16          THE COURT:  Why isn't it rational?

17          MS. GIBSON:  We don't really have facts in the record

18  to establish what you're saying about infection, your Honor,

19  and so if we want to have a hearing --

20          THE COURT:  Just to be clear, you brought this on by

21  order to show cause.  You sought a preliminary injunction.

22  Your obligation is to show that there's a probability of

23  success for you; that is, that you're going to win the lawsuit.

24  So that's your burden.  And I asked you at the very beginning

25  what you proposed to put on in terms of testimony, and you said

LacWkanD

1   they would repeat what's in their affidavits.  I've read their

2   affidavits.

3          MS. GIBSON:  If you'd like to cross-examine them on

4   infection --

5          THE COURT:  I don't want to cross-examine them.  I

6   want to decide based on the evidence you've presented me.

7          MS. GIBSON:  OK, your Honor.  Well, I believe that our

8   burden is to show likelihood of success on the merits.  In

9   terms of whether the people are a direct threat, then the

10   burden shifts.  Once we've shown likelihood of success on the

11   merits because there's a facially discriminatory policy adopted

12   by the New York City Department of Education, the burden then

13   does shift to defendants to prove that they've used the least

14   likely, least burdensome -- I mean, sorry, least intrusive and

15   least burdensome methods to meet their compelling interests.

16   That is *Roman Catholic Diocese*, for example, and a number of

17   other cases.

18          THE COURT:  Again, those were very different.  Those

19   were facial claims where you had overtly discriminatory

20   provisions.  That's not this.

21          MS. GIBSON:  And I would submit that the UFT

22   arbitration award, as implemented by the DOE, is overtly

23   discriminatory --

24          THE COURT:  That's an as-applied challenge.

25          MS. GIBSON:  -- people.  It's overtly discriminatory

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LacWkanD

1   to all people who don't belong to certain religions or have

2   religious beliefs that are echoed by their religious leaders,

3   so anyone with personally held religious beliefs is overtly

4   discriminated against by this policy.

5        THE COURT:  OK.

6        MS. GIBSON:  Your Honor, the last thing I'd like to

7   say is the mandatory versus prohibitory injunction standard,

8   there's a lot of different -- discussion about different dates

9   of things being announced, but I don't believe there's any real

10  debate about when it was to go into effect, and that was

11  October 4.  I'll direct the Court to exhibit 45-2.

12        THE COURT:  You mean October 1.

13        MS. GIBSON:  October 4 is when they were excluded from

14  school.

15        THE COURT:  OK.

16        MS. GIBSON:  October 1 is when they had to get

17  vaccinated, but they could still go to school and were still

18  being paid.  October 4 is when they could no longer come into

19  the building.

20        THE COURT:  But October 1 was the deadline.

21        MS. GIBSON:  No -- but October 4 is when they stopped

22  getting paid, and the mayor said that anyone who wants to get

23  vaccinated over the weekend -- a lot of people did get

24  vaccinated after October 1 and were allowed in October 4.

25        THE COURT:  OK.

LacWkanD

1          MS. GIBSON:  So the only meaningful -- the meaningful

2     deadline, in any event, is October 4.  And the case law, as

3     defendants acknowledge, discuss that the status quo is the last

4     applicable time line before the controversy arose.  So we're

5     talking about a couple of days here, but not even, because as

6     exhibit 45-2 shows, the school -- the DOE clearly told people

7     that they had to be vaccinated before October 4 or they'd be

8     excluded.  And we filed the morning of the 4th, so at the time

9     of filing, all of these plaintiffs, the status quo was that

10    they could teach.  In fact, most of them have been teaching in

11    the schools for the last year and a half unvaccinated.  There's

12    really no difference between then and allowing them to keep

13    doing so while we determine the merits of this case.

14          And then on top of that, if the Court was to

15    ultimately find that they did not deserve relief, either as

16    applied or facially, they could always then be told to leave at

17    that point.

18          In closing, I would like to state that we are looking

19    for a stay of this entire policy because it is facially

20    discriminatory.  But if the Court doesn't grant that, in the

21    alternative, we would like at least the as-applied relief for

22    these plaintiffs who have not been -- who have put declarations

23    in stating that they have sincerely held religious beliefs and

24    were denied protection on the basis of a discriminatory policy

25    adopted by the DOE.

LacWkanD

1          THE COURT:  Thanks.

2          Why shouldn't I view the UFT decision as facially

3    discriminatory?

4          MS. MINICUCCI:  Your Honor, because it's not.  Like I

5    said before, it simply provides a framework.

6          THE COURT:  It does say that if the leader of the

7    faith organization has said something to the contrary, then the

8    exemption will not be granted.  Right?

9          MS. MINICUCCI:  Correct.  I mean it does say that on

10   page 5, but obviously, there have been Roman Catholic people

11   who have had exemptions granted, and the Pope has come out for

12   vaccines.

13         THE COURT:  So you're saying that because there was an

14   exception, the language of this doesn't mean what it says it

15   says?

16         MS. MINICUCCI:  I think that the way that the UFT

17   award is written, it's setting forth examples of reasons that

18   would lead to a denial, because the next sentence after that

19   says where the documentation is readily available, so that goes

20   to, Well, if you can just find this letter online, it's going

21   to be denied.

22         THE COURT:  I understood that point.  The notion that

23   because you've read about it in the papers, that there are all

24   kinds of charlatans who are just posting Religions R Us letters

25   that say we're opposed, but that was what that was addressed

LacWkanD

1    to.  I understood that.

2         I was more focusing on the first sentence, which is --

3    the second sentence, "requests shall be denied where the leader

4    of the religious organization has spoken publicly in favor of

5    the vaccine," that clause.

6         MS. MINICUCCI:  Yes, your Honor.  And I guess I'm

7    using the second clause to provide context.  I think it's

8    creating a shorthand, but in any event, this is sort of the

9    last step of the award.  The award itself is one that's

10   facially discriminatory against any religion, even privately

11   held religious beliefs, and the mandate is the DOE's mandate.

12   The award is going beyond what plaintiffs are challenging.  The

13   mandate from the department of --

14        THE COURT:  No, that's not true.  They are quite

15   clearly challenging the UFT awards, the UFT structure, whatever

16   you want to call this.  They're saying that, as the arbitrator

17   came down with this decision, this decision discriminates on a

18   religious basis.

19        That's your claim, right, Ms. Gibson?

20        MS. GIBSON:  Yes, your Honor.

21        MS. MINICUCCI:  So, to sort of -- I don't know.  I

22   can't speak to what the arbitrator was thinking when he wrote

23   this, but I think that it was created as a sort of shorthand.

24   And again, it's obviously not proof that people who had

25   requests for religious exemption that fall under these

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LacWkanD

1    categories where the religious leader did speak out for

2    vaccines but they weren't granted.  Obviously there's a lot of

3    personal decisions and personal documentation and personal

4    testimony with each application, and that's where the

5    arbitrator specifically needs to consider.

6              THE COURT:  OK.

7              MS. MINICUCCI:  Thank you.

8              THE COURT:  All right.  I'm going to take about a

9    ten-minute break.  It's 12:15 now.  I'll be back at 12:30 on

10   the dot.

11             (Recess)

12             THE COURT:  Please be seated.

13             Thank you, all.  I'm now ready to rule.

14             I want to start by thanking the ten plaintiffs and the

15   many other DOE employees in my courtroom, in the overflow

16   courtrooms and listening on the phone for their tireless work

17   on behalf of the students of this city in what can only be

18   described as next-to-impossible conditions this past year and a

19   half.  You've all worked hard to do the best you can under very

20   difficult circumstances.

21             I also want to thank the city defendants, who have

22   been tireless in pursuing a strategy for the city to get back

23   to normal while minimizing the risk to public health and

24   safety.  The city officials have plotted a course between

25   Scylla and Charybdis and have done so in the face of rapidly

LacWkanD

1    evolving scientific and medical knowledge.  They have done so

2    in the face of massive disinformation about Covid and vaccines

3    that has been relentlessly pushed out through social media and

4    has been swallowed by some people hook, line, and sinker.  It

5    is clear to me that if social media had been around at the

6    beginning of the last century, we would not have eliminated

7    smallpox, and polio would still be endemic in this country.

8              Plaintiffs have applied for a preliminary injunction

9    to enjoin the implementation of the city's Covid vaccine

10   mandate for DOE employees.  For the reasons I will lay out in

11   detail, plaintiffs have not shown that they are entitled to

12   this extraordinary remedy, and their application for

13   preliminary injunction is denied.

14             Ten Department of Education employees have sued the

15   mayor, the city health commissioner, and the DOE, claiming that

16   a city order requiring DOE employees to be vaccinated against

17   COVID-19 violates their constitutional rights.  The challenged

18   order, which was initially published on August 24, required all

19   DOE employees to provide proof of vaccination by September 27.

20   *See* Aug. 24 order, which is at Dkt. 1-1.  After discussions

21   with DOE regarding the impact of the order on the employees it

22   represents were unsuccessful, on September 1, the United

23   Federation of Teachers, or UFT, filed a declaration of impasse

24   and the parties proceeded to arbitration.  Compl., Dkt. 1 at ¶

25   29.

JA-677

LacWkanD

```
1              On September 10, the arbitrator published an award
2      which required that DOE provide eligible UFT employees with
3      medical and religious exemptions according to criteria laid out
4      in the award.  Id. ¶ 30; Arb. Award, Dkt. 1-2.  The award also
5      established that employees who do not submit proof of
6      vaccination and who do not have a pending or granted exemption
7      would be placed on leave without pay, Resp., Dkt. 31 at 4.  A
8      similar award was entered a few days later to cover DOE
9      employees represented by the Council of School supervisors &
10     Administrators, or CSA, Compl. ¶ 31.  The two awards will be
11     collectively referred to as "arbitration awards."
12             On September 15, Commissioner Chokshi updated the
13     vaccine mandate order, adding a provision that "nothing in this
14     order shall be construed to prohibit any reasonable
15     accommodations otherwise required by law." Sept. 15 order,
16     Dkt. 31-2 ¶ 6.  And on September 28, 2021, Commissioner Chokshi
17     extended the date by which DOE employees must submit proof of
18     vaccination to October 1.  Sept. 28 order, Dkt. 31-3.
19             I will refer to the various commissioner of health
20     orders I just described as the vaccine mandate.
21             Plaintiffs filed this lawsuit on September 21, after
22     the arbitration awards had been issued and after Commissioner
23     Chokshi added to the mandate the possibility of a reasonable
24     accommodation.  Almost two weeks later, after the extended date
25     for compliance had passed, on October 4, plaintiffs applied for
```

LacWkanD

1    an order to show cause why a preliminary restraining order, or

2    TRO, and a preliminary injunction should not be ordered.  The

3    next day, Judge Vyskocil, sitting in part 1, denied the

4    plaintiffs' request for a TRO and scheduled this hearing on

5    plaintiffs' application for a preliminary injunction.  *See*

6    order, Dkt. 33.

7           Plaintiffs challenge the vaccine mandate facially and

8    as applied, Compl. ¶ 2.  An as-applied challenge addresses "the

9    application of an order to a particular set of plaintiffs,"

10   whereas a facial challenge addresses "the legality of the

11   [order] itself."  *Congregation Rabbinical Coll. of Tartikov,*

12   *Inc. v. Vill. of Pomona*, 915 F.Supp.2d 574, 611 (S.D.N.Y. 2011)

13   *aff'd sub nom.*, 945 F.3d 83 (2d Cir. 2019) (cleaned up).

14          I will begin with the plaintiffs' as-applied

15   challenges.

16          The vaccine mandate is applied to these 10 plaintiffs

17   through the arbitration awards.  Defendants report -- and

18   plaintiffs do not contest -- that all 10 plaintiffs are

19   represented by either the UFT or the CSA and are, therefore,

20   subject to the procedures and consequences outlined in the

21   arbitration awards.  *See* first Bernstein Decl., Dkt. 31-10, ¶¶

22   2, 4.  Instead of arguing that the arbitration awards do not

23   apply to them, plaintiffs argue that the contours of the

24   arbitration awards' religious exemptions are unconstitutional

25   or that, as interpreted by the arbitration panels that are

LacWkanD

1   handling the exemption process, are being applied

2   unconstitutionally.  *See generally* Compl., Dkt. 1; Mem. of Law,

3   Dkt. 16.

4           On the record before me, I cannot conclude that

5   plaintiffs have standing to challenge the exemption process

6   established by the arbitration awards as applied to them.  In

7   denying the TRO, Judge Vyskocil noted that neither party had

8   briefed the question of "whether, because there is the

9   collective bargaining process, the individual teachers as

10  opposed to the union have standing to even assert those

11  violations."  TRO hearing Tr. at 6; *see also Id.* at 18.

12  Despite having the issue flagged for them and being given the

13  opportunity to submit supplemental briefing, inexplicably,

14  plaintiffs' counsel did not address this crucial threshold

15  issue.

16          Under New York law, it is well established that "[i]f

17  there is no claim that the union breached its duty of fair

18  representation, an individual employee represented by a union

19  generally does not have standing to challenge an arbitration

20  proceeding to which the union and the employer were the only

21  parties." *Katir v. Columbia Univ.*, 15 F.3d 23, 24–25 (2d Cir.

22  1994) (internal citation omitted); *see also Chupka v.*

23  *Lorenz-Schneider Co.*, 12 N.Y.2d 1, 6 (1962) ("[E]ach individual

24  employee in becoming a beneficiary to the [collective

25  bargaining agreement] gives up to the union, as his

LacWkanD

1  representative, his individual right to sue on or litigate as

2  to the contract."); *Bd. of Educ. Commack Union Free Sch. Dist.*

3  *v. Ambach*, 70 N.Y.2d 501, 508 (1987) (collecting cases).

4  Plaintiffs may have a claim of breach of the duty of fair

5  representation, but the complaint does not articulate it, and I

6  have no facts before me that even remotely suggest that the

7  unions' conduct was arbitrary, discriminatory, or in bad faith.

8  *See Hunt v. Klein*, 2011 WL 651876, at *3 (S.D.N.Y. Feb. 10,

9  2011), *aff'd*, 476 F.App'x 889 (2d Cir. 2012).

10         In this case, due to the lack of briefing, it is not

11  clear that plaintiffs have standing.  Accordingly, I will order

12  supplemental briefing on that issue as well as the issue of

13  whether plaintiffs' remedy is an Article 75 proceeding.

14         Plaintiffs' facial challenges concern the legality of

15  the vaccine mandate itself.  To be entitled to a preliminary

16  injunction enjoining the implementation of the mandate,

17  plaintiffs must show: (1) a likelihood of success on the

18  merits; (2) that the plaintiff is liked to suffer irreparable

19  injury in the absence of an injunction; (3) that the balance of

20  hardships tips in the plaintiff's favor; and (4) that the

21  injunction is in the public interest.  *Capstone Logistics*

22  *Holdings, Inc. v. Navarette*, 736 F.App'x 25, 26 (2d Cir. 2018).

23  That burden is even higher when a party seeks "a mandatory

24  preliminary injunction that alters the status quo by commanding

25  some positive act, as opposed to a prohibitory injunction

LacWkanD

1   seeking only to maintain the status quo." *Cachillo v. Insmed,*

2   *Inc.*, 638 F.3d 401, 406 (2d Cir. 2011) (cleaned up).  To meet

3   that higher burden, a party seeking a mandatory injunction must

4   show a "clear or substantial likelihood of success on the

5   merits." *Donninger v. Neihoff*, 527 F.3d 41, 47 (2d Cir. 20008)

6   (cleaned up).

7        Plaintiffs are clearly seeking to change the status

8   quo.  The vaccine mandate went into effect on October 1, and

9   their challenge was filed on the morning of October 4.  But

10  because I find that plaintiffs have not met the lower standard

11  of a likelihood of success on the merits, I need not grapple

12  with the question of whether plaintiffs are seeking a

13  prohibitive or mandatory injunction.

14        Because plaintiffs assert a violation of their

15  constitutional rights as the irreparable harm, the first two

16  prongs of the preliminary injunction standard merge into one.

17  In order to show irreparable injury, plaintiff must show a

18  likelihood of success on the merits.  *Turley v. Giuliani*, 86

19  F.Supp.2d 291, 295 (S.D.N.Y. 2000).

20        Before I turn to the likelihood of success on the

21  merits, I note that preliminary injunctions are generally

22  issued when there is an urgent need for speedy action to

23  protect a plaintiff's rights.  As the Second Circuit has noted,

24  "a delay in seeking enforcement of those rights...tends to

25  indicate at least a reduced need for such drastic, speedy

LacWkanD

1   action."  *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d

2   Cir. 1985).

3        I am absolutely baffled by plaintiffs' delay in

4   seeking a preliminary injunction.  The vaccine mandate was

5   announced on August 23 and published on August 24.  Plaintiffs

6   filed this action almost a month later, on September 21.

7   Although the complaint asserted that plaintiffs were seeking a

8   preliminary injunction, *see* Compl. ¶ 6, there is no indication

9   that they served the complaint promptly and, even if they did,

10   they waited to seek an order to show cause why a TRO and

11   preliminary injunction should not be granted until October 4,

12   three days after the effective date of the order they were

13   challenging.  Although I am not denying the request for

14   emergency relief because of plaintiffs' delay, the apparent

15   gamesmanship by plaintiffs' counsel in waiting to file this

16   case and then in seeking a preliminary injunction does nothing

17   to help her cause.

18        I now turn to the likelihood of success on the merits

19   of plaintiffs' constitutional challenge, starting with the

20   alleged violations of the free exercise clause of the First

21   Amendment.

22        The Court's assessment of the free exercise claims

23   turns on whether the challenged restriction is "neutral" and of

24   "general applicability."  "[W]hen the government seeks to

25   enforce a law that is neutral and generally applicable, it need

LacWkanD

1    only demonstrate a rational basis for its enforcement, even if

2    enforcement of the law incidentally burdens religious

3    practices." *Commack Self-Serv. Kosher Meats, Inc. v. Hooker*,

4    680 F.3d 194, 212 (2d Cir. 2012).  If the restriction is not

5    neutral and generally applicable, then it is subject to "strict

6    scrutiny," which means that the restriction must be "narrowly

7    tailored" to serve a "compelling" state interest.  *See Roman*

8    *Cath. Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 67 (2020).

9            The first step in determining whether a law is neutral

10   is to look at the text of the law, because "if it refers to a

11   religious practice without a secular meaning discernible from

12   the language or context," it lacks facial neutrality.  *Church*

13   *of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S.

14   520, 533 (1993).  In *Roman Cath. Diocese of Brooklyn v. Cuomo*,

15   for example, the Supreme Court found that New York State

16   regulations that expressly established more restrictive Covid

17   rules for houses of worship than for similar secular activities

18   could not be viewed as neutral.  141 S.Ct. at 66.  Similarly,

19   in *Church of Lukumi*, the Supreme Court found that a city

20   ordinance was not facially neutral in part because it expressly

21   recited that the ordinance was passed to address the fact that

22   "certain religions may propose to engage in practices which are

23   inconsistent with public morals, peace or safety."  508 U.S. at

24   535.  There is no analogous language in the vaccine mandate; it

25   does not mention religion or religious practices at all.

LacWkanD

1          Although the explicit text of the order begins the

2     evaluation, it is not the end of the inquiry.  In addition to

3     overt discrimination against religious practices, the free

4     exercise clause also "forbids subtle departures from

5     neutrality," and "covert suppression of particular religious

6     beliefs." *Church of Lukumi*, 508 U.S. 534 (internal citations

7     omitted).  To ascertain whether such "subtle departures" exist,

8     courts consider "the historical background of the decision

9     under challenge, the specific series of events leading to the

10    enactment or official policy in question, and the legislative

11    or administrative history, including contemporaneous statements

12    made by members of the decision-making body." *Id.* at 540.

13         For example, in assessing New York State's Covid

14    restrictions on houses of worship, the Supreme Court and the

15    Second Circuit found it significant that a day before issuing

16    the order, then-Governor Cuomo said that if the "ultra-Orthodox

17    community" would not agree to enforce the rules, "then we'll

18    close the institutions down." *Agudath Israel of Am. v. Cuomo,*

19    983 F.3d 620, 627 (2d Cir. 2020); *see also Roman Cath. Diocese*

20    *of Brooklyn*, 141 S.Ct. at 66 (citing *Agudath Israel of Am. v.*

21    *Cuomo*, 980 F.3d 222, 229 (2d Cir. 2020) (Park, J., dissenting).

22    And although *Masterpiece Cakeshop* was an as-applied challenge

23    that is not directly on point, in that case the Supreme Court

24    found significant the "official expressions of hostility to

25    religion," including a comment by a commissioner that freedom

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LacWkanD

1    of religion had been used to justify slavery and the Holocaust.

2    138 S.Ct. 1719, 1729, 1732 (2018).

3          In this case, plaintiffs argue that comments by the

4    mayor indicate that there is religious animus surrounding the

5    vaccine mandate.  Their rhetoric notwithstanding, plaintiffs

6    have not provided a single statement made by the mayor or the

7    governor or Dr. Chokshi preceding or contemporaneous to the

8    vaccine mandate that suggests even a whiff of antireligion

9    animus.  The vaccine mandate was first announced on August 23

10   and it was published the next day.  The only statement cited by

11   the mayor cited by plaintiffs that precedes those dates was

12   made on August 3.  In that statement, the mayor is reported to

13   have said: "if you're unvaccinated, unfortunately, you will not

14   be able to participate in many things.  That's the point we're

15   trying to get across.  It's time for people to see vaccination

16   as literally necessary to living a good and full and healthy

17   life."

18         But far from targeting religious practices, the

19   mayor's messaging was clearly aimed at 100 percent of the

20   unvaccinated populace, whether their reason for being

21   unvaccinated was inertia, political objection, disinformation,

22   fear of needles, hostility to Big Pharma, or religion.  In

23   short, his statement did not in any way signal that the goal of

24   the law was to infringe on or to restrict the free exercise of

25   religion.

LacWkanD

1         The other two statements attributed to the mayor were

2    allegedly made on September 23 and 24, a month after the

3    vaccine mandate had been announced.  *See* Mem. of Law at 16

4    (citing the two media articles).  Plaintiffs' reliance on those

5    statements is baseless.  Putting aside the fact that the

6    articles are hearsay, they neither quote the mayor in full nor

7    provide the context in which the complained-of statements were

8    made.  Statements in which the mayor purportedly suggested that

9    religious exemptions would be available only to Christian

10   Scientists and Jehovah's Witnesses say nothing about the

11   purpose of a vaccine mandate and, if anything, to the

12   plaintiffs' as-applied challenges.  Evidence that the mayor's

13   statements may be being taken out of context can be found in

14   the fact, whomever he thought would be eligible for religious

15   exemption, religious exemptions have in fact been granted to

16   DOE employees who self-identify as adhering to at least 20

17   different religions.  Second Bernstein Decl., Dkt. 52 ¶ 7.  In

18   any event, the mayor's statements are of no moment to the

19   inquiry before me, which is whether the vaccine mandate itself,

20   not the arbitration awards, is neutral and generally applicable

21   to everyone, regardless of why he or she is not vaccinated.

22        Plaintiffs also contend that the vaccine mandate was a

23   "coordinated effort between the state and the city."  Mem. of

24   Law at 18.  Here, too, the only statements preceding or

25   contemporaneous with the vaccine mandate were purportedly made

LacWkanD

1   on August 24.  Those statements concerned the mayor's attempt

2   to forge a productive relationship with the new governor, *see*

3   Mem. of Law at 2, and have nothing to do with religion or

4   vaccines.  Moreover, the statements attributed to Governor

5   Hochul and allegedly made on September 15 and September 26

6   concern the state vaccine mandate for healthcare workers, *see*

7   Mem. of Law at 2-3, which has no bearing on whether the city's

8   mandate for DOE employees is a covert attempt to interfere with

9   the free exercise of religion by DOE employees.  In short, none

10  of the statements highlighted by plaintiffs is indicative of

11  subtle or covert departures from neutrality.

12          Additionally, when determining whether restrictions

13  are neutral and generally applicable, the Supreme Court

14  requires courts to assess whether the text of the restriction

15  was crafted to proscribe religious conduct while permitting

16  similar secular activities.  For example, in *Church of Lukumi*,

17  the Supreme Court found that the city ordinance at issue was

18  drafted in a way to prohibit the killing of animals as part of

19  a Santeria religious sacrifice but to permit the killing of

20  animals that is no more necessary or humane than a sacrifice

21  would be (like hunting, extermination of mice and rats, and

22  killing stray animals).

23          Here, the text of the vaccine mandate was not crafted

24  to target religious conduct for less favorable treatment than

25  the secular conduct.  DOE employees with political, moral, or

LacWkanD

1    philosophical objections to vaccines are all required to be

2    vaccinated.  In short, plaintiffs are not likely to prevail on

3    their argument that the vaccine mandate is not neutral and

4    generally applicable.

5           Because the city is likely to prevail on its argument

6    that the vaccine mandate is neutral and generally applicable,

7    for it to be unconstitutional, it must lack a rational basis.

8    Plaintiffs argue that the vaccine mandate is, in fact,

9    irrational.  *See, e.g.*, Compl. ¶ 312.  In support, plaintiffs

10   rely principally on a declaration from Dr. Jayanta

11   Bhattacharya, a medical doctor on the faculty of Stanford

12   Medical School, whose review of medical literature plaintiffs

13   claim supports their conclusion that the COVID-19 vaccines "are

14   for personal protection, and will not meaningfully mitigate the

15   spread of COVID-19 through the population."  Mem. of Law at 10;

16   Bhattacharya Decl., Dkt. 18.

17          Data cited by the CDC, on the other hand, indicate

18   that "fully vaccinated persons are less likely than

19   unvaccinated persons to acquire [COVID-19]" in the first place.

20   *See Science Brief: COVID-19 vaccines and vaccination*, Centers

21   for Disease Control & Prevention (last updated Sept. 15, 2021)

22   (collecting studies).  I do not need to conclude whose review

23   of the data is more accurate.  Given the data that exists, it

24   was not irrational for the city to conclude that vaccinations

25   reduced the probability of infection.  As Judge Cogan stated in

LacWkanD

1    a different challenge to the DOE vaccine mandate, "even if

2    plaintiffs disagree with it, the order at issue represents a

3    rational policy decision surrounding how best to protect

4    children during a global pandemic."  *Maniscalco v. New York*

5    *City Dep't of Educ.*, 2021 WL 4344267, at *3 (E.D.N.Y. Sept. 23,

6    2021).

7            Although that is enough on its own to find that

8    plaintiffs are unlikely to prevail on their argument that the

9    vaccine mandate is irrational, I do want to take the

10   opportunity to highlight some of the indefensible assertions in

11   plaintiffs' discussion of the Covid vaccines.  As an initial

12   matter, it is unclear whether Dr. Bhattacharyta's opinion would

13   survive a *Daubert* challenge.  Putting aside the fact that his

14   expertise is not epidemiology -- he has a Ph.D. in economics

15   and specializes in health policy -- 15 of the studies he relies

16   on come from MedRxiv or BioRxiv, websites that post preliminary

17   reports of work that have not been peer reviewed.  MedRxiv

18   explicitly cautions readers not to rely on the studies on the

19   site "to guide clinical practice or health-related behavior and

20   should not be reported in news media as established

21   information."  While the websites do not expressly caution

22   against citing studies on its site in court papers,

23   Dr. Bhattacharyta should have known better or at the very

24   minimum should have provided a disclaimer of some kind to

25   designate for the Court which of the studies he was relying on

LacWkanD

1   are not peer reviewed.  Because a substantial portion of the

2   authority on which he relies has not been peer reviewed, the

3   Court is entirely unable to assess what weight, if any, should

4   be given to his opinion.

5        Plaintiffs also emphasize that "vaccination cannot

6   stop transmission" of the virus.  *See, e.g.*, Compl. ¶ 117.  But

7   you do not have to be an epidemiologist or a statistician to

8   see that plaintiffs are conflating conclusions about

9   transmissions by vaccinated persons with rates of infection

10  among vaccinated persons.  There is no dispute that there have

11  been breakthrough infections and that the Covid vaccines do not

12  fully prevent transmission.  But so what?  The fact that a

13  vaccinated person can become infected does not mean that

14  vaccinated persons and unvaccinated persons have the same

15  <u>likelihood</u> of becoming infected.  Put another way, concluding

16  that infected vaccinated persons transmit the virus at similar

17  rates to unvaccinated persons says nothing about how likely it

18  is for someone who is vaccinated to be infected in the first

19  place.  The CDC director brought home that point in the very

20  CNN interview on which plaintiffs rely when she noted that

21  surges of Covid infections were occurring "areas that have

22  pockets of people who are unvaccinated."  If *both* the

23  susceptiblity to infection and the rate of transmission were

24  the same for vaccinated and unvaccinated persons, we would have

25  expected to see uniform case numbers of COVID-19 across the

LacWkanD

1    country after the vaccine became available.  But we do not see

2    that; there is no disputing that places with higher vaccination

3    rates are seeing lower rates of Covid infections than areas

4    with lower vaccination rates.

5         Additionally, plaintiffs argue strenuously that people

6    who have recovered from COVID-19, even if they are not

7    vaccinated, have robust natural immunity that prevents

8    transmission of the disease.  *See, e.g.,* Compl. ¶ 114; Mem. of

9    Law at 11; Bhattacharya Decl. ¶¶ 14, 18; Makary Decl., Dkt. 19

10   ¶ 12.  But even assuming that were true -- an assessment the

11   Court cannot make given plaintiffs' expert's heavy reliance on

12   articles that have not been peer reviewed -- it says nothing

13   about whether the city acted rationally in relying on the CDC

14   advice that even people who have had Covid should be

15   vaccinated.  In addition to it being rational to follow the

16   advice of the CDC, the Court can think of other rational

17   reasons not to exclude from operation of the mandate to

18   employees who have had, or believe they have had, COVID-19.

19   Just to name one, the city may wish to avoid a policy that may

20   encourage employees to purposely infect themselves with the

21   virus, especially because -- as plaintiffs recognize --

22   unvaccinated persons are more likely to suffer a severe course

23   of infection, including hospitalization and death, than those

24   who have been vaccinated.

25         In short, I cannot conclude that plaintiffs are likely

LacWkanD

1   to prevail on their claim that the vaccine mandate is

2   unconstitutional because it is irrational.

3          Plaintiffs have not shown that they are likely to

4   succeed on the merits of any of their other facial challenges

5   to the mandate.  Plaintiffs contend that the vaccine mandate

6   violates the establishment clause of the First Amendment, which

7   prohibits excessive government entanglement with religion.

8   Mem. of Law at 19-20.  But that argument is unlikely to succeed

9   on the merits for the same reason as plaintiffs' free exercise

10  claims; most of plaintiffs' challenges regard the application

11  of the vaccine mandate through the arbitration awards, an issue

12  I cannot at this point for the reasons I've already discussed.

13  And facially, the vaccine mandate requires no entanglement with

14  religion whatsoever.  In short, plaintiffs' establishment

15  clause claims are unlikely to succeed on the merits.

16         Plaintiffs also argue that the vaccine mandate

17  violates their substantive due process rights under the

18  Fourteenth Amendment.  *See*, *e.g.*, Compl. ¶¶ 318-319; Mem. of

19  Law at 8, 22.  "To allege a violation of substantive due

20  process, plaintiff must claim (1) a valid...fundamental right;

21  and (2) that the defendant infringed on that right by conduct

22  that shocks the conscience or suggests a gross abuse of

23  governmental authority."  *Dukes v. New York City Employees'*

24  *Ret. Sys.*, 361 F.Supp.3d 358 375, (S.D.N.Y. 2019).  I do not

25  need to opine on whether the rights identified by plaintiffs,

JA-693

LacWkanD

1   including the right to refuse administration of medical

2   products and the right to bodily integrity, *see* Compl. ¶¶

3   318-321, constitute fundamental rights under pertinent case

4   law.  Instead, I find that plaintiffs' substantive due process

5   arguments are unlikely to succeed on the merits because the

6   vaccine mandate does not shock the Court's conscience.  Vaccine

7   mandates are not new*, see, e.g., Jacobson v. Commonwealth of*

8   *Massachusetts*, 197 U.S. 11 (1905), and it is far from shocking

9   for the city to conclude that requiring vaccination of its DOE

10   employees is a rational way to get and keep the schools open

11   and to protect school children, many of whom are not yet

12   eligible to the vaccinated.

13        Plaintiffs also argue that the vaccine mandate

14   unlawfully discriminates against unvaccinated persons in

15   violation of the Fourteenth Amendment's equal protection

16   clause.  Compl. ¶ 329.  Because the unvaccinated are not a

17   "protected class," to prevail on their equal protection claim,

18   plaintiffs must demonstrate that there is no rational basis for

19   the difference in treatment between the vaccinated and the

20   unvaccinated.  *See Kadrmas v. Dickinson Pub. Sch.*, 487 U.S.

21   450, 457-58 (1988).  Plaintiffs have not demonstrated that they

22   are likely to prevail on their argument that there is no

23   rational basis for the vaccine mandate.  It follows that they

24   are also not likely to prevail on their argument that there is

25   no rational basis to distinguish, for purposes of employment in

JA-694

LacWkanD

1    New York City public schools, between those who have been

2    vaccinated and those who have not.

3         In short, plaintiffs have not shown that they are

4    likely to succeed on the merits of any of their facial

5    constitutional challenges to the vaccine mandate.

6         Although plaintiffs' failure to show a likelihood of

7    success on the merits is enough of a reason for me to deny

8    their application for a preliminary injunction, I will also

9    consider the last two elements of the preliminary injunction

10   standard: the balance of the equities and the public interest.

11   Because the government is the opposing party, those two factors

12   merge and are considered together.  *Coronel v. Decker*, 449

13   F.Supp.3d 274, 287 (S.D.N.Y. 2020).  In assessing the two

14   factors, a court must "balance the competing claims of injury

15   and must consider the effect on each party of the granting or

16   withholding of the requested relief, as well as the public

17   consequences in employing the extraordinary remedy of

18   injunction."  *Yang v. Kosinski*, 960 F.3d 119, 135-36 (2d Cir.

19   2020) (cleaned up).

20        Defendants contend that the vaccine mandate furthers

21   the "public interest in limiting the spread of COVID-19 in

22   schools for the safety of children, other school employees, and

23   the community at large"  And that it ensures "that in-person

24   schooling may continue, uninterrupted, for as many children as

25   possible."  Resp. at 18.  Plaintiffs, on the other hand,

LacWkanD

1    emphasize that losing 15,000 teachers and staff will "endanger

2    and harm the one million children who attend public schools in

3    New York City." Mem. of Law at 25.  Although defendants report

4    that the 15,000 number is likely closer to 7,000, *see* second

5    Bernstein Decl. ¶ 5, I have no doubt that students will suffer

6    from losing their regular teachers and support staff.

7            Reasonable minds can disagree on the right way to

8    achieve public goals.  In this case, plaintiffs argue that the

9    city's way is draconian and unfair; the city's response is that

10   it is neither and that it strikes an appropriate balance

11   between the needs of its schools and their employees and public

12   health risks.  Different public officials may weigh all of

13   those interests differently, but given the complex and

14   life-threatening challenges associated with the COVID-19

15   pandemic, striking that balance is left to our elected

16   officials -- not the courts.  In short, the balance of the

17   equities and the public interest tip decidedly in defendants'

18   favor.

19           In sum, based on the record before me, because there

20   is a question whether plaintiffs have standing to challenge the

21   UFT awards and because plaintiffs have not shown that they are

22   likely to succeed on the merits of their facial challenges,

23   plaintiffs' application for a preliminary injunction is denied.

24   Plaintiffs' request to hold the record open for additional

25   evidence of animus is denied, because plaintiff had more than

LacWkanD

1    enough time to pull the evidence together before this hearing.

2    I will consider any such evidence on the merits outside of the

3    preliminary injunction context.

4         The Court had previously set a conference in this case

5    for November 12.  Before I get to the briefing schedule on the

6    standing issue, is the city's plan to answer the complaint or

7    move to dismiss it?

8         MS. MINICUCCI:  Move to dismiss, your Honor.

9         THE COURT:  OK.

10        To the plaintiffs, if the city moves to dismiss your

11   complaint, as of right, you can amend your complaint.  If you

12   think you can solve the problems that they identify in your

13   complaint, I encourage you to amend the complaint.  I'll then

14   dismiss their motion at moot, and we'll start all over again.

15   If you can't fix the complaint to deal with the problems they

16   raise, then respond to it.  But please do not do both.  OK?

17        MS. GIBSON:  Yes, your Honor.

18        THE COURT:  Now, the issue of standing, I'm going to

19   give the plaintiffs the opportunity to go first.

20        How long would you like?

21        MS. GIBSON:  Five minutes, your Honor.

22        THE COURT:  You're going to brief it in five minutes?

23        MS. GIBSON:  Oh.  Oh, OK.  Yes, I thought you wanted

24   me to argue.

25        THE COURT:  Holy cow.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LacWkanD

1          MS. GIBSON:  A week.

2          THE COURT:  I'm going to give you two.  I want you to

3     do a good job on this.  This is a significant issue to your

4     clients.  If they have standing to challenge the arbitration

5     awards, then I'm going to be asking you to brief, in a rational

6     way, whether they have, in fact, been discriminated against;

7     that is, as they actually were injured on an as-applied basis,

8     but the critical first point is whether they can challenge the

9     awards.

10          I'm going to give you two weeks, and I urge you to do

11     a good job, a much better job than you've done on your papers

12     that were before me.  This is a critical issue.

13          How long does the city want in response?

14          MS. MINICUCCI:  Two weeks, please, your Honor.

15          THE COURT:  All right.  Two weeks.  According to my

16     little calendar, today's the 12th, so the plaintiffs' brief

17     will be due the 26th.  The city's response is due the 9th, and

18     I'll give you a reply, which will be due November 16.

19          After reviewing those papers, we'll determine what the

20     next steps are.

21          Anything further from the plaintiffs?

22          MS. GIBSON:  No.  Thank you, your Honor.

23          THE COURT:  Anything further from the defendants?

24          MS. MINICUCCI:  Your Honor, defendants would just ask

25     to have more time to respond to the complaint since we've been

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LacWkanD

1   served.

2           THE COURT:  When did you all get served?

3           MS. MINICUCCI:  Last week.  I believe it was towards

4   the end of the week, but not all the defendants, I believe,

5   have been served.

6           THE COURT:  OK.  Why don't we do this.  I'm going to

7   stay your time to respond to the complaint.  Let's figure out

8   what the plaintiffs exactly have standing to challenge.  Then

9   I'll set a date for you to answer, and we'll go forward with

10  the briefing at that point.

11          MS. MINICUCCI:  Thank you, your Honor.

12          THE COURT:  You're welcome.

13          Anything else from defendants?

14          MS. MINICUCCI:  No.

15          THE COURT:  All right.

16          MS. MINICUCCI:  Thank you, your Honor.

17          THE COURT:  Thanks, everybody.

18          (Adjourned)

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ x

NICOLE BROECKER, et al., on behalf of themselves and
all other similarly situated employees of the New
York City Department of Education,,

                                                                            No. 21 Civ 6387 (KAM)(LB)

                                    Plaintiffs,

                    - against -

NEW YORK CITY DEPARTMENT OF EDUCATION,
MEISHA PORTER, in her official and individual
capacities, UNITED FEDERATION OF TEACHERS,
LOCAL 2, AMERICAN FEDERATION OF TEACHERS,
AFL-CIO, MICHAEL MULGREW, in his official and
individual capacities, JOHN DOE #1-10, in their official
and individual capacities; and JANE DOE #1-10 in their
official and individual capacities,

                                    Defendants.

------------------------------------------------------------------------ x

STATE OF NEW YORK    )
                          ) SS.:
COUNTY OF NEW YORK  )

**VICKI BERNSTEIN** being duly sworn, deposes and says:

      1.  I am the Chief Human Capital Officer at the New York City Department of

Education (DOE). I submit this declaration in opposition to Plaintiffs' application for a

preliminary injunction.  I am familiar with the facts set forth herein based on my personal

knowledge as well as discussions with other DOE employees and the review of DOE records and

publicly available information.

      2.  Under Education Law §2573, a teacher must complete four years of service to

achieve tenure.  According to the New York State Education Department ("SED") a teacher may

begin teaching with what is referred to as an "Initial Certificate," which is valid for five years,

JA-700

during which time the teacher is expected to obtain a master's degree and a "Professional Certificate" and complete all necessary certification requirements.  A teacher may complete a probationary period and, based on the collective bargaining agreement between the DOE and UFT, be entitled to the protections afforded by Education Law §3020-a, which requires that a teacher be brought up on disciplinary charges and a hearing prior to being terminated, among other things.

3.   The Department reviews pedagogical certification status on a regular basis and identifies pedagogical employees who are close to the expiration of their Initial Certification.

4.   Each year, the Department identifies pedagogical employees who have an expired Initial Certification (including teachers that have completed the probationary period), and who have not completed the necessary certifications, and separates such employees from service without a hearing pursuant to Education Law §3020-a. Indeed, the union representing New York City teachers, the United Federation of Teachers, in its own website, admonishes teachers that: "although you can be tenured while holding an initial certificate, you can be terminated without the right to due process for failure to complete the requirements for the professional certificate in the same license area" See "How do I achieve Tenure" *available at* https://www.uft.org/teaching/new-teachers/tenure

2

5. For example, in the 2018-2019 school year, the Department separated 136 staff (131 teachers, 3 guidance counselors, and 2 social workers); in the 2019-2020 school year, the Department separated 30 staff (27 teachers, and 3 social workers); and in the 2020-2021, school year, the Department separated 217 staff (198 teachers, 3 guidance counselors, 15 social workers, 1 psychologist) from service based on their failure to obtain the required certifications.

Dated:    New York, New York
          November 19, 2021

          _____
          VICKI BERNSTEIN

Sworn to before me this
19th day of November, 2021

_____
NOTARY PUBLIC

NOTARY PUBLIC
MALLORY OSGOOD SULLIVAN
No. 02SU6535673
Exp. 01/19/2022
KINGS COUNTY
STATE OF NEW YORK

3

JA-702

```
SCHEINMAN ARBITRATION AND MEDIATION SERVICES
------------------------------------------- X
In the Matter of the Arbitration
                                             X
            between
                                             X
NEW YORK CITY DEPARTMENT OF EDUCATION                Re: UFT. 962
                                             X
            and
                                             X
   ANASTASIA CHRISTOPOULOS
                                             X
------------------------------------------- X
```

Issue:      _Religious Exemption_____

Date of Hearing: _____

<u>Award</u>

APPLICATION FOR EXEMPTION: GRANTED [ ]    DENIED [X]    OTHER [ ]

_____

_____

_____

_____

_____

_____

_____            _9/4/21_____
Arbitrator                             Date

Barry J. Peek, Esq

JA-703

SCHEINMAN ARBITRATION AND MEDIATION SERVICES
------------------------------------------------ X

In the Matter of the Arbitration                 X

                between                           X

NEW YORK CITY DEPARTMENT OF EDUCATION            X          Re: UFT. 1056

                and                              X

          JEANNINE LAM                           X

------------------------------------------------ X

Issue: _Religious Exemption_____

Date of Hearing: _____

                        <u>Award</u>

APPLICATION FOR EXEMPTION: GRANTED [ ]    DENIED [X]    OTHER [ ]

_____

_____

_____

_____

_____

_____

_____        _____
Arbitrator                                Date
Barry J. Peck, Esq.

JA-704

SCHEINMAN ARBITRATION AND MEDIATION SERVICES
------------------------------------------- X
In the Matter of the Arbitration

                                            X

            between

                                            X

NEW YORK CITY DEPARTMENT OF EDUCATION             Re:UFT.687

                                            X

            and

                                            X

      Maria Ruscelli                        X

------------------------------------------- X


Issue:    Religious Exemption


Date of Hearing: September 24, 2021

                         Award

APPLICATION FOR EXEMPTION: GRANTED [ ]   DENIED [ x]   OTHER [ ]


The requirements necessary to establish a religious exemption
were not met. Of note, the Pfizer and Moderna vaccines do not
use fetal cell lines for vaccine production and manufacturing
and do not contain any animal byproducts or preservatives.


_____          September 24, 2021
                                         _____
Arbitrator                               Date

JA-705

```
SCHEINMAN ARBITRATION AND MEDIATION SERVICES
------------------------------------------------- X
In the Matter of the Arbitration
                                                  X
              between
                                                  X
NEW YORK CITY DEPARTMENT OF EDUCATION                  Re: UFT. 1184
                                                  X
              and
                                                  X
      KELLY DIXON
                                                  X

------------------------------------------------- X
```

Issue: _Religious Exemption_

Date of Hearing: _____

<u>Award</u>

APPLICATION FOR EXEMPTION: GRANTED [ ]   DENIED [X]   OTHER [ ]

_____

_____

_____

_____

_____

_____

_____          _____
Arbitrator                          Date

Barry J. Peck, Esq,

JA-706

SCHEINMAN ARBITRATION AND MEDIATION SERVICES

------------------------------------------- x

In the Matter of the Arbitration              x

between                              x

NEW YORK CITY DEPARTMENT OF EDUCATION          x     Re: *Anita Quash*

and                                x        *UFT, 977*

*United Federation of Teachers*  x

------------------------------------------- x

Issue: *Shall Ms. Quash's appeal from the Department of Education's denial of her application for a religious exemption from the City's vaccine mandate be granted or denied under the September 10, 2021 Award of Arbitrator Martin F. Scheinman?*

Date of Hearing: *September 30, 2021*

Award

APPLICATION FOR EXEMPTION: GRANTED [ ]   DENIED [X]   OTHER [ ]

Arbitrator *Earl R. Pfeffer*          Date *10/7/2021*

JA-707

```
SCHEINMAN ARBITRATION AND MEDIATION SERVICES
-------------------------------------------- X
In the Matter of the Arbitration
                                             X
          between
                                             X
NEW YORK CITY DEPARTMENT OF EDUCATION              Re:UFT.388
                                             X
          and
                                             X
AMOURA BRYAN
                                             X

-------------------------------------------- X
```

Issue:    Religious Exemption

Date of Hearing: September 24, 2021

<u>Award</u>

APPLICATION FOR EXEMPTION: GRANTED [ ]   DENIED [X]   OTHER [ ]


_____          <u>September 25, 2021</u>
Arbitrator Robert A. Grey, Esq.        Date

JA-708

```
SCHEINMAN ARBITRATION AND MEDIATION SERVICES
---------------------------------------------- X
In the Matter of the Arbitration
                                          X
        between
                                          X
NEW YORK CITY DEPARTMENT OF EDUCATION            Re: UFT.515
                                          X
        and
                                          X
Gina Porcello
                                          X

---------------------------------------------- X
```

Issue:    Religious Exemption

Date of Hearing: September 27, 2021

## AWARD

APPLICATION FOR EXEMPTION: GRANTED [ ]  DENIED [ ]  OTHER [✓]

*Withdrawn by Employee*

*Carol M. Hoffman*
--------------------------
Carol M. Hoffman, Esq.

Arbitrator

Date: Sept.28,2021    *Sept. 28, 2021*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------- X
                                                         :
BROECKER *et al.*,                                       :
                                                         :
                              Plaintiffs,                :
                                                         :
          -against-                                      :
                                                         :          Index No. 21-cv-6387
                                                         :
NEW YORK CITY DEPARTMENT OF                              :
EDUCATION, *et al.*,                                     :
                                                         :
                              Defendants.                :
-------------------------------------------------------- X

**DEFENDANT UNITED FEDERATION OF TEACHERS, LOCAL 2, AFL-CIO'S
MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' APPLICATION FOR A
<u>TEMPORARY RESTRAINING ORDER AND PERMANENT INJUNCTION</u>**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ................................................................................... 1

ADDITIONAL RELEVANT FACTS .......................................................................... 4

    I.    New York's State of Emergency, Shutdown, and Reopening ............................. 4

    II.    The DOE Vaccination Mandate .......................................................................... 6

    III.    The Award ............................................................................................................ 7

    IV.    Court Challenges To Vaccination Mandates ...................................................... 9

ARGUMENT ............................................................................................................... 14

    I.    PLAINTIFFS' CANNOT DEMONSTRATE A LIKELIHOOD OF
            SUCCESS ON THE MERITS OF THEIR 42 U.S.C. § 1983 CLAIMS .............. 14

            A. UFT Is Not a State Actor ................................................................................ 14

            B. The UFT Has Not "Aided and Abetted" Violations of § 1983 ........................ 18

    II.    PLAINTIFFS FAIL TO CONSIDER THE AWARD ......................................... 18

CONCLUSION ............................................................................................................. 20

## TABLE OF AUTHORITIES

Page(s)

**Cases**

Ahrens v. New York State Pub. Employees Fed'n, AFL-CIO,
    203 A.D.2d 796 (3d Dep't 1994) ........................................................................................17

Burton v. Wilmington Parking Auth.,
    365 U.S. 715 (1961)..........................................................................................................16

Callaghan v. United Federation of Teachers,
    133 A.D.3d 412 (1st Dep't 2015) ......................................................................................14

Chambers v. Time Warner, Inc.,
    282F.3d 147 (2d Cir. 2002)...............................................................................................18

Ciambriello v. County of Nassau,
    292 F.3d 307 (2d Cir. 2002)....................................................................................14, 16, 17

Commodari v. Long Island Univ.,
    89 F. Supp. 2d 353 (E.D.N.Y. 2000), aff'd, 62 F. App'x 28 (2d Cir. 2003) ..........................15

Dahl v. Bd. of Trustees of W. Mich. Univ.,
    No. 21-2945, 2021 WL 4618519 (6th Cir. Oct. 7, 2021) ......................................................12

Dennis v. Sparks,
    449 U.S. 24 (1980)...........................................................................................................15

Doe v. Mills,
    16 F.4th 20 (1st Cir. 2021), petition for cert. filed (Nov. 15, 2021) .......................................12

Driskell v. New York City,
    11 Civ. 4915 (BMC), 2011 WL 6812516 (E.D.N.Y. Dec. 23, 2011)....................................14

Dykes v. Southeastern Pa. Transp. Auth.,
    68 F.3d 1564 (3d Cir. 1995)..............................................................................................18

Figueroa v. City of Camden,
    580 F. Supp. 2d 390 (D.N.J. 2008) ...................................................................................18

Goel v. Bunge, Ltd.,
    820 F.3d 554 (2d Cir. 2016)..............................................................................................18

Harmon v. Matarazzo,
    162 F.3d 1147 (2d. Cir. 1998)...........................................................................................14

International Audiotext Network, Inc. v. Am. Tel. and Tel. Co.,
   62 F.3d 69 (2d Cir. 1995).................................................................................18

Jacobson v. Massachusetts,
   197 U.S. 11 (1905)........................................................................................11

Jessamy v. City of New Rochelle, New York,
   292 F. Supp. 2d 498 (S.D.N.Y. 2003)............................................................16

Kane, et al. v. de Blasio et al.,
   No. 21-2678 (2d Cir. Nov. 15, 2021)............................................................12

Klaassen et al. v. Trustees of Indiana University,
   No. 21-2326 (7th Cir. Aug. 2, 2021)............................................................12

Leahy v. Board of Trustees,
   912 F.2d 917 (7th Cir. 1990) .......................................................................17

Maniscalco et al. v. The New York City Department of Education, et al.,
   21-cv-5055 (BMC) (E.D.N.Y. Sept. 23, 2021)..............................................11

Mehrhoff v. William Floyd Union Free School District,
   No. 04-CV-3850, 2005 WL 2077292 (E.D.N.Y. Aug. 22, 2005) ..................15, 18

MLC et. Al. v. City of New York et al.,
   158368/2021 (Sup. Ct. N.Y. Cnty.) .............................................................9

National Broadcasting Co. v. Communications Workers of America,
   860 F.2d 1022 (11th Cir. 1988) ...................................................................15

New York City Mun. Labor Comm. v. City of New York,
   73 Misc. 3d 621 (Sup. Ct. N.Y. Cnty. 2021) ...........................................2, 11, 18

Sykes v. Bank of America,
   723 F.3d 399 (2d Cir. 2013)..........................................................................16

Town of Southampton v. N.Y. State Pub. Empl. Rels. Bd.,
   2 N.Y.3d 513 (2004) ...................................................................................19

Valvo v. Dep't of Educ. of N.Y.,
   19-CV-8341 (JPO), 2021 WL 1063759 (S.D.N.Y. Mar. 18, 2021).................17

We the Patriots USA, Inc. et al. and Dr. A. v. Hochul
   (No. 21-2179 (2d Cir. Nov. 4, 2021) .............................................................12

We the People v. Hochul,
   Nos. 21-2179, 21-2566 (2d Cir. Nov. 4, 2021)..............................................18

iii

**Statutes**

42 U.S.C. § 1983 ................................................................................................... *passim*

N.Y. Civil Service Law § 75 ............................................................................................. 9

N.Y. Civil Servivce Law § 200 *et seq.* ........................................................................... 14

N.Y. Education Law § 3020 .............................................................................................. 9

N.Y. Education Law § 3020-a .......................................................................................... 9

**Other Authorities**

Arbitrator rules in union's favor on medical accommodations, UFT (Sept. 10,
     2021),  https://www.uft.org/news/news-stories/arbitrator-rules-unions-favor-
     on-medical-accommodations ....................................................................................... 13

Article 1 § 6 of the New York Constitution ...................................................................... 9

CPLR Article 78 .......................................................................................................... 9, 11

COVID-19: Data, NYC HEALTH, https://www1.nyc.gov/site/doh/covid/covid-19-
     data-variants.page (last accessed Nov. 19, 2021). ...................................................... 5

Education Employee Vaccine Mandate, NYC OFFICE OF THE MAYOR (Aug. 23,
     2021), https://www1.nyc.gov/office-of-the-mayor/news/578-21/mayor-de-
     blasio-chancellor-porter-commissioner-chokshi-department-education .................... 6

Education Employees, Contractors, Visitors, and Others, NEW YORK CITY
     DEPARTMENT OF HEALTH AND MENTAL HYGIENE (Sept. 28, 2021),
     https://www1.nyc.gov/assets/doh/downloads/pdf/covid/covid-19-vaccination-
     requirement-doe-3.pdf ................................................................................................. 2

Emergency Executive Order No. 98 (Mar. 12, 2020) ....................................................... 5

Executive Order No. 202.8 (Mar. 20, 2020) ..................................................................... 5

Executive Order No. 202 (Mar. 7, 2020) .......................................................................... 5

Governor Cuomo Signs the 'New York State on PAUSE' Executive Order, New
     York State Governor (Mar. 20, 2020),
     https://www.governor.ny.gov/news/governor-cuomo-signs-new-york-state-
     pause-executive-order (last accessed Nov. 19, 2021) .................................................. 5

Mayor de Blasio, Chancellor Porter and Commissioner Chokshi Announce
    Department of Education Employee Vaccine Mandate, NYC OFFICE OF THE
    MAYOR (Aug. 23, 2021), https://www1.nyc.gov/office-of-the-
    mayor/news/578-21/mayor-de-blasio-chancellor-porter-commissioner-
    chokshi-department-education ...........................................................................................6.

MSNBC's Morning Joe, NYC OFFICE OF THE MAYOR (July 21, 2021),
    https://www1.nyc.gov/office-of-the-mayor/news/508-21/transcript-mayor-de-
    blasio-appears-live-msnbc-s-morning-joe ...................................................................6

New York Constitution Amendment, Article 1 § 6 ...........................................................9

New York Is Reopening. Here's What That Actually Means, N.Y. TIMES (May
    19, 2021, updated Sept. 17, 2021) .................................................................................5

Order of the Commissioner of Health and Mental Hygiene to Require COVID-19
    Vaccination or Testing for Staff in Public health Settings (July 21, 2021),
    https://www1.nyc.gov/assets/doh/downloads/pdf/covid/covid-19-vaccination-
    or-testing-staff-public-settings-072121.pdf ..................................................................6

Order of the Commissioner of Health and Mental Hygiene to Require COVID-19
    Vaccination For Department of Education Employees, Contractors, Visitors,
    and Others, NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE
    (Aug. 24, 2021),
    https://www1.nyc.gov/assets/doh/downloads/pdf/covid/covid-19-vaccination-
    requirement-doe.pdf...................................................................................................2, 7

Order of the Commissioner of Health and Mental Hygiene to Require COVID-19
    Vaccination For Department of Education Employees, Contractors, Visitors,
    and Others, NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE
    (Sept. 15, 2021),
    https://www1.nyc.gov/assets/doh/downloads/pdf/covid/covid-19-vaccination-
    requirement-doe-2.pdf .............................................................................................2, 10

Order of the Commissioner of Health and Mental Hygiene to Require COVID-
    19 Vaccination For Department of Education Employees, Contractors,
    Visitors, and Others, NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL
    HYGIENE (Sept. 28, 2021),
    https://www1.nyc.gov/assets/doh/downloads/pdf/covid/covid-19-vaccination-
    requirement-doe-3.pdf ..................................................................................................2

PAUSE' Executive Order, New York State Governor (Mar. 20, 2020),
    https://www.governor.ny.gov/news/governor-cuomo-signs-new-york-state-
    pause-executive-order (last accessed Nov. 19, 2021)...................................................5

Sharon Otterman, New York Is Reopening.  Here's What That Actually Means,
      N.Y. Times (May 19, 2021, updated Sept. 17, 2021),
      https://www.nytimes.com/2021/05/19/nyregion/nyc-reopening-restrictions-
      masks-vaccines.html.

Sharon Otterman, Here's Who Is Hospitalized for Covid in New York City as
      Cases Rise, N.Y. Times (July 30, 2021) ................................................................6

Transcript: Mayor de Blasio Holds Media Availability, NYC Office of the
      Mayor (July 26, 2021), https://www1.nyc.gov/office-of-the-
      mayor/news/517-21/transcript-mayor-de-blasio-holds-media-availability ..............................6

Transcript: Mayor de Blasio Appears Live on MSNBC's Morning Joe, NYC
      Office of the Mayor (July 21, 2021), https://www1.nyc.gov/office-of-the-
      mayor/news/508-21/transcript-mayor-de-blasio-appears-live-msnbc-s-
      morning-joe.........................................................................................................6

UFT (Sept. 10, 2021), https://www.uft.org/news/news-stories/arbitrator-rules-
      unions-favor-on-medical-accommodations ............................................................13

## PRELIMINARY STATEMENT

The pervasive impact of the COVID-19 pandemic and its impact on New York City, the rest of the country and – indeed – the world, needs little introduction.  At the height of the pandemic, public schools and educators, in particular, faced nearly overwhelming obstacles in balancing the continued provision of quality education with the health and safety of students, school staff, and their respective families.  Throughout this period, Defendant United Federation of Teachers (the "UFT") strove to protect the health and safety of its members and the children they serve, first in securing the closing of the New York City public schools and then working towards accomplishing their safe re-opening. Contributing to this latter success was the development and (eventual) widespread distribution of Covid-19 vaccines.

Yet, although it encourages vaccination for all who are able, the UFT – contrary to the impression created by the Complaint – understands that not all of its members are able or willing to undergo inoculation.  The UFT has made considerable efforts to press the rights of those individuals, and – when courts across New York and the country were finding that public employers had the right to impose vaccination mandates – the UFT worked to soften the impact of those mandates on the relatively few who declined the vaccine.  It is this important context that is missing from the Complaint, and which is essential to this Court's consideration of the instant application and underlying claims.

When the New York City Department of Health and Mental Hygiene ("DOHMH") issued the initial version of a vaccination mandate for all workers in City educational facilities (the "DOE Vaccination Mandate" or the "Mandate"), it did not even provide for the possibility of medical or religious exemptions, let alone offer alternatives for those who declined vaccination

1

and would, therefore, be precluded by the Mandate from working inside school buildings.[1]  In response to the Mandate, the UFT immediately moved on two parallel tracks: first, together with other City unions, bringing a challenge to the Mandate itself and the omission of medical and religious objections in New York State court on constitutional due process and other grounds; and, second, proceeding to expedited negotiations regarding the Mandate's implementation.

The New York State Supreme Court granted the Unions' application for a temporary restraining order, and, following the "suggestion" of the Court "that the City allow for the possibility of medical and religious exemption requests" the City quickly amended the Mandate to allow for reasonable medical and religious accommodation.  However, after further briefing, the remainder of the Unions' challenges (premised in part on due process arguments analogous to those asserted by Plaintiffs here) were denied, and the Mandate was permitted to continue.[2]  As time would tell, this result was consistent with numerous other challenges to COVID-19 vaccine mandates.[3]

While the amendment to the Mandate forced by the Unions' court challenges aided in moving the implementation bargaining process forward, the looming start date for the new school year created urgency in negotiation process on both sides.  With the parties far from

---

[1] See Order of the Commissioner of Health and Mental Hygiene to Require COVID-19 Vaccination For Department of Education Employees, Contractors, Visitors, and Others, NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE (Aug. 24, 2021), https://www1.nyc.gov/assets/doh/downloads/pdf/covid/covid-19-vaccination-requirement-doe.pdf.  That Order was amended twice – once to include reasonable medical and religious accommodations, Order of the Commissioner of Health and Mental Hygiene to Require COVID-19 Vaccination For Department of Education Employees, Contractors, Visitors, and Others, NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE (Sept. 15, 2021), https://www1.nyc.gov/assets/doh/downloads/pdf/covid/covid-19-vaccination-requirement-doe-2.pdf, and again following the dissolution of the Second Circuit's temporary restraining order in a separate matter challenging the Citywide Mandate.  Order of the Commissioner of Health and Mental Hygiene to Require COVID-19 Vaccination For Department of Education Employees, Contractors, Visitors, and Others, NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE (Sept. 28, 2021), https://www1.nyc.gov/assets/doh/downloads/pdf/covid/covid-19-vaccination-requirement-doe-3.pdf.

[2] See New York City Mun. Labor Comm. v. City of New York, 73 Misc. 3d 621 (Sup. Ct. N.Y. Cnty.  2021).

[3] See infra at __.

JA-718

agreement, the UFT sought a declaration of impasse from the New York Public Employment
Relations Board ("PERB") and the appointment of a mediator to assist the negotiations. When
several sessions of mediation did not produce a final agreement, the parties moved to arbitration,
which resulted in a binding impasse arbitration award (the "Award").[4] That Award, missing
from the factual picture presented by the Complaint, places both the facts and Plaintiffs' claims
in context.

Through that arbitration, the UFT was able to secure processes for staff to apply for, and,
when needed, take appeals from determinations for medical and religious accommodations to an
independent arbitration panel. The Award also secured options for members either to separate
from the DOE with a compensation incentive, or to elect for an extended leave without pay
("LWOP"), all while maintaining health benefits until September 5, 2022. Furthermore, for
those who opted for the new LWOP, the Award allowed them to immediately return to their
positions should they decide to take the vaccine (an opportunity that some have already
accepted). And, as relevant here, the Award specifically authorized the DOE to place individuals
who have not complied with the Mandate on LWOP, while restricting the DOE from seeking to
terminate those who were not in compliance prior to December 1, 2021. However, once the
December 1, 2021 threshold is crossed, that restriction ends, and the DOE will be able to seek
the termination of noncompliant employees through existing procedures. However, the ability to
"seek to unilaterally terminate" is not tantamount to termination itself, and the UFT most
assuredly did not "bargain away" any employee's right to due process before termination  Should
the DOE seek to terminate any employee after December 1, the UFT expects the DOE to follow

---

[4] See Board of Education of the City School District of the City of New York and United Federation of Teachers,
Local 2, AFT, AFT-CIO (Impact Bargaining), Arbitration Award (Sept. 10, 2021) Klinger Decl. Ex. D.

JA-719

established procedures (including specifically the preference of charges), and anticipates making available Union-provided counsel in the normal course.

Plaintiffs' claims fail to account for the fact that a binding impasse arbitration award becomes part of the collective bargaining agreement. Accordingly, it is not accurate to say that employees have been placed on LWOP in contravention of applicable collective bargaining agreements. They have been placed on LWOP pursuant to the Award.

This is also why the UFT – which is not a state actor – has exercised its lawful discretion to decline pursuit of contractual grievances that fail to account for the impact of the Award. Accordingly, any § 1983 claim against the UFT for failure to stop the Mandate or refusal to bring a grievance is deficient. Likewise, claims based on collusion with the DOE or contribution to the diminution of Plaintiffs' constitutional rights cannot be made out, where the underlying basis for such claims are the failure to bring a grievance that is improper pursuant to the Award (which is itself incorporated into the UFT's CBA with the DOE).

The UFT understands the impact the Mandate has on Plaintiffs; yet – as evidenced by the UFT's own efforts – constitutional due process challenges to the Mandate, and similar orders, have failed time and again. To the extent Plaintiffs challenge the implementation of the Mandate, the UFT is bound by the terms of the Award.

Accordingly, Plaintiffs' application for a temporary restraining order and permanent injunction should be denied, and this proceeding dismissed as to the UFT.

## ADDITIONAL RELEVANT FACTS

I.    New York's State of Emergency, Shutdown, and Reopening

On March 12, 2020, Mayor Bill de Blasio declared a state of emergency for New York City, recognizing that "the risk of community spread throughout New York City impacts the life and health of the public and public health is imperiled by the person-to-person spread of

4

JA-720

COVID-19[.]"[5]  This announcement echoed then-Governor Cuomo's declaration of a disaster emergency for all of New York State, made days earlier.[6]

Thereafter, on March 20, 2020, Governor Cuomo issued Executive Order 202.8 and announced the "New York State on PAUSE" plan, which shuttered all non-essential businesses statewide, and banned "[n]on-essential gatherings of individuals of any size for any reason (*e.g.*, parties, celebrations or other social events)[.]"[7]  From that time until roughly May of this year, it had been best practice to periodically close spaces (particularly indoors) where individuals gather, in order to reduce community spread or flare ups.[8]

Since May, activities in the City have moved towards a return to normal.  The change was due primarily to the widespread availability and utilization of the Pfizer, Moderna, and Johnson & Johnson vaccines.[9]  Today, nearly all individuals aged 5 and older are eligible to receive the vaccine, with many eligible to receive a booster dose.

For several months now, a strain of COVID-19 known colloquially as the "Delta variant" has become the predominant version of the virus affecting City residents.[10]  Despite the Delta

---

[5] See Emergency Executive Order No. 98, City of New York Office of the Mayor (Mar. 12, 2020).

[6] Governor Cuomo had previously declared a disaster emergency for the State of New York.  See Executive Order No. 202, State of New York Executive Chamber (Mar. 7, 2020).  The Governor has since issued a series of related executive orders continuing and expanding on the declaration of disaster emergency.  On March 13, 2020, a state of national emergency was declared.

[7] See Governor Cuomo Signs the 'New York State on PAUSE' Executive Order, New York State Governor (Mar. 20, 2020), https://www.governor.ny.gov/news/governor-cuomo-signs-new-york-state-pause-executive-order (last accessed Nov. 19, 2021).  Governor Cuomo's mandate has since been relaxed, but social distancing guidelines are still in effect, and limits continue to exist on the size of social gatherings and how specific business may serve the public.

[8] Sharon Otterman, New York Is Reopening.  Here's What That Actually Means, N.Y. TIMES (May 19, 2021, updated Sept. 17, 2021), https://www.nytimes.com/2021/05/19/nyregion/nyc-reopening-restrictions-masks-vaccines.html.

[9] See id.

[10] See COVID-19: Data, NYC HEALTH, https://www1.nyc.gov/site/doh/covid/covid-19-data-variants.page (last accessed Nov. 19, 2021).

**JA-721**

Variant, rising vaccination rates have resulted in COVID-19 cases and hospital admissions significantly below their 2020 peaks.[11]

While the extraordinary powers granted to the Governor have been relinquished, and the State's declaration of emergency ended on June 24, 2021, the City has maintained its state of emergency.

II.     The DOE Vaccination Mandate

In their ongoing efforts to address the pandemic the City and State have issued a series of requirements and mandates regarding vaccination and COVID-19 safety protocols.

The City initially announced a vaccination-or-test mandate for public sector health care workers on July 21, 2021.[12]  That day, the Commissioner of DOHMH ordered vaccination or weekly testing for staff in public healthcare settings.[13]  Less than a week later, the Mayor proclaimed that "every single city employee will be expected to be either vaccinated or be tested weekly."[14]

Shortly thereafter, on August 23, 2021, following FDA approval of the Pfizer vaccine, Mayor de Blasio and DOHMH Commissioner Chokshi announced the at-issue vaccination mandate for all employees in the City school district.[15]  The following day, DOHMH imposed

---

[11] See Sharon Otterman, Here's Who Is Hospitalized for Covid in New York City as Cases Rise, N.Y. TIMES (July 30, 2021), https://www.nytimes.com/2021/07/30/nyregion/nyc-covid-hospitalizations.html.

[12] Transcript: Mayor de Blasio Appears Live on MSNBC's Morning Joe, NYC OFFICE OF THE MAYOR (July 21, 2021), https://www1.nyc.gov/office-of-the-mayor/news/508-21/transcript-mayor-de-blasio-appears-live-msnbc-s-morning-joe.

[13] See Order of the Commissioner of Health and Mental Hygiene to Require COVID-19 Vaccination or Testing for Staff in Public health Settings (July 21, 2021),  https://www1.nyc.gov/assets/doh/downloads/pdf/covid/covid-19-vaccination-or-testing-staff-public-settings-072121.pdf

[14] See Transcript: Mayor de Blasio Holds Media Availability, NYC OFFICE OF THE MAYOR (July 26, 2021), https://www1.nyc.gov/office-of-the-mayor/news/517-21/transcript-mayor-de-blasio-holds-media-availability.

[15] See Mayor de Blasio, Chancellor Porter and Commissioner Chokshi Announce Department of Education Employee Vaccine Mandate, NYC OFFICE OF THE MAYOR (Aug. 23, 2021), https://www1.nyc.gov/office-of-the-mayor/news/578-21/mayor-de-blasio-chancellor-porter-commissioner-chokshi-department-education.

the first version of the DOE Vaccination Mandate, which requires all DOE staff, City employees, and contractors who "work in-person in a DOE school setting or DOE building" and others in City schools to – no later than September 27, 2021 – provide proof that they have at least received the first dose of a vaccine.[16]  While the DOE was willing to discuss the impact of the Mandate, the original mandate, as indicated above, failed to provide for either medical or religious exemptions.  The City continued to issue analogous policies, culminating in a citywide vaccination mandate issued on October 20, 2021.

Throughout these changing policies, the UFT and other City unions have sought to negotiate aspects of the policies and their implementation in the interest of their members The City acknowledged an obligation to bargain over the implementation of the vaccine mandates, and engaged in bargaining with the UFT on the impact and implementation of the August 23, 2021 DOE Vaccination Mandate.  Moreover, the City did not challenge the UFT's declaration of impasse, filed with PERB on September 1, 2021,[17] leading PERB to appoint  Martin F. Scheinman to mediate the matter and subsequently arbitrate the dispute.

III.    The Award

On September 10, 2021, after expedited mediation and then arbitration between the UFT, the City and DOE, Scheinman issued the Award concerning the impact and implementation of the August 23, 2021 DOE Vaccination Mandate.[18]  The Award provides that, although the

---

[16] Order of the Commissioner of Health and Mental Hygiene to Require COVID-19 Vaccination For Department of Education Employees, Contractors, Visitors, and Others, NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE (Aug. 24, 2021), https://www1.nyc.gov/assets/doh/downloads/pdf/covid/covid-19-vaccination-requirement-doe.pdf

[17] See Declaration of Impasse, PERB (Sept. 1, 2021), attached to the Klinger Decl. as Ex. A.

[18] See Klinger Decl. Ex. D.

Mandate prevents unvaccinated employees form being in school buildings, no one would be summarily dismissed.  Rather, the Award provides, *inter alia,* for the following benefits:

1. A procedure for applying for both medical and religious accommodations (see Award at 7);

2. A procedure for appealing the denial of said accommodations to a panel of impartial arbitrators (see Award at 10);

3. The ability to remain on payroll and continue to receive medical coverage while such applications and appeals are pending (see Award at 11-12);

4. For those not awaiting accommodation review, who declined to vaccinate, the ability to elect non-disciplinary leave without pay that allows them to continue to receive health benefits, and from which they could resume their position upon vaccination (see Award at 13-14);

5. The option to, within a specified window, elect to separate from the DOE, receive an incentive payment, and have health benefits continue through September 5, 2022 (see Award at 16); and

6. A prohibition on the DOE seeking to terminate any employee for noncompliance until after December 1, 2021 (see Award at 17-18).

The DOE's ability *to seek* termination is limited to those employees who, after December 1, 2021, have chosen to remain unvaccinated, and have not elected one of the options provided for in the Award.  The Award does not provide the DOE a unilateral right to summarily terminate employees.  Rather, it recognizes that, after December 1, 2021, the DOE may choose to use available procedures to seek termination.

8

JA-724

Following the Award, subsequent negotiation and arbitration was then had with the Council of School Supervisors and Administrators, the City, and DOE, which produced its own award from Arbitrator Scheinman on September 15, 2021.[19]  Teamsters Local 237 and other unions pursued their own paths with the City and DOE, also overseen by Arbitrator Scheinman, which received their own analogous awards.[20]  All the awards provided for the employer to place noncompliant employees on leave without pay under applicable circumstances.

IV.   Court Challenges To Vaccination Mandates

While pursuing impasse arbitration, on September 9, 2021, the UFT – together with other unions – filed an order to show cause and petition for a temporary restraining order and a preliminary injunction in New York Supreme Court to vacate the DOE Vaccination Mandate pursuant to CPLR Article 78.[21]  In brief, the Unions argued that the Mandate, (a) violates employees' individual bodily integrity and right to refuse medical treatment by forcing employees to undergo unwanted medical procedures or be precluded from engaging in their chosen professions; (b) violates employees' due process rights by involuntarily preventing permanently-appointed DOE and City employees declining vaccination from engaging in their employment, resulting in a deprivation of their vested property rights in violation of the Fourteenth Amendment, Article 1 § 6 of the New York Constitution, N.Y. Education Law §§ 3020 and 3020-a, and N.Y. Civil Service Law § 75; and (c) fails to provide required exceptions for those with medical contraindications or sincerely-held religious objections to inoculation.

---

[19] See Board of Education of the City School District of the City of New York and Council of Supervisors and Administrators (Impact Bargaining), Arbitration Award (Sept. 15, 2021), attached to the Klinger Decl. as Ex. E.

[20] See Board of Education of the City School District of the City of New York and International Brotherhood of Teamsters, Local 237 (Impact Bargaining), Arbitration Award (Sept. 15, 2021), attached to the Klinger Decl. as Ex. F.

[21] MLC et. Al. v. City of New York et al., 158368/2021 (Sup. Ct. N.Y. Cnty.).

**JA-725**

On September 14, 2021, New York Supreme Court Justice Larry Love granted the application for a temporary restraining order.[22]  In a subsequent conference, the Court suggested that the City might want to re-examine the absence of medical and religious exemption, which, as indicated above, the City did.[23]

Following oral argument on the Unions' remaining claims, Justice Love dismissed the petition, reasoning:

> Having resolved the issue of appropriate medical and religious exemptions with the New Order, Petitioners' sole argument is that the New Order violates school-based employees substantive due process rights by threatening their personal autonomy, bodily integrity and right to reject medical treatment.
>
> [. . .]
>
> Since *Jacobson*, the state and federal courts have consistently held that a mandatory vaccine requirement does not violate substantive due process rights and properly fall within the State's police power.  *See, Phillips v. City of New York*, 775 F.3d 538, 542 (2d Cir. 2015) (holding that New York's mandatory vaccine requirement did not violate substantive due process rights as the vaccinations were within the State's police power, and individual liberties did not overcome its judgement that such vaccination was in the interest of the population as a whole); *Caviezel v. Great Neck Pub. Schs.*, 500 F. App'x 16, 19 (2d Cir. 2012); *C.F. v. New York City Dept. of Health & Mental Hygiene*, 191 A.D. 3d 52, 69 (2d Dep't Dec. 23, 2020) (holding that the City of New York's measles vaccine mandate did not violate the due process rights secured by the Fourteenth Amendment).  As such, Petitioners will be unable to establish a likelihood of ultimate success on the merits.

---

[22] A true and correct copy of the executed Order to Show Cause for a Temporary Restraining Order is attached hereto as Exhibit G.

[23] See Order of the Commissioner of Health and Mental Hygiene to Require COVID-19 Vaccination For Department of Education Employees, Contractors, Visitors, and Others, NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE (Sept. 15, 2021), https://www1.nyc.gov/assets/doh/downloads/pdf/covid/covid-19-vaccination-requirement-doe-2.pdf

See New York Mun. Labor Comm. v. The City of New York, 73 Misc. 3d 621, 625-27 (Sup. Ct. N.Y. Cnty. 2021).

Nationally, a plethora of due process challenges to employee vaccination mandates have met the same fate as the Unions' Article 78 proceeding.  Indeed, before this very Court, Plaintiff Rachel Maniscalco was herself a named plaintiff in Maniscalco et al. v. The New York City Department of Education, et al., wherein she challenged the very same DOE Vaccination Mandate at issue here as a violation of substantive due process and equal protection rights under the Fourteenth Amendment, as well as an arbitrary and capricious agency determination under CPLR Article 78.  There, Judge Cogan held that the plaintiffs had "not shown a likelihood of success on the merits." See Maniscalco, 21-cv-5055 (BMC), at *1, 2, 6 (E.D.N.Y. Sept. 23, 2021) (citations omitted).

Moreover, Judge Cogan – like Judge Love – cited Jacobson v. Massachusetts, 197 U.S. 11 (1905), for the proposition that "the state may curtail constitutional rights in response to a society-threatening epidemic so long as the measures have at least some 'real or substantial relation' to the public health crisis and are not 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.'"  See id. at *6 (citations omitted).  Therefore, "mandating a vaccine approved by the FDA" did not qualify as a "plain, palpable invasion" of fundamental rights."  See id.  at *7.

The Second Circuit affirmed by summary order "for substantially the reasons stated in the district court's thoughtful memorandum decision[.]"  See No. 21-2343 (2d Cir. Oct. 15, 2021). The Maniscalco plaintiffs then applied for an emergency application for a writ of injunction to the Supreme Court of the United States. That application was denied on October 1, 2021.

11

Nor is this result singular.  The Seventh Circuit Court of Appeals, citing Jacobson, also rejected due process challenges to a COVID-19 vaccine mandate for students, faculty, and staff at Indiana University.  See Klaassen et al. v. Trustees of Indiana University, No. 21-2326 (7th Cir. Aug. 2, 2021).  Plaintiffs there also applied to the Supreme Court for injunctive relief. Justice Barrett denied that application on August 12, 2021.

Employee vaccine mandates have also been upheld outside of the due process context. See, e.g., Kane, et al. v. de Blasio et al., No. 21-2678 (2d Cir. Nov. 15, 2021) (rejecting challenge to the DOE Vaccination mandate based on the Free Exercise Clause, Establishment Clause, and Title VII, following denial of religious exemption requests), en banc hearing pending November 22, 2021; We the Patriots USA, Inc. et al. and Dr. A. v. Hochul (No. 21-2179 (2d Cir. Nov. 4, 2021) (consolidated) (rejecting challenges to New York State medical health professional vaccination mandate based on the Supremacy Clause, Free Exercise Clause, Fourteenth Amendment, and Title VII); Doe v. Mills, 16 F.4th 20 (1st Cir. 2021), petition for cert. filed (Nov. 15, 2021), (rejecting challenge to health care worker vaccination mandate based on the Free Exercise Clause, Supremacy Clause, and Equal Protection Clause), application for extraordinary relief denied 595 U.S. __, No. 21A90 (2021).[24] Dahl v. Bd of Trustees of W. Mich. Univ., No. 21-2945, 2021 WL 4618519 (6th Cir. Oct. 7, 2021) (holding that University's failure to grant religious exemptions burdened student athlete free exercise rights).

---

[24] Dahl v. Bd. of Trustees of W. Mich. Univ., No. 21-2945, 2021 WL 4618519 (6th Cir. Oct. 7, 2021) is a distinguishable exception.  There, the court declined to stay a vaccination mandate that considered student-athlete religious exemptions on a case-by-case basis.  The court reasoned that the University did not dispute that the vaccine would violate plaintiffs' sincerely held religious beliefs, and that the the privilege of playing college sports should not be based on the forced compromise of those beliefs.

JA-728

V.        The UFT Openly Communicated With Employees Regarding Grievances

Following issuance of the Mandate, some UFT members reached out to the UFT to

request that the union file grievances on their behalf.  Initially, the UFT considered the requests;

however, given the binding protocols and procedures in the Award (the terms of which are

incorporated into the UFT's CBA) it was apparent that any grievances would lack merit.

Accordingly, the UFT advised inquiring members that procedures regarding unvaccinated

employees were governed by the binding Award, which was circulated to members along with

plain-language guidance of the Award's terms.[25]  Moreover, the UFT informed its members that

they were still able to file step 1 grievances on their own.

Indeed, on November 11, 2021, prior to filing this Complaint, Plaintiff Jeannine Lam

emailed the UFT requesting that it file grievances on her behalf for "stopping my pay without

any 'right to due process' at all"; and for "8 unauthorized absences, so far, which have been put

into the system under my name[.]"[26]

In response, UFT General Counsel Beth Norton stated:

> the DOE's procedure for unvaccinated employees is governed by
> the September 10, 2021 interest arbitration award issued by
> Arbitrator Martin Scheinman (the "Award").  Under the Award,
> unvaccinated DOE employees have until November 30, 2021 to
> elect to either (1) separate from service or (2) remain on an unpaid
> leave through September 5, 2022.  If an unvaccinated DOE
> employee does not select either of these options by the November
> 30, 2021 deadline, the Award provides that as of December 1,
> 2021, "the DOE shall seek to unilaterally separate employees who
> have not opted" to either separate from service or remain on an
> unpaid leave.

---

[25] See Arbitrator rules in union's favor on medical accommodations, UFT (Sept. 10, 2021),
https://www.uft.org/news/news-stories/arbitrator-rules-unions-favor-on-medical-accommodations.

[26] Norton Decl. Ex. A.

**JA-729**

> At this time, the DOE has not announced the procedure it will seek to implement to "unilaterally separate" employees that do not elect to separate from service or extend their leave through September 5, 2022 by the November 30, 2021 deadline.  When the announcement is made, we will send a communication to all affected members explaining the next steps.

See Ex. A.

## ARGUMENT

**I.     PLAINTIFFS' CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR 42 U.S.C. § 1983 CLAIMS**

A. UFT Is Not a State Actor

Defendant UFT is a public employee labor organization pursuant to New York Civ. Serv. L. § 200 et seq., and Michael Mulgrew is a private individual who is its elected president. State and federal courts – including this Court – have explicitly recognized that the UFT is not a state actor.  See Driskell v. New York City, 11 Civ. 4915 (BMC), 2011 WL 6812516, at *3 (E.D.N.Y. Dec. 23, 2011) (citing Ciambriello, 292 F.3d 307, 323 (2d Cir. 2003)) ("Plaintiff does not allege that the UFT is a state actor, nor could she."); see also Callaghan v. United Federation of Teachers, 133 A.D.3d 412 (1st Dep't 2015) (holding that the UFT is a private actor, and that "courts in this State have consistently held that unions, even those representing public employees, such as the UFT, are not state actors").

Furthermore, as a general rule, labor unions – even public-sector unions – and their agents are not state actors.  See Ciambriello v. County of Nassau, 292 F.3d 307, 323 (2d Cir. 2002) (stating that New York's Civil Service Employees Association (CSEA) was not a state actor for the purposes of 42 U.S.C. § 1983).  Nor does the mere fact that a union represents public employees render that union a state actor.  See Harmon v. Matarazzo, 162 F.3d 1147 (2d. Cir. 1998) (Table) (dismissing plaintiff's § 1983 claim and noting that the Patrolmen's Benevolent Association is an independent private entity that is in no way intertwined with the

14

Case 23-655, Document 73, 06/05/2023, 3525005, Page202 of 286

police department, except to the extent that its members are policemen).  Rather, the UFT exists to represent the collective interests of employees in positions it represents separate and apart from their role as civil servants, and by the design of state law maintains an "inherently advers[ar]ial" relationship with the state employers who employ its members and others it represents.  See Mehrhoff v. William Floyd Union Free School District, No. 04-CV-3850, 2005 WL 2077292, at * 4 (E.D.N.Y. Aug. 22, 2005) (citing McGovern v. Local 456, Int'l Bhd. Of Trustees, 107 F. Supp. 2d 311, 317 (2d Cir. 2000)).

Therefore, Plaintiffs' burden is high, and unsatisfied.  To survive a motion to dismiss, let alone demonstrate a likelihood of success on the merits, Plaintiffs must allege facts showing that UFT was acting under the color of state law when engaging in the alleged violation.  See Dennis v. Sparks, 449 U.S. 24, 27 (1980).  In general, there are three main situations where private action is treated as state action under § 1983: "(1) when the private actor performs a traditional state function; (2) when a symbiotic relationship or close nexus exists between the private actor and the state; and (3) when the private actor is a willful participant in joint activity with the State or its agents." Commodari v. Long Island Univ., 89 F. Supp. 2d 353, 373 (E.D.N.Y. 2000), aff'd, 62 F. App'x 28 (2d Cir. 2003) (internal citations and quotations omitted).  None of these factors are satisfied here.

The UFT is not performing a traditional state function, which is limited to actions which are "traditionally the exclusive prerogative of the State." National Broadcasting Co. v. Communications Workers of America, 860 F.2d 1022, 1026 (11th Cir. 1988) (citing Jackson v. Metropolitan Edison Co., 419 U.S. 345, 353 (1988)).  Similarly, the UFT has no close nexus with the DOE or any other state institution, which exists when a private actor's conduct "has

JA-731

sufficiently received the imprimatur of the State so as to render it an action of the State." <u>Sykes v. Bank of America</u>, 723 F.3d 399, 406 (2d Cir. 2013) (internal citations omitted).

There is also no symbiotic relationship between the UFT and the DOE, which generally exists only when a private actor's conduct "has sufficiently received the imprimatur of the State so as to render it an action of the State." <u>Sykes</u>, 723 F.3d at 406 (internal citations omitted).  To establish such a relationship, Plaintiffs must show that the UFT "has so far insinuated itself into a position of interdependence with [the DOE] that it must be recognized as a joint participant in the challenged activity." <u>See</u> <u>Burton v. Wilmington Parking Auth.</u>, 365 U.S. 715, 725 (1961). Yet, the UFT has acted as a bulwark against the very City mandates Plaintiffs now challenge – a far cry from the symbiotic relationship or "willful participation" required under § 1983.

Nor have Plaintiffs mustered more than "mere[ ] conclusory allegation[s] that [UFT,] a private entity[,] acted in concert with" the DOE or the City.  <u>See</u> <u>Ciambriello</u>, 292 F.3d at 324 (holding that CSEA was not acting under color of state law, and dismissing § 1983).  Such "diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct[,]" which Plaintiffs have not plead.  <u>See</u> <u>Jessamy v. City of New Rochelle, New York</u>, 292 F. Supp. 2d 498, 513 (S.D.N.Y. 2003) (citing <u>Pangburn v. Culbertson</u>, 200 F.3d 65, 72 (2d Cir. 1999)).

To the contrary, as evidenced <u>supra</u>, the UFT has actively sought to protect the interests of its members – including those who choose not to become vaccinated – throughout the announcement and implementation of the Mandate.  These actions constitute significantly more adversity to the interests of the City than courts have found necessary to stave off a § 1983 claim against a private actor.

16

Leahy v. Board of Trustees, 912 F.2d 917 (7th Cir. 1990), is instructive.  There, a college teacher brought suit against his public employee union under 42 U.S.C. § 1983 on grounds that the union had refused to take his grievance to arbitration.  The court found that he had alleged no facts "supporting the conclusion or inference that the Union has either acted as a state instrumentality, performed traditionally exclusive sovereign functions, or been compelled or even encouraged by the state to make the decisions challenged in his complaint." See id. at 921. Rather, the allegations of conspiracy and refusal to arbitrate grievances were held conclusory. See id.; see also Ciambriello, 292 F.3d at 324 ("conclusory allegations of conspiracy [rang] especially hollow in light of the adversarial relationship between the County and CSEA").

In the instant case, Plaintiffs allege no specific facts or instances of misconduct or conspiracy by the UFT.  Instead, they make a nonspecific claim of "collusion" between the UFT and DOE.  Complaint ¶¶ 135-36.  They further allege that the UFT "foster[ed] and encourage[d] the NYCDOE to violate the Plaintiffs' constitutional rights."  Complaint at ¶ 156.  Yet, as in Leahy, the only basis for either of these allegations is that the UFT has declined to pursue Plaintiffs' grievances, Complaint at ¶¶ 92-93, which, in light of the binding Award, would not prevail.

Regardless, refusal to pursue a particular grievance is well within the discretion of a labor union.  See, e.g., Ahrens v. New York State Pub. Employees Fed'n, AFL-CIO, 203 A.D.2d 796 (3d Dep't 1994).  Recently, the Southern District of New York emphatically rejected the claim that refusal to pursue a particular grievance on a party's behalf constituted a constitutional violation or evidence of a conspiracy. Valvo v. Dep't of Educ. of N.Y., 19-CV-8341 (JPO), 2021 WL 1063759, at *5 (S.D.N.Y. Mar. 18, 2021) ("From the Complaint, Plaintiff's primary concern about UFT appears to be its refusal to initiate a Step 3 grievance on her behalf. But nothing in the

17

Constitution required UFT, acting pursuant to whatever private agreement it may have had with Plaintiff, to initiate a Step 3 grievance … . Furthermore, the Court rejects any insinuation that UFT's decision not to pursue a Step 3 grievance indicates a conspiracy between UFT and DOE.") (internal citations omitted).

Therefore, the UFT's actions – challenging the DOE Vaccination Mandate and refusing to arbitrate grievances foreclosed by the Award – are insufficient to support claims of a § 1983 violation.

B. The UFT Has Not "Aided and Abetted" Violations of § 1983

As argued supra, the UFT has engaged in no conduct with, or in support of, the City or DOE capable of supporting an "aiding and abetting"[27] claim under § 1983. Rather, the UFT's litigation against the City, impasse arbitration,[28] and precedent point to the simple truth that UFT's actions have been inherently adversarial to the City/DOE, and in Plaintiffs' best interests. See, e.g., New York City Mun. Labor Comm. v. City of New York, 73 Misc. 3d 621 (N.Y. Sup. Ct. 2021); Mehrhoff, 2005 WL 2077292, at * 4.

II.     PLAINTIFFS FAIL TO CONSIDER THE AWARD

The Complaint does not include any reference to the binding Award issued by PERB-appointed arbitrator Scheinman, the terms of which are incorporated into the UFT and DOE's

---

[27] While 42 U.S.C. § 1983 does not explicitly account for "aiding and abetting" violations of the statute, several courts have recognized such claims as allegations of conspiracy. See, Dykes v. Southeastern Pa. Transp. Auth., 68 F.3d 1564, 1570 (3d Cir. 1995); Figueroa v. City of Camden, 580 F. Supp. 2d 390, 401-02 (D.N.J. 2008) ("While it is not entirely clear on the face of their Complaint, Plaintiffs clarify that they intended to allege that the Unions conspired with state and local officials in order to deprive Plaintiffs of their rights.").

[28] The fact of the UFT's litigation against the City is public record, and is therefore proper for judicial notice. Likewise, this Court may take notice of the Award in its reasoning, as the Award is incorporated by law into the CBA, and is "integral to the complaint" – in that it is cited by, and forms the basis for, Plaintiffs' claims. See, e.g., Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016); Chambers v. Time Warner, Inc., 282F.3d 147 (2d Cir. 2002); International Audiotext Network, Inc. v. Am. Tel. and Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995). Furthermore, a "court may consider hearsay evidence such as affidavits when determining whether to grant a preliminary injunction," which Plaintiffs seek here. See We the People v. Hochul, Nos. 21-2179, 21-2566, at *11 n.3 (2d Cir. Nov. 4, 2021).

JA-734

CBA by law, and supersedes provisions to the contrary.  See Town of Southampton v. N.Y. State Pub. Empl. Rels. Bd., 2 N.Y.3d 513, 523 (2004) (holding that under New York State collective bargaining laws, a binding interest arbitration award "effectively redefine[s] the parties' agreement on [a] mandatory term and condition of employment").  The Award stipulates the entirety of the leave and separation procedures with which Plaintiffs take umbrage, and removes the contractual basis upon which Plaintiffs have asked the UFT to pursue grievances – the CBA bases for which are rendered inapplicable by the Award.  See Award, Klinger Decl. Ex. D.  As such, the UFT respectfully directs the Court to the Award, which needs to be read in tandem with the CBA when assessing Plaintiffs' claims that they have been placed on LWOP in contravention of their contractual or statutory rights.  However, as set forth supra, the Award does not obviate or otherwise do away with existing procedure that would need to be followed should the DOE decide either to seek discipline or termination of a DOE employee.  The reality that Plaintiffs need to face is that the validity of the Mandate has been upheld, meaning that unvaccinated DOE employees may not perform their work in a school building.

JA-735

## CONCLUSION

For the reasons set forth herein and in the accompanying submissions, Petitioners

respectfully request that the Court:

1. deny Plaintiff's application for a temporary restraining order and preliminary

   injunction; and

2. award such other and further relief as the Court deems just and proper.

Dated: November 19, 2021                    Respectfully submitted,


                                        /s/ ALAN M. KLINGER
                                    STROOCK & STROOCK & LAVAN LLP
                                    Alan M. Klinger, Esq.
                                    Dina Kolker, Esq.
                                    Arthur J. Herskowitz, Esq.
                                    180 Maiden Lane
                                    New York, New York 10038
                                    (212) 806-5400
                                    aklinger@stroock.com
                                    dkolker@stroock.com
                                    aherskowitz@stroock.com

                                    - and –

                                    Beth A. Norton, Esq.
                                    UNITED FEDERATION OF TEACHERS,
                                    LOCAL 2, AFT, AFL-CIO
                                    52 Broadway
                                    New York, NY 10004
                                    bnorton@uft.org

                                    *Co-counsel for Defendant UFT*

Case 23-655, Document 73, 06/05/2023, 3525005, Page208 of 286

JA-736

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Defendant United Federation of Teachers, AFT Local 2 ("PSC") is an unincorporated association under New York state law and has no parent corporations.

JA-737

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

BROECKER *et al.*,

                          Plaintiffs,

         -against-

                                    Index No. 21-cv-6387

NEW YORK CITY DEPARTMENT OF
EDUCATION, *et al.*,

                          Defendants.

------------------------------------------------------------ X

## DECLARATION OF ALAN M. KLINGER IN OPPOSITION TO PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PERMANENT INJUNCTION

      **Alan M. Klinger**, pursuant to 28 U.S.C. § 1746, declares the following to be true under penalty of perjury:

      1.      I am an attorney duly admitted to practice in the State of New York and not a party to the above-captioned action.

      2.      I am a partner with the law firm of Stroock & Stroock & Lavan LLP, the attorneys of record for Defendant United Federation of Teachers, Local 2, AFL-CIO (the "UFT") in this matter.

      3.      I submit this declaration in opposition to Plaintiffs' application for a temporary restraining order and permanent injunction.

      4.      I have personal knowledge of the matters set forth in this declaration, except for such matters as are based on my review of court files or other relevant documents, and I believe such matters to be true.  If called as a witness, I would testify competently to the matters set forth

in this declaration.

**The City Issues the DOE Vaccination Mandate**

5.      On August 23, 2021, following FDA approval of the Pfizer vaccine, Mayor de Blasio and DOHMH Commissioner Chokshi announced a vaccination mandate for all employees in the City school district.[1]

6.      The following day, DOHMH imposed the first version of the DOE Vaccination Mandate, which requires all DOE staff, City employees, and contractors who "work in-person in a DOE school setting or DOE building" and others in City schools to – no later than September 27, 2021 – provide proof that they have at least received the first dose of a vaccine.[2]

7.      The UFT immediately moved on two parallel tracks: first, together with other City unions, bringing a challenge to the Mandate itself and the omission of medical and religious objections in New York State court on constitutional due process and other grounds; and, second, proceeding to expedited negotiations regarding the Mandate's implementation.

**The Arbitration Award**

8.      The City acknowledged an obligation to bargain over the implementation of the vaccine mandates, and engaged in bargaining with the UFT on the impact and implementation of the August 23, 2021 DOE Vaccination Mandate.

9.      However, given the impending first day of school on September 13, 2021, and the DOE Vaccination Mandate's September 27, 2021 compliance date, it became apparent that the UFT and the City/DOE needed to expediate negotiations.

---

[1] See Mayor de Blasio, Chancellor Porter and Commissioner Chokshi Announce Department of Education Employee Vaccine Mandate, NYC Office of the Mayor (Aug. 23, 2021), https://www1.nyc.gov/office-of-the-mayor/news/578-21/mayor-de-blasio-chancellor-porter-commissioner-chokshi-department-education.
[2] Order of the Commissioner of Health and Mental Hygiene to Require COVID-19 Vaccination For Department of Education Employees, Contractors, Visitors, and Others, New York City Department of Health and Mental Hygiene (Aug. 24, 2021), https://www1.nyc.gov/assets/doh/downloads/pdf/covid/covid-19-vaccination-requirement-doe.pdf

JA-739

10.     Accordingly, on September 1, 2021, the UFT filed a declaration of impasse with the New York Public Employment Relations Board ("PERB").  A true and correct copy of the UFT's declaration of impasse is attached hereto as Exhibit A.

11.     The City did not challenge the UFT's declaration of impasse, leading PERB to appoint Martin F. Scheinman to mediate the matter and subsequently arbitrate the dispute.

12.     Attached as Exhibit B is a September 3, 2021, letter from PERB to DOE Chancellor Meisha Porter and UFT President Michael Mulgrew alerting the parties that Martin F. Scheinman was appointed mediator for their impasse dispute.

13.     Thereafter, on September 2, 3, 4, and 5, the UFT and the DOE engaged in multiple sessions (often more than one per day) to negotiate implementation of the DOE Vaccination Mandate.

14.     However, it became apparent to the parties that the September 13, 2021 first day of school, coupled with the DOE Vaccination Mandate's September 27, 2021 compliance deadline, would require a further expedited negotiation timeline.

15.     As such, the parties opted to move from mediation to an expedited arbitration, presided over by Martin F. Scheinman.

16.     Attached as Exhibit C is my email to PERB, coping Steve Banks, Esq., Deputy Commissioner and General Counsel of the New York City Office of Labor Relations and UFT General Counsel Beth Norton, Esq., advising PERB that the parties had agreed to move to expedited arbitration in lieu of mediation.

17.     On September 10, 2021, after expedited mediation and then arbitration between the UFT, the City and DOE, Scheinman issued the decision (the "Award") concerning the impact and implementation of the August 23, 2021 DOE Vaccination Mandate.

3

18. Attached as Exhibit D is a true and correct copy of the Award.

19. The Award provides that, although the Mandate prevents unvaccinated employees form being in school buildings, no one would be summarily dismissed. Rather, the Award provides, *inter alia,* for the following benefits:

   a. A procedure for applying for both medical and religious accommodations (see Award at 7);

   b. A procedure for appealing the denial of said accommodations to a panel of impartial arbitrators (see Award at 10);

   c. The ability to remain on payroll and continue to receive medical coverage while such applications and appeals are pending (see Award at 11-12);

   d. For those not awaiting accommodation review, who declined to vaccinate, the ability to elect non-disciplinary leave without pay that allows them to continue to receive health benefits, and from which they could resume their position upon vaccination (see Award at 13-14);

   e. The option to, within a specified window, elect to separate from the DOE, receive an incentive payment, and have health benefits continue through September 5, 2022 (see Award at 16); and

   f. A prohibition on the DOE seeking to terminate any employee for noncompliance until after December 1, 2021 (see Award at 17-18)

20. The DOE's ability *to seek* termination is limited to those employees who, after December 1, 2021, have chosen to remain unvaccinated, and have not elected one of the options provided for in the Award.

4

JA-741

21.     The Award does not provide the DOE a unilateral right to summarily terminate employees.  Rather, it recognizes that, after December 1, 2021, the DOE may choose to use available procedures to seek termination.

22.     Following the Award, subsequent negotiation and arbitration was then had with the Council of School Supervisors and Administrators, the City, and DOE, which produced its own award from Arbitrator Scheinman on September 15, 2021.  A true and correct copy of this award is attached hereto as Exhibit E.

23.     Teamsters Local 237 and other unions pursued their own paths with the City and DOE, also overseen by Arbitrator Scheinman, which received their own analogous awards.  A true and correct copy of this award is attached hereto as Exhibit F.

24.     All the awards provided for the employer to place noncompliant employees on leave without pay under applicable circumstances

**Court Challenges To Vaccination Mandates**

25.     While pursuing impasse arbitration, on September 9, 2021, the UFT – together with other unions – filed an order to show cause and petition for a temporary restraining order and a preliminary injunction in New York Supreme Court to vacate the DOE Vaccination Mandate pursuant to CPLR Article 78.[3]

26.     In brief, the Unions argued that the Mandate, (a) violates employees' individual bodily integrity and right to refuse medical treatment by forcing employees to undergo unwanted medical procedures or be precluded from engaging in their chosen professions; (b) violates employees' due process rights by involuntarily preventing permanently-appointed DOE and City employees declining vaccination from engaging in their employment, resulting in a deprivation

---

[3] MLC et. Al. v. City of New York et al., 158368/2021 (Sup. Ct. N.Y. Cnty.).

5

JA-742

of their vested property rights in violation of the Fourteenth Amendment, Article 1 § 6 of the New York Constitution, N.Y. Education Law §§ 3020 and 3020-a, and N.Y. Civil Service Law § 75; and (c) fails to provide required exceptions for those with medical contraindications or sincerely-held religious objections to inoculation.

27.     On September 14, 2021, New York Supreme Court Justice Larry Love granted the application for a temporary restraining order.  A true and correct copy of the executed Order to Show Cause for a Temporary Restraining Order is attached hereto as Exhibit G.

28.     In a subsequent conference, the Court suggested that the City might want to re-examine the absence of medical and religious exemption, which, as indicated above, the City did.[4]

29.     Following oral argument on the Unions' remaining claims, Justice Love dismissed the petition, reasoning:

> Having resolved the issue of appropriate medical and religious exemptions with the New Order, Petitioners' sole argument is that the New Order violates school-based employees substantive due process rights by threatening their personal autonomy, bodily integrity and right to reject medical treatment.
>
> [. . .]
>
> Since Jacobson, the state and federal courts have consistently held that a mandatory vaccine requirement does not violate substantive due process rights and properly fall within the State's police power. See, Phillips v. City of New York, 775 F.3d 538, 542 (2d Cir. 2015) (holding that New York's mandatory vaccine requirement did not violate substantive due process rights as the vaccinations were within the State's police power, and individual liberties did not overcome its judgement that such vaccination was in the interest of the population as a whole); Caviezel v. Great Neck Pub. Schs., 500 F. App'x 16, 19 (2d Cir. 2012); C.F. v. New

---

[4] See Order of the Commissioner of Health and Mental Hygiene to Require COVID-19 Vaccination For Department of Education Employees, Contractors, Visitors, and Others, New York City Department of Health and Mental Hygiene (Sept. 15, 2021), https://www1.nyc.gov/assets/doh/downloads/pdf/covid/covid-19-vaccination-requirement-doe-2.pdf

JA-743

> York City Dept. of Health & Mental Hygiene, 191 A.D. 3d 52, 69 (2d Dep't Dec. 23, 2020) (holding that the City of New York's measles vaccine mandate did not violate the due process rights secured by the Fourteenth Amendment). As such, Petitioners will be unable to establish a likelihood of ultimate success on the merits.

See New York Municipal Labor Committee, et al. v. The City of New York, et al., 73 Misc. 3d 621, 625-27 (Sup. Ct. N.Y. Cnty. 2021).

30.     The UFT is aware of multiple other failed challenges to employee vaccination mandates across the country.

31.     At least two of these suits have alleged violations of employees' due process rights.

**Conclusion**

32.     The UFT has never colluded or conspired with the City or DOE to enact the DOE Vaccination Mandate or violate Plaintiffs' rights. Rather, the UFT has been engaged in active litigation and impasse arbitration, seeking to stay or alter the implementation of the DOE Vaccination Mandate. Like Plaintiffs, the UFT's arguments have included allegations that the Mandate violates employees' due process rights, but those have not been sustained by the courts. Accordingly, the UFT and Plaintiffs must adjust to the existence of the Mandate and look to the ways in which the UFT has sought to soften the impact of the Mandate on those who decline to become vaccinated.

 Dated: November 19, 2021                 Respectfully submitted,


                                          /s/ ALAN M. KLINGER
                                          STROOCK & STROOCK & LAVAN LLP
                                          Alan M. Klinger, Esq.
                                          180 Maiden Lane
                                          New York, New York 10038
                                          (212) 806-5400

7

JA-744

aklinger@stroock.com

*Counsel for Defendant UFT*

JA-745

NEW YORK STATE PUBLIC EMPLOYMENT RELATIONS BOARD
PO BOX 2074, ESP AGENCY BLDG 2, FLS 18 & 20, ALBANY, NEW YORK 12220-0074

# DECLARATION OF IMPASSE

**INSTRUCTIONS:** Complete in full, retain one copy and distribute in the following manner: A) File an original and one (1) copy with the Director of Conciliation, PERB, PO BOX 2074, ESP AGENCY BLDG 2, FLS 18 & 20, ALBANY, NEW YORK 12220-0074. B) Simultaneously serve one (1) copy upon the respondent.

**Date:** Sep 1, 2021

## PUBLIC EMPLOYER

**Name of Public Employer.................................** Bd. of Ed. of the City School District of New York

**NAME, TITLE, ADDRESS, TELEPHONE AND FAX NUMBERS of the Representative** to whom PERB should direct correspondence

Meisha Porter, Chancellor

52 Chambers Street, New York, NY 10007

**(Email)** mross@schools.nyc.gov    **(Telephone)** 212 374 6000    **(FAX)** __ __ __

## EMPLOYEE ORGANIZATION

**Name of Employee Organization.......................** The United Federation of Teachers

**NAME, TITLE, ADDRESS, TELEPHONE AND FAX NUMBERS of the Representative** to whom PERB should direct correspondence

Michael Mulgrew

52 Broadway, New York, NY

**(Email)** mmulgrew@uft.org    **(Telephone)** 212 598 9215    **(FAX)** __ __ __

| | IDENTIFYING PARTY DECLARING IMPASSE | | |
|---|---|---|---|
| Public Employer ☐ | Employee Organization ☒ | | Joint Declaration ☐ |

## DESCRIPTION OF UNIT

**A** - **Number of employees in the unit:** 180,000

**B** - **Included titles:** Teachers

**C** - **Excluded titles:** None

**D** - **Employer's fiscal year:** 7/1 to 6/30
(Mo./Day/Yr.)    (Mo./Day/Yr.)

**E** - **Effective date and expiration date of present agreement:** 2/14/2019 to 9/13/2022
(Mo./Day/Yr.)    (Mo./Day/Yr.)

**F** - **Date of recognition or certification of negotiating agent:** December 1961

**IMPORTANT**    DETAILS OF DECLARATION    **IMPORTANT**

On a separate sheet of paper which should be attached hereto, write a clear and concise history of negotiations leading to this Declaration of Impasse. Include the number and dates of the negotiating sessions and specifically list all presently unresolved issues.

Pursuant to Article 14 of the Civil Service Law, as amended (Public Employees' Fair Employment Act), the undersigned hereby declare(s) that a state of impasse exists between the above noted public employer and employee organization within the meaning of Section 209 of said Act.

| *Michael Mulgrew* | President | Sep 1, 2021 |
|---|---|---|
| **Signature of Representative Declaring Impasse** | **Title** | **Date** |

If joint declaration, both representatives must sign:

| | | |
|---|---|---|
| **Signature of Representative Declaring Impasse** | **Title** | **Date** |

Reset Form    Print Form

JA-746

## **Schedule A**

<u>Dates of Bargaining Sessions</u>

August 25, 2021
August 30, 2021

## STATEMENT OF IMPASSE

The United Federation of Teachers, Local 2, American Federation of Teachers, AFL-CIO (the "UFT"), is the sole and exclusive bargaining representative of all nonsupervisory pedagogical employees, as well as certain others employed by the Board of Education of the City School District of the City of New York (the "BOE").  The UFT and BOE are parties to collective bargaining agreements for Teachers and Functional Chapters covering the period from February 14, 2019 through September 13, 2022.

The instant negotiations were prompted by the BOE's unilateral promulgation of its "Vax-or-Test" policy for BOE employees in advance of the new school year, a policy slated to become effective on September 13, 2021, just days away.  Exacerbating matters is that the City has now abandoned that policy – again without prior consultation or bargaining with the UFT – in favor of a draconian imposed policy that now mandates, as of September 27th, vaccination for all BOE employees, without any medical or religious accommodation or exception.  The UFT and other municipal unions have attempted, for weeks, to arrive at a negotiated program to implement the City's vaccine/testing policy, one that appropriately balances the need to address the advance of the Delta variant with the liberty interests and basic due process and collective bargaining rights of all teachers and other school-based workers.  With the last-minute shift to an absolute mandate for all BOE staff, the UFT has continued to try to work with the BOE to tailor a policy that allows for medical and religious accommodation, while also respecting the due process rights of those who choose not to vaccinate.  Recent bargaining sessions have demonstrated, however, that with the quickly approaching implementation date, the BOE has no

Case 23-655, Document 73, 06/05/2023, 3525005, Page220 of 286

intention of budging from its inflexible stance or including the UFT in any meaningful bargaining concerning the implementation of the City's vaccination policy.

To be clear, the UFT supports vaccination and encourages all of its members to become vaccinated if they are able.  Indeed, the UFT has among the highest – if not the highest – member vaccination rate of any municipal union in New York City at almost 80%.  The UFT's first priority has always been keeping children and staff safe and schools open.  Indeed, rigorous COVID precautions thus far have resulted in schools being among the safest public spaces in New York City – with an infection rate of less than 1% even when community infection rates are much higher.

These successes – and the UFT's willingness to negotiate a common-sense vaccination policy – make the City's sudden and rigid policy stance patently unreasonable.  The vaccination mandate eviscerates the due process and collective bargaining rights of educators who could lose their livelihoods, health benefits and pensions, and disregards those who for whom vaccination is medically contraindicated or violates a sincerely-held religious belief of employees.  The implementation of a vaccination protocol must be negotiated.  To create a realistic and thoughtful policy with far reaching consequences for City employees, as we continue to manage the presence of COVID in our communities, requires two parties to work closely together and negotiate in good faith.  The City has closed the door on good faith bargaining just as it had only begun.

PERB has the authority to apply the statutory impasse procedure to impasses, such as this, that arise in connection with an existing agreement.[1]  The parties cannot bridge this divide

---

[1] See City of Newburgh, 15 PERB ¶ 3116, 3 (1982) (rejecting City's argument that impasse procedures do not apply to negotiations during the life of a contract and holding that "the impasse procedures specified in ¶ 209 of the Taylor Law apply wherever there is a statutory obligation to negotiate and the parties fail to reach an agreement."), aff'd 97 A.D.2d 258 (3d Dept. 1983), aff'd 63 N.Y.2d 793 (1984).

2

Case 23-655, Document 73, 06/05/2023, 3525005, Page221 of 286

without PERB's assistance, and certainly not within the expedited timeframe that is necessary due to the belated issuance of the policies and the fast approaching commencement of the school year.

## BACKGROUND

For the past year and a half, New York City educators have performed heroically to ensure that the children of New York City continue to receive a high quality education even in the most challenging of circumstances. They have worked tirelessly in remote teaching and have returned to school for in-person instruction when many employees in New York City and across the country have remained home. To overcome the harsh realities of COVID-19, our State and City governments invoked emergency powers and, even through the darkest days, worked with the UFT and their Union partners to protect City workers and serve City residents. Throughout the pandemic, the UFT was flexible with regard to many mandatory subjects of bargaining, and understood that, at many points, time was of the essence. Although the battle with COVID-19 has been costly – with too many lives lost – we have persevered through the worst and now attempt some semblance of a return to normalcy.

Within the past few months, a strain of COVID-19 known colloquially as the "Delta variant" arrived in New York (as well as across the United States), and quickly became the predominant version of the virus affecting City residents.[2] Some percentage of COVID-19 vaccinated individuals have been known to catch "breakthrough" Delta infections and – for at least a period of time – have viral loads as high as the unvaccinated. Accordingly, they can

---

[2] See COVID-19: Data, NYC Health, https://www1.nyc.gov/site/doh/covid/covid-19-data-variants.page (last accessed Aug. 20, 2021).

3

spread the virus to others.[3]  That said, even with the Delta variant, hospital admissions remain significantly below their 2020 peaks.[4]  An average of 1138 New Yorkers were hospitalized for COVID-19 from August 13 through August 19[5] – in contrast with nearly 19,000 average daily hospitalizations in April 2020.[6]  The worst of the COVID-19 outbreak in New York City appears to be behind us.[7]

Yet, while the extraordinary powers granted to Governor Cuomo have been relinquished as the pandemic has subsided, and the State's declaration of emergency – first announced on March 7, 2020 – ended on June 24, 2021, the City has chosen to remain in a state of perpetually renewed declaration of emergency.  Mayor de Blasio has not rescinded the emergency powers he first invoked on March 12, 2020, and the City of New York continues to issue frenetic, and frequently changing decrees affecting the education staff.  The BOE's vaccination policy is the latest example of the ever-changing edicts.

Up until last week, for the start of school year, the State and City appeared to have settled on a "Vax-or-Test" policy, a mandate requiring all City employees (and vendors) to provide proof of vaccination to return to work or else submit to weekly testing.  A July 27, 2021 draft letter from the Commissioner of the Department of Health and Mental Hygiene (DHMH) to the President of the Municipal Labor Committee outlined that the "Vax-or-Test" mandate would be

---

[3] See Delta Variant: What We Know About the Science, Centers for Disease Control and Prevention (Aug. 19, 2021), https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html.

[4] See Sharon Otterman, Here's Who Is Hospitalized for Covid in New York City as Cases Rise, N.Y. TIMES (July 30, 2021), https://www.nytimes.com/2021/07/30/nyregion/nyc-covid-hospitalizations.html.

[5] See Tracking Coronavirus in New York City, N.Y., N.Y. TIMES (Aug. 21, 2021), https://www.nytimes.com/interactive/2021/us/new-york-city-new-york-covid-cases.html

[6] See Otterman, Here's Who Is Hospitalized for Covid in New York City as Cases Rise, supra n.4.

[7] See David Leonhardt and Ashly Wu, Has Delta Peaked?, N.Y. TIMES (September 1, 2021), https://www.nytimes.com/2021/09/01/briefing/delta-peak-covid-caseload.html

4

JA-751

phased-in from August 2nd to September 13th and that the policy "requires all City employees and contractors to show either one-time proof of vaccination or a negative COVID-19 test once every seven days."[8]  The policy was announced without bargaining with the UFT or any of the other municipal unions, disregarding the collective bargaining rights of all the City's employees and their bargaining representatives, but it at least appeared to accommodate medical and religious exceptions and provide a path forward for non-vaccinated teachers to avoid discipline and keep their jobs.  As recently as last week, on August 24, 2021, Governor Hochul affirmed that she would "pursue options to mandate vaccines for school employees *or require weekly testing in the absence of vaccines.*"[9]

Notwithstanding the validity of the "Vax-or-Test" mandate, on the very same day that the Governor supported its implementation, the City jettisoned a month-and-a-half of Vax-or-Test proclamations in an August 24, 2012 Order from the Commissioner of the DOHMH (the "Order").  The new Order gives school-based employees one option – vaccination.  The severity of the Order is particularly confounding given that other recent DOHMH orders allowed alternatives to vaccination for City healthcare, residential and congregate setting employees. Subsequent State emergency regulations superseding those orders, too, provide for medical and other reasonable accommodations for those same employees.  Not only does the City's conduct in setting the policy violate its obligation to negotiate in good faith, but the Order itself – without any accommodation for existing medical reasons or religious beliefs –violates federal and state

---

[8] The July 27, 2021 email and letter from OLR to Harry Nespoli is attached to the Declaration of Impasse as Exhibit A.

[9] Press Release, "*On First Day In Office, Governor Hochul Announces Comprehensive Plan to Help Ensure a Safe Productive Return to Schools This Fall,*" August 24, 2021, available at https://www.governor.ny.gov/news/first-day-office-governor-hochul-announces-comprehensive-plan-help-ensure-safe-productive

law, including, among other things, the right to refuse unwanted medical treatment and Title

VII's protection against discrimination based on religious practices.

All summer long the UFT has tried to work on the implementation of a sensible

vaccination policy for New York City schools.  On at least two separate occasions (and in many

informal conversations prior to these sessions), the UFT, along with the other municipal labor

unions, have attempted to negotiate, in good faith, aspects of the vaccine mandates.  Yet, the City

has refused, insisting that there can be no exceptions to the mandate – medical, religious or

otherwise.  In the latest bargaining session held on August 30, 2021, the City detailed how far the

new policy goes in punishing teachers who may, through no fault of their own, be unable to take

the vaccine.

Under the newly described policy, the City definitively said across the bargaining table

that teachers with a legitimate medical exception to the vaccine will not be accommodated either

by the initial testing option (the UFT would be open to twice a week testing) or the opportunity

for those qualified to teach remotely (as was done last year) despite the City's acknowledgment

that some students will continue to receive remote instruction.  Instead, the UFT was told, these

employees will be "permitted" to use their own cumulative absence reserve ("CAR"), effectively

their accrued sick leave balances, for a period of up to 90 days, at which time they must go on

unpaid leave and will lose health insurance.  Educators who have a legitimate religious

exemption will also not be accommodated and will not even be permitted to use accrued sick

time.  They will be limited to other accrued time (according to the BOE, because they are not

sick) and then also stripped of pay and benefits.  Those who choose not to vaccinate for other

sincerely held reasons will be placed on immediate unpaid leave without health insurance for an

indeterminate period of time.

The unreasonableness of the City's intransigent stance with regard to unvaccinated teachers is compounded by the existence of a host of remote teaching opportunities that unvaccinated teachers could perform within the system. There are estimated to be at least 5,000 students on "home instruction" this upcoming school year and there are a variety of other tasks – among them curriculum development, academic and social screening as well as school data management and analysis – that can be done outside the classroom setting. The City appears unwilling to place unvaccinated teachers in these types of roles, and instead insists on placing them on unpaid leave.

Moreover, this latest disclosure of the City's extreme plan to place educators on involuntary leave violates statutory and related contractual disciplinary provisions, and strips teachers of their core due process rights as public employees. All unvaccinated teachers who are placed on unpaid leave will be effectively suspended without pay without any of the due process protections codified in the State Education Law as well as the parties' collective bargaining agreement. These suspensions will also impact employee's pension rights and ability to accrue time, vest and/or retire as planned.

The Taylor Law does not permit such consequential policy decisions and potential disciplinary action to be implemented by mayoral edict. They must be negotiated. Given the current stalemate between the parties and the fleeting time before the upcoming school year, a Declaration of Impasse is the only way to bring the City to the negotiating table to properly bargain these important issues affecting hundreds of thousands of City teachers and public employees citywide.

**Bargaining History**

The initial rollout of what is now referred to as the "Vax-or-Test" policy applied only to City public sector health care workers, and was first announced on July 21, 2021 during MSNBC's Morning Joe program, where the Mayor stated: "[w]hat we're doing is mandate for the folks who work in our public hospitals and clinics, they need to be safe, the people they serve need to be safe. So, we're saying, get vaccinated, or get tested once every week."[10] That day, the Commissioner of the Department of Health and Mental Hygiene ("DOHMH") ordered vaccination or weekly testing for staff in public healthcare settings.[11]

Less than a week later, on July 21, the Mayor proclaimed via press conference that:

> on September 13th, which is the first full day of school, every single city employee will be expected to be either vaccinated or be tested weekly. This means everybody. This means obviously everyone who works in our schools, our educators and staff. It means the NYPD, the FDNY, it means all city agencies. It means people who work in offices and people work on the frontline.[12]

On July 27, 2021, the Office of Labor Relations ("OLR") emailed the Chair of the Municipal Labor Committee ("MLC"), of which the UFT is a member and its President, Michael Mulgrew, is Executive Vice Chair, relaying a DOHMH draft letter that the Commissioner of DOHMH allegedly intended to send to all City employees that same evening.[13] The draft letter outlined, in broad strokes, the "Vax-or-Test" mandate, stating:

---

[10] Transcript: Mayor de Blasio Appears Live on MSNBC's Morning Joe, City of New York Office of the Mayor (July 21, 2021), https://www1.nyc.gov/office-of-the-mayor/news/508-21/transcript-mayor-de-blasio-appears-live-msnbc-s-morning-joe.

[11] See Order of the Commissioner of Health and Mental Hygiene to Require COVID-19 Vaccination or Testing for Staff in Public Healthcare Settings, New York City Department of Health and Mental Hygiene (July 21, 2021), attached as Exhibit B.

[12] See Transcript: Mayor de Blasio Holds Media Availability, City of New York Office of the Mayor (July 26, 2021), https://www1.nyc.gov/office-of-the-mayor/news/517-21/transcript-mayor-de-blasio-holds-media-availability.

[13] See Exhibit A.

8

all City employees[14] and contractors will soon be responsible for
meeting the COVID-Safe Requirement, to be phased in from August
2nd to September 13th. This policy requires all City employees and
contractors to show either one-time proof of vaccination or a
negative COVID-19 test once every seven days.

The MLC quickly responded to this unilateral change to the terms and conditions of

employment for the City's entire workforce, and, having sought a discussion, met (virtually) on

July 28, 2021 with two Deputy Mayors, the Commissioner of Labor, and several other

commissioners and senior staff from various agencies, together with MLC officers, regarding the

"Vax-or-Test" mandate.

The following day, Mayor de Blasio appeared on the radio station Hot 97 to announce

further, unspecified edicts to supplement the "Vax-or-Test" policy:

Radio Host: You know other than the vaccination conversation, the
getting back in schools in September conversation is coming up and,
you know, people over 12, getting the vax and what's mandatory and
not, I saw you talking about city workers are either going to need to
get a mandatory vaccination or test every week. **Where is that plan
at?**

Mayor: That's exactly where we're at. All city workers, it's phased
in, starting with hospital workers. **They'll phase in over the next
few weeks.** Everyone has to – if your city employee, that's almost
400,000 people, you have to either get the vaccination once, you
know, done get fully vaccinated, meaning, you know, the two shots,
be done with the full vaccination and you never have to test after
that. Or if you are not yet vaccinated, you have to test every single
weekend. **It's your responsibility to get those tests, and obviously
give an update on what the tests say.** I believe that's going to really
encourage a lot of people. **We are going to keep pushing mandates
of all kinds**, and I'm urging the private sector to do the same.[15]

---

[14] Although the DOE is not a mayoral agency and BOE employees are not City employees, the Mayor, as a result of
mayoral control and the recharacterization of the DOE as a City agency, often refers to BOE employees as City
employees and the policies applicable to City personnel are often also applicable to BOE employees.

[15] See Transcript: Mayor de Blasio Appears Live on Hot 97, City of New York Office of the Mayor (July 29, 2021),
https://www1.nyc.gov/office-of-the-mayor/news/529-21/transcript-mayor-de-blasio-appears-live-hot-97 (emphasis
added).

9

JA-756

Despite the UFT's efforts, through the MLC and independently, to work together on implementation of Vax-Or-Test, the City continued to unilaterally dictate the program.  On August 19, 2021, the City – via OLR – sent Counsel to another MLC union an email attaching a 10-page document titled "COVID-Safe Requirement: Frequently Asked Questions" (the "COVID-Safe Requirement") purporting to require for all City employees, *inter alia*:

    a.  One-time verification of full vaccination or weekly records of a negative PCR test taken with the preceding seven days;

    b.  "If an employee, volunteer, or intern chooses not to be vaccinated, they will have to submit evidence of a weekly negative COVID-19 test."

    c.  "If an employee, volunteer, or intern does not want to undergo weekly testing for any reason, they must get fully vaccinated."

    d.  "If an employee, volunteer, or intern has a medical reason for not complying with these requirements, they should be referred to the agency EEO office to review and discuss that information";

    e.  "Any employee who prefers to keep their vaccination status private can do so by providing a weekly COVID-19 PCR test and wearing a face covering."

    f.  Leave without pay for any noncompliant employees; and – in seeming conflict with that provision –

    g.  "Employees who refuse to comply will be terminated."[16]

The COVID-Safe Requirement also incorporates by reference mayoral Executive Order 75, which requires all new hires to "provide proof of having received at least one dose of an approved COVID-19 vaccine prior to beginning their employment (unless they have a reasonable accommodation)."[17]

_____

[16] The COVID-Safe Requirement, dated August 11, 2021, is attached as Exhibit C.

[17] See Executive Order No. 75, City of New York Office of the Mayor (Aug. 2, 2021), https://www1.nyc.gov/office-of-the-mayor/news/075-000/executive-order-75 and Executive Order No. 76, City of New York Office of the Mayor (Aug. 17, 2021), https://www1.nyc.gov/office-of-the-mayor/news/076-000/executive-order-76 (amending Executive Order No. 75).

The MLC, on behalf of the UFT and other unions, sent a letter dated August 12, 2021 to First Deputy Mayor Dean Fuleihan, Chief of Staff and Deputy Mayor for Administration Emma Wolfe, and OLR Commissioner Renee Campion, underscoring the fact that the City had ignored the various proposals MLC had made during the virtual meeting on July 28, 2021, but expressing the Unions' desires to move forward expeditiously to arrive at a workable Vax-or-Test program.[18]

Shortly thereafter, the MLC received word that the City was considering abandoning the "Vax-or-Test" mandate before it had truly even begun, in favor of a pure vaccination mandate. Therefore, on August 17, 2021, the MLC sent an additional letter to First Deputy Mayor Fuleihan, Chief of Staff and Deputy Mayor Wolfe, and OLR Commissioner Campion, highlighting the capricious switch to a vaccination mandate before "Vax-or-Test" had even begun in earnest.[19]

This letter, too, went ignored.

On August 23, 2021, three weeks before the start of school, Mayor de Blasio and DOHMH Commissioner Chokshi announced a vaccination mandate for all employees in the City school district.[20]  The following day, Respondent Chokshi imposed the Order, which requires all DOE staff; City employees who "work in-person in a DOE school setting or DOE building"; staff of City or DOE contractors "who work in-person in a DOE school setting or DOE buildings"; and "[a]ll employees of any school serving students up to grade 12 and any UPK-3 or

---

[18] MLC's August 12, 2021 Letter is attached as Exhibit D.

[19] MLC's August 17, 2021 Letter is attached as Exhibit E.

[20] See Mayor de Blasio, Chancellor Porter and Commissioner *Chokshi Announce* Department of Education Employee Vaccine Mandate, New York City Office of the Mayor (Aug. 23, 2021), https://www1.nyc.gov/office-of-the-mayor/news/578-21/mayor-de-blasio-chancellor-porter-commissioner-chokshi-department-education.

11

UPK-4 program that is located in a DOE building who work in-person, and all contractors hired by such schools or programs to work in-person" to – no later than September 27, 2021 – provide proof that they (a) have been fully vaccinated; (b) have received a single dose vaccine; or (c) have received the first dose of a two-dose vaccine, and must additionally provide proof that they have received the second dose within 45 of the initial inoculation.[21]  The City has signaled that this is part of a larger effort to intensify vaccine mandates for all municipal employees in the days to come.[22]

In an effort to bargain over the implementation of vaccine policy – bargaining which the City had previously indicated it was amenable to – the UFT participated in two bargaining sessions, one with all the MLC officers on August 25, 2021 and another, with just the UFT, on August 30, 2021.  On August 25, 2021, union leaders, including UFT President Michael Mulgrew, met at City Hall and outlined the issues they saw for the implementation of a vaccine policy.  Among the issues discussed were whether and, if so, how non-school personnel would be allowed inside the school building, testing for those applicable whether for pre-September 27th compliance or possible accommodation, as well as how the medical and religious accommodations would be implemented.

On August 30th, the UFT expected to continue a working dialogue on the implementation of a vaccination policy, but the conversation quickly hit major obstacles when the City stated unequivocally that there would be no accommodations and no exceptions to the vaccination

---

[21] The August 24, 2021 Order is attached as Exhibit F.

[22] See Eliza Shapiro, Educators Will Be First N.Y.C. Workers to Face Full Vaccine Mandate, N.Y. Times (Aug. 23, 2021), available at: https://www.nytimes.com/2021/08/23/nyregion/nyc-schools-vaccine-mandate.html.

JA-759

mandate.  With the sides so far apart and time clearly of the essence, the parties agreed that it was unrealistic that there was any basis for continued negotiation.

## <u>CONCLUSION</u>

With the fundamental and urgent issue of whether unvaccinated teachers under specified circumstances will be permitted in BOE schools or allowed other work accommodation driving the impasse between the parties, agreement will not occur absent PERB proceedings. Accordingly, in the interest of achieving agreement on this time-sensitive modification, it is imperative that the parties be allowed to proceed to impasse on an expedited basis such that a solution can be reached for this coming school year.

JA-760

Case 1:21-cv-06387-KAM-LB   Document 21-1   Filed 11/19/21   Page 18 of 45 PageID #: 1321

**From:** Renee Campion (OLR) <rcampion@olr.nyc.gov>
**Sent:** Tuesday, July 27, 2021 4:32 PM
**To:** Harry Nespoli - USA Local 831 (Pres831secy@usa-sbf.com) <Pres831secy@usa-sbf.com>
**Cc:** Klinger, Alan M. <aklinger@stroock.com>; Steve Banks (OLR) <sbanks@olr.nyc.gov>
**Subject:** [EXTERNAL] Letter to All Employees

Harry –
The Health Commissioner will be sending out a letter to all City employees this evening.

1

I have attached the letter below.

Please reach out to me if you have any questions.

-Renee

**Letter to All NYC Employees from NYC Health Commissioner**

I want to take a moment to thank all of you for your tireless dedication this past year and a half. Whether you're in the office or in our communities, New York City's employees stepped up to keep the city safe and moving forward. As a result, we made enormous strides in our fight against COVID-19, even before the vaccination stage of our response.

But as you know, nothing can provide a higher level of protection against the virus or do more to speed the city's recovery than vaccines, which are safe and lifesaving, and which we have made free and accessible all over the city.

To protect each other and those we serve, and to set an example for our fellow New Yorkers, the Mayor has announced that all City employees and contractors will soon be responsible for meeting the COVID-Safe Requirement, to be phased in <u>from August 2nd to September 13th</u>. This policy requires all City employees and contractors to show either one-time proof of vaccination or a negative COVID-19 test once every seven days.

Convenient and community-based vaccination sites are accessible via <u>nyc.gov/vaccinefinder</u> or by calling 877-VAX-4-NYC.

For those who choose instead to be tested weekly, <u>a diagnostic PCR test</u> -- which has the highest level of accuracy -- will be required. Most PCR tests must be sent to a lab for processing and come back within one or two days, but some are rapid and can yield a result while you wait. Either is acceptable for meeting the COVID-Safe Requirement. There are hundreds of PCR testing locations in the five boroughs; the list can be found at <u>nyc.gov/covidtest.</u> If you'd like to receive a test specifically at a City-sponsored site, that list can be found here: <u>https://www.nychealthandhospitals.org/test-and-trace/testing/.</u>

While testing is available it cannot replace the moral and health imperative to get vaccinated. I urge you in the strongest of terms: it is time to get vaccinated if you have not already. By not getting vaccinated you are putting yourself, your loved ones, and your City at risk. Vaccination is safe, effective, and free. It is the best thing we can do to keep each other, our loved ones, and all New Yorkers safe.

Thank you,
Dave A. Chokshi, MD, MSc
Commissioner
NYC Department of Health and Mental Hygiene

**ORDER OF THE COMMISSIONER
OF HEALTH AND MENTAL HYGIENE
TO REQUIRE COVID-19 VACCINATION OR TESTING FOR
STAFF IN PUBLIC HEALTHCARE SETTINGS**

**WHEREAS**, on March 12, 2020, Mayor Bill de Blasio issued Emergency Executive Order No. 98 declaring a state of emergency in the City to address the threat posed by COVID-19 to the health and welfare of City residents, and such order remains in effect; and

**WHEREAS**, on March 25, 2020, pursuant to Section 3.01 of the New York City Health Code ("Health Code"), the existence of a public health emergency within the City as a result of COVID-19, for which certain orders and actions are necessary to protect the health and safety of the City of New York and its residents, was declared; and

**WHEREAS**, pursuant to Section 558 of the New York City Charter (the "Charter"), the Board of Health may embrace in the Health Code all matters and subjects to which the power and authority of the Department of Health and Mental Hygiene (the "Department") extends, and pursuant to Section 556 of the Charter and Section 3.01 of the Health Code, the Department is authorized to supervise the control of communicable diseases and conditions hazardous to life and health and take such actions as may be necessary to assure the maintenance of the protection of public health; and

**WHEREAS**, the U.S. Centers for Disease Control ("CDC") reports that new variants of COVID-19, identified as "variants of concern" have emerged in the United States, and some of these new variants which currently account for the majority of COVID-19 cases sequenced in New York City, are more transmissible; and

**WHEREAS**, the Department's clinical settings and the facilities and personnel of the New York City Health and Hospitals Corporation ("NYC Health + Hospitals") provide health services to all New Yorkers seeking care and have a duty to take reasonable measures to reduce the risk of transmission of COVID-19 as part of their mission to protect the public health; and

**WHEREAS,** the Department's clinical settings and the facilities and personnel of NYC Health + Hospitals serve individuals from all areas of the city, including those with the highest rates of COVID-19 infection and hospitalization, and the areas of the city with the lowest vaccination rates; and

**WHEREAS,** the CDC has stated that vaccination is an effective tool to prevent the spread of COVID-19 and benefits both vaccine recipients and those they come into contact with, including persons who for reasons of age, health, or other conditions cannot themselves be vaccinated; and

**WHEREAS**, pursuant to Health Code Section 3.07, no person "shall do or assist in any act which is or may be detrimental to the public health or to the life or health of any individual . . . or . . . shall fail to do any reasonable act or take any necessary precaution to protect human life and health;" and

**WHEREAS,** pursuant to Section 3.01 of the Health Code, I am authorized to issue orders and take actions that I deem necessary for the health and safety of the City and its residents when urgent public health action is necessary to protect the public health against an existing threat and a public health emergency has been declared pursuant to such section;

**NOW THEREFORE** I, Dave A. Chokshi, MD, MSc, Commissioner of Health and Mental Hygiene, finding that a public health emergency within New York City continues, and that it is necessary for the health and safety of the City and its residents, do hereby exercise the power of the Board of Health to prevent, mitigate, control and abate the current emergency, and hereby order that:

1. By August 2, 2021, the Department shall require from each staff member working in a clinical setting:

    a. Proof of full vaccination, to be provided in a manner determined by the Department; or

    b. For any staff member who does not provide such proof:

        (i) Proof of a negative COVID-19 diagnostic test (not an antibody test) at least once per week, to be provided in a manner determined by the Department; and

        (ii) Wearing a well-fitted face covering at all times while in the workplace, as provided in Department guidance or policies, which may also provide for the use of other types of personal protective equipment.

2. By August 2, 2021, NYC Health + Hospitals shall require from each staff member:

    a. Proof of full vaccination, to be provided in a manner determined by NYC Health + Hospitals; or

    b. For any staff member who does not provide such proof:

        (i) Proof of a negative COVID-19 diagnostic test (not an antibody test) at least once per week, to be provided in a manner determined by NYC Health + Hospitals; and

        (ii) Wearing a well-fitted face covering at all times while in the workplace, as provided in NYC Health + Hospitals guidance or policies, which may also provide for the use of other types of personal protective equipment.

3. Within 90 days, the Department shall report to the Board of Health on the implementation of the requirements of this Order and any recommendations to limit the spread of COVID-19 infection in health care settings.

For the purposes of this order:

"Clinical setting" means a Department clinic where staff members have contact with patients seeking medical opinions, services, or treatment.  This Order applies to all staff members working in such clinics, including staff members providing administrative or technical support, and operational or custodial services at the clinic site, regardless of whether the staff member has direct contact with patients. This Order does not include services provided by the Department in schools or private homes.

"Full vaccination" means two weeks after a having received the second dose of a two-dose COVID-19 vaccine or two weeks after receiving a single-dose COVID-19 vaccine, except that, for the purposes of this Order, a staff member who provides documentation of having received one dose of any COVID-19 vaccine before August 1, 2021 will be considered fully vaccinated so long as, if such staff member received a two-dose vaccine,

2

the staff member provides documentation that the second dose has been administered before September 1, 2021.

"Staff member" is any full or part time employee of the Department or NYC Health + Hospitals.

This Order shall be effective immediately and remain in effect until rescinded, subject to the authority of the Board of Health to continue, rescind, alter or modify this Order pursuant to Section 3.01 of the Health Code.

Dated: 07/21/2021

_____
Dave A. Chokshi, MD, MSc
Commissioner

3

Issued 08/11/2021

<u>COVID-Safe Requirement: Frequently Asked Questions</u>

**Under the COVID-Safe Requirement, employees must either:**
- provide one-time verification that they are fully vaccinated; OR
- provide a weekly record of a negative PCR test as evidence that they are in compliance with the mandate.

Any employee who has not provided proof of full vaccination must wear a face covering, regardless of test compliance, unless they have been granted a reasonable accommodation by their agency's EEO office (or office/personnel providing the EEO function).

<u>Policy Details</u>

1. **Which employees are covered by the COVID-Safe Requirement?**
   By September 13th, all full-time and part-time NYC employees who were hired before August 2, 2021 and all Contracted Employees interacting with the public or City employees are covered.

   All Health + Hospitals employees and most DOHMH clinic-based employees are covered beginning August 2nd.

   For City employees who were hired on or after August 2, 2021, please refer to <u>Executive Order 75</u>, which requires all new hires to provide proof of having received at least one dose of an approved COVID-19 vaccine prior to beginning their employment (unless they have a reasonable accommodation).

   City employees and employees of City contractors working in residential and congregate settings (defined below) pursuant to a City contract are covered, effective August 16th. See appendix for full list.

2. **For the purpose of this policy, how are you defining "contracted employee" and "City contractor"?**
   For the purposes of this policy, a contracted employee and City contractor are, respectively, an individual or entity whose salary or funding is paid, in whole or part, by a contract with a New York City agency to perform work within New York City, and interacts with city employees or members of the public.

   The City strongly urges organizations to adopt this policy as broadly as possible and cover of all of their employees, as the City has done. This policy is intended to keep your employees and the clients they serve safe, as well as streamline the implementation process.

3. **Does this policy apply to the clients served by the City or its contractors?**
   No. This policy is specific to City employees and City contractors including their staff, volunteers and interns. City contractors should integrate this policy into their own COVID-19 return to office and health and safety policies. Clients must wear face coverings at all times.

Case 23-655, Document 73, 06/05/2023, 3525005, Page238 of 286

JA-766

Issued 08/11/2021

4. **Does this policy cover interns?**
   Yes, interns, aides, and fellows that work directly with service recipients or in person with City employees are covered by this policy. All agencies should update their policies to include this requirement.

5. **Does this policy cover volunteers?**
   Yes, volunteers who work directly with service recipients or in person with City employees are covered by this policy. All agencies should update their volunteer policies to include this requirement.

6. **Does this policy extend to subcontractors?**
   Yes, this policy extends to subcontractors including building security, food service employees, and other subcontractors.

7. **Does this apply to people who come on-site (e.g. vendors, home health aides) that do not have a contract with the City?**
   City contractors are responsible for verifying that all visitors that enter the contracted space and will be interacting with or in close proximity to clients or City employees are either fully vaccinated or have proof of a negative test result within the last 7 days.

8. **Do staff interacting with the public have to wear a face covering, even if fully vaccinated?**
   Yes, staff interacting with members of the public – including employees, visitors, volunteers and interns of City agencies, City contractors and their subcontractors – must wear a face covering, even if they have submitted proof of full vaccination. Further, a face covering is required for all individuals at all times when present in a pre-kindergarten to twelfth grade school, public transit, homeless shelter, correctional facility, nursing home, or health care setting.

9. **Will there be any medical accommodations for the program?**
   If an employee, volunteer, or intern chooses not to be vaccinated, they will have to submit evidence of a weekly negative COVID-19 test. If an employee, volunteer, or intern does not want to undergo weekly testing for any reason, they must get fully vaccinated.

   If an employee, volunteer, or intern has a medical reason for not complying with these requirements, they should be referred to the agency EEO office to review and discuss that information.

10. **Which vaccines count? What if the employee has been vaccinated with a non-FDA approved vaccine?**
    FDA-authorized vaccines will be accepted. Today, this includes the Pfizer, Moderna, and Johnson & Johnson vaccines.

    It is possible that someone was vaccinated outside of the country with a non-FDA approved vaccine. Only vaccines listed for emergency use by the World Health Organization (WHO) are acceptable and the person needs to have received a complete vaccine series. The current list of vaccines authorized by the WHO for emergency use is here.

Issued 08/11/2021

People who have started, but not completed, a full series of a vaccine that is approved by the WHO, but not by the FDA, should receive a complete vaccine series with a U.S. FDA-authorized vaccine.

Employees, interns and volunteers who have been vaccinated outside the U.S. may submit their vaccine record from the place where it was administered.

11. **If an employee, intern, or volunteer gets their first dose prior to when they are subject to this requirement will they be required to provide weekly test results?**
Employees, interns, and volunteers covered by the DOHMH Commissioner's Orders related to Staff in Public Health Care Settings or Residential and Congregate Settings must have their first dose by the date specified in those orders. An employee, intern or volunteer who has received at least one dose of a vaccine that requires two doses (ex. Moderna and Pfizer) will not need to submit the results of weekly testing as long as proof of their second dose is provided within one month. If the employee, intern or volunteer does not submit proof of having received the second dose by such time, they will be subject to the weekly testing requirement until they do submit that proof.

For all others:
An employee, intern, or volunteer who has received one dose of a single dose COVID-19 vaccine (ex. Johnson and Johnson) by September 13, 2021 or the date they commence employment ("the effective start date"), whichever is later, will not need to submit proof of weekly negative test results.

An employee, intern or volunteer who has received at least one dose of a vaccine that requires two doses (ex. Moderna and Pfizer) by September 13, 2021, or the effective start date, whichever is later, will not need to submit the results of weekly testing as long as proof of their second dose is provided within one month of their effective start date. If the employee, intern or volunteer does not submit proof of having received the second dose by such time, they will be subject to the weekly testing requirement until they do submit that proof.

Employees, interns, and volunteers who wish to remove their face covering must be fully vaccinated (note there is a different policy for staff who are client-facing and in certain settings, see Question 7). An individual is considered fully vaccinated two or more weeks following receipt of the second dose in a 2-dose series of a COVID-19 vaccine, or two or more weeks following receipt of one dose of a single dose COVID-19 vaccine.

12. **What counts as proof of vaccination?**
Employees, interns, and volunteers may submit, using secure means, proof of vaccination directly to their own agency or contract organization. Employers should maintain a confidential record of the employees who have demonstrated proof of vaccination.
Proof must be:
- An official CDC card or other official immunization card bearing the employee's name and date(s) of vaccine administration.  The employer must see this document or a photograph of it;
- An Excelsior Pass issued by the State of New York; or
- The NYC COVID SAFE app that clearly displays an image of the CDC card or other official immunization card with the above noted requirements. The NYC COVID SAFE app can be

Issued 08/11/2021

downloaded for Apple or Android (or by searching "NYC COVID Safe" on Apple app store or Google Play store).

Proof of vaccination for vaccines administered outside the U.S. must be an official immunization record and will include all of the following:
- First name and last name
- Date of birth
- Vaccine product name (ex: Moderna)
- Lot number (note: lot number may not be included on all official cards)
- Date(s) administered
- Site where the vaccine was administered or person who administered the vaccine.

**13. How will City agencies use the proof of vaccination?**
Agencies will collect vaccination proof from City employees using secure means. This information will be used to compile a list of employees who have not submitted proof of vaccination and must wear a face covering and submit weekly negative test results. HR must ensure that these employees submit negative test results, as a term of their employment. See information below regarding consequences for failure to comply.

This list of employees, volunteers, and interns required to wear a face covering will be securely shared with designated supervisors and other designated agency personnel who will conduct audits of face covering compliance. Agencies should proactively audit for compliance daily. In the compliance support role, designated agency staff must never inquire about an employee's medical condition; such inquiries may be a violation of federal law. Refer to the guidance issued by the City's Chief Privacy Officer on 7/30/21 for further information about handling individuals' confidential vaccination status and related information.

An employee, intern, or volunteer who chooses not to share their vaccination status with their agency's Human Resource Department (HR) must continue to wear a face covering. An unvaccinated employee, intern, or volunteer, other than those with an approved reasonable accommodation, must continue to wear a face covering as required by DCAS Commissioner's Directive 2020-1.

**14. What if an employee, intern, or volunteer is vaccinated, but lost their CDC vaccination card?**
Employees, interns, and volunteers who lost their CDC vaccination card should contact the medical provider where they got vaccinated to get an official record of vaccination. If an employee, intern or volunteer was vaccinated in New York City, they can request their immunization record through the DOHMH self-service portal My Vaccine Record.

**15. For employees, interns, and volunteers who opt to do weekly testing, which tests qualify?**
Only polymerase chain reaction (PCR) tests processed by medical professionals qualify for the City's COVID-Safe Requirement. These tests usually take one-two days to process at a lab, but some PCR tests are rapid tests. Both rapid and non-rapid PCR tests can be used.

**16. Where can people be vaccinated?**
Vaccination is free and convenient across the five boroughs and in bordering counties. Over 95% of all NYC residents live within half a mile of a public vaccination site. Convenient vaccination

sites can be found via https://www.nyc.gov/vaccinefinder or by calling 877-VAX-4-NYC. For anyone who lives within the five boroughs (including City employees and contractors' employees), the City is also making at-home vaccination free and available; call 877-VAX-4-NYC or visit https://www.nyc.gov/homevaccine to sign up to have a team member come to your home to vaccinate you and any other household members, with any of the three FDA-authorized vaccines you choose.

**17. When must employees submit a weekly test?**
For each day that an employee reports to work onsite, they must have had a negative COVID-19 PCR test taken within the preceding seven days. This test result, which must be submitted to HR, must be negative. An employee who has been tested within the preceding seven days, but is still waiting for the result may report to work with a pending test result as long as they meet the criteria of the health screening, and provided that the test result is submitted to HR as soon as it becomes available.

**18. Where can people find testing?**
The City of New York offers free COVID-19 testing in convenient locations across the five boroughs and will continue to do so, but employees may opt to go to their trusted medical professionals as well. There are hundreds of PCR testing locations in the five boroughs; the list can be found at http://www.nyc.gov/covidtest. If employees or contractors would prefer to receive a test specifically at a City-sponsored site, that list can be found here: https://www.nychealthandhospitals.org/test-and-trace/testing.

**19. Will the City be providing on-site vaccination and testing at City worksites?**
Testing and vaccination are both widely available and convenient for all New Yorkers.
The City will continue to bring mobile vaccination clinics to select worksites, including certain City worksites. The City will bring mobile testing to City worksites that previously receiving regular testing, specifically for schools, corrections facilities, and some congregate settings.

**20. Do rapid tests qualify?**
Rapid PCR tests will qualify for this requirement. Antigen tests will not.

**21. Do at-home tests qualify?**
At-home tests will not be accepted at this time.

**22. What happens if an employee, intern, or volunteer tests positive?**
An employee, intern or volunteer who tests positive must not report to work until they meet all the criteria of the health screening and all of these conditions are met:
   a. It has been at least 10 days since their symptoms began;
   b. They have not had a fever for at least 24 hours without the use of a fever reducer; and
   c. Other respiratory symptoms (cough, shortness of breath) have improved.

For information on the City's Leave Policy during COVID-19, please see: Updated Guidance for City Agencies on Leave Policy Applicable During the Outbreak of Coronavirus Disease 2019 (COVID-19).

23. **Will employees, interns, and volunteers be expected to pay out of pocket for vaccine or test?**
No. Vaccination is free to all New Yorkers including City and contract organization employees; nearly 60% of all employees have chosen to protect themselves and their community by getting vaccinated. Testing is provided at no cost to the individual and is widely available. The City will continue to provide options for both vaccinations and weekly PCR testing in all five boroughs and near public transportation hubs to make compliance as convenient as possible.

24. **Can employees take time from their shift to get vaccinated?**
All employees are allowed to take up to four hours to get vaccinated during their workday. Employees who get a vaccine that requires two doses may take up to four hours on both days they receive a dose of that vaccine. Please see <u>PSB 600-4 Temporary Citywide Policy for Vaccination of City Employees against SARS-CoV-2</u> for more information. In addition, all employees may be entitled to paid excused leave for any side effects experienced due to the vaccination. Please see: <u>Updated Guidance for City Agencies on Leave Policy Applicable During the Outbreak of Coronavirus Disease 2019 (COVID-19)</u> for more information.

It is suggested that City contractors adopt the same or similar policy. The City will reimburse contractors for costs associated with providing time off to employees getting vaccinated.

25. **What happens if an employee is supposed to come in, but says their test results are pending? Do we track how many times someone does this?**
Employees who have been tested, but whose test results are pending should come to work as long as they meet the criteria of the health screening. They must provide proof of test collection while they await the result.

26. **Does the COVID-Safe Requirement apply to pre-K staff in City-contracted sites? Or only DOE staff?**
The COVID-Safe Requirement applies to all City employees and contracted staff interacting with the public or City employees. This includes Pre-K staff in City-contracted sites.

27. **Is the City offering any exemptions for the vaccination requirement?**
Any employee, intern, or volunteer who is unwilling or unable to be vaccinated, including for medical reasons, will be required to show proof of a COVID-19 PCR test with a negative result once every seven days.

28. **Can City and contracted employees take time from their shift to get tested?**
City employees may use City time to be tested, but some restrictions apply:
- Employees are required to get tested at the beginning or end of their shift.
- If testing is offered at an employee's place of work, they may not use work hours to be tested off-site.
- If testing is not onsite at the workplace, employees should get tested in a place close to their home or work.
- Employees will be required to document time taken to seek testing and will be required to seek the fastest option available.
- Employees should work with their supervisors to schedule a time for testing.
- Testing time should be scheduled so that it does not have any detrimental impact on operations.

Case 23-655, Document 73, 06/05/2023, 3525005, Page243 of 286

Issued 08/11/2021

Like City employees, contracted employees may use shift time to get tested and the same restrictions apply. Contracted employees with testing available on site must use that option if they get tested during their shift. No additional funding will be provided associated with time off for testing.

**29. Will tests at City sites be billed to employees' insurance (which the City pays)?**
For many of the tests conducted, employee insurance will be billed. At City-run sites, FEMA requires that the City attempt to bill for all tests in order to seek federal reimbursement for any costs not covered by insurance. For this reason, the City will attempt to bill for most tests performed by a City provider regardless of the fact that the City pays for the insurance coverage. The City does provide some testing without billing for it because the testing is funded by sources of federal funds that are not subject to FEMA rules and regulations.

**30. Who is responsible for paying for tests at non-City sites (to the extent it isn't covered)?**
Tests are widely available at no cost to individuals across dozens of City-sponsored test sites. Private providers may charge for testing or charge a co-pay and all New Yorkers are strongly encouraged to ask about associated costs before being tested. Most providers across the City will attempt to bill insurance for test collection.

**31. Will the City reopen its employee testing sites?**
Testing is now widely available and convenient for all New Yorkers. The Test & Trace Corps will continue to deploy City resources to ensure all geographies have access and to respond to case rates, outbreaks, and demand.

**32. What incentives are available for vaccination?**
Please visit https://www1.nyc.gov/site/coronavirus/vaccines/vaccine-incentives.page for a full list of incentives offered for vaccination.

**Enforcement and Compliance**

**33. How will City agencies track compliance?**
Each agency will track compliance for their employees, interns, and volunteers. Agencies are responsible for verifying individual vaccination status of each employee, intern, and volunteer, and monitoring compliance with weekly testing and face covering requirements for those who have not submitted proof of vaccination.

**34. Are there privacy concerns with handling employee vaccination information and documents?**
Yes. Employee vaccination information is considered confidential medical information under the federal Americans with Disabilities Act and is also identifying information that is protected under the City's privacy law. This information must be kept private and secure and may only be shared with designated agency staff and City officials. Refer to guidance issued by the City's Chief Privacy Officer on July 30, 2021 for further information on handling this information, or email PrivacyOfficer@cityhall.nyc.gov.

**35. What tools can an agency use to collect and store vaccination or testing proof?**
Agencies developing or utilizing a survey tool to collect proof of employee vaccination status, because it is confidential medical information, must only use tools that have successfully

Case 23-655, Document 73, 06/05/2023, 3525005, Page244 of 286

completed the citywide application security review and have the appropriate controls to support the storage, transmission, and handling of information classified as "Restricted" information under the NYC Cyber Command Policies & Standards. If an agency procures a vendor to develop its survey tool, the contract should include NYC3 security provisions and be reviewed by the Chief Privacy Officer to ensure appropriate privacy protections are included. For further information, contact PrivacyOfficer@cityhall.nyc.gov or legal@cyber.nyc.gov.

**36. How will the COVID-Safe Requirement be enforced for contracted organizations?**
All City contractors with covered contracts must submit a signed certification that they are complying with the City's policies regarding testing, vaccine proof, and face coverings by uploading it directly to their PASSPort vendor profile or sending it to their contracting agency if they do not have a PASSPort account. They must also submit related policies. Further guidance on certification of the COVID-Safe Requirement will be issued soon.

If an agency does not manage contracts via PASSPort, it must independently collect contractor certifications and policies and monitor them in an ongoing manner.

Contractors are subject to reviews for compliance. Like all other contract provisions, if providers are non-compliant, contracting agencies will exercise any rights they may have under the contract.

**37. What is the penalty for non-compliance? Will non-compliant employees be subject to termination?**
City staff who are in violation of either the COVID-Safe Requirement to be vaccinated or complete weekly testing will be placed on Leave Without Pay until they are in compliance. Employees who refuse to comply will be terminated.

It is suggested that contracted organizations adopt a similar policy. If providers are non-compliant, contracting agencies will exercise any rights they may have under their contract.

**38. Will employees be required to use the City's NYC COVID Safe application?**
No. The NYC COVID Safe application should be on every phone issued by the City of New York, if an employee wishes to use it. However, employees may choose to provide one-time documentation of vaccination or provide weekly documentation of a test via any proof acceptable to the employer and consistent with guidance provided above.

**39. In City agencies, who is responsible for checking if someone has had a test in the last week? Are supervisors supposed to be involved in enforcement or just HR? Will supervisors be told who is and isn't vaccinated to enforce among their staff? Will they make direct outreach to employees or go through HR?**
Employees, volunteers, and interns must submit proof of full vaccination once or proof of a negative COVID-19 PCR test ever seven days to HR. HR will provide designated supervisors and other designated personnel with a list of employees who are required to wear a face covering. HR will enforce compliance with the test requirement and will notify any employee who is out of compliance. HR and HR-designated supervisors/personnel will enforce compliance with the face covering requirement using the list provided by HR.

Issued 08/11/2021

Employees seeking reasonable accommodations should seek them through the agency's EEO office. A supervisor who becomes aware that an employee may need an accommodation should let them know the official way to request an accommodation.

**40. In City agencies, if someone suspects that a coworker is in violation of the COVID-Safe Requirement, what is the process for reporting their concern?**
An employee may speak to their HR representative if they believe that a coworker is not complying with City policy. The employee should not engage their coworker directly on the issue.

**41. In City agencies, do staff have to show proof of vaccination or testing multiple times a day every time someone comes in and out of the workplace, or can they get a "pass" for the day or permanently?**
No. Designated supervisors and other designated personnel will be provided with a weekly list of employees for the purpose of monitoring face covering compliance. HR will be responsible for monitoring weekly test compliance for those who choose to remain unvaccinated. Agencies will designate supervisors or other agency personnel who will conduct audits of face covering compliance on a regular basis.

**42. Do staff have to tell the City whether or not they are vaccinated?**
No. Any employee who prefers to keep their vaccination status private can do so by providing a weekly COVID-19 PCR test and wearing a face covering.

**43. Does a test have to be within the previous seven days or in the same calendar week?**
The test must be within the previous seven days and does not need to be in the same calendar week.

**Where can I find...**
- Vaccination sites: www.nyc.gov/vaccinefinder
- Vaccination appointments: www.vax4nyc.nyc.gov and 877-VAX-4-NYC
- How to schedule an at home vaccine appointment: www.nyc.gov/homevaccine and 877-VAX-4-NYC
- A testing site: www.nyc.gov/covidtest
- A City-run testing site: www.nychealthandhospitals.org/test-and-trace/testing/
- A doctor or nurse to talk with about my vaccination concerns: call 311 and ask to talk to a clinician about COVID-19 vaccination
- Assistance for New Yorkers experiencing Long COVID: www.nyc.gov/aftercare
- CPO Privacy Guidance dated 7/30/21 contact PrivacyOfficer@cityhall.nyc.gov

Case 23-655, Document 73, 06/05/2023, 3525005, Page246 of 286

Issued 08/11/2021

**Appendix: Phases**

**On August 2nd: Clinical settings**
- **Health + Hospitals**
  - All employees and contractors
- **DOHMH**
  - All clinic-based employees and contractors

**On August 16th: Residential and Congregate Programs, including the following agencies and their contractors.**
- ACS
  - Residential juvenile justice programs (Secure and nonsecure detention, close to home)
  - Residential foster care
  - The Children's Center
- DFTA
  - Senior Centers
  - NORCS
  - Social Adult Day Cares
- DHS
  - Shelter (family, adult, safe havens, etc.)
  - Drop in Centers
- DOC
  - Jails
- DOHMH
  - Supportive housing
- DYCD
  - RHY Shelter
  - Drop in center
- HRA
  - DV Shelter
  - HASA shelter/supportive housing
- MOCJ
  - Transitional housing sites

**On September 13th: ALL City Workforce and Certain Contracted Employees**
- All City employees
- All City interns and volunteers working in person and indoors with service recipients or working in person and indoors with City employees.
- All contracted employees interacting with members of the public or City employees

JA-775

# Municipal Labor Committee

55 Water Street, 23rd Floor / New York, NY 10041 / (212) 815-1474

**CHAIRPERSON**
HARRY NESPOLI
Local 831, I.B.T. Uniformed
Sanitationmen's Association, AFL-CIO

**CO-CHAIRPERSON**
HENRY A. GARRIDO
District Council 37, AFSCME, AFL-CIO

**EXECUTIVE VICE-CHAIR**
MICHAEL MULGREW
United Federation of Teachers, AFL-CIO

**SECRETARY**
GREGORY FLOYD
Local 237
City Employees Union, I.B.T., AFL-CIO

**TREASURER**
MARK CANNIZZARO
Council of School Supervisors &
Administrators

**VICE CHAIRPERSONS**

ANDREW ANSBRO
Uniformed Firefighters Association

BENNY BOSCIO, JR.
Correction Officers' Benevolent Association

BARBARA BOWEN
Professional Staff Congress
City University of New York

JOSPEH COLANGELO
S.E.I.U. New York City Local 246

ROBERT CROGHAN
Organization of Staff Analysts

JUDITH A. CUTCHIN
New York State Nurses Association

PAUL DIGIACOMO
Detectives' Endowment Association

JAMES LEMONDA
Local 854, Uniformed Fire Officers
Association, AFL-CIO

MARTIN A. LYDON
District Council of Carpenters, AFL-CIO

WILLIAM M. LYNN
International Union of Operating Engineers
Local 30, AFL-CIO

JOSEPH MANNION
Sanitation Officers Association

GLORIA MIDDLETON
Local 1180, NYC Administrative
Employees, CWA, AFL-CIO

FRANK PROSCIA, M.D.
Doctors Council

PETER STEIN
Local 508, NYC Lifeguard Supervisors,
AFSCME, AFL-CIO

LOUIS TURCO
Lieutenants Benevolent Association

MAF MISBAH UDDIN
Local 1407, NYC Accountants, Statisticians
& Actuaries, AFSCME, AFL-CIO

ANTHONY WELLS
Local 371, Social Service Employees,
AFSCME, AFL-CIO

*Executive Secretary*
ELLEN MEDWID

August 12, 2021

Hon. Dean Fuleihan
First Deputy Mayor
City of New York
City Hall
New York, New York 10007

Hon. Emma Wolfe
Chief of Staff and
  Deputy Mayor for Administration
City of New York
City Hall
New York, New York 10007

Hon. Renee Campion
Commissioner
New York City Office of Labor Relations
22 Cortlandt St.
New York, NY 10007

Dear All:

I write to express the severe concern—and great disappointment—of the MLC Union leaders on the lack of progress in arriving at a negotiated program to implement the City's vaccine/testing policy.

Several weeks ago, the City announced, without prior consultation or bargaining with the Unions, a policy that would require public employees either to be vaccinated or be tested weekly to avoid suspension without pay. Despite this unilateral action, with an eye towards the unfortunate advance of the Delta variant, the MLC's officers agreed to meet and discuss the proposed policy with you and numerous other key City officials on July 28th. The tenor of the discussion, we thought, was the City's desire to work collaboratively with the Unions to navigate a path towards achieving the objectives of the policy.

City leadership collectively asked the Union leaders to provide proposals and raise concerns, which we did. Primary among those concerns was the major logistical hurdle of providing timely and accessible testing to the likely 100,000 City workers who, despite the encouragement of many (including Union leaders), would opt out of vaccination for medical, religious and other reasons. This major dilemma, the Unions warned, would exist even if the policy was successful in encouraging a significant portion of the currently unvaccinated employees to vaccinate.

JA-776

Page 2… Vaccine/Testing Policy

The MLC officers cautioned that logistics take time to work out, would necessarily be agency specific in places and that, without proper planning, the City would be in a position of having to order so many employees home without pay that there would be insufficient staffing to carry out the duties required to appropriately provide services to the residents of the City. We also raised fundamental questions, including, with regard to testing, whether it would be performed at the work site and on work time, and if not, where testing would be available and how workers would be compensated for complying with the mandated policy.

The discussion concluded on a hopeful note with the City agreeing to take back many of the comments, concerns and suggestions for consideration and to continue the discussions with the Unions. *That was two weeks ago.* While there have been sporadic discussions with some, MLC inquiries regarding these essential matters have essentially gone unanswered. This is unacceptable.

The MLC and its leaders have been firm and consistent that while the Unions support encouraging vaccination (and have made considerable efforts on their own to encourage their members to vaccinate), they will not abdicate their legal right and responsibility to protect the rights of workers to opt for either vaccination or testing, to be held harmless for both the time and cost of testing and vaccination, and to have a fair process for any form of discipline. Make no mistake, despite calling this a vaccination policy, the City's proposal creates a new criterion and process for discipline that would allow agencies to suspend workers without pay and without the typical forms of due process provided for under collective bargaining agreements and law.

Accordingly, we seek a prompt meeting to continue this vital discussion. In the meantime, no policy should be implemented before it is negotiated.

Sincerely,

*Harry Nespoli*

Harry Nespoli
Chair

cc:    Henry Garrido
       Co-Chair
       District Council 37

       Michael Mulgrew
       Executive Vice Chair
       United Federation of Teachers

       Gregory Floyd
       Secretary
       Local 237, City Employees Union

       Mark Cannizzaro
       Treasurer
       Council of School Supervisors & Administrators

# Municipal Labor Committee

55 Water Street, 23rd Floor / New York, NY 10041 / (212) 815-1474

**CHAIRPERSON**
HARRY NESPOLI
Local 831, I.B.T. Uniformed
Sanitationmen's Association, AFL-CIO

**CO-CHAIRPERSON**
HENRY A. GARRIDO
District Council 37, AFSCME, AFL-CIO

**EXECUTIVE VICE-CHAIR**
MICHAEL MULGREW
United Federation of Teachers, AFL-CIO

**SECRETARY**
GREGORY FLOYD
Local 237
City Employees Union, I.B.T., AFL-CIO

**TREASURER**
MARK CANNIZZARO
Council of School Supervisors &
Administrators

**VICE CHAIRPERSONS**

ANDREW ANSBRO
Uniformed Firefighters Association

BENNY BOSCIO, JR.
Correction Officers' Benevolent Association

BARBARA BOWEN
Professional Staff Congress
City University of New York

JOSPEH COLANGELO
S.E.I.U. New York City Local 246

ROBERT CROGHAN
Organization of Staff Analysts

JUDITH A. CUTCHIN
New York State Nurses Association

PAUL DIGIACOMO
Detectives' Endowment Association

JAMES LEMONDA
Local 854, Uniformed Fire Officers
Association, AFL-CIO

MARTIN A. LYDON
District Council of Carpenters, AFL-CIO

WILLIAM M. LYNN
International Union of Operating Engineers
Local 30, AFL-CIO

JOSEPH MANNION
Sanitation Officers Association

GLORIA MIDDLETON
Local 1180, NYC Administrative
Employees, CWA, AFL-CIO

FRANK PROSCIA, M.D.
Doctors Council

PETER STEIN
Local 508, NYC Lifeguard Supervisors,
AFSCME, AFL-CIO

LOUIS TURCO
Lieutenants Benevolent Association

MAF MISBAH UDDIN
Local 1407, NYC Accountants, Statisticians
& Actuaries, AFSCME, AFL-CIO

ANTHONY WELLS
Local 371, Social Service Employees,
AFSCME, AFL-CIO

*Executive Secretary*
ELLEN MEDWID

August 17, 2021

Hon. Dean Fuleihan
First Deputy Mayor City of New York
City Hall
New York, New York 10007

Hon. Emma Wolfe
Chief of Staff and
Deputy Mayor for Administration
City of New York
City Hall
New York, New York 10007

Hon. Renee Campion
Commissioner
New York City Office of Labor Relations
22 Cortlandt St.
New York, NY 10007

Dear All:

As I have written before, the MLC and its constituent Unions believe strongly that it was inappropriate for the City to have announced the vaccination/testing policy without having met first with the Unions. Nonetheless, we have been working with you on the policy and have sought follow-up meetings, in particular regarding the testing component of the policy.

We are hearing now that the City is considering jettisoning the vaccination/testing program before it has even started in favor of an across the board vaccination mandate. To be clear, any such unilateral action would be improper and a violation of the City's duty to bargain pursuant to the Taylor Law, the New York City Collective Bargaining Law and various collective bargaining agreements.

Should the City move to unilaterally implement a vaccination mandate without the option for regular testing in lieu of vaccination, the MLC and likely various individual Unions would be compelled to take appropriate steps, including legal action, to protect the rights of their members.

Case 23-655, Document 73, 06/05/2023, 3525005, Page250 of 286

JA-778

Page 2...  Vaccination/Testing Program


We look forward to continuing working collaboratively on the vaccination/testing program.


Sincerely,

*Harry Nespoli*

Harry Nespoli
Chair


cc:   Henry Garrido
      Co-Chair
      District Council 37

      Michael Mulgrew
      Executive Vice Chair
      United Federation of Teachers

      Gregory Floyd
      Secretary
      Local 237, City Employees Union

      Mark Cannizzaro
      Treasurer
      Council of School Supervisors & Administrators

JA-779

## ORDER OF THE COMMISSIONER
## OF HEALTH AND MENTAL HYGIENE
## TO REQUIRE COVID-19 VACCINATION FOR
## DEPARTMENT OF EDUCATION
## EMPLOYEES, CONTRACTORS, AND OTHERS

**WHEREAS**, on March 12, 2020, Mayor Bill de Blasio issued Emergency Executive Order No. 98 declaring a state of emergency in the City to address the threat posed by COVID-19 to the health and welfare of City residents, and such order remains in effect; and

**WHEREAS**, on March 25, 2020, the New York City Commissioner of Health and Mental Hygiene declared the existence of a public health emergency within the City to address the continuing threat posed by COVID-19 to the health and welfare of City residents, and such declaration and public health emergency continue to be in effect; and

**WHEREAS**, pursuant to Section 3.01(d) of the New York City Health Code ("Health Code"), the existence of a public health emergency within the City as a result of COVID-19, for which certain orders and actions are necessary to protect the health and safety of the City of New York and its residents, was declared; and

**WHEREAS**, pursuant to Section 558 of the New York City Charter (the "Charter"), the Board of Health may embrace in the Health Code all matters and subjects to which the power and authority of the Department of Health and Mental Hygiene (the "Department") extends; and

**WHEREAS**, pursuant to Section 556 of the Charter and Section 3.01(c) of the Health Code, the Department is authorized to supervise the control of communicable diseases and conditions hazardous to life and health and take such actions as may be necessary to assure the maintenance of the protection of public health; and

**WHEREAS**, the U.S. Centers for Disease Control ("CDC") reports that new variants of COVID-19, identified as "variants of concern" have emerged in the United States, and some of these new variants which currently account for the majority of COVID-19 cases sequenced in New York City, are more transmissible than earlier variants; and

**WHEREAS,** the CDC has stated that vaccination is an effective tool to prevent the spread of COVID-19 and benefits both vaccine recipients and those they come into contact with, including persons who for reasons of age, health, or other conditions cannot themselves be vaccinated; and

**WHEREAS** New York State has announced that, as of September 27, 2021 all healthcare workers in New York State, including staff at hospitals and long-term care facilities, including nursing homes, adult care, and other congregate care settings, will be required to be vaccinated against COVID-19 by Monday, September 27; and

**WHEREAS**, section 17-104 of the Administrative Code of the City of New York directs the Department to adopt prompt and effective measures to prevent the communication of infection diseases such as COVID-19; and

**WHEREAS**, in accordance with section 17-109(b) of such Administrative Code, the Department may adopt vaccination measures in order to most effectively prevent the spread of communicable diseases; and

**WHEREAS**, pursuant to Section 3.07 of the Health Code, no person "shall do or assist in any act which is or may be detrimental to the public health or to the life or health of any individual" or "fail to do any reasonable act or take any necessary precaution to protect human life and health;" and

**WHEREAS**, the CDC has recommended that school teachers and staff be "vaccinated as soon as possible" because vaccination is "the most critical strategy to help schools safely resume] full operations… [and] is the leading public health prevention strategy to end the COVID-19 pandemic;" and

**WHEREAS** the New York City Department of Education ("DOE") serves approximately 1 million students across the City, including students in the communities that have been disproportionately affected by the COVID-19 pandemic and students who are too young to be eligible to be vaccinated; and

**WHEREAS**, a system of vaccination for individuals working in school settings or other DOE buildings will potentially save lives, protect public health, and promote public safety; and

**WHEREAS,** pursuant to Section 3.01(d) of the Health Code, I am authorized to issue orders and take actions that I deem necessary for the health and safety of the City and its residents when urgent public health action is necessary to protect the public health against an existing threat and a public health emergency has been declared pursuant to such section; and

**WHEREAS,** on July 21, 2021, I issued an order requiring staff in public healthcare and clinical settings to demonstrate proof of COVID-19 vaccination or undergo weekly testing; and

**WHEREAS,** on August 10, 2021, I issued an order requiring staff providing City operated or contracted services in residential and congregate settings to demonstrate proof of COVID-19 vaccination or undergo weekly testing;

**NOW THEREFORE** I, Dave A. Chokshi, MD, MSc, Commissioner of Health and Mental Hygiene, finding that a public health emergency within New York City continues, and that it is necessary for the health and safety of the City and its residents, do hereby exercise the power of the Board of Health to prevent, mitigate, control and abate the current emergency, and hereby order that:

1. No later than September 27, 2021 or prior to beginning employment, all DOE staff must provide proof to the DOE that:
   a. they have been fully vaccinated; or
   b. they have received a single dose vaccine, even if two weeks have not passed since they received the vaccine; or
   c. they have received the first dose of a two-dose vaccine, and they must additionally provide proof that they have received the second dose of that vaccine within 45 days after receipt of the first dose.

2. All City employees who work in-person in a DOE school setting or DOE building must provide proof to their employer no later than September 27, 2021 or prior to beginning such work that:
   a. they have been fully vaccinated; or
   b. they have received a single dose vaccine, even if two weeks have not passed since they received the vaccine; or

    c.  they have received the first dose of a two-dose vaccine, and they must additionally provide proof that they have received the second dose of that vaccine within 45 days after receipt of the first dose.

3.  All staff of contractors of DOE and the City who work in-person in a DOE school setting or DOE building, including individuals who provide services to DOE students, must provide proof to their employer no later than September 27, 2021 or prior to beginning such work that:
    a.  they have been fully vaccinated; or
    b.  they have received a single dose vaccine, even if two weeks have not passed since they received the vaccine; or
    c.  they have received the first dose of a two-dose vaccine, and they must additionally provide proof that they have received the second dose of that vaccine within 45 days after receipt of the first dose.

Self-employed independent contractors hired for such work must provide such proof to the DOE.

4.  All employees of any school serving students up to grade 12 and any UPK-3 or UPK-4 program that is located in a DOE building who work in-person, and all contractors hired by such schools or programs to work in-person in a DOE building, must provide proof to their employer, or if self-employed to the contracting school or program, no later than September 27, 2021 or prior to beginning such work that:
    a.  they have been fully vaccinated; or
    b.  they have received a single dose vaccine, even if two weeks have not passed since they received the vaccine; or
    c.  they have received the first dose of a two-dose vaccine, and they must additionally provide proof that they have received the second dose of that vaccine within 45 days after receipt of the first dose.

5.  For the purposes of this Order:

    a.  "DOE staff" means (i) full or part-time employees of the DOE, and (ii) DOE interns (including student teachers) and volunteers.

    b.  "Fully vaccinated" means at least two weeks have passed after a person received a single dose of a one-dose series, or the second dose of a two-dose series, of a COVID-19 vaccine approved or authorized for use by the Food and Drug Administration or World Health Organization.

    c.  "DOE school setting" includes any indoor location, including but not limited to DOE buildings, where instruction is provided to DOE students in public school kindergarten through grade 12, including residences of pupils receiving home instruction and places where care for children is provided through DOE's LYFE program.

JA-782

d.    "Staff of contractors of DOE and the City" means a full or part-time employee, intern or volunteer of a contractor of DOE or another City agency who works in-person in a DOE school setting or other DOE building, and includes individuals working as independent contractors.

e.    "Works in-person" means an individual spends any portion of their work time physically present in a DOE school setting or other DOE building. It does not include individuals who enter a DOE school setting or other DOE location only to deliver or pickup items, unless the individual is otherwise subject to this Order. It also does not include individuals present in DOE school settings or DOE buildings to make repairs at times when students are not present in the building, unless the individual is otherwise subject to this Order.

6.    This Order shall be effective immediately and remain in effect until rescinded, subject to the authority of the Board of Health to continue, rescind, alter or modify this Order pursuant to Section 3.01(d) of the Health Code.

Dated:   August 24th, 2021 _____

_____
Dave A. Chokshi, M.D., MSc
Commissioner

JA-783



**STATE OF NEW YORK**
**PUBLIC EMPLOYMENT RELATIONS BOARD**

PO BOX 2074
ESP AGENCY BLDG 2, FLS 18 & 20
ALBANY, NEW YORK 12220-0074
TEL: (518) 457-2690
(518) 457-6433 (fax)
www.perb.ny.gov

**JOHN F. WIRENIUS**
CHAIRPERSON

**WILLIAM M. CONLEY**
ACTING DIRECTOR
OFFICE OF CONCILIATION

September 3, 2021

MEISHA PORTER
CHANCELLOR
NYC BOARD OF EDUCATION
52 CHAMBERS STREET
NEW YORK, NY   10007
212-374-6000

MICHAEL MULGREW
PRESIDENT
UNITED FEDERATION OF TEACHERS
52 BROADWAY
NEW YORK, NY   10004
212-598-9215

<u>APPOINTMENT OF MEDIATOR</u>

    Re:    CASE NO. M2021-064
           NYC BD OF EDUCATION & UNITED FEDERATION OF TEACHERS

    The mediator appointed for the above-referenced case is:

        MARTIN F. SCHEINMAN
        322 MAIN STREET
        POINT WASHINGTON, NY   11050
        516-944-1700

    The mediator has been instructed to contact you directly to make arrangements for mediation meetings.

    Upon receipt of this letter, please mail Martin Scheinman a copy of your party's bargaining proposals and a copy of the parties' most recent collective bargaining agreement. If the impasse involves interest arbitration eligible employees and the parties have received an interest arbitration award since their last negotiated collective bargaining agreement, include a copy of the interest arbitration award.

    May we remind you that the Mediator is limited to THREE days unless additional time is expressly approved by the Director of Conciliation. Because of these limits, we suggest that you concentrate on those issues of high priority which can be handled in a limited manner.

                WILLIAM M. CONLEY
                Acting Director of Conciliation

cc:    Martin F. Scheinman

JA-784

| | |
|---|---|
| **From:** | Klinger, Alan M. |
| **To:** | wconley@perb.ny.gov |
| **Cc:** | Steve Banks (OLR); Beth A. Norton |
| **Subject:** | UFT/DOE Impasse Update |
| **Date:** | Monday, September 6, 2021 2:08:10 PM |

We write to advise you that PERB-appointed mediator Martin Scheinman held (virtual) mediation sessions with the parties on each of September 2, 3, 4 and 5, with some days having multiple sessions.  While progress was made, with the start of the school  year imminent along with the vaccine-related mandates scheduled to commence on Sept. 13th and Sept. 27th, respectively, the parties have agreed to move to an expedited arbitration due to the exigencies of these circumstances and fairness to the affected workforce.  Arbitration sessions are being held on Sept. 6th.  We will keep PERB apprised as to status.

**Alan M. Klinger**
Co-Managing Partner
(he | him | his)

**STROOCK**
180 Maiden Lane, New York, NY 10038
D: 212.806.5818
M: 646.468.7793

aklinger@stroock.com | vCard | www.stroock.com



**SCHEINMAN**
ARBITRATION & MEDIATION SERVICES

September 15, 2021

**Via E-Mail Only**
Renee Campion, Commissioner
Steven H. Banks, Esq.
New York City Office of Labor Relations
The Office of Labor Relations
22 Cortlandt Street, 14th Floor
New York, NY 10007

Susan Davis, Esq.
Cohen, Weiss and Simon, L.L.P.
900 Third Avenue, Suite 2100
New York NY 10022

Re:   **Board of Education of the City School District of the City of New York**
      **and**
      **International Brotherhood of Teamsters, Local 237**
      **(Impact Bargaining)**

Dear Counsel:

Enclosed please find my Award in the above referenced matter.

Thank you.

Sincerely,

Martin F. Scheinman

MFS/sk
BOE.Local 237.Impact Bargaining.trans

```
-------------------------------- X
In the Matter of the Arbitration
                                 X
         between
                                 X
BOARD OF EDUCATION OF THE CITY            Re: Impact Bargaining
SCHOOL DISTRICT OF THE CITY OF   X
NEW YORK
                                 X
         "Department"
                                 X
         -and-
                                 X
INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, LOCAL 237             X

         "Union"                 X

-------------------------------- X
```

**APPEARANCES**

      <u>**For the Department**</u>
        Renee Campion, Commissioner of Labor Relations
        Steven H. Banks, Esq., First Deputy Commissioner
        and General Counsel of Labor Relations

      <u>**For the Union**</u>
      COHEN, WEISS AND SIMON, L.L.P.
        Susan Davis, Esq.

**BEFORE**: Martin F. Scheinman, Esq., Arbitrator

JA-787

**BACKGROUND**

The Union ("Union" or "Local 237") protests the Department of Education's ("Department" or "DOE") failure to reach agreement on the impact of its decision mandating all employees working in Department buildings show proof they started the Covid-19 vaccination protocols by September 27, 2021. The Union contends the Department failed to adequately provide, among other things, for those instances where employees have proof of a serious medical condition making the vaccine a danger to their health, as well as for employees who have a legitimate religious objection to vaccines.

The basic facts are not in dispute.

A mediation session was held with the parties on September 14, 2021. Thereafter, an arbitration hearing was before me on September 15, 2021. During the course of the arbitration hearing, both sides were given full opportunity to introduce evidence and argument in support of their respective positions. They did so. Both parties made strenuous and impassioned arguments reflecting their viewpoints on this entire issue.

On September 10, 2021, I issued an Award resolving the same issues for the Department and the United Federation of Teachers. ("UFT Award"). I am hereby adopting the findings and application of the UFT Award to the issues before me in this proceeding.

However, because the Collective Bargaining Agreement ("CBA") between the Department and Local 237 contains different terms and conditions than UFT employee, I have modified this Award in two (2)

2

JA-788

aspects.  In order to give Local 237 members ample to file a request for an exemption or accommodation, the time to do so will be extended by one (1) day, until the close of business Tuesday, September 21, 2021.  In addition, I have modified the Maternity/Parental Leave provision set forth in Section II, E, to comply with the terms of the parties' CBA.  In all other respects, this Award and the UFT Award are identical.

**Opinion**

After having carefully considered the record evidence, and after having the parties respond to countless inquiries. I have requested to permit me to make a final determination, I make the rulings set forth below. While some of the language has been drafted, initially, by the parties in response to my rulings, in the end the language set forth, herein, is mine alone and I issue the following Award:

**I.   Exemption and Accommodation Requests & Appeal Process**

As an alternative to any statutory reasonable accommodation process, the City of New York (the "City"), the Board of Education of the City School District for the City of New York (the "DOE"), and Local 237, International Brotherhood of Teamsters ("Local 237"), (collectively the "Parties") shall be subject to the following Expedited Review Process to be implemented immediately for full-time staff Employed by the DOE and School Safety Agents employed by the New York City Police Department ("NYPD"). This process shall only apply to (a) religious and medical exemption requests to the

3

mandatory vaccination policy, and (b) medical accommodation requests where an employee is unable to mount an immune response to COVID-19 due to preexisting immune conditions. This process shall be in place for the 2021-2022 school year and shall only be extended by mutual agreement of the Parties.

Any requests to be considered as part of this process must be submitted via the SOLAS system for DOE employees or on a form created by NYPD to the Office of the Deputy Commissioner, Equity & Inclusion for NYPD employees, no later than 5:00 p.m. on Tuesday, September 21, 2021.

A. Full Medical Exemptions to the vaccine mandate shall only be considered where an individual has a documented contraindication such that an individual cannot receive any of the 3 authorized vaccines (Pfizer, Moderna, J&J)—with contraindications delineated in CDC clinical considerations for COVID-19 vaccination. Note that a prior immediate allergic reaction to one type of vaccine will be a precaution for the other type of vaccine, and may require consultation with an allergist.

B. Temporary Medical Exemptions to the vaccine mandate shall only be based on the following valid reasons to defer or delay COVID-19 vaccination for some period:

o Within the isolation period after a COVID-19 infection;

o Within ninety (90) days of monoclonal antibody treatment of COVID-19;

4

    o Treatments for conditions as delineated in CDC clinical considerations, with understanding CDC guidance can be updated to include new considerations over time, and/or determined by a treating physician with a valid medical license responsible for the immunosuppressive therapy, including full and appropriate documentation that may warrant temporary medical exemption for some period of time because of active therapy or treatment (e.g., stem cell transplant, CAR T-cell therapy) that would temporarily interfere with the patient's ability to respond adequately to vaccination;

    o Pericarditis or myocarditis not associated with COVID-19 vaccination or pericarditis or myocarditis associated with COVID-19 vaccination.

Length of delay for these conditions may vary, and the employee must get vaccinated after that period unless satisfying the criteria for a Full Medical Exemption described, above.


C. Religious exemptions for an employee to not adhere to the mandatory vaccination policy must be documented in writing by a religious official (e.g., clergy). Requests shall be denied where the leader of the religious organization has spoken publicly in favor of the vaccine, where the documentation is readily available (e.g., from an online source), or where the objection is personal, political, or

5

JA-791

philosophical in nature. Exemption requests shall be considered for recognized and established religious organizations (e.g., Christian Scientists).

D. There are cases in which, despite an individual having sought and received the full course of the vaccination, he or she is unable to mount an immune response to COVID-19 due to preexisting immune conditions. In these circumstances, each individual case shall be reviewed for potential accommodation. Medical accommodation requests must be documented in writing by a medical doctor.

E. The initial determination of eligibility for an exemption or accommodation shall be made by staff in the Division of Human Capital in the Office of Medical, Leaves and Benefits; the Office of Equal Opportunity; and Office of Employee Relations. These determinations shall be made in writing no later than Thursday, September 23, 2021, and, if denied, shall include a reason for the denial.

F. If the employee wishes to appeal a determination under the identified criteria, such appeal shall be made in SOLAS to the DOE for DOE employees and to the NYPD Office of the Deputy Commissioner, Equity & Inclusion for NYPD employees within one school day of the agency's issuance of the initial eligibility determination. The request for appeal should include the reason for the appeal and any additional documentation. Following the filing of the appeal, any

6

supplemental documentation may be submitted by the employee to the Scheinman Arbitration and Mediation Services ("SAMS") within 48 hours after the filing of the appeal. If the stated reason for denial of a medical exemption or accommodation request is insufficient documentation, the employee may request from the arbitrator and, upon good cause shown, the arbitrator may grant an extension beyond 48 hours and permit the use of sick and/or annual leave after September 27 for the employee to gather the appropriate medical documentation before the appeal is deemed submitted for determination.

G. A panel of arbitrators identified by SAMS shall hear these appeals, and may request that the employee or the agency submit additional documentation. The assigned arbitrator may also request information from City and/or DOE doctors as part of the review of the appeal documentation.  The assigned arbitrator, at his/her discretion, will either issue a decision on the appeal based on the documents submitted or hold an expedited (virtual) factual hearing. If the panel requests a factual hearing, the employee may elect to have a union representative present but neither party shall be required to be represented by an attorney at the hearing. The expedited hearing shall consist of brief opening statements, questions from the arbitrator, and brief closing statements. Cross examination shall not be permitted. Any documentation submitted at the Arbitrator's request must be

7

provided to the agency at least one business day before the hearing or the issuance of the written decision without hearing. Appeal decisions shall be issued to the employee and the DOE no later than Saturday September 25, 2021. Appeal decisions shall be expedited without full Opinion, and final and binding.

H. Appeal decisions shall be issued to the employee and the agency no later than Saturday September 25th Appeal decisions shall be expedited without full Opinion, and final and binding. The DOE and/or the City shall cover all arbitration costs from SAMS under this process. To the extent the arbitrator requests additional medical documentation or information from the DOE, or consultation with City and/or DOE Doctors, arranging and paying for such documentation and/or consultation shall be the responsibility of the DOE.

I. While an appeal is pending, the exemption shall be assumed granted and the individual shall remain on payroll consistent with Section K below. However, if a larger number of employees than anticipated has a pending appeal as of September 27, as determined by SAMS, SAMS may award different interim relief consistent with the parties' intent. Those employees who are vaccinated and have applied for an accommodation will have the ability to use sick and/or annual leave while their application and appeal are pending, should the appeal be granted, these employees will be

8

reimbursed any sick and/or annual leave used retroactive to the date of their initial application.

J. The employing agency shall cover all arbitration costs from SAMS under this process. To the extent that the arbitrator requests additional medical documentation or information from the agency, or consultation with City and/or DOE doctors, arranging and paying for such documentation and/or consultation shall be the responsibility of the agency.

K. An employee who is granted a medical or religious exemption or a medical accommodation under this process and within the specific criteria identified above shall be permitted the opportunity to remain on payroll while the exemption and/or accommodation is in place, but in no event required/permitted to enter a school building while unvaccinated, as long as the vaccine mandate is in effect. In order to keep the employee on payroll, the agency may, in its discretion:

I.    Assign the employee to work outside of a school building (e.g., at DOE administrative offices for DOE employees, or at other NYPD locations for NYPD employees) to perform functions as determined by the agency.

II.   Assign the employee to work on alternative shifts, with no payment of any shift differentials.

III.  Temporarily detail the employee to perform work for another City agency which is not subject to a vaccination mandate.

9

L. For those with underlying medical issues granted an accommodation under Section I(D), the agency will make best efforts to ensure that the alternate work setting is appropriate for the employee's medical needs. The agency shall make best efforts to make these assignments within the same borough as the employee's current school, to the extent such assignment exists. DOE employees assigned to alternative assignments shall be required to submit to COVID testing twice per week for the duration of the assignment. NYPD employees so assigned shall be required to comply with the NYPD's testing policy for unvaccinated employees.

M. The process set forth herein shall constitute the exclusive and complete administrative process for the review and determination of requests for religious and medical exemptions to the mandatory vaccination policy and accommodation requests where the requested accommodation is that the employee not appear at school. The process shall be deemed complete and final upon the issuance of an appeal decision. Should either party have reason to believe the process set forth herein is not being implemented in good faith, it may bring a claim directly to SAMS for expedited resolution.

JA-796

II. **Leave**

A. Any unvaccinated employee who has not requested an exemption pursuant to Section 1, or who has requested an exemption which has been denied, may be placed by the agency on leave without pay effective September 28, 2021, or upon denial of appeal, whichever is later, through November 30, 2021. Such leave may be unilaterally imposed by the agency and may be extended at the request of the employee consistent with Section III(B), below.

B. Except as otherwise noted herein, this leave shall be treated consistent with other unpaid leaves at the agency for all purposes.

C. During such leave without pay, employees shall continue to be eligible for health insurance. As with other agency leaves without pay, employees are prohibited from engaging in gainful employment during the leave period.

D. Employees who become vaccinated while on such leave without pay and provide appropriate documentation to the agency prior to November 30, 2021 shall have a right of return to employment as soon as is practicable but in no case more than one week following notice and submission of documentation to the agency.

E. Pregnancy/Parental Leave

    i. Any soon-to-be birth mother who starts the third trimester of pregnancy on or before September 27, 2021 (e.g. has a due date no later than December 27, 2021), may utilize

11

sick leave, annual leave, and/or compensatory time prior to the child's birth date, but not before September 27, 2021. Upon giving birth, they may be eligible for paid family leave in accordance with existing law and rules.

ii. No documentation shall be necessary for this use of accrued leave, other than a doctor's written assertion that the employee is in her third trimester as of September 27, 2021.

iii. Eligible the event that an eligible employee exhausts accrued leave prior to giving birth, that employee shall be placed on a leave without pay, but with medical benefits at least until the birth of the child. As applicable, unvaccinated employees may be placed in the leave as delineated in Section II(A).

iv. Eligible employees who have a pregnancy disability or maternity disability outside of the regular maternity period may, in accordance with existing rules, borrow CAR/sick days and use a Grace Period. This eligibility to borrow CAR/sick days does not apply to employees during the regular maternity recovery period if they have opted to use Parental Leave.

v. All other eligibility and use rules regarding use of sick leave, annual leave, compensatory time, paid family leave, and FMLA remain in effect.

JA-798

## III. Separation

A. During the period of September, 28, 2021 through October 29, 2021 any employee who is on leave without pay due to vaccination status may opt to separate from the agency. In order to separate under this Section and receive the commensurate benefits, an employee must file a form created by the agency which includes a waiver of the employee's rights to challenge the employee's involuntary resignation, including, but not limited to, through a contractual or statutory disciplinary process. If an employee opts to separate consistent with this Section, the employee shall be eligible to be reimbursed for unused sick leave on a one-for-one basis, up to 100 days, to be paid following the employee's separation with documentation including the general waiver and release. Employees who elect this option shall be deemed to have resigned involuntarily effective on the date contained in the general waiver as determined by the agency, for non-disciplinary reasons.  An employee who separates under this Section shall continue to be eligible for health insurance through September 5, 2022, unless they have health insurance available from another source (e.g., a spouse's coverage or another job). During the period of November 1, 2021, through November 30, 2021, any employee who is on leave without pay due to vaccination status may alternately opt to extend the leave through September 5, 2022. In order to extend this leave pursuant to this Section, and continue to receive the

13

commensurate benefits, an employee must file a form created by the DOE which includes a waiver of the employee's rights to challenge the employee's voluntary resignation, including, but not limited to, through a contractual or statutory disciplinary process. Employees who select this option shall continue to be eligible for health insurance through September 5, 2022. Employees who comply with the health order and who seek to return from this leave, and so inform the DOE before September 5, 2022, shall have a right to return to the same school as soon as is practicable but in no case more than two (2) weeks following notice to the DOE. Existing rules regarding notice of leave intention and rights to apply for other leaves still apply. Employees who have not returned by September 5, 2022, shall be deemed to have voluntarily resigned.

B. During the period of November 1st through November 30, 2021, any employee who is on leave without pay due to vaccination status may alternately opt to extend the leave through September 5, 2022. In order to extend this leave pursuant to this Section and continue to receive the commensurate benefits, an employee must file a form created by the agency which includes a waiver of the employee's rights to challenge the employee's voluntary resignation, including, but not limited to, through a contractual or statutory disciplinary process. Employees who select this option shall continue to be eligible for health insurance through September 5, 2022. Employees who comply with

14

**JA-800**

the health order and who seek to return from this leave, and so inform the agency before September 5, 2022, shall have a right to return to the agency as soon as practicable but in no case more than two weeks following notice to the agency.  Existing rules regarding notice of leave intention and rights to apply for other leaves still apply. Employees who have not returned by September 5, 2022 will be deemed to have voluntarily resigned.

C. Beginning December 1, 2021, the agency will seek to unilaterally separate employees who have not opted into separation under Sections III(A) and III(B). Except for the express provisions contained herein, all parties retain all legal rights at all times relevant herein.

September 15, 2021.

_____
Martin F. Scheinman, Esq.
Arbitrator


STATE OF NEW YORK      )
                       )   ss.:
COUNTY OF NASSAU       )


I, MARTIN F. SCHEINMAN, ESQ., do hereby affirm upon my oath as Arbitrator that I am the individual described herein and who executed this instrument, which is my Award.

September 15, 2021.

_____
Martin F. Scheinman, Esq.
Arbitrator

DOE.OFT.Impact Bargaining.awd

15

**JA-801**

Case 1:21-cv-06387-KAM-LB   Document 21-7   Filed 11/19/21   Page 2 of 4 PageID #: 1407

At ~~IAS~~ Part 63 of the Supreme Court
of the State of New York held in and
for the County of New York at the
Courthouse located at 60 Centre
Street, New York, New York on the
9th day of September, 2021

PRESENT: **HON. LAURENCE L. LOVE**
**J.S.C.**

NEW YORK SUPREME COURT
COUNTY OF NEW YORK

---------------------------------------------------------- X

In the Matter of the Application of:                      :   Index No. _158368/2021_

                                                          :

THE NEW YORK CITY MUNICIPAL LABOR                         :
COMMITTEE; HARRY NESPOLI as President of                  :
UNIFORMED SANITATIONMEN'S                                 :   **ORDER TO SHOW CAUSE**
ASSOCIATION, LOCAL 831, IBT; HENRY                        :   **FOR A TEMPORARY**
GARRIDO, as Executive Director of DISTRICT                :   **RESTRAINING ORDER AND**
COUNCIL 37, AFSCME; MICHAEL MULGREW, as                   :   **PRELIMINARY INJUNCTION**
President of UNITED FEDERATION OF                          :
TEACHERS; MARK CANNIZZARO as President of                 :   _Amended_
COUNCIL OF SCHOOL SUPERVISORS AND                         :
ADMINISTRATORS; GREGORY FLOYD as                          :
President of INTERNATIONAL BROTHERHOOD                     :
OF TEAMSTERS, LOCAL 237; JOSEPH MANNION                   :
as President of SANITATION OFFICERS'                       :
ASSOCIATION, LOCAL 444; JOSEPH                            :
COLANGELO as President of SERVICE                         :
EMPLOYEES INTERNATIONAL UNION, LOCAL                      :
246; MARTIN LYDON as Civil Service Director of           :
DISTRICT COUNCIL OF CARPENTERS; CHRIS                     :
MONAHAN as President of CAPTAINS                          :
ENDOWMENT ASSOCIATION; LOUIS TURCO as                    :
President of LIEUTENANTS BENEVOLENT                       :
ASSOCIATION; WILLIAM LYNN as Business                     :
Manager of INTERNATIONAL UNION OF                        :
OPERATING ENGINEERS, LOCAL 30; DALVANIE                  :
POWELL as President of UNITED PROBATION                   :
OFFICERS ASSOCIATION; JAMES MCCARTHY as                  :
President of UNIFORMED FIRE OFFICERS                      :
ASSOCIATION, LOCAL 854, I.A.F.F.; IGNAZIO                :
AZZARA as President of UNIFORMED                          :
SANITATION CHIEFS ASSOCIATION; and                       :
JOSEPH AZZOPARDI as Business Manager and                 :
Secretary Treasurer of DISTRICT COUNCIL NO. 9            :

1

JA-802

PAINTERS & ALLIED TRADES,                         :
                                                  :
                          Petitioners,            :
                                                  :
For a Judgment Pursuant to Article 78 of the New York :
Civil Practice Law and Rules,                     :
                                                  :
       -against-                                  :
                                                  :
                                                  :
THE CITY OF NEW YORK; NEW YORK CITY               :
DEPARTMENT OF HEALTH AND MENTAL                   :
HYGIENE; THE BOARD OF EDUCATION OF THE            :
CITY SCHOOL DISTRICT OF THE CITY OF NEW           :
YORK,                                             :
                                                  :
                          Respondents.            :
-------------------------------------------------- X

Upon review of the annexed Verified Petition, verified on the 8th and 9th days of

September 2021, and the exhibits annexed thereto, the Affirmation of Emergency and in Support

of Application for Temporary Restraining Order and Preliminary Injunction, dated September 9,

2021, and the accompanying Memorandum of Law, dated September 9, 2021, and for good

cause shown, it is hereby:

**ORDERED** that Respondents show cause before this Court either virtually, or at the

Supreme Court Courthouse in the County of New York, 60 Centre Street, New York, NY, in IAS

Part _63_ as assigned by the Court and per the Court's instructions, on _Sept 22_, 2021 at

~~9:30~~ _11 am_ a.m. or as soon thereafter as counsel may be heard, why an Order should not be made

herein:

1.      Vacating as arbitrary, capricious and contrary to law the August 24, 2021 Order

of the Commissioner of Respondent New York City Department of Health and Mental Hygiene

2

JA-803

Case 1:21-cv-06387-KAM-LB   Document 21-7   Filed 11/19/21   Page 4 of 4 PageID #: 1409

(the "Order")[1];

    2.     Enjoining Respondents from implementing the Order; and

    3.     Granting such other and further relief as the Court may deem appropriate.

    **IT IS FURTHER ORDERED** that pending the hearing upon the aforementioned

Petition, Respondents *are temporarily restrained* from implementing the Order.

    **SUFFICENT CAUSE APPEARING THEREFORE, IT IS ORDERED** that leave is

hereby granted to Petitioners to submit upon the return day of this Order to Show Cause, and any

subsequent day as shall be determined by the Court on said return day, such additional evidence,

exhibits, legal memoranda and other proof as may be necessary.

    **IT IS FURTHER ORDERED,** that service of a copy of this Order together with the

papers upon which it is granted be made upon all Respondents by email or personal service on or

before the ___ day of _____, 2021; and that such method of service shall be deemed

good and sufficient service thereof.

    **IT IS FURTHER ORDERED** that papers in response to the relief requested herein, if

any, shall be filed on the NYSCEF system and e-mailed to Alan M. Klinger at

aklinger@stroock.com and Dina Kolker at dkolker@stroock.com, on or before the ___ day of

_____, 2021.

Signed this ___ day of _____, 2021, at New York, New York.

                           **ENTER:**

                                              HON. LAURENCE L. LOVE
                                                   J.S.C.

[1] The Order is attached to the Verified Petition as Exhibit A.

3

JA-804

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
BROECKER *et al.*,                                           :
                                                            :
                              Plaintiffs,                    :
                                                            :
          -against-                                          :
                                                            :          Index No. 21-cv-6387
                                                            :
NEW YORK CITY DEPARTMENT OF                                  :
EDUCATION, *et al.*,                                         :
                                                            :
                              Defendants.                    :
------------------------------------------------------------ X

**DECLARATION OF BETH NORTON IN OPPOSITION TO PLAINTIFFS'
APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PERMANENT
INJUNCTION**

        **Beth Norton**, pursuant to 28 U.S.C. § 1746, declares the following to be true under

penalty of perjury:

        1.      I am an attorney duly admitted to practice in the State of New York and not a

party to the above-captioned action.

        2.      I am General Counsel of Defendant United Federation of Teachers, Local 2, AFL-

CIO (the "UFT") in this matter.

        3.      I submit this declaration in opposition to Plaintiffs' application for a temporary

restraining order and permanent injunction.

        4.      I have personal knowledge of the matters set forth in this declaration, except for

such matters as are based on my review of court files or other relevant documents, and I believe

such matters to be true.  If called as a witness, I would testify competently to the matters set forth

in this declaration.

JA-805

5.      On August 24, 2021, DOHMH imposed the first version of the DOE Vaccination Mandate, which requires all DOE staff, City employees, and contractors who "work in-person in a DOE school setting or DOE building" and others in City schools to – no later than September 27, 2021 – provide proof that they have at least received the first dose of a vaccine.[1]

6.      The UFT immediately moved on two parallel tracks: first, together with other City unions, bringing a challenge to the Mandate itself and the omission of medical and religious objections in New York State court on constitutional due process and other grounds; and, second, proceeding to expedited negotiations regarding the Mandate's implementation.

7.      On September 10, 2021, after expedited mediation and then arbitration between the UFT, the City and DOE, Arbitrator Martin F. Scheinman issued the decision (the "Award") concerning the impact and implementation of the August 23, 2021 DOE Vaccination Mandate.

8.      The Award is attached as Exhibit D to the Klinger Declaration.

9.      The Award provides that, although the Mandate prevents unvaccinated employees form being in school buildings, no one would be summarily dismissed.  Rather, the Award provides, *inter alia,* for the following benefits:

   a.   A procedure for applying for both medical and religious accommodations (see Award at 7);

   b.   A procedure for appealing the denial of said accommodations to a panel of impartial arbitrators (see Award at 10);

   c.   The ability to remain on payroll and continue to receive medical coverage while such applications and appeals are pending (see Award at 11-12);

---

[1] Order of the Commissioner of Health and Mental Hygiene to Require COVID-19 Vaccination For Department of Education Employees, Contractors, Visitors, and Others, New York City Department of Health and Mental Hygiene (Aug. 24, 2021), https://www1.nyc.gov/assets/doh/downloads/pdf/covid/covid-19-vaccination-requirement-doe.pdf

JA-806

    d.   For those not awaiting accommodation review, who declined to vaccinate, the ability to elect non-disciplinary leave without pay that allows them to continue to receive health benefits, and from which they could resume their position upon vaccination (see Award at 13-14);

    e.   The option to, within a specified window, elect to separate from the DOE, receive an incentive payment, and have health benefits continue through September 5, 2022 (see Award at 16); and

    f.   A prohibition on the DOE seeking to terminate any employee for noncompliance until after December 1, 2021 (see Award at 17-18)

10.    The DOE's ability *to seek* termination is limited to those employees who, after December 1, 2021, have chosen to remain unvaccinated, and have not elected one of the options provided for in the Award.

11.    The Award does not provide the DOE a unilateral right to summarily terminate employees.  Rather, it recognizes that, after December 1, 2021, the DOE may choose to use available procedures to seek termination.

12.    Following issuance of the Mandate, some UFT members reached out to the UFT to request that the union file grievances on their behalf.

13.    Initially, the UFT considered the requests; however, given the binding protocols and procedures in the Award (the terms of which are incorporated into the UFT's CBA) it was apparent that any grievances would lack merit.

14.    Accordingly, the UFT advised inquiring members that procedures regarding unvaccinated employees were governed by the binding Award, which was circulated to members along with plain-language guidance of the Award's terms.  See Arbitrator rules in union's favor

3

**JA-807**

on medical accommodations, UFT (Sept. 10, 2021), https://www.uft.org/news/news-stories/arbitrator-rules-unions-favor-on-medical-accommodations

15.    Moreover, the UFT informed its members that they were still able to file step 1 grievances on their own.

16.    Indeed, on November 11, 2021, prior to filing this Complaint, Plaintiff Jeannine Lam emailed the UFT requesting that it file grievances on her behalf for "stopping my pay without any 'right to due process' at all"; and for "8 unauthorized absences, so far, which have been put into the system under my name[.]"  A true and correct copy of Plaintiff Lam's email chain with the UFT is attached hereto as Exhibit A.

17.    In response, I replied:

> the DOE's procedure for unvaccinated employees is governed by the September 10, 2021 interest arbitration award issued by Arbitrator Martin Scheinman (the "Award").  Under the Award, unvaccinated DOE employees have until November 30, 2021 to elect to either (1) separate from service or (2) remain on an unpaid leave through September 5, 2022.  If an unvaccinated DOE employee does not select either of these options by the November 30, 2021 deadline, the Award provides that as of December 1, 2021, "the DOE shall seek to unilaterally separate employees who have not opted" to either separate from service or remain on an unpaid leave.
>
> At this time, the DOE has not announced the procedure it will seek to implement to "unilaterally separate" employees that do not elect to separate from service or extend their leave through September 5, 2022 by the November 30, 2021 deadline.  When the announcement is made, we will send a communication to all affected members explaining the next steps.

See Ex. A.

4

JA-808

**<u>Conclusion</u>**

18.    The UFT has been transparent with members regarding (a) their rights under the Award (which is incorporated by reference into the UFT's CBA); and (b) UFT's position that it will not file grievances that lack merit under the Award.  Indeed, UFT has provided members not only with copies of the Award, but also with plain language explanations of same.  Plaintiffs, and other employees, are still free to initiate step 1 grievances of their own accord.

Dated: November 19, 2021                    Respectfully submitted,

         /s/ BETH A. NORTON, ESQ.
UNITED FEDERATION OF TEACHERS
Beth A. Norton, Esq.
52 Broadway
New York, NY 10004
bnorton@uft.org

*Counsel for Defendant UFT*

5

From: Jeannine Lam <jlam682@yahoo.com>
Sent: Friday, November 12, 2021 9:27 AM
To: Beth A. Norton
Subject: Re: Response to inquiry

What do you mean by governed?  Is the NYCDOE and the UFT required to enforce it?
Sent from my iPhone

On Nov 12, 2021, at 9:06 AM, Beth A. Norton <BNorton@uft.org> wrote:

Ms. Lam,

Thank you for reaching out.  As you likely know, the DOE's procedure for unvaccinated
employees is governed by the September 10, 2021 interest arbitration award issued by Arbitrator
Martin Scheinman (the "Award").  Under the Award, unvaccinated DOE employees have until
November 30, 2021 to elect to either (1) separate from service or (2) remain on an unpaid leave
through September 5, 2022.  If an unvaccinated DOE employee does not select either of these
options by the November 30, 2021 deadline, the Award provides that as of December 1, 2021,
"the DOE shall seek to unilaterally separate employees who have not opted" to either separate
from service or remain on an unpaid leave.

At this time, the DOE has not announced the procedure it will seek to implement to "unilaterally
separate" employees that do not elect to separate from service or extend their leave through
September 5, 2022 by the November 30, 2021 deadline.  When the announcement is made, we
will send a communication to all affected members explaining the next steps.

Beth A. Norton
General Counsel
United Federation of Teachers

From: Jeannine Lam <jlam682@yahoo.com>
Sent: Thursday, November 11, 2021 6:28 PM
To: Michael Sill <MSill@uft.org>
Subject: Grievances

To Michael Sill of the UFT:

I would like to follow up about my concerns to see how to proceed. I have reached out to my
building rep, Eric (MS 137) and someone at the district office in the salary department named
Tamika (via number provided by Eric). I am still seeking further support for my complaints
which I would prefer to officially grieve.

The first grievance I am seeking is against the NYCDOE for stopping my pay without any "right
to due process" at all. The fact that my pay has been stopped is a clear punishment prior to any
due process or procedure that the NYCDOE is clearly planning against anyone who does not
comply as of December 1, 2021, at which time they say that they will unilaterally seek

separation. As far as this looks, it is more clearly aggressive than when any teacher has been brought up on 3020a-Charges for abuse of a child, for instance, and put into the "Rubber Room" because those individuals are still being paid and have not lost their rights to their pay during their entirety of their investigations and due process proceedings, until the Arbitrator's decisions, yet the teachers who are not complying right now to a mandate that only of the NYCDOE, yet no other district throughout New York State. Being automatically punished by placement at home without pay has been tremendously triggering to me as each day passes. Meanwhile, it seems that NYCDOE's intention is to "unilaterally separate" those who do not comply, which is also an intent when the DOE files 3020a-charges, but, in the case of all of those not being paid since October 4, 2021, they have not informed us of the procedure which will follow and they are leaving us in limbo, with an unfair unconstitutional arbitration hovering over our futures. This action of withdrawing my pay feels like a coercive action on the part of the NYCDOE, as well as a punishment for not following the "mandate", even though no other districts have even close to such a mandate, all prior to due process/ 3020a-charges being served. The only intention seems to be to punish those who have not complied, either because they were denied religious and/or medical exemptions, and/or to set up those employees who do not comply, in the end, with NYCDOE's hard-handed rules, to be fired. The NYCDOE is doing anything in their power to then be able to fire non-compliant employees, as effectively as possible. This is retaliation and harassment and it is making me more uncomfortable as the days pass. That's where unauthorized absences come in.

With that being said, comes the second grievance of 8 unauthorized absences, so far, which have been put into the system under my name, which, according to the Chancellor's Regulations, could be used as a sole basis for the NYCDOE to file 3020a Charges against me. It is quite timely that this Chancellor's Regulation C-601 was newly revised this year on June 17, 2021 after not being revised since the year 2000. I'm concerned that these days will be used against me. The CBA does not have "unauthorized absences" in it, and this new term may set me up "on that cause alone" for the NYCDOE to attempt to fire me from my position and take my license, for standing up for my religious beliefs. The addition of this Chancellor's Regulation seems only added with the intention of firing teachers who didn't sign away their rights by choosing choice A or B in the Arbitration agreement between the NYCDOE and the UFT. The NYCDOE alongside the UFT, by following and agreeing to this Arbitration brought against its members, have set its members up for getting fired through 3020a-Charges rather than protect the teachers who fall into the category of denied religious exemptions or medical exemptions, not to mention the lack of ability to get the medical accommodations previously approved by the NYCDOE at the start of the "pandemic". The revised change of the Chancellor's Regulations C-601 was clearly done as a way to work around the contract as a plan to coerce NYCDOE employees, move to have 3020a Charges against teachers who stand by their beliefs and get rid of those who are not responding to coercion.

Please let me know how I could feel reassured that these actions are not going to happen and let me know how to formally put in a complaint.
Sincerely,
Jeannine Lam

JA-811

```
**************************************************************************
*
The views, opinions, and judgments expressed in this message are solely those of the author. The
message contents have not been reviewed or approved by the UFT.
**************************************************************************
*
```

JA-812

# THE SCHER LAW FIRM, LLP

ONE OLD COUNTRY ROAD, SUITE 385
CARLE PLACE, NY 11514

MARTIN H SCHER*
JONATHAN L SCHER**

AUSTIN R. GRAFF*

TEL· 516-746-5040

FAX  516-746-5043

W  SCOTT KERSHAW
COUNSEL

MICHAEL SCHILLINGER
COUNSEL

ROLAND P BRINT
COUNSEL

ADAM GANG
COUNSEL

ROBERT S. NAYBERG
(1959-2012)

* Also Admitted in District of Columbia
· Also Admitted in New Jersey

November 24, 2021

BY ECF
Honorable Kiyo A. Matsumoto, U.S.D.J.
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     Broecker, et al. v. New York City Department of Education, et al.
        Docket No. 21-CV-06387-KAM-LB

Dear Judge Matsumoto:

This law firm represents all of the Plaintiffs, in the above-referenced Action.

After meeting with the Plaintiffs last night, there was concern that the Court may have had a misperception regarding the November 30, 2021 deadline from yesterday's oral argument.

If the Plaintiffs select to continue go on an unpaid leave status through September 5, 2022 in return for their health insurance as was addressed by the Defendants yesterday, they are also required to electronically sign the attached waiver, which also bars the Plaintiffs "from engaging in gainful employment while…on an unpaid leave at the DOE."   This means they cannot work or even collect unemployment insurance benefits.

In addition, the waiver includes a release of all claims, liabilities or causes of action that the Plaintiffs have against the DOE and any of its present or former employees and agents.  The Plaintiffs intend to challenge this release as coerced, under duress, and unenforceable, but it is included in what the Plaintiffs must sign to obtain health insurance through September 5, 2022.

The Plaintiffs felt that this information was not communicated to the Court at yesterday's conference so we seek to supplement the record with this letter and the attachment.

Thank you for your time and consideration.

Respectfully submitted,
THE SCHER LAW FIRM, LLP

Austin Graff

ARG:mc
cc:     Counsel of Record (by ECF)

Page 1 of 1

17. ▮▮▮▮▮▮▮▮▮▮, opt to extend my leave without pay due to vaccination status through September 6, 2022. I understand that by selecting to extend such leave, I will be eligible to maintain health insurance through September 6, 2022.

I understand that if I have not returned by September 6, 2022, I shall be deemed to have voluntarily resigned and knowingly waive my rights to challenge such resignation, including, but not limited to, through a contractual or statutory disciplinary process. I understand that upon the effective date of such resignation, as it relates to the DOE, I lose all entitlements to reversion, retention, and tenure.

I understand that I am prohibited from engaging in gainful employment while I am on unpaid leave at the DOE.

I understand that: I have the right to return to employment at any time prior to September 6, 2022, if I provide to the DOE documentation that I have complied with the Commissioner of Health's order regarding vaccination of NYC Department of Education employees and inform the DOE that I seek to return before September 6, 2022. In exchange for the right to return and extended health benefits as set forth herein, I agree to waive and release the DOE and any of its present or former employees or agents (collectively the "Released Parties"), from any and all claims, liabilities, or causes of action which were or could have been asserted by me against any of the Released Parties based upon anything that has happened up to now and including the date of the execution of this Attestation, including, but not limited to, any right or claim that may exist or arise up to and including the date that this Attestation is signed.

For Employees Currently Age Forty (40) and Older Only: If I am currently age forty (40) or older, I acknowledge that in accordance with the Older Workers Benefit Protection Act (i) I enter into this release voluntarily and with full under-standing and knowledge of its consequences; (ii) I have been advised by the DOE to consult with an attorney prior to executing this agreement and release; (iii) I have been provided at least a twenty-one (21) day period to review and consider whether to sign this Attestation; and (iv) I have been advised that I have seven (7) days following execution to revoke it (the "Revocation Period"). This Attestation will not be effective and enforceable until the Revocation Period has expired. Such revocation shall only be effective if an originally executed written notice of revocation is delivered by email to Revokevaccinationprovision@schools.nyc.gov on or before 5:00 p.m. on the seventh day after execution of this Attestation. If so revoked, this Attestation shall be deemed to be void ab initio and have no force or effect.

I affirm that as of the date that this Attestation is signed, I have not received any dose of a COVID-19 Vaccine.

Subject to review of eligibility.

☐ Electronic Signature

**JA-814**



THE CITY OF NEW YORK

**LAW DEPARTMENT**

100 CHURCH STREET
NEW YORK, NY 10007

**GEORGIA M. PESTANA**
*Corporation Counsel*

**Andrea O'Connor**
Assistant Corporation Counsel
Phone: (212) 356-4015
E-mail: aoconnor@law.nyc.gov

November 24, 2021

**By ECF**
Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East, Room S905
Brooklyn, New York 11201

Re: <u>Broecker. et al. v. New York City Department of Education. et al.,</u>
Docket No. 21 Civ 6387

Dear Judge Matsumoto:

I am an Assistant Corporation Counsel in the office of Georgia M. Pestana, Corporation Counsel of the City of New York, attorney for defendants New York City Department of Education and Meisha Porta (collectively, "DOE Defendants") in the above-captioned matter. I write today on behalf of DOE Defendants and defendant United Federation of Teachers, Local 2, AFL-CIO's ("UFT Defendant") in response to plaintiffs' November 24, 2021 letter.

Plaintiffs are correct that if a DOE employee covered by the Impact Arbitration Decision opts to extend their leave without pay through September 5, 2022 they must file a form which includes a waiver of the employee's rights to challenge the employee's voluntary resignation, including, but not limited to, through a contractual or statutory disciplinary process. <u>See</u> O'Connor Decl., Ex. A, Impact Arbitration Decision at III(B). In consideration for this waiver, the employee shall continue to be eligible for health insurance coverage through September 5, 2022 **and**, while on leave without pay, shall have the right to return to their assigned school within two weeks of notifying the DOE that they have come into compliance with the DOE Vaccination Mandate. <u>Id.</u> As with other DOE leaves, DOE employees are prohibited from engaging in other employment during the leave period. <u>Id.</u> at II(C).

Defendants DOE and UFT thank the Court for its attention to this matter.

Respectfully submitted,
/s/
Andrea O'Connor

cc:    All Counsel (via ECF)